_____

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) )    **Case No. 17-cv-11633** |
| NAVELLIER & ASSOCIATES, INC. and LOUIS NAVELLIER, | ) ) ) |
| Defendant. | ) ) ) |

_____ )

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    **February 13, 2020**

## I.    Introduction

The Securities and Exchange Commission ("SEC") filed this lawsuit against Navellier & Associates, Inc. ("NAI") and its principal, Louis Navellier ("Navellier") (collectively, "Defendants"), alleging violations of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-1–80b-21. D. 1. The SEC has moved for partial summary judgment on Defendants' affirmative defense of selective enforcement and on Counts One and Two of the complaint. D. 220. Defendants have cross-moved for summary judgment on all counts. D. 223. For the reasons stated below, the Court DENIES Defendants' motion for summary judgment and ALLOWS the SEC's motion as to Defendants' affirmative defense and Counts One and Two.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter

of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The movant "bears the burden of demonstrating the absence of a genuine issue of material fact." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in his pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which [he] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [his] favor." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'" Id. (quoting Anderson, 477 U.S. at 249) (alteration in original). When assessing a motion for summary judgment, the Court will not consider "conclusory allegations, improbable inferences, and unsupported speculation." Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009). "At the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." DeNovellis v. Shalala, 124 F.3d 298, 308 (1st Cir. 1997).

### III. Factual Background

The following facts are drawn primarily from the SEC's statement of undisputed material facts, D. 222, Defendants' statement of undisputed facts,[1] D. 227, each party's response to same, D. 232 & D. 236, and the SEC's reply to Defendants' response, D. 242.

#### A. History of SEC Communication with NAI

At all times relevant to this dispute, both NAI and Navellier acted as investment advisers pursuant to the definition in the Advisers Act.[2] D. 232, ¶ 1; D. 242, ¶¶ 6 & 8. In 1999, the SEC's Office of Compliance Inspections and Examinations ("OCIE") sent a letter to NAI detailing compliance deficiencies regarding NAI's failure to disclose that certain performance figures had been backtested. D. 242, ¶ 35; D. 222-20. OCIE sent another letter to NAI in 2003 detailing deficiencies in NAI's advertisement of investment performance figures. D. 242, ¶ 36; D. 222-21. OCIE examined NAI again in 2006 and sent a letter to NAI in 2007 detailing deficiencies in NAI's presentation of performance figures. D. 242, ¶ 37; D. 222-22. The 2007 letter indicated that "NAI should be aware that the [SEC] staff views repeat violations as a serious matter and considers

---

[1] The SEC argues that Defendants' motion should be denied in full based on violations of Local Rule 56.1, which sets forth procedural requirements for summary judgment motions, including the statements of material facts required to be filed by both parties in conjunction with their motions. See D. 231 at 1. In particular, the SEC argues that Defendants' statement of material facts is not supported by evidentiary cites or cites to documents that do not fully support the statements made. Id. The Court declines to deny Defendants' motion on this basis, but the Court has not relied upon any alleged facts or claimed disputes of fact that have not been adequately supported by record evidence. See Bradley v. Cruz, 13-cv-12927-IT, 2017 WL 1197700, at *1 (D. Mass. March 30, 2017); Shervin v. Partners Healthcare Sys., 2 F. Supp. 3d 50, 60 (D. Mass. 2014).

[2] The Advisers Act defines "investment adviser" as, in part, "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities." 15 U.S.C. § 80b-2(a)(11). The Advisers Act defines "person" as "a natural person or company." Id. § 80b-2(a)(16).

recidivist behavior when making a determination whether to refer matters to enforcement staff for possible further actions."  Id. at 8-9.

## B.    NAI Agreement with F-Squared

In 2009, a representative from NAI, Peter Knapp ("Knapp"), met with Howard Present ("Present"), the founder of F-Squared Investments, Inc. ("F-Squared"), to conduct due diligence on an investment strategy developed by F-Squared called the AlphaSector Allocator ("AlphaSector").  D. 232, ¶ 21; D. 242, ¶ 49.  Following this meeting, Knapp prepared an "Executive Summary" detailing his due diligence.  D. 232, ¶ 26; D. 242, ¶ 49.  In the Executive Summary, Knapp stated that "[F-Squared] flat out won't show the math to us" in regard to the AlphaSector strategies.  D. 242, ¶ 49; D. 222-42.  Knapp later testified that NAI never received any trading confirmations for the AlphaSector performance returns.  D. 242, ¶ 50; D. 222-43 at 7.  NAI's President, Arjen Kuyper ("Kuyper"), also testified that NAI was not given any materials to confirm the AlphaSector strategy performance prior to 2008.  D. 242, ¶ 52; D. 222-44 at 3.  Knapp discussed the due diligence with Navellier, who agreed that NAI should enter into a model management agreement with F-Squared to license the AlphaSector strategies.  See D. 232, ¶ 27.  Pursuant to the model management agreement, F-Squared sent NAI securities and percentage allocation information for each of the licensed AlphaSector strategies.  D. 232, ¶ 63.  NAI re-branded the licensed strategies they offered to clients as "Vireo AlphaSector" strategies.  See D. 232, ¶ 63; D. 242, ¶ 1.

The SEC alleges that materials used by NAI to market the Vireo AlphaSector products falsely indicated that the track record of the Vireo AlphaSector strategy was based on live trading since 2001.  D. 242, ¶ 4.  Defendants dispute that their marketing materials include these claims; however, the SEC has submitted exhibits of NAI marketing materials that state that the strategies

were live traded since 2001 and that they were not backtested. Id.; D. 222-27-35. Additionally, NAI's Rule 30(b)(6) witness confirmed that NAI marketing materials included the claim that the strategies were live traded for the entire time that NAI sold the Vireo AlphaSector strategies. D. 242, ¶ 41. This was confirmed by other witnesses for NAI, including NAI's Director of Marketing. D. 242, ¶ 42. In particular, NAI marketing materials included the claims that "live assets began tracking the [Vireo AlphaSector] strategies" beginning in 2001, that the returns were "not back-tested" and that presented results were "based on an active strategy with an inception date of April 1, 2001," among other claims. D. 242, ¶ 43. Defendants have admitted that they do not have sufficient knowledge to confirm whether the strategy underlying the Vireo AlphaSector products was backtested. D. 242, ¶ 5; D. 222-2, ¶ 5.

### C. NAI's Internal Communications Regarding AlphaSector

During a conference call in March 2011 in which Present and NAI participated, Present stated that the AlphaSector strategies were not based on actual trades starting in 2001. D. 242, ¶ 55. A month later, in April 2011, Navellier sent an internal email to NAI personnel in which he stated that he "went to get the [AlphaSector] confirms yesterday . . . and I was told there were no confirms, just a spreadsheet. I was shocked. Any idiot can send a bogus spreadsheet!" D. 242, ¶ 56; D. 222-46. Navellier then stated "[t]hat is not due diligence, that is stupidity" and expressed concerns about avoiding liability based on this revelation, noting that "[w]e just have to cover our ass somehow" and that "the SEC is going to love this." Id. In May 2011, Navellier sent another internal email stating that "[u]nless somebody shows me the confirms, [F-Squared] is merely a model and I am protecting the firm from potential fraud, so we must not talk about [F-Squared] as being base[d] on real $ since 2001." D. 242, ¶ 57; D. 222-47. Navellier, however, stated at that time that he was "not stopping Vireo [AlphaSector] sales." Id. In August 2011, Navellier sent an

internal email to NAI leadership stating that "Vireo was a good idea, but we sold the wrong product that continues to smell like FRAUD." D. 242, ¶ 58; D. 222-48. He then stated that NAI could possibly sell the Vireo AlphaSector business so that members of management could "have a big payday." Id. Navellier sent another email in August 2011 in which he referenced selling off the Vireo AlphaSector business because the F-Squared model is "made up" and "fraud does not protect you from the SEC and other regulatory heat." D. 242, ¶ 59; D. 222-49.

### D.  Compliance Review by ACA

In January 2013, NAI entered into a consulting agreement with ACA Compliance Group ("ACA") to conduct a focused market review. D. 242, ¶ 65. Ted Eichenlaub ("Eichenlaub"), a representative of ACA, spoke with Kuyper and, in contemporaneous email notes to himself regarding the call, Eichenlaub noted that he was told, in part, that the Vireo AlphaSector performance results were backtested and that they were incorrect. D. 242, ¶ 68. Kuyper then followed up with an email to Eichenlaub that stated, in part, that F-Squared could not provide any confirmations of the performance numbers for the AlphaSector strategies, that there was no way to confirm actual trades and that marketing materials used by NAI incorrectly indicated that Vireo AlphaSector returns went back ten years. D. 242, ¶ 69. Eichenlaub advised NAI in a response to Kuyper that NAI was required to "have a basis for representing" performance numbers in their marketing materials. D. 242, ¶ 72.

### E.  Sale of Vireo AlphaSector to F-Squared

In March 2013, Navellier executed a letter of intent to sell NAI's "Vireo strategies and associated client accounts using such strategies" to F-Squared. D. 242, ¶ 73; D. 222-63. The letter of intent stated that the purchase price would be $14 million upon the fulfillment of certain terms, including that there was "at least $1.1 billion in revenue generating clients at the time of closing."

Id.  In April 2013, Navellier emailed employees of NAI to notify them of the sale to F-Squared, stating, in part, that "[t]he catalyst for the surrender . . . is that F-Squared refuses to stop circulating its fake 10+ year AlphaDEX indexes before the ETFs actually commenced on May 10, 2007" and that NAI was "tipped off to F-Squared's fraud by an ex-SEC enforcement officer, so we have no other choice other than to clean up this mess ASAP."  D. 242, ¶ 74; D. 222-64.  The letter noted that this was "a massive due diligence failure" on behalf of NAI and that NAI was "at risk of a $225,000 fine" from the SEC for their distribution of the false performance records.  Id.  In August 2013, NAI and F-Squared entered into an assignment and asset purchase agreement to sell the Vireo AlphaSector business to F-Squared.  D. 242, ¶ 75; see D. 232, ¶ 138.  NAI also sent a letter to its clients in August 2013 announcing the sale of the Vireo AlphaSector products to F-Squared. D. 242, ¶ 77; D. 222-67.  The letter did not indicate the reasons for the sale that were articulated in the letter to NAI employees and failed to notify clients that the performance information included in advertisements and marketing materials had been inaccurate and misleading.  Id. Defendants do not dispute that they never informed their clients that there was no evidence to support the performance record of the Vireo AlphaSector strategy between 2001 and 2008 or any evidence that the strategy had been live traded and not backtested as they had marketed.  D. 242, ¶ 77.

F.      **SEC Investigates F-Squared, NAI, and Other Investment Advisers**

In October 2013, the SEC began investigating F-Squared and served investigative subpoenas on NAI and other advisory firms that had similarly licensed the AlphaSector products from F-Squared.  D. 232, ¶ 143.  During this investigation, the SEC collected approximately fifteen million pages of documents and conducted interviews.  D. 232, ¶ 144.  The SEC instituted an administrative action against F-Squared, which was later settled.  D. 232, ¶ 145.  In 2014, the SEC

also initiated a civil action against Present.  D. 232, ¶ 146; D. 242, ¶ 10.  The SEC litigated its case against Present and obtained an injunction and industry bar against him.  D. 242, ¶ 13.  The SEC brought enforcement actions against over twenty investment firms in connection with the investigation into F-Squared.  D. 232, ¶ 147; D. 242, ¶ 10.  Many of the parties settled with the SEC.  D. 242, ¶ 13.  The SEC and NAI attempted to negotiate a similar settlement, but negotiations eventually broke down and the SEC initiated the present action against NAI and Navellier in August 2017.  <u>See</u> D. 242, ¶¶ 14-34.

## IV.    Procedural History

The SEC instituted this action on August 31, 2017.  D. 1.  The SEC moved for summary judgment on Defendants' affirmative defense of selective enforcement and on Counts One and Two, which allege violations of the Advisers Act.  D. 220.  Defendants cross-moved for summary judgment on all counts.  D. 223.  The Court held a hearing on the motions and took the matter under advisement.  D. 246.

## V.    Discussion

### A.    <u>Selective Enforcement</u>

Defendants' fourteenth affirmative defense asserts that the SEC has engaged in selective enforcement in bringing this action against them.  D. 53 at 37-38.  Defendants allege selective enforcement based on both a violation of the Equal Protection clause and under a class of one theory.  D. 235 at 22.  They claim that similar actions have not been brought against other entities and individuals that are similarly situated and, therefore, the entire action against them must be dismissed.  D. 53 at 37-38; D. 235 at 25.  Defendants also assert that the SEC brought this action in bad faith to punish them for declining a settlement offer.  D. 224 at 29-30.  The SEC argues that it should be granted summary judgment on Defendants' selective enforcement defense because the

evidence demonstrates that it sought enforcement against similarly situated entities and that any differences in enforcement against those who are similarly situated to NAI and Navellier had a rational basis. D. 221 at 11-14.

             *1.*     *Equal Protection*

To establish a claim for an equal protection violation based on selective enforcement, the individual or entity must show that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Rubinovitz v. Rogato, 60 F.3d 906, 910 (1st Cir. 1995) (quoting Yerardi's Moody St. Restaurant & Lounge, Inc. v. Board of Selectmen, 878 F.2d 16, 21 (1st Cir. 1989)); Barth v. City of Peabody, No. CV 15-13794-MBB, 2017 WL 114403, at *4 (D. Mass. Jan. 11, 2017) (internal quotations omitted); see Aponte-Ramos v. Álvarez-Rubio, 783 F.3d 905, 908 (1st Cir. 2015) (quoting Marrero-Gutierrez v. Molina, 491 F.3d 1, 9 (1st Cir. 2007)). To determine whether individuals or entities are similarly situated, "the test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated . . . the 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result." Aponte-Ramos, 783 F.3d at 909 (quoting Barrington Cove Ltd. P'ship v. R.I. Hous. & Mort. Fin. Corp., 246 F.3d 1, 8 (1st Cir. 2001)).

Defendants argue that the SEC has failed to enforce against numerous entities and individuals engaged in conduct like that on which the SEC bases its claims against NAI and Navellier. D. 235 at 24. The SEC counters that these entities and individuals are not similarly situated to NAI and Navellier because they did not engage in conduct as severe as that of NAI and,

with regard to the individuals identified by Defendants, they were not in similar roles in their respective companies as Navellier, who is the owner and Chief Investment Officer of NAI. D. 231 at 4-5. For example, the SEC notes that Defendants have not addressed the volume and length of time over which the false claims were made or whether, like NAI and Navellier, these other entities and individuals were aware that their marketing claims were fraudulent. Id. Additionally, Defendants had also been warned of previous violations on at least three occasions but have not provided any evidence indicating that these entities and individuals that they claim are similarly situated had received similar warnings. Defendants have failed to meet their burden to establish that the comparators they identify are similarly situated in all relevant aspects to NAI and Navellier. See Startzell v. City of Philadelphia, 533 F.3d 183, 203 (3d Cir. 2008) (stating that, for the purposes of a selective enforcement claim, "[p]ersons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects" (internal quotations omitted)).

Even if Defendants had successfully established that they were selectively treated as compared to those similarly situated, they have not established that the SEC enforced this action against them based upon impermissible considerations, to inhibit or punish the exercise of their constitutional rights, or in bad faith. Defendants claim that "it cannot be disputed" that the SEC is pursuing this enforcement action against them in bad faith based upon Defendants' denial of the SEC's settlement terms. D. 224 at 29-30. To show that the SEC acted in bad faith, however, Defendants must establish that the SEC acted with "gross abuse of power, invidious discrimination or fundamentally unfair procedures." Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 145 (D. Mass. 2006) (quoting Baker v. Coxe, 230 F.3d 470, 474 (1st Cir. 2000)). The standard for bad faith is "very high and must be scrupulously met." Kitras v. Temple, No. 16-cv-11428-ADB, 2017 WL 4238862, at *5 (D. Mass. Sept. 25, 2017) (internal quotations omitted). Although Defendants

argue that a settlement agreement was reached with the SEC, the SEC disputes this fact and the record indicates that settlement negotiations between the parties broke down before any settlement was agreed to by both parties.  See D. 242, ¶ 19.  There is no indication that the SEC sought to enforce more harshly against NAI or Navellier following the breakdown in settlement negotiations; rather, the SEC seeks enforcement consistent with that which they discussed in their initial communications with NAI and Navellier.  D. 222-9 at 1 ("Wells Notice" sent from SEC to Defendants' counsel indicating that, if it proceeded to an enforcement action, the SEC could seek remedies similar to those sought in the present action for the same violations alleged herein).  Defendants have not provided evidence sufficient to support their claim that the SEC in enforcing against them in bad faith or is based upon an improper consideration.  See Rubinovitz, 60 F.3d at 911.

Defendants further argue that the SEC is estopped from disputing that it is proceeding against Defendants in bad faith because the SEC "refused" to produce certain documents related to its enforcement decisions in discovery.  D. 224 at 30.  The Court previously ruled on the Defendants' attempts to seek discovery related to the SEC's decision-making process regarding enforcement against other investment advisers.  D. 175 (denying various document requests and deposition topics regarding the SEC's enforcement considerations and noting that the decision did not "deprive Defendants, as they suggest, of pursuing their selective enforcement defense" but that it reflected the need for discovery requests to comport with Rule 26).  Defendants cite no cases that support their argument that the SEC is estopped from denying that it is acting in bad faith based on the SEC's objections to discovery requests that the Court has already determined were overbroad and not proportional.

   2.    *Class of One*

11

"A cognizable class of one equal protection claim requires a showing that the plaintiff 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Boyle v. Barnstable Police Dep't, 818 F. Supp. 2d 284, 314 (D. Mass. 2011) (quoting SBT Holdings, LLC v. Town of Westminster, 547 F.3d 28, 34 (1st Cir. 2008)); see Comley v. Town of Rowley, 296 F. Supp. 3d 327, 335 (D. Mass. 2017). "[T]he proponent of the equal protection violation must show that the parties with whom he seeks to be compared have engaged in the same activity vis-a-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile." Cordi-Allen v. Conlon, 494 F.3d 245, 251 (1st Cir. 2001).

The SEC has enforced against other investment advisers that are similarly situated to NAI in cases regarding false advertising of the AlphaSector strategy. D. 242, ¶¶ 10-12. Defendants argue that, despite the SEC's enforcement of claims against these similarly situated entities, there are other similarly situated entities and individuals that the SEC did not enforce against and, thus, Defendants are in a class of one and the claims against them must be dismissed. D. 224 at 29. This argument is unavailing as a class of one defense cannot be maintained where similar enforcement has been sought against other individuals and entities. Cordi-Allen, 494 F.3d at 254 (rejecting a class of one claim and stating that "[b]y definition, a class of one is not a class of many"). It is undisputed that the SEC has initiated enforcement proceedings against numerous similarly situated entities and against one individual, Present. D. 242, ¶ 10. Defendants, therefore, have not demonstrated that the SEC's initiation of proceedings against them regarding the marketing of the AlphaSector strategy selectively singled them out.

In further support of their class of one argument, Defendants claim that the SEC sought less severe remedies against the other similarly situated investment advisory firms. D. 224 at 29.

Proceedings against most of the other similarly situated entities, however, ended in settlements rather than proceeding to litigation.  D. 242, ¶ 13.  The SEC initially sought to negotiate a similar settlement with Defendants, but negotiations between the parties broke down.  Defendants do not dispute that the SEC settled with these other similarly situated parties.  See id.

Additionally, the SEC has offered a rational basis for any difference in treatment between Defendants and others similarly situated.  See Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 104 (1st Cir. 2002) (to prove class of one selective enforcement, a party must show that "there is no rational basis for the difference in treatment") (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).  For example, the SEC identifies three prior instances whereby the SEC had sent prior warnings to Defendants about problems in their advertising and disclosures and also warning that it would consider "recidivist behavior" when determining whether to bring enforcement actions.  D. 221 at 14; D. 242, ¶¶ 35-37.  The SEC also claims that Defendants' "major role in pushing AlphaSector products into the marketplace" and the evidence indicating that Navellier and other NAI personnel were aware of the false marketing and concealed it from clients contributed to any difference in treatment from other investment advisers against whom enforcement proceedings were brought regarding the AlphaSector strategies.  D. 221 at 14; D. 242, ¶ 40.  Defendants have failed to offer evidence disputing these rational bases for any difference in enforcement as compared to other similarly situated entities and individuals.  As a result, the Court allows SEC's motion for summary judgment as to Defendants' selective enforcement defense and denies Defendants' motion for summary judgment as to the same defense.

**B.**      **Counts One & Two – Violations of Sections 206(1) and (2) of the Advisers Act**

Both parties argue that summary judgment should be awarded in their favor on Counts One and Two, alleging that Defendants violated Sections 206(1) and (2) of the Advisers Act.  D. 1,

¶¶ 73-82.  Section 206(1) provides that it is unlawful for an investment adviser, "by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly" to "employ any device, scheme, or artifice to defraud any client or prospective client."  15 U.S.C. § 80b-6(1). Section 206(2) of the Advisers Act makes it unlawful for an investment adviser, "by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly," to "engage in any transaction, practice, or course of business which operates a fraud or deceit upon any client or prospective client."  Id. § 80b-6(2).  "[T]o establish a violation, each of these sections requires the SEC to show the investment adviser made a material misrepresentation with a culpable mental state."  ZPR Inv. Mgmt. v. SEC, 861 F.3d 1239, 1247 (11th Cir. 2017) (citing Steadman v. SEC, 603 F.2d 1126, 1129-34 (5th Cir. 1979)).  Section 206(1) violations require a showing of scienter, whereas Section 206(2) violations do not.  Steadman, 603 F.2d at 1134 (citing SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195 (1963)); SEC v. Slocum, Gordon, & Co., 334 F. Supp. 2d 144, 182 (D.R.I. 2004).  Therefore, "to demonstrate a Section 206(1) violation, the [SEC] must show that the Defendants willfully or recklessly employed a device, artifice, or scheme to defraud," but "to establish a violation of Section 206(2), the [SEC] must show that Defendants failed to disclose or omitted material facts in their dealings with clients."  Slocum, Gordon, & Co., 334 F. Supp. 2d at 182.

The SEC argues that the evidence shows that Defendants marketed to potential and current clients that the Vireo AlphaSector strategy had been live traded since 2001 and that Defendants were aware that they did not have any documentation or confirmation to support those assertions. D. 221 at 17.  Defendants argue that they are not liable under Section 206 because there is no evidence that they "market[ed]" the strategies, they did not "make" the original false claims and certain other investment advisory firms did not discover the falsity and did not conduct due

diligence but have not been similarly charged with negligent advertising. D. 224 at 32. Defendants also argue that the statements made were not false because they described the performance of a hypothetical index and not an "actual performance record." D. 235 at 30. Defendants further claim that, even if marketing materials included false information, they did not have the requisite scienter because they were not aware that the performance records of the AlphaSector strategies were false. Id.

### 1. False Claims

Defendants' argument that they did not market the AlphaSector strategies is inconsistent with the undisputed evidence and Defendants' own admissions. Defendants admit that they distributed AlphaSector brochures to "brokers and advisers" that would then distribute them to clients who, if interested, would be referred to NAI. D. 242, ¶ 3. Further, the suggestion that Defendants did not "make" the false statements regarding the AlphaSector strategies is inapposite where they incorporated these statements into their own marketing materials where Section 206(1) of the Advisers Act requires only that they "employ any device, scheme, or artifice to defraud" their clients. 15 U.S.C. § 80b-6(1); see Lorenzo v. SEC, __ U.S. __, 139 S. Ct. 1094, 1101 (2019) (concluding, under Rule 10b-5, that "[b]y sending emails he understood to contain material untruths, Lorenzo 'employ[ed]' a 'device,' 'scheme' and 'artifice to defraud'"). The record includes multiple examples of NAI-created marketing materials that include false and misleading statements regarding the performance of the AlphaSector strategies. D. 222-27–34 (Vireo AlphaSector marketing stating that the strategies had been live tested since 2001). Although certain of these advertisements include reference to an index, they claim that the index was based on an active strategy that had an inception date of April 1, 2001 even though Defendants did not

have the data to support this statement.  See id.  Each of these examples includes the NAI Vireo branding and was distributed by NAI personnel.  Id.

Defendants also argue that the statements alleged to be false were not material because, by 2011, NAI was publishing actual performance numbers for the strategies and, therefore, any prior false statements were insufficient to support a violation of Section 206(1).  D. 235 at 30. Defendants, however, cite no legal or factual support of their claim that the false and misleading statements regarding the historical performance of the strategies were immaterial to investors.  See id.  Kuyper admitted that the historical performance of a strategy would be material to an investor, in particular whether a strategy had been back-tested or was based on actual performance.  See D. 222-68 at 2-3.  "A statement is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether or not to invest his money in a particular security." SEC v. Fife, 311 F.3d 1, 9 (1st Cir. 2002).  This is especially true here as the AlphaSector strategies were marketed as defensive strategies that had been "stress tested across *two* bear markets."  See D. 222-27 at 3 (emphasis in original).[3]

    2.    *Scienter*

"To prove scienter, a plaintiff must show 'either a conscious intent to defraud or a high degree of recklessness."  SEC v. EagleEye Asset Mgmt., LLC, 975 F. Supp. 2d 151, 158 (D. Mass. 2013) (quoting SEC v. Ficken, 546 F.3d 45, 47 (1st Cir. 2008)).  The record demonstrates that NAI personnel, including Navellier, were aware that the marketing was not supported by sufficient data, but that they took no steps to inform clients of the false statements and, instead, continued to sell

---

[3] To the extent that Defendants argue that these claims are time-barred because certain of the statements fell outside of the five-year statute of limitations, D. 244 at 3, n.2, that contention fails because record shows that they sent such marketing materials to clients within the statute of limitations.  See D. 222-27–34.

the AlphaSector strategies despite their knowledge that representations about the strategies were false and misleading. After conducting due diligence on the F-Squared AlphaSector strategies, Knapp prepared an "Executive Summary" of his findings, which stated that "F-Squared flat out won't show the math to us [supporting the strategies]." D. 242, ¶ 49; D. 222-42 at 2. Defendants relied on a letter from NASDAQ in lieu of actual performance indices; however, it is clear on the record indicates that NASDAQ did not conduct any independent testing but relied upon information provided by F-Squared. D. 236-1 at 299-301. Despite this lack of support, NAI licensed and sold the AlphaSector strategies under its own branding. Navellier acknowledged that the due diligence conducted by NAI was insufficient in an email to Knapp, stating that Navellier "went to get the confirms yesterday . . . and I was told there were no confirms, just a spreadsheet . . . That is not due diligence, that is stupidity." D. 242, ¶ 56; D. 222-46 at 3. Navellier later emailed other management personnel at NAI stating that "[u]nless somebody shows me the confirms, [F-Squared] is merely a model and I am protecting the firm from potential fraud, so we must not talk about [F-Squared] being base[d] on real $ since 2001." D. 242, ¶ 57; D. 222-47. Despite this acknowledgement, Navellier further stated in the email that he was "not stopping Vireo [AlphaSector] sales." Id. Navellier acknowledged that NAI was selling AlphaSector strategies based on fraudulent representations in another email to NAI management, stating "we sold the wrong product that continues to smell like FRAUD, especially since no one can find the [F-Squared] indices" and "[m]aybe we can try to sell the Vireo managed account business . . . so you & Peter K. can have a big payday." D. 242, ¶ 58; D. 222-48. Defendants claim that emails sent by Navellier to other NAI personnel that reference fraud in relation to the AlphaSector strategies were not indicative of any true concerns, but were lies told by Navellier to NAI personnel because he wanted to scare them into no longer selling the strategies and he disliked Present. D.

242, ¶¶ 56-62.  Such contention, however, does not change the fact that Defendants made the actionable statements to clients or the undisputed record that Defendants were, at a minimum, highly reckless in making statements to clients about investment strategies.

NAI further acknowledged that it was aware of problems with its due diligence and marketing in an email that Kuyper sent to Eichenlaub, a compliance officer NAI hired to conduct a review, in which Kuyper notes that NAI did not have any data to confirm the actual performance of the strategies and that this raised concerns about certain marketing claims.  See D. 242 ¶ 69, D. 222-59 at 3-4.  After conducting a review, Eichenlaub responded to Kuyper that NAI "must have a basis for representing [their] numbers and the legitimacy of the numbers."  D. 242, ¶ 72.[4] Despite their knowledge of the inadequate due diligence and the misleading statements in their marketing, NAI did not attempt to halt sales or inform clients of the fraudulent statements, but instead began to explore opportunities to sell the Vireo AlphaSector business.  Such actions demonstrate an intention to defraud clients or, at least, a high degree of recklessness in violation of Section 206(1).  On this record, NAI, through their management team and Navellier in particular, were aware that they had not obtained sufficient support for the claims included in their marketing of the AlphaSector strategies and that they did not take any action to inform their clients, but instead continued to sell the strategies while exploring options for selling the business.  See D. 242, ¶¶ 75, 77.

The same evidence supporting a finding in favor of the SEC on Count One, that NAI and Navellier violated Section 206(1), supports a finding that Navellier and NAI violated Section

---

[4] Defendants move to strike communications between NAI and ACA as privileged.  D. 235 at 20-21.  This Court previously considered this issue and found that the communications were not subject to either the attorney-client or the work product privilege.  D. 125.  Accordingly, the Court denies Defendants' motion to strike these communications.

206(2). As noted above, violations of Section 206(1) include a scienter requirement, whereas violations of Section 206(2) do not. Section 206(2) makes it unlawful to "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6(2). For the reasons stated above, the Court concludes that the undisputed record shows that that Defendants engaged in a course of business that operated a fraud or deceit upon their clients. Accordingly, the Court allows summary judgment in favor of the SEC on Counts One and Two.

### C.      Counts Three and Four

Defendants seek summary judgment on Counts Three and Four. D. 224 at 33. Count Three alleges that, in the alternative to finding Navellier liable on Counts One and Two, Navellier should be found liable for aiding and abetting NAI's violations of Sections 206(1) and (2) of the Advisers Act. D. 1, ¶¶ 83-87. To establish a claim for aiding and abetting, the SEC must show "(1) a primary or independent securities law violation by an independent violator; (2) the aider and abettor's knowing and substantial assistance to the primary securities law violator; and (3) awareness or knowledge by the aider and abettor that his role was part of an activity that was improper." Slocum, Gordon, & Co., 334 F. Supp. 2d at 184 (citing SEC v. Fehn, 97 F.3d 1276, 1288 (9th Cir. 1996); Cleary v. Perfectune, Inc., 700 F.2d 774, 777 (1st Cir. 1983)). As discussed previously, NAI has violated Sections 206(1) and (2) because it included material misrepresentations in its marketing materials with knowledge that it lacked sufficient data to support its claims. Further, the evidence indicates that Navellier was aware of these misleading claims and chose not to halt sales of the AlphaSector strategies or inform clients of the false claims. See D. 222-46; 222-48; 222-64. Accordingly, the Court denies Defendants' motion for summary judgment as to Count Three.

Count Four alleges that NAI violated Section 206(4) of the Advisers Act, which makes it unlawful for an investment adviser "by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly" to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(4). The SEC has also promulgated rules and regulations describing the conduct prohibited. Rule 206(4)-1 states that it is a fraudulent, deceptive, or manipulative act for an investment adviser to "publish, circulate, or distribute any advertisement . . . which contains any untrue statement of material fact, or which is otherwise false or misleading." 17 C.F.R. § 275.206(4)-1. For the same reasons that NAI is liable under Counts One and Two, Defendants are not entitled to summary judgment on Count Four where NAI never obtained confirmation for the claims that it included in its marketing of the Vireo AlphaSector strategies and did not halt the sale of the strategies or inform existing clients of the misleading marketing. Thus, the Court denies Defendants' motion for summary judgment as to Count Four.

### D. **Injunctive Relief**

Defendants seek summary judgment on the SEC's claim for injunctive relief, arguing that the SEC improperly seeks an injunction banning Defendants "for life from the securities industry" where the SEC has not sought similar relief against any similarly situated investment advisers. D. 224 at 34-35. Defendants also argue that there is no basis to bar NAI and Navellier from marketing the AlphaSector strategies because they sold the AlphaSector business to F-Squared. Id. at 35. The SEC responds that it does not seek an injunction barring Defendants from marketing the AlphaSector strategies but, rather, seeks to enjoin Defendants from engaging in actions that violate Section 206 of the Advisors Act. D. 231 at 14; see D. 1, ¶ A.

An injunction barring a defendant from violating the securities laws is "appropriate where there is, 'at a minimum, proof that a person is engaged in or is about to engage in a substantive violation of either one of the Acts or of the regulations promulgated thereunder.'" <u>SEC v. Sargent</u>, 329 F.3d 34, 39 (1st Cir. 2003) (quoting <u>Aaron v. SEC</u>, 446 U.S. 680, 700-01 (1980)). To determine whether future violations are reasonably likely, courts consider numerous factors, including "the nature of the violation, including its egregiousness and its isolated or repeated nature, as well as whether the defendants will, owing to their occupation, be in a position to violate again." <u>Id.</u> (citing <u>SEC v. Youmans</u>, 729 F.2d 413, 415 (6th Cir. 1984)); <u>SEC v. First City Fin. Corp.</u>, 890 F.2d 1215, 1228 (D.C. Cir. 1989); <u>SEC v. Universal Major Indus. Corp.</u>, 546 F.2d 1044, 1048 (2d Cir. 1976)). Here, the undisputed evidence indicates that, on at least three prior occasions, the SEC sent deficiency letters to Defendants identifying violations related to their marketing materials. D. 242 ¶¶ 35-37. Despite these notices, Defendants continued to violate the Advisors Act in their marketing materials. D. 242, ¶ 37. Additionally, despite their awareness that their Vireo AlphaSector marketing materials contained misleading statements, Defendants continued to use these materials and did not halt sales of the strategies or notify clients of the misleading statements. Further, as Defendants continue to operate as investment advisors, they are in a position to commit further violations of the Advisors Act. For these reasons, the Court denies Defendants' motion for summary judgment on the SEC's claim for injunctive relief.

### E.    <u>Disgorgement</u>

Defendants also seek summary judgment on the SEC's claim for disgorgement of Defendants' "ill-gotten gains and losses avoided" as a result of their violations. D. 1, ¶ D. In a securities law action, "[d]isgorgement forces the defendant to give up the amount by which he was unjustly enriched, 'even if it exceeds actual damages to victims.'" <u>SEC v. Present</u>, No. 14-cv-

14692-LTS, 2018 WL 1701972, at *2 (D. Mass. Mar. 20, 2018) (quoting <u>SEC v. Cavanagh</u>, 445 F.3d 105, 117 (2d Cir. 2006)).  "The Court has discretion to enter an order of disgorgement in an amount reflecting 'a reasonable approximation of the profits causally connected to'" the violations.  <u>Id.</u> (quoting <u>SEC v. Happ</u>, 392 F.3d 12, 31 (1st Cir. 2004)).

Defendants argue that the five-year statute of limitations applicable to the SEC's claims bars consideration of violations that occurred prior to August 10, 2011[5] and, thus, bars the SEC's claim for disgorgement based on marketing prior to that date.  D. 224 at 35.  The SEC does not dispute that the applicable statute of limitations is five years and that it "cannot seek penalties or disgorgement for violations before that time."  D. 231 at 17.  The Supreme Court has stated that the five-year statute of limitations applies to disgorgement in SEC enforcement actions.  <u>Kokesh v. SEC</u>, __ U.S. __, 137 S. Ct. 1635, 1639 (2017).  The Court concluded that "any claim for disgorgement in an SEC enforcement action must be commenced within five years of the date the claim accrued."  <u>Id.</u> at 1645.  The SEC seeks disgorgement of the ill-gotten gains realized when NAI sold its Vireo AlphaSector business to F-Squared in 2013.  It is undisputed that these gains were realized within the applicable statute of limitations.

Defendants also argue that it is entitled to summary judgment on the SEC's claim for disgorgement in its entirety because NAI was well within its rights to sell its "goodwill" to F-Squared and there was "no obligation" on the part of NAI's Vireo AlphaSector clients to transfer their business to F-Squared following the sale of the business.  D. 224 at 37.  Defendants, however, ignore the fact that the value of the business, and thus the value it received in the sale, is traceable to its wrongdoing in violating the Advisers Act.  In misleading clients by making claims in its

---

[5] The SEC claims the applicable date is August 10, 2011 pursuant to tolling agreements.  D. 231 at 16, n.6.

marketing materials, Defendants were able to gain clients that they arguably would not have gained had these misleading statements been omitted. These actions contributed to the value of the Vireo AlphaSector business that Defendants then sold to F-Squared. Since Defendants have failed to meet their burden for summary judgment as to the SEC's claim for disgorgement, the Court denies their motion as to this claim.

## VI. Conclusion

For the foregoing reasons, the Court DENIES Defendants' motion for summary judgment, D. 223, and ALLOWS the SEC's motion as to Defendants' fourteenth affirmative defense and Counts One and Two, D. 220.

**So Ordered.**

/s/ Denise J. Casper
U.S. District Judge