# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　Plaintiff,<br>　v.<br><br>NAVELLIER & ASSOCIATES, INC., and LOUIS NAVELLIER,<br><br>　　　　　　　Defendants. | Civil Action No. 17-cv-11633 |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION OF THE COURT'S FEBRUARY 13, 2020 ORDER GRANTING PARTIAL SUMMARY JUDGMENT TO PLAINTIFF

**INTRODUCTION**

Defendants request that the Court reconsider and vacate its February 13, 2020 Order because:

1.  It was manifest error for the Court to determine that the two subject statements were "false" when the SEC presented no proof that the statements were, in fact, "false." *Harley-Davidson Credit Corp v Galvin* 807 F3d 407, 411 (1st Cir. 2015); *ZPR Investment Management v SEC* 861 F3d 1239, 1247 (11th Cir. 2017) In fact, the two statements were true. (DKT#236-7, pp. 170 through 179: 7-11; DKT#236-7, p. 203 of 465; DKT#224-1, pp. 190-191 and 201 and 202 of 309)

2.  It was manifest error, on a partial summary judgment motion, for the Court to resolve the disputed evidence as to knowledge, intent, materiality and the SEC's bad faith purpose for selectively enforcing against Defendants. *SEC v EagleEye Asset Mgmt* 975 F. Supp 2d 151, 158-159 (D Mass. 2013)

**ARGUMENT**

**I.     THE PARTIAL SUMMARY JUDGMENT ORDER SHOULD BE RECONSIDERED AND VACATED BECAUSE OF MANIFEST ERROR AND MANIFEST INJUSTICE**

While reconsideration is generally not favored, it is appropriate where, as here, there has been a manifest error of the law or fact or where the Order results in manifest injustice. *National Metal Finishing Co v Barclays American Commercial Inc.* 899 F2d 119, 123 (1st Cir. 1990); *Ruiz Rivera v Pfizer Pharmaceuticals, LLC* 521 F3d 76, 81-82 (1st Cir. 2008)

In the present case, the Court should reconsider and vacate or amend its partial summary judgment Order because it was a manifest error of law and fact for the Court to determine that

the two subject statements were "false" when there was no evidence presented by the SEC to prove the two subject statements were, in fact, "false."

### A. __No Proof Defendants' Statements Were "False"__

In order for the SEC to obtain summary judgment as to Counts One and Two for violations of §206(1) and §206(2), it had to prove, with undisputed evidence, that the two allegedly "false" statements - 'live traded' and 'not back tested'- were actually false. *ZPR Investment Management v SEC* 861 F3d 1239, 1247 (11th Cir. 2017) [[T]o establish a violation [of §206(1) and §206(2)] each of these sections requires the SEC to show the investment adviser made a material misrepresentation]

The SEC failed to present evidence to prove that either statement was "false." While the SEC made conclusory <u>assertions</u> that the statements were "false", it presented no evidence in its moving papers (DKT# 221) or in its 83 statements of undisputed fact (DKT#222) or in its exhibits in support of partial summary judgment (DKT# 221-1 through 221-71) or in its supplemental exhibits (DKT 231-1 through 232-11) or in its reply memorandum (DKT# 241) or in its Supplemental Appendix (DKT#242-1) or in its reply to Defendants' responses to Plaintiff's Statement of Facts (DKT# 242)[1] to prove that the Morton strategy, which underlay the F-Squared and Vireo AlphaSector strategies, was not "live traded since April 1, 2001" or that the Morton live traded strategy was "back tested." The SEC, as Plaintiff, must do more than simply

---

[1] During oral argument, in response to Defendants' repeated argument, that the SEC had failed to prove the statements were "false", counsel for the SEC stated that the SEC's settlement with F-Squared (DKT#222-4) was evidence that the statements were false. That is incorrect. The document is a negotiated settlement, to which Defendants were not party, which is not proof that the negotiated statements therein are true or can be used as evidence that the statements therein are true. In fact, the settlement at page 2, note 1 specifically provides that "[[T]he findings herein are made pursuant to Respondents' [F-Squared's] offer and are not binding on any other person or entity in this or any other proceeding." (DKT#222-4, p. 2 of 112)

assert that a statement is false. It must demonstrate with specificity why that is so. *Rombach v Chang* 355 F3d 164, 174 (2nd Cir. 2004)

Not only did the SEC fail to carry its burden to show the statements were "false," but Defendants presented evidence from Jay Morton and Howard Present and NASDAQ OMX that the "live traded since 2001" and "not back tested" statements were true. (DKT#224-1, pp. 190 and 191 of 309; DKT#236-7, pp. 170-179:7-11; DKT#236-7, pp. 199 through 203 of 465; DKT#224-1, pp. 190-191 of 309 and pp. 199 through 202 of 309) Defendants presented evidence from an independent, globally renowned performance calculation firm, NASDAQ OMX, that reasonably confirmed to Defendants that F-Squared's AlphaSector index was based on an actual strategy of a wealth manager (Morton) that had applied its strategy to manage its client's assets since April 1, 2001:

> NASDAQ calculated the historical data… This data was indicated to represent live historical investment decisions…
>
> …
>
> NASDAQ… distributed to the industry's market data vendors a… historical track record as calculated by our firm. The historical track record went back to the inception date of April 1, 2001
>
> (DKT 224-1 p. 201 of 309)
>
> …
>
> This engine has been developed over a period of time dating back to 2001, and has had Private Wealth Client assets managed based on its output over that entire time period.
>
> (DKT 224-1, p. 202 of 309)

In addition, Defendants presented further evidence that the AlphaSector Index (which the Vireo AlphaSector Premium strategy tracked) was based on a strategy (Morton's strategy) that was live traded since 2001:

> Q… When did Morton Financial start applying the sector rotation strategy to ETFs?
>
> A… I was informed by him April of 2001.
>
> > (DKT#236-7, p. 179 or 465)
>
> I spoke with Jay…  He said… he used the 60 week moving average… I can pull up the historic information…
>
> > …
>
> Attached [historic spreadsheet starting in 2001]
>
> > (DKT#236-7, pp. 199 through 203 of 465)

The law is clear that a materially <u>true</u> statement is not actionable under the securities laws as a device or scheme to defraud. *In re Lululemon Securities Litigation* 14 F Supp 3d 553, 571 (S.D.N.Y. 2014) ["Neither immaterial false statements, nor material true statements are actionable" (citing <u>*Basic Inc. v Levinson*</u> 485 U.S. 224, 238 (1998)]

Despite the SEC's failure to prove that the statements were false, the Court impermissibly stated _____ times in its memorandum that the NAI statements were "false." The Court did not cite to a single piece of evidence to support its conclusory determination that the statements were "false."

## B.  The Court Misapprehended What Was Actually Stated In NAI's Marketing Materials

Not only did the SEC fail to prove the statements were "false", this Court, in determining the "statements" were "false", misapprehended what NAI's marketing materials actually stated.

Thus, this Court states:

> The SEC *alleges* that materials used by NAI to market Vireo AlphaSector products falsely indicated the <u>track</u> record of the <u>Vireo</u> <u>AlphaSector</u> **strategy** was based on live trading since 2001. (Emphasis added)
>
> > (DKT# 252, pp. 4 and 5)
>
> ….
>
> NAI marketing materials… included the claims that "live assets began tracking the [<u>Vireo</u> AlphaSector] <u>strategies</u> beginning in 2001, [and] the returns were "not back tested." (Emphasis and Bracketing added)
>
> > (DKT# 252, p. 5)
>
> ….
>
> The SEC *argues* that the evidence shows that Defendants marketed to potential and current clients that the <u>*Vireo*</u> AlphaSector *strategy* has been live traded since 2001 … (Emphasis added)
>
> > (DKT#252, p. 14)

NAI's "marketing" materials did <u>not</u> state that the "<u>Vireo</u> AlphaSector <u>strategy</u> has been live traded since 2001." NAI's "marketing" materials also did <u>not</u> state that the <u>Vireo</u> AlphaSector strategy "track record" was based on live trading since 2001. As can be seen even from the SEC Exhibits 25 through 33 (DKT# 222-27 through 222-35) (cited by the Court), what NAI's marketing materials <u>actually</u> and <u>correctly</u> stated was:

> Navellier Vireo AlphaSector Allocator Premium is a new _strategy_ that attempts to track an _index_ known as the AlphaSector Allocator Premium Index…
>
> …
>
> The "US equity sleeve" referenced in the materials refers to the AlphaSector Premium _Index_, with the strategy that the AlphaSector premium Index _is based on having_ an inception date of April 1, 2001. The _process of converting the active strategy to an index implies that the returns presented, while not back tested, reflect theoretical performance_ an investor would have obtained had it invested in the manner shown and does not represent returns that an investor may have actually attained, as an investor cannot invest directly into an index. (Emphasis added)

(DKT 222-32, page 6 of 9)

Thus, NAI correctly states in its "marketing" that its new strategy- the Vireo AlphaSector Premium strategy- is a strategy that attempts to track [F-Squared's] AlphaSector Premium Index and that the references to the [live traded] equity sleeve of the AlphaSector Premium Index are references to the strategy the Index is based on and that that underlying, live traded strategy had an inception date of April 1, 2001. Because the underlying strategy was live traded since 2001, it was not back tested. This was confirmed by NASDAQ OMX.

(DKT#222-28, pp. 4 of 8 and DKT#222-32, p. 6 of 9)

Since proof of a false statement is required to establish a violation of §206(1) and of §206(2) and since the SEC did not prove the statements[2] were false, it was manifest error for the

---

[2] The SEC was clear that its partial summary judgment motion was limited to two allegedly "false" statements by Defendants "not back tested" back to 2001… The Commission does not seek summary judgment on Defendants' statements about the index" (DKT# 241, pp. 2 and 3) Contrary to the SEC's misleading argument (apparently adopted by the Court), the issue is not whether Defendants' marketing materials contained these statements, but instead, whether those statements were "false." The SEC has not proved they were false (they were/are true). Therefore, it was manifest error for this Court to determine that these statements were false. (DKT#241, pp. 2 and 3)

Court to grant partial summary judgment as to Count One and Count Two. The Court should vacate its Feb 13, 2020 Order.

The SEC next misleadingly asserts that NAI's marketing materials (SEC Exhibits 25, 26, 27) state that there was a "live track record for the US equity sleeve- stress tested across two bear markets." But, as shown above, what the NAI marketing material *actually* stated was that the "US equity sleeves" referenced in the materials refer to the US equity sleeve of the AlphaSector Premium **Index** which is based on the live traded Morton strategy which was live traded across two bear markets. Therefore, the Index's hypothetical performance which is based on that live strategy was stress tested across two bear markets.

(SEC Exhibit 25; DKT#222-27, pp. 3 of 15 and p. 7 of 15)

Thus, the (Morton) strategy that the AlphaSector Index was based on was stress tested across two bear markets. Crucially, the SEC produced no evidence that the Morton strategy (on which the Equity Sleeve of the AlphaSector index was based) was not live traded since 2001 or stress tested across two bear markets. Thus, the SEC failed to prove the statement was false. In fact, the evidence showed the statement was true. (DKT# 224-1, pp. 201 and 202; DKT#236-7, pp. 170-179 of 465 and p. 204)

The SEC's failure to carry its burden to prove the statements were "false" was, by itself, enough to require that the Court deny its summary judgment motion. The Court should vacate its Order.

**C.   It Was Not A Violation Of §206(1) Or §206(2) For The Defendants To Make True Statements Even If *Arguendo* They Did Not Have Support For The Statements**

The Court also manifestly erred, factually and legally, in holding that Defendants violated §206(1) and §206(2) by making the statements about the Vireo strategies being "live tested (sic)

since 2001 even though Defendants did not have the data to support this statement." (DKT#252, pp. 15 and 16) That is not the law and is not a correct statement of fact.

1.   The Law

It is not a securities law violation for an investment adviser to make a true statement, whether the adviser has support for the statement or not. In re *Lululemon,* supra 14 F Supp 3d at 571. A true statement does not become false, even if *arguendo,* the adviser does not have support for the statement. To establish a §206(1) or §206(2) violation, the SEC must prove that each Defendant made a *false* statement (not that each made a true statement). *ZPR Investment Management v SEC* 861 F3d 1239 (11th Cir. 2017) The Court cites no law or case holding that making a true statement, even without "support" for the statement is a material misstatement in violation of §206(1) or §206(2). Since the statements were true, it didn't matter if Defendants had support for the true statements. Therefore, it was a manifest error of law for the Court to hold that making the [true] statement even, *arguendo,* without support was a violation.

2.   The Facts

The Court was also misled by the SEC to hold that "Defendants did not have the data to support the statement." (DKT#252, pp. 15 and 16) Defendants _did_ have the "data" to support the statement. Defendants presented evidence from an _independent_, globally renowned performance calculation firm, NASDAQ OMX, that reasonably confirmed to Defendants that F-Squared's AlphaSector Index was based on an actual strategy of a wealth manager (Morton) that had applied its strategy to manage its clients' assets since April 1, 2001:

> NASDAQ calculated the historical data… This data
> was indicated to represent live historical investment
> decisions…
>
> (DKT# 224-1, p. 201 of 309)

This engine has been developed over a period of time dating back to 2001, and has had Private Wealth Client assets managed based on its output that entire time period.

(DKT 224-1, p. 202 of 309)

The Court argues that NASDAQ didn't confirm that the statements about live traded and not back tested were true, so Defendants must have known they had no support for the statements. That non-sequitur makes no sense. Investment advisers are not required to investigate the Dow Jones regarding the basis or validity of its performance reporting. Because of its reputation, advisers can rely on proven industry leaders. It was more than reasonable for Defendants to rely on the representations of NASDAQ OMX. Whether NASDAQ OMX did independent testing or not doesn't affect the issue of whether <u>NAI</u> or Mr. Navellier <u>knew</u> the statements were true. NASDAQ OMX is a large, well respected performance calculator relied on in the industry for its accuracy. It was more than reasonable for Defendants to rely on the NASDAQ OMX letter. At the least, it is a jury question as to whether Defendants' reasonably relying on the industry leader, NASDAQ OMX letter is somehow <u>proof</u> that they <u>knew</u> the statements were "false." The notion that Defendants had to inquire if NASDAQ, who calculated the historical index performance going back to 2001, did research to confirm its written representations, is not the law. That is simply an argument that the SEC would try to make to a jury to attempt to show that it was not reasonable for NAI or Navellier to rely on the NASDAQ letter. Relying on NASDAQ when Defendants (and the rest of the industry) believe is credible, <u>is certainly not proof</u> that Defendants <u>knew</u> the "based on live traded" and "not back tested" statements were false. A reasonable jury could easily believe Defendants' evidence and decide

that the NASDAQ letter was from a highly reliable, trusted source and that it was not even

negligent, let alone "extremely reckless", for NAI and Navellier to believe NASDAQ was being

truthful.

Defendants also had written support for the subject statements from the written

representations from F-Squared's Chief Investment Officer indicating that the F-Squared

AlphaSector strategy was based on an index calculated by NASDAQ OMX which index, in turn,

was based on a wealth manager's strategy live traded since 2001. (DKT#224-1, pp. 190 and 191

of 309) Defendants also had the NASDAQ OMX (calculated) spreadsheets of the Index

hypothetical trades to support the Index performance back to 2001.

(DKT#224-2, pp. 2-290 of 290)

While the SEC or this Court may not personally believe that this "data" was "sufficient"

to support the statements (no supporting data was necessary to support the true statements), it

was still impermissible for the Court to decide this (knowledge/negligence) issue. And it was

clearly error for the Court to decide that relying on the NASDAQ OMX letter was "highly

reckless." It was for the jury to decide whether it was reasonable for Defendants to rely on this

"data". And it is certainly the jury's duty to decide if relying on this information was "extremely

reckless" *SEC v Present* 2018 WL 1701972 (D. Mass. 2017)

[With respect to any counts that require a showing of scienter, viewing the record in the light

most favorable to Defendant, a reasonable trier of fact could find Morton told Defendant and

Defendant believed him that a version of the model had been used to manage live assets since

April 2001… A jury could conclude Defendant had no intent to deceive.]

**III.    IT WAS MANIFEST ERROR FOR THE COURT TO RESOLVE DISPUTED ISSUES OF FACT AS TO DEFENDANTS' "KNOWLEDGE" AND "INTENT", I.E., SCIENTER**

As shown above, the SEC had the burden to, but did not, prove NAI's statements were false. *ZPR Investment Management* supra 861 F3d at 1247. Therefore, its partial summary judgment motion should have been denied outright at that point without the need to even consider the scienter requirements of knowledge and intent and materiality. *Harley-Davidson Credit Corp v Galvin* 807 F3d 407, 411 (1st Cir. 2015) The Court did, however, decide each of those disputed issues. But it was manifest error for the Court to decide these disputed material issues of fact. *Noonan v Staples Inc.* 556 F 3d 20, 25 (1st Cir. 2009); *Burns v Johnson* 829 F3d 1, 8 (1st Cir. 2017) ["At summary judgment, the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."]

A.  <u>No Knowledge Of Falsity</u>

The Court impermissibly weighed and credited the mischaracterized "evidence" presented by the SEC and indulged in inferences in favor of the SEC while disregarding Defendants' disputing evidence and the reasonable inferences therefrom. Defendants presented evidence that Mr. Navellier did not know the statements were not true. His emails show that when he railed against F-Squared and AlphaSector as a "fraud", he was just making up lies because he was jealous of Howard Present's success and was furious that NAI's sales people were obsessed with selling F-Squared based Vireo strategies instead of NAI's historic 30-year, core strategies that Mr. Navellier had personally created and managed.

(DKT#222-4, pp. 543-544 of 583; DKT#222-4, pp. 538-539 of 583)

11

**Thus, the Court quotes, as proof Defendants knew the statements were false and had nothing to confirm the statements**, **only portions of Mr. Navellier's *emails* to NAI sales personnel ostensibly criticizing the F-Squared AlphaSector strategy:**

"there were no confirms [from F-Squared] to support its performance [I [Mr. Navellier] had [supposedly] been told], only "spreadsheets" (D 222-46, p. 3 of 11); and

"we have to cover our ass somehow" (D222-46); and

"F-Squared is merely a model, so don't talk about F Squared being based on real money since 2001". (D 222-47) but "not stopping Vireo sales" (D 222-47) and

"Vireo was a good idea but smells like FRAUD" (D222-48) and

"the catalyst for the "surrender" [sale of Vireo goodwill to F-Squared] is that F-Squared refuses to stop circulating fake 10+ year AlphaDEX indices before the ETF's actually commenced on May 10, 2007"; and

"NAI was tipped off to F-Squared's fraud by an ex-SEC enforcement officer" (D222-64)

But, impermissibly, the Court does not consider the context of the emails or the context in which they were written. Nor does the Court refer to or credit Defendants' evidence disputing any Defendant knowledge of falsity.

First, Defendants, including Mr. Navellier, can't have known the two statements were false because they weren't. Defendants, including Mr. Navellier, were given no evidence to prove the live traded, not back tested statements were untrue. Nothing in Mr. Navellier's rants mentions any actual basis to support his rants. The lack of "confirms" for the hypothetical trades

for a model strategy that doesn't make any actual trades is not proof that the strategy underlying the Index was not live traded. In fact, the undisputed fact that the statements were true is evidence that Defendants couldn't have known they were making these allegedly "false" statements. *In re Lululemon* 14 F Supp 3d 553, 571 (S.D.N.Y. 2014)

Second, each of Mr. Navellier's emails must be viewed in whole and in context. Thus, a look at his complete August 6, 2011 series of email rants shows that the purpose of his railing against NAI's salespeople and making up false criticisms was part of his anger at them for not selling NAI's historic core products. Mr. Navellier's "I was told there were no confirms… I was shocked" statement was false and was refuted as a lie by Mr. Knapp (DKT#222-46, p. 3 of 11), who referred Mr. Navellier to the October 5, 2009 Executive Summary, where he had told Mr. Navellier that there were no confirms but that there was other evidence to support the "live traded statements".

Mr. Navellier's anger and jealousy of Howard Present is shown in those emails where he tells Mr. Knapp (NAI's longtime general counsel) "you are way out of your league and now I pity you." (DKT#222-46, p. 3 0f 11) and "our relationship is over." "I will never do another meeting with you and will not support any of your products [Vireo strategies]". I do not trust you." (Id) And he emails John Ranft (NAI's marketing director) in the same email where he again lies and says "I was told we had all the trade confirms. … The irony is that I can show all kinds of incredible performance from StockGrader [Mr. Navellier's newsletter product] … but Navellier's compliance continues to try to systematically destroy Shawn and Michael G [NAI's analysts that manage NAI core strategies]… Steve O told me he cannot sell Large Growth [another NAI core product] [despite] the "fact it is in the top 5% in the past 10 years and 11% in the past year." "I will never run with Steve… I told him we are in the best earnings environment

since 1950 in on[e] of the greatest bull markets in history"… "I [do not] want to run with weenies and depressed people." I think the bottom line is if we cannot sell our traditional growth portfolios, perhaps we can have AAM sell them… while our salespeople concentrate on Vireo, since that is all they are selling anyway". "We should cut off all those that do not sell our growth portfolios." (DKT 222-46, p. 4 of 11)

Thus, it is clear that he is making these criticisms and unfounded accusations, not because they are real, or because he knows them to be true, but to scare and coerce NAI's salespeople to quit selling Vireo and focus on NAI core products or they might get cut off.

On May 21, 2011 Mr. Navellier emailed John Ranft and carried on his theme: "Touchstone questioned me for 40 minutes why we're selling index strategies and are so bearish." I repeatedly told them I have nothing to do with Vire[o]" that it is not my portfolio…" "selling a defensive index strategy [Vireo AlphaSector] and an upbeat growth strategy [NAI core strategies] does not mix well…" (DKT 222-47, p. 4 of 6) Mr. Ranft refuted Mr. Navellier and told him no one has ever said that Large Cap [NAI's core product] is "broke" or needs to be "fixed"… (DKT 222-47, p. 2 of 6) and disputed Mr. Navellier's accusations, i.e.: "the Vireo portfolios are not "index portfolios" and "there is NO fraud behind these portfolios… F Squared has now proven itself to be an excellent partner… Howard Present is not you and he conducts himself in a completely different manner." Louie you have got to stop being such a divisive force within the firm." (DKT 222-47, p. 3 of 6)

Mr. Navellier kept up his attack on Mr. Present in an August 11, 2011 email to Mr. Ranft by writing "the Sector report raises the ongoing Vireo questions" to which Ranft responded "what ongoing questions?... Howard's write-up on Vireo's recent activity and non-activity does a pretty good job explaining why it has acted and reacted the way it has. (DKT 222-48, p. 2 of 3);

to which Mr. Navellier responds "when Howard [Present] answered the broker question about "garbage in, garbage out" he got an F in knowledge of basic statistics… and that F2 has absolutely no idea whatsoever what they are doing." (DKT 222-48, p. 1 of 3)

Mr. Navellier continued his hatred for Howard Present and F2 by fabricating: "if Howard was out there taking bullets, it would not be a problem. However by Flynn [an F-Squared marketer] bragging he has a kid from sleeping around does not imply professionalism on F2's part"… "our sales rep bragging about their buddy who was a high school coach getting underage girls to provide oral sex to brokers… does not imply professionalism." (DKT 222-49)

Mr. Navellier continues with his fabrications about F2 by writing "Howard (Present) is reinventing F2 but as state regulators move… to nail his advisors/distributors… Howard hides!" "F2 will not allow me to validate their First Trust backtest…" (DKT 222-49)

But those too were lies by Mr. Navellier, intended to trash Howard Present and scare NAI salespeople. There were no state regulators investigating F2. The California Department of Corporations was not investigating F2 in 2011 as Mr. Navellier fabricated.

Mr. Navellier's false assertion that F2 was failing was revealed to be false by Mr. Ranft who showed the F-Squared AlphaSector Premium portfolio beating the S&P by almost 400bps [4%]". (DKT 222-49, p. 2 of 5)

The Court also cites to an excerpt from an email from Mr. Navellier to NAI employees (mostly marketers of Vireo) notifying them of the sale of Vireo goodwill, supposedly because F-Squared refused to stop circulating its "fake" 10+ year AlphaDEX indexes that "actually commenced on May 10, 2007", and because he'd been tipped off to F-Squared's fraud by an ex-SEC enforcement officer. The Court cites this as evidence that Defendants knew the subject

marketing statements were false. Again, the email must be taken in context. Mr. Navellier is

attempting to placate the marketers, who have been earning their livelihood marketing Vireo, for

the loss of substantial revenue. The employees tenuously oppose the sale, believe F2 is a good

relationship, that is being destroyed as well as the firm because Mr. Navellier hates and is jealous

of Howard Present's success with a weenie index product. All of which is true, so he continues

to fabricate mysterious ex SEC enforcement officer, just like there was no California Department

of Corporations investigating F2. This is April 2013, long before even the SEC had an inkling

(from Corey Hoffstein, a disgruntled former partner with F2 who felt slighted for losing his cash

$3 million/year licensing fees from Howard Present) that there might be a problem at F2. No one

was "tipping off" Mr. Navellier, nor were the AlphaDEX indices fake or fraudulent. Again, the

SEC has not enforced against First Trust, the creator and primary marketer of AlphaDEX, or

against F2 or Howard Present or the other advisers that used the AlphaDEX strategy because the

AlphaDEX index performance did begin in 2007 as it claimed. It is disingenuous that the SEC,

which has not found fault with AlphaDEX, is trying to use Mr. Navellier's accusation which the

SEC knows is a fabrication, as "evidence" that Mr. Navellier knew there were problems with the

Alpha<u>Sector</u> statements. This email, like the others, is not evidence that Mr. Navellier knew the

"live traded, not baktested" statements were "false." How could he- no one else "knew" because

the statements were true. Rather, the emails are the vestiges of a competitive investment adviser

who is getting beat by a competitor he personally detests, with a "weenie index" product. Mr.

Navellier just can't cope with that situation and finally decides to leave the fold.

It is clear, even from the context of the Navellier emails selectively chosen by the SEC,

that his accusations about F2 AlphaSector being a fraud were unsubstantiated, false accusations

by a "hot head" (DKT#224-3, pp. 148-149 of 269) who was jealous of Howard Present and his

success. Mr. Navellier's testified in deposition that his accusations were fabricated to scare and

intimidate NAI's marketers to quit selling Vireo and focus on selling NAI core products:

> Q. And you say "We just have to cover our ass somehow"… what did you mean by "cover our ass somehow?"
>
> A. That's just again me being political.
>
> …
>
> Q. What did you mean by that sentence?
>
> …
>
> A. Marc [SEC's counsel], this is very simple. Everything I said was made up about criticizing F2 and Howard Present. I hated the man[.] I despised the man; I didn't want to sell an index product; I was jealous that he was stealing accounts from me. Obviously, the accounts were lower margin; they weren't profitable. I didn't want to be affiliated with this guy. I just made up crap to get rid of him. I was a political operative. Okay? Internally, in my own firm, I was a jerk. Okay? And I was doing my best to be a jerk and intimidate the crap out of everybody.
>
> You're not going to get an email from me criticizing Howard where I didn't make up crap. Okay? Now, look, I say "made up." I made up the SEC, I made up the California Department of Corporations. It was just me going off to intimidate people.

(DKT#224-4, pp. 543-544 of 583)

The Knapp Executive Summary

As to the Court's reliance on Mr. Knapp saying in his Executive Summary that "F-

Squared won't show the math to us", he was referring to the "math" (i.e., the proprietary

17

statistical analysis done by F-Squared for its strategies, i.e., the secret recipe Index[3]) for F-Squared Index model. A look at the full sentence of what Mr. Knapp <u>actually</u> said and meant in his Executive Summary was that "F-Squared won't show the math to us which would knock them out of contention <u>but for</u> the following factors:" and then he references: "Virtus performed significant due diligence which, apart from testing the system ourselves, [NAI couldn't because F-Squared wouldn't reveal its proprietary quantitative analysis system for its model] is our best test for the legitimacy of F2 and the system"; that  NASDAQ used the data to calculate and publish indices' performance and the reputations of the independent F2 investment committee members. (DKT#224-1, p. 187 of 309)

Moreover, shortly after writing the Executive Summary, Knapp and NAI <u>did</u> receive the "math" in the form of the NASDAQ spreadsheet of hypothetical trades F Squared made that corroborated the F-Squared AlphaSector Index performance. (DKT#224-2, pp. 2-290 of 290)

Mr. Knapp also testified that he believed F2's representations: "I had no reason not to believe him… the weight to (sic) the evidence was that he was telling the truth." (DKT#244, Exh. D-217, p. 34:14-19) Therefore, contrary to what the Court was led to believe, the evidence shows that Defendant did not believe the statements were "false."

### 3.  No Knowledge Of "Falsity" By NAI Personnel

The Court states that NAI senior executives (Peter Knapp and Arjen Kuyper) testified that they never received any trading confirmations for AlphaSector performance returns and were not given any materials to confirm the AlphaSector strategy performance prior to 2008.

---

[3] F-Squared was selling a "model" strategy whereby it sent weekly or monthly signals of what hypothetical ETF sectors to buy sell or hold. Those hypothetical signal trades were tracked to create the AlphaSector Index which was the performance record of the hypothetical trades. Because the Index "trades" are hypothetical there are no <u>confirms</u> for the trades because no actual trades were made. (Ex. 22, p. 204:20-206:3; DKT#222-24)

(DKT#252, p. 4, citing to DKT#242, ¶50) The Court simply lifts from the SEC's statement of facts but ignores Defendants' disputing response and evidence. (DKT#242, pp. 80-91) for showing that the <u>strategy</u> had been live traded and not back tested from 2001 to 2008. But that was disputed. First, the F-Squared AlphaSector strategy had no performance prior to 2008 and NAI never claimed it did. That's why no pre-2008 AlphaSector <u>"strategy"</u> performance was published in NAI marketing material. What was published was AlphaSector <u>Index performance</u> and NAI had NASDAQ spreadsheets received from NASDAQ to confirm the Index performance. (DKT#224-2, pp. 2-290) NAI materials did correctly state that the AlphaSector Index was based on a live (Morton) strategy and received that confirmation from NASDAQ that that was true. (DKT#224-1, pp. 201-202) The Court cites to an out of context snippet from Mr. Knapp's investigative hearing testimony (without NAI attorneys present to cross-examine or obtain clarification[4]) that there was no evidence for pre-2008 live trading of the AlphaSector strategy, but the Court leaves out Mr. Knapp's due diligence Executive Summary, wherein he attaches a copy of the NASDAQ OMX letter which confirms that the index was based on a live money strategy going back to 2001. (DKT#224-1) Mr. Knapp also testified that he believed the pre-2008 representations about the wealth management group. "… raised some suspicions for us but I had no reason not to believe him… the weight to (sic) the evidence was that he's telling the truth." (DKT#244, p. 34:14-19)

1. <u>Arjen Kuyper Did Not Have Knowledge</u>

---

[4] Defendants object and moved to strike that deposition excerpt as hearsay and contrary to the evidence, lack of foundation, assumes facts not in evidence and not best evidence. Mr. Knapp's own due diligence report (DKT#224-1, p. 186) attaches a copy of the NASDAQ OMX letter. The actual documents giving the basis for the live assets statement (D-174; D-175) (See also Exhibits D-218 and D-219) are the best evidence.

Likewise, the Court erroneously accepted the SEC's mischaracterization of Arjen Kuyper's testimony. Mr. Kuyper testified that he and Mr. Knapp reasonably could not "verify" the live assets back to 2001 because Howard Present licensed the strategy from a wealth manager with whom he had a confidentiality agreement. But Mr. Kuyper later testified that NAI did have a reasonable basis for believing the pre-2008 index performance, because they had received the NASDAQ OMX letter and spreadsheets backing up the index performance and the NASDAQ calculations before 2008 and how NASDAQ calculated the performance during the 2008 Great Recession. (DKT#244, Ex. D-220)

### Howard Present Did Not State That AlphaSector Strategies Were Not Based On Actual Trades Back To 2001

The Court states that, during a conference call in which NAI and Mr. Present supposedly participated, Present stated that the AlphaSector strategies were not based on live trades back to 2001. The Court again just lifts from the SEC's SUF (DKT#242, ¶55) but ignores Defendants' disputing evidence and argument. First, NAI was not on any supposed conference call in which Mr. Present stated that AlphaSector "strategy" was not based on live trades. When Joe Guerin of RBC called NAI (Mr. Knapp) to ask about what he thought he heard, a call was set up where Mr. Guerin was informed that he was mistaken and Mr. Present had not said that. Mr. Present then sent emails to Mr. Guerin to clarify any misunderstanding or "slip of the tongue" and referred Mr. Guerin and Mr. Knapp to the NASDAQ letter confirming that the AlphaSector model (strategy) *was* based on the Index which in turn was based on a live traded strategy back to 2001. See Defendants' Response to SEC SUF (DKT#242, ¶55) and Defendants' Exhibits 188, 189, 190.

<u>Defendants Have Made No Admissions</u>

The Court next erroneously states that Defendants have "admitted" they do not have sufficient knowledge to confirm whether the strategy underlying the Vireo products was back tested. That is disputed. Defendants have produced evidence that they did have evidence that the underlying strategy was not back tested, i.e., the  NASDAQ letter, which they relied on (  ) that confirmed that the underlying strategy was live traded and not back tested. (DKT#224-1, pp. 190 and 201 of 309)

<u>ACA Eichenlaub Non-Expert Report</u>

NAI's work product/attorney-client providing privileged communications with ACA were at the behest of NAI's attorney (the undersigned) was to assist him in providing legal advice to his clients in anticipation of possible litigation. Respectfully it was and is error for the Court to allow those communications into the case (See DKT#242, p. 120 of 144) While the Court earlier ruled that the ACA communications were not attorney-client privileged or work-product protected, that ruling was made before and without the benefit of the Court's review of those communications. A review of the communications reveals that they are and are so designated, as attorney client privileged and work product. (DKT#244, Ex. D-223)

In addition, it is error to "admit" these documents (which are irrelevant or confusing) since they are, at best, inadmissible, non-expert opinion. Mr. Eichenlaub and ACA are admittedly not attorneys and were not designated as experts in this case.

Also, the statements reach no opinion, let alone any conclusion, as to whether any violations of the securities laws have occurred. Indeed, ACA indicates that it does not give legal opinions. Mr. Eichenlaub incorrectly believed that F-Squared was a sub-adviser to Navellier. In

truth, F-Squared was a signal provider which did not sub-advise or manage NAI clients assets. He does not state any belief that any violations <u>have</u> occurred in regard to statements about performance and merely suggest that <u>if</u> performance claims (track records) are made, the SEC might want to see those records. Defendant had records to support their claims. Again, this Court impermissibly weighed the evidence, but disregarded Defendants' evidence.

Erroneous Holdings

After impermissibly weighing the disputed evidence, this Court ruled that Defendants' evidence "does not change the *fact* that Defendants made the <u>actionable</u> statements to clients[5] or the *undisputed* record that Defendants were, at a minimum, highly reckless in making statements to clients about investment strategies."[6] (DKT#252, pp. 17-18) That is an incorrect reading of the record. Whether Defendants had "knowledge" of the "falsity" of the statements is hotly disputed. Indeed, it has not been proven that the statements made were even untrue.

Likewise, there is substantial evidence cited alone that there was no "intent" by Defendants to defraud, i.e., that Mr. Navellier did not make his rants to defraud clients but rather, to scare NAI's salespeople to focus on selling NAI core strategies. The issue of scienter on this disputed record is a jury question. (DKT#222-4, pp. 538-539 and 543-544) What the Court's statement shows is that it impermissibly disbelieved Defendants' evidence and chose to believe the SEC's "evidence." But it is manifestly improper for the Court to choose whose evidence to believe on a summary judgment motion. The Court's sole duty is to determine if there is a disputed issue of material fact and if, as here, there is, then the Court must deny the summary

---

[5] There is no evidence Mr. Navellier made any statements to any Vireo clients. Moreover, all the emails relied on by the Court were internal to NAI personnel- not to clients.

[6] "Statements" <u>not</u> about "live traded or not back tested" are not part of the SEC's summary judgment motion and are therefore irrelevant to that motion.

judgment motion. The believability of the evidence and the credibility of the witnesses' testimony are for the jury to decide. Whatever the Court's view, a reasonable jury in this case could easily conclude that Mr. Navellier did not know or believe that the subject statements were false, that the statements were true and that it was reasonable (more than reasonable and not negligent or reckless, let alone extremely reckless) for Defendants to rely on the NASDAQ OMX letter, and on Howard Present's letter, and on the spreadsheets of the Index performance and on the fact that the strategy indisputably worked extremely well during the then recent 2008 bear market. Therefore, the Court should reconsider and vacate is Order so the jury can decide the disputed issue of knowledge.

<u>No Intent To Defraud</u>

The issue of intent to defraud is also extremely factual and is rarely subject to a grant of summary judgment. <u>*SEC v EagleEye Asset Mgmt*</u> 975 F. Supp 2d 151 (D. Mass) Again, there is no proof in the record that the subject statements were false, nor is there any evidence that NAI employees intended to defraud any clients.

As to Mr. Navellier, he testified that he did not intend to defraud any clients and had no reason to believe the information was false. (DKT#222-4, pp. 538-539 and 543-544 of 583) Far from attempting to induce clients to purchase NAI Vireo advisory service with false statements, he engaged in a vigorous campaign to discredit Howard Present and the Vireo AlphaSector-based products in order to scare NAI's marketing people from promoting Vireo even though they were raising a substantial amount of assets. It is not plausible that he would disparage the Vireo products and discourage their sale if he was trying to defraud clients. A reasonable jury could easily find there was no intent to defraud. At a minimum, there is an intense dispute as to intent which precludes summary judgment.

<u>The Subject Statements Were Not Material</u>

The Court erred in determining that the 'live traded since 2001' and 'not back tested' statements were material. The statute of limitations bars violations for statements made before August 11, 2011 and the SEC concedes such statements were removed after September 2012 (DKT#224-4, p. 177 of 583; DKT#224-4, p. 470 of 583; DKT#244-1, p. 288; DKT#224-2, p. 3 of 8). So the window is statements between August 11, 2011 and September 2012. By that time, NAI had its own <u>actual,</u> two year, GIPS certified track record. (DKT#224-3, p. 232 of 269) NAI's actual track record became much more material to investors than whether the Morton strategy, upon which the Index was based, managed live assets <u>10 years</u> <u>earlier</u>.

Contrary to the Court's assertion that no evidence of immateriality was presented by Defendants (DKT#252, p. 16), Defendants presented evidence from the testimony of the SEC's own 30(b)(6) witness, Robert Baker, one of the SEC attorneys that has conducted these enforcement actions, that shows the 10-year-old existence of a strategy whose track record is not even published which had much less, if any, effect on clients' decisions to invest. (DKT# 224-6, pp. 199-200):

> "With respect to advertising… there's academic paper out there- the older the track record gets, the less important it is as a general matter.
>
> …
>
> We accepted the notion that for purposes of coming to a settlement that over time the fake inflated track record which… stops… in 2008- becomes less important… its not nearly as important when you're sitting in September 2013. An investor might care more about one year's performance less than…they would about 5 years or 10 years."
>
> (DKT#224-4, pp. 470 and 471 of 583)

What is material is the current and actual performance, not the existence of a ten year old strategy with unsupported performance. Indeed, even after the 'live traded' statement was removed from the Vireo material in September 2012, the volume of Vireo clients increased in 2013. Therefore, the "live traded" statement couldn't have been material. By 2011, it was insignificant. A reasonable jury could easily so conclude.

## II.   THE EVIDENCE AS TO THE SEC'S SELECTIVE ENFORCEMENT IMPROPER PURPOSE IS, AT THE LEAST, A DISPUTED ISSUE FOR THE JURY

Finally, the Court materially erred in deciding, rather than letting the jury decide, the disputed issues of whether a settlement agreement was reached and whether the SEC did acted with the improper purpose in bad faith with intent to punish Defendants for their having initially refused to agree to the SEC's new settlement demands. Whether a contract (offer, acceptance) was formed is a disputed issue of fact.

The question of whether a settlement offer and acceptance were reached forming a contract, is, at a minimum, a disputed, factual issue for the jury to decide. *Brewster Wallcoverings v Blue Mountain Wallcoverings* 68 Mass App Ct. 582, 596; *Verified Creations Inc. v 10 L Worldwide Inc.* 2018 WL 10152222 *2 (D.R.I. May 31, 2012) There is plenty of evidence that a settlement was reached on May 30, 2016, i.e., the series of emails between parties when the last of the negotiation terms was agreed to by the parties. (DKT#224-4, pp. 470 through 493 of 583) At that point, those were not negotiations. The evidence proves an acceptance of an offer and an agreement. It was error for the Court to decide this factual dispute.

Likewise, Defendants presented substantial evidence as to the dispute regarding the SEC's intent and punitive mental state. Defendants presented evidence that a settlement was

reached, that the SEC then attempted to change the agreement and that the SEC attempted to add more onerous terms once they got Defendants to agree to the settlement. When Defendants initially balked at the new censure term, which had not been discussed once the serious settlement negotiations began, and the SEC Boston staff, became embarrassed that they could not obtain a modification with a new censure agreement, it became personal. The SEC dug in its (their) heels, filed this enforcement action, sought 67 times more ($23 million) than the amount ($714,000) they had agreed to settle for a few months earlier, and brought this action, not only against NAI but now against Mr. Navellier personally. Before, they had agreed to settle with NAI with no claims against Mr. Navellier. After Defendants resisted the new censure terms, the SEC demanded a lifetime ban from the industry whereas before, the SEC had agreed to settle with no ban against either NAI or Mr. Navellier. Also, the SEC refused to settle on the terms it had found agreeable two and a half months earlier, even after Defendants agreed to the SEC's censure demand (DKT#224-6, pp. 114 through 115 of 429) The SEC's intent and purpose are, at least, factual issues for a jury to decide.

### III.   MANIFEST INJUSTICE

A reconsideration and a new trial is also appropriate where the order results in manifest injustice. A determination that each Defendant entered into a scheme to defraud clients and was negligent in violation of §206(1) and §206(2) of the Investment Advisers Act, without proof of a false statement or proof of knowledge or proof of intent as to an immaterial statement without an opportunity for a jury determination, on hotly disputed facts, where the "defrauded" clients made $350 million, and where other similarly situated advisers were not enforced against at all, would

be a manifest injustice. If Defendants really violated §206(1) and §206(2), then let the SEC

prove it to a jury because there is substantial evidence that they did not violate these laws. It

would be manifestly unfair to have Defendants' careers, reputations and lives ruined without an

opportunity to at least fully present their case, call live witnesses and have their credibility

judged. Before Defendants are deprived of their lifelong careers, they should have an opportunity

to defend themselves to a jury.

## CONCLUSION

For all the reasons set forth above, the Court should reconsider and vacate its Order.

There is no proof the statements were false, so no violation occurred. The Court appears to have

been seriously misled by the SEC's argument and erroneously weighed the disputed evidence. A

jury must decide the disputed scienter issues and the selective enforcement bad faith punishment

issue.

Respectfully Submitted

Dated: March 12, 2020              LAW OFFICES OF SAMUEL KORNHAUSER

                                   By: */s/ Samuel Kornhauser*_____
                                        Samuel Kornhauser
                                        Law Offices of Samuel Kornhauser
                                        155 Jackson Street, Suite 1807
                                        San Francisco, CA
                                        (415) 981-6281
                                        skornhauser@earthlink.net

                                        BROOKS & DeRENSIS

                                        111 Devonshire Street, Suite 800

                                        Boston, MA 02109
                                        (857) 259-5200
                                        sbrooks@bdboston.com

                                        Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this day of March 12, 2020.

By: */s/ Dan Cowan*
Dan Cowan