UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>     v.<br><br>NAVELLIER & ASSOCIATES, INC. and<br>LOUIS NAVELLIER,<br>     Defendants. | Case No. 17-cv-11633-DJC |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR ENTRY OF FINAL JUDGMENT**

Plaintiff Securities and Exchange Commission submits this memorandum in support of its Motion for Entry of Final Judgment against Defendants Navellier & Associates ("NAI") and Louis Navellier ("Mr. Navellier").  In further support of its motion, the SEC submits the Declaration of SEC accountant Rory Alex and a proposed final judgment.

**INTRODUCTION**

NAI, through their "Vireo" line of business, recommended the F-Squared AlphaSector strategy branded as "Vireo AlphaSector," to its clients and to other investment professionals. Defendants created and distributed Vireo AlphaSector advertising materials that were based on information from F-Squared and represented that the performance track record of the strategy underlying AlphaSector was based on live trading since approximately April 2001.  But Defendants—despite advertising that strategy as live traded and not back-tested—admit they lack knowledge or information sufficient to support the statements surrounding the Vireo AlphaSector performance track record.  After an outside compliance consultant informed Defendants that they must have a basis for the Vireo AlphaSector performance claims, Defendants went one step further to conceal their fraud.  Instead of telling clients and prospective

clients that the performance advertising numbers were unsupported, Defendants sold the Vireo AlphaSector business to F-Squared to extricate themselves from liability.

On February 13, 2020, the Court granted the SEC's Motion for Partial Summary Judgment on Counts One and Two, and found that the Defendants intentionally or recklessly violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"). The Commission, in a separate motion filed herewith, has moved (with Defendants' assent) to dismiss the remaining unresolved counts (Three and Four).  The Court should enter a final judgment on Counts One and Two that permanently enjoins the Defendants from violating the Advisers Act, orders the Defendants to pay disgorgement and prejudgment interest in the total amount of $ 28,964,571 and orders each Defendant to pay an appropriate civil penalty.

## ARGUMENT

**I.     The Court Should Enter a Permanent Injunction against Defendants.**

Section 209(d) of the Advisers Act provides that, upon a showing that a person has engaged in an act or practice that violates the Act, a permanent injunction "shall be granted without bond."  15 U.S.C. §80b-9(d).  "An injunction is appropriate if the Court determines there is a reasonable likelihood that the defendant will violate the laws again in the future."  *SEC v. Tropikgadget FZE*, 146 F. Supp. 3d 270, 283 (D. Mass. 2015) (quoting *SEC v. Druffner*, 517 F. Supp. 2d 502, 513 (D. Mass. 2007)).  To determine whether future violations are reasonably likely, courts consider numerous factors, including "the nature of the violation, including its egregiousness and its isolated or repeated nature, as well as whether the defendants will, owing to their occupation, be in a position to violate again."  Memorandum and Order (ECF No. 252) at p.21, hereinafter "Order," (citing *SEC v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003)); *Tropikgadget*,

146 F. Supp. 3d at 283.

As the Court noted, the SEC's Office of Compliance Inspections and Examinations sent letters to Defendants on three separate occasions (1999, 2003, and 2007) detailing compliance deficiencies regarding NAI's advertisement of its performance history, including *specifically* a failure to disclose that certain performance information had been back-tested.[1] Despite these warnings, during the entire time that NAI sold the Vireo AlphaSector products, NAI advertised the AlphaSector strategy as "based on an active strategy with an inception date of April 1, 2001" and "not back-tested"[2] when they knew they could not confirm whether those claims were true.[3] Defendants have demonstrated their likelihood to reoffend if not enjoined by this Court.

Defendants' violations of the Advisers Act were "flagrant and deliberate," not "merely technical in nature." *See Tropikgadget*, 146 F. Supp. 3d at 283 (quoting *Druffner*, 517 F. Supp. 2d at 513). Even when confronted with numerous red flags (including a conference call informing NAI that the AlphaSector strategies were not based on actual trades starting in 2001 and a compliance review highlighting that Defendants needed documentation to substantiate the performance claims they were advertising), Defendants did not halt sales of Vireo or notify clients of the misleading statements.[4] Their misrepresentations to clients and prospective clients lasted (and were repeated) over several years. Instead, knowing the performance advertising numbers were unsupported, Defendants sold the Vireo AlphaSector business to extricate

---

[1] Order at pp. 3-4, 21; Plaintiff's Summary Judgment Exhibit Nos. 18-20 (ECF No. 222-20 through 222-22), hereinafter "P. Ex."
[2] Order at pp. 4-5; P. Ex. 1 at ¶4 (ECF No. 222-2); 22 at 197:9-20 (ECF No. 222-24); 25- 33 (ECF Nos. 222-27 through 222-35).
[3] Order at p. 4-5; P. Ex. 1 at ¶5 (ECF No. 222-2), 40 (ECF No. 222-42), 41 at pp. 26-28 (ECF No. 222-43), 42 at 50:6-11 (ECF No. 222-44).
[4] Order at p. 5-6, 21; P. Ex. 41 at 131-132 (ECF No. 222-43); 43(ECF No. 222-45), 45 (ECF No. 222-47), 60 at p. 14 (ECF No. 222-62).

themselves from liability.[5] They monetized their client relationships instead of fulfilling their fiduciary duties to those clients. Therefore, the Court should find that Defendants conduct was egregiousness and repetitive in nature.

Next, when deciding whether to enter a permanent injunction, courts ask if "the defendants will, owing to their occupation, be in a position to violate again." *Sargent*, 329 F.3d at 39. The Court has already found that "as Defendants continue to operate as investment advisors, they are in a positon to commit further violations of the Advisors Act."[6] Accordingly, the Court should permanently enjoin the Defendants from violating the relevant provisions of the Advisers Act and related rules.

## II. The Court Should Order the Defendants to Pay Disgorgement.

After a defendant has been found liable for securities law violations, the district court has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits. *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996); *SEC v. Present*, No. 14-cv-14692-LTS, 2018 WL 1701972, at *2 (D. Mass. Mar. 20, 2018) (citing *SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004)). The purpose of disgorgement is "to prevent unjust enrichment." *E.g.*, *Druffner*, 517 F. Supp. 2d at 511. As this Court has observed, "Disgorgement forces the defendant to give up the amount by which he was unjustly enriched, 'even if it exceeds actual damages to victims.'" Order at pp. 21-22 (citing *Present*, 2018 WL 1701972, at *2 (quoting *SEC v. Cavanagh*, 445 F.3d 105,117 (2d Cir. 2006)). The amount of disgorgement ordered "need only be a reasonable approximation of profits causally connected to the violation," and the "risk of uncertainty in calculating disgorgement should fall on the

---

[5] Order at p. 6-7; P. Ex. 61 (ECF No. 222-63), P. Ex. 62 (ECF No. 222-64).
[6] Order at p. 21.

wrongdoer whose illegal conduct created that uncertainty." *Happ*, 392 F.3d at 31 (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231-1232 (D.C. Cir. 1989)).

The Defendants sold the Vireo AlphaSector strategies as the right product (a defensive strategy with a "live historical track record") at the right time (after the 2008-2009 financial crisis). Thanks to their material misrepresentations, Vireo AlphaSector generated substantial profits for NAI and filled the Defendants' pockets with millions of dollars. The Court should order disgorgement of $22,450,952, the sum of the profit earned by Defendants for the Vireo AlphaSector business and the sale price paid to Defendants for the Vireo AlphaSector assets.[7] Defendants' many material misrepresentations about Vireo AlphaSector worked, and Defendants collected millions in advisory fees from thousands of people they had deceived into becoming clients and continued to deceive when they were clients. From September 2011 through 2013,[8] the Defendants received a total of $8,450,952 in profit from the fees charged to investors for the Vireo AlphaSector products.[9] *See SEC v. AbsoluteFuture.com*, 115 Fed. Appx. 105, 106-107 (2d. Cir. 2004) (affirming order to disgorge all profits received as result of fraud). According to Navellier's income statements, total revenue earned from the Vireo AlphaSector business was $20,634,408 from September 1, 2010 through 2013. Navellier paid $12,183,456 of that amount to F-Squared over this period in connection with a fee-sharing arrangement whereby a percentage of the Vireo revenue would be paid to F-Squared. Therefore, Navellier's resulting

---

[7] Declaration of Rory Alex at ¶ 6, hereinafter "Decl. Alex."
[8] Disgorgement has been conservatively calculated from September 1, 2011 forward to fall within the applicable statute of limitations based on available annual sales data. The SEC and Defendants have entered into agreements tolling the period from August 10, 2011 through September 1, 2017. The Complaint in this matter was filed on August 31, 2017. Pursuant to 28 U.S.C. § 2462, all activity from August 10, 2011 through the filing of the Complaint would fall within the applicable five year statute of limitations.
[9] Decl. Alex at ¶ 7.

profit is $8,450,952 ($20,634,408 less $12,183,456 paid to F-Squared).[10]

In addition to the fees earned, Navellier subsequently sold the Vireo AlphaSector assets (namely, its client relationships) on September 23, 2013 for $14,000,000.[11]  This Court has concluded that "the value [Defendants] received in the sale is traceable to its wrongdoing in violating the Advisers Act[,]" and that Defendants "actions contributed to the value of the Vireo AlphaSector business that Defendants then sold to F-Squared.  Order at pp. 22-23.  Adding the sale proceeds to the Vireo AlphaSector profits discussed above, the total disgorgement equals $22,450,952 ($14,000,000 plus $8,450,952).  *See Happ*, 392 F.3d at 31.

Disgorgement here should be ordered to be joint and several.  Courts may order that an owner-officer and a company pay disgorgement on a joint and several basis.  *SEC v. Esposito, et al.*, Civ. No. 16-cv-10960-ADB, 2018 WL 2012688, *9 (D. Mass. April 30, 2018) (ordering managing director and entity jointly and severally liable for total disgorgement and prejudgment interest where violations are closely intertwined); *SEC v. Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d 355, 369 (D.R.I. 2011) (holding entity and entity's sole owner, an individual, jointly and severally liable for disgorgement); *see SEC v. Tropikgadget FZE*, 146 F. Supp. 3d 270, 282 (D. Mass. 2015) (holding defendants "jointly and severally liable" for disgorgement amount with prejudgment interest).  Mr. Navellier, the Chief Investment Officer and Chief Executive Officer of NAI, is the sole owner of NAI and shares in all profits and proceeds received by NAI.[12]  He had the power to decide what products NAI offered and approved the selling of the Vireo AlphaSector products although he was well aware that the Vireo AlphaSector performance

---

[10] *Id.*
[11] *Id.* at ¶8.
[12] P. Ex. 1 at pp. 8-9 (ECF No. 222-2) ("Defendants admit that from 2009 to August 2013, Mr. Navellier owned at least 75% of NAI … in 2013 Mr. Navellier acquired complete ownership of NAI.")

claims were unsupported.[13] With this knowledge, Mr. Navellier did not stop sales of the Vireo products or notify clients of any of Defendants' misrepresentations.[14] In the end, he decided to sell the Vireo assets in response to what he considered "a massive due diligence failure."[15] Therefore, the Court should order that any disgorgement be paid jointly and severally by the Defendants.

### III.     The Court Should Order the Defendants to Pay Prejudgment Interest.

A district court has "broad discretion" to order a defendant to pay prejudgment interest on the disgorgement amount. *First Jersey*, 101 F.3d at 1476. "Courts have recognized that an assessment of prejudgment interest, like the disgorgement remedy, is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws." *Sargent*, 329 F.3d at 40 (citation omitted). Without an award of prejudgment interest, a securities law violator receives an "interest-free loan" on his unjust enrichment. *Id*. at 41. In SEC cases, courts typically calculate prejudgment interest using the rate established by the Internal Revenue Service for tax underpayment, which reasonably approximates the unjust benefit of a defendant's use of the money. *See First Jersey*, 101 F.3d at 1476; *Druffner*, 517 F. Supp. 2d at 512-13.

Using the Internal Revenue Service's interest rate for unpaid balances, prejudgment interest on $22,450,952 is $6,513,619 for a total disgorgement of $28,964,571.[16] The Court should order the Defendants to pay prejudgment interest, because they have enjoyed the financial benefits of their wrongful conduct since the 2011 to 2013 period.

---

[13] *Id.*; Order at p. 5; P. Ex. 44 (ECF No. 222-46), 45 (ECF No. 222-47).
[14] *Id*.
[15] Order at p. 6-7; P. Ex. 61 (ECF No. 222-63), 62 (ECF No. 222-64); *see* P. Ex.46 (ECF No. 222-48).
[16] Decl. Alex at ¶ 9-11.

### IV.     The Court Should Order Each Defendant to Pay an Appropriate Civil Penalty.

Section 209(e) of the Advisers Act provides that a district court may order a person who violated the Act to pay a civil penalty. 15 U.S.C. §80b-9(e). The imposition of a civil penalty furthers "the dual goals of punishment of the individual violator and deterrence of future violations." *Official Committee of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006) (citation omitted); *Happ*, 392 F.3d. at 32.

Section 209(e) of the Advisers Act creates three tiers of civil penalties for natural persons and three tiers for entities.[17] The court may impose a third-tier penalty if "the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and if the defendant's conduct "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §80b-9(e)(2)(C). When setting an appropriate penalty, courts have considered such factors as: "(1) the egregiousness of the defendant' conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent.…" *SEC v. Intervest Corp.*, 2016 WL 8711689, *1 (D. Mass. Dec. 23, 2016); *Present*, 2018 WL 1701972, at *4.

As discussed above, the Defendants' conduct was both egregious and recurrent because Defendants engaged in a multi-year marketing campaign using unsupported performance claims in many marketing pieces and presentations to make millions of dollars at the expense of their clients and the fiduciary duty Defendants owed them. The Court found that Defendants acted with scienter, as they "were aware that they had not obtained sufficient support for the claims

---

[17] Under the Advisers Act, "person" is defined as a natural person or a company. 15 U.S.C. § 80b-2(a)(16). Separate tiers are established for natural persons and other persons. *Id.* at § 80b-9(e)(2).

included in their marketing of the AlphaSector strategies and that they did not take any action to inform their clients, but instead continued to sell the strategies while exploring options for selling the business." Order at p.18.

Finally, a third-tier penalty is warranted for the Defendants' violations of the Advisers Act, because the fraudulent conduct directly or indirectly created substantial losses or a risk of substantial losses to Defendants' clients. 15 U.S.C. §80b-9(e)(2)(C). Investment advisers collect advisory fees in exchange for fulfilling their fiduciary duties to their clients. Defendants fraudulently induced investors to pay millions in fees (a percentage each year of the total amount they invested) for the Vireo AlphaSector based on misleading claims about the products' track record. Defendants (who only provided "advice" to these clients through the Vireo products) breached that duty, and each client suffered the loss of their advisory fees (totaling over $20 million).

Additionally, Defendants' fraud risked the loss of the clients' money as well. As Defendants misrepresented the performance history of the Vireo strategies, claiming it avoided losses during periods of severe market decline without knowing if that was actually true, Defendants put their clients' investment money at significant risk. By marketing a seven-year live track record and inducing scared investors to pay millions in fees on a product that had never been tested in the real world – and might well not have protected them against a sudden downturn in the stock market – Defendants created a significant risk of substantial losses to its clients.

A third-tier penalty may not exceed the larger of a figure established by the statute or "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. §80b-

9(e)(2). Thus, the Court could set a penalty for each Defendants of up to $22,450,952, Defendants' gross pecuniary gain beginning on September 1, 2011.[18]

Alternatively, the Court could treat each occasion when Defendants made material misrepresentations as a separate violation of the Advisers Act and impose the regulatory maximum for each. Many courts have determined that a "violation" encompasses each occasion when a defendant acted to violate the securities laws. *See, e.g., SEC v. China Infrastructure Investment Corp.*, 189 F. Supp. 3d 118, 136 (D.D.C. 2016) (each misrepresentation was a violation); *SEC v. Tourre*, 4 F. Supp. 3d 579, 592-93 (S.D.N.Y. 2014) (same); *SEC v. Colonial Inv. Mgmt. LLC*, 659 F. Supp. 2d 467, 503 (S.D.N.Y 2009) (eighteen violations of same regulation); *SEC v. Coates*, 137 F. Supp. 2d 413, 428-29 (S.D.N.Y. 2001) (same); *SEC v. Kenton Cap., Ltd.*, 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998) (multiplying statutory amount by number of investors who received misrepresentations). Each material misrepresentation that Defendants made about the Vireo AlphaSector performance is a separate violation of Sections 206(1) and 206(2) of the Advisers Act. In the summary judgment briefing, the Commission cited to at least nine pieces of fraudulent marketing material and sixteen different fraudulent misrepresentations.[19] The regulatory cap for third-tier penalties for individuals is $150,000 for each violation prior to March 6, 2013, and $160,000 for each violation after that date. The

---

[18] A court may not impose a civil penalty for a violation that occurred more than five years before the SEC's enforcement case was filed. 28 U.S.C. § 2462. As discussed in the footnote 1 *supra*, disgorgement (used here as a measure of pecuniary gains) has been calculated to include only money collected within the statute of limitations period (accounting for tolling). Thus, the SEC does not seek any penalty for Defendants pre-September 1, 2011 conduct.

[19] SEC's Reply to Defendants' Resp. To SEC's Statement of Undisputed Facts, at ¶43 and exhibits cited (ECF No. 242); P. Ex. 25-33 (ECF Nos. 222-27 through 222-35).
.

regulatory cap for third-tier penalties for entities is $725,000 for each violation prior to March 6, 2013, and $775,000 for each violation after that date. [20]

The SEC has settled several actions against similarly situated investment advisers and imposed penalties of up to $5 million in the settled context. For the one similarly situated individual who litigated and ultimately was found liable, the court imposed a penalty of $1.575 million. Below is a listing of the remedies imposed in the settlements of comparable investment adviser firms, as well as, the final judgment entered against Howard Present. Each of these investment adviser firms incorporated F-Squared AlphaSector's misleading performance claims in their own marketing materials. The civil penalty for NAI should exceed the civil penalty for the firms listed below, because (1) those penalty amounts were set in a pre-litigation settlement context; (2) with the exception of F-Squared and Present, those penalty amounts were in connection with a violation of 206(2) of the Advisers Act, not a finding of scienter-based liability under 206(1) of the Advisers Act; and (3) none of the other firms sold their AlphaSector business in an attempt to evade liability.

| Defendant | Remedy | Cite |
|---|---|---|
| F-Squared Investments | Cease & Desist, Censure, $30 million disgorgement, $5 million penalty. Company settlement included admissions. | P. Ex. 3 part 1 at 1 (Dkt. 222-4). |
| Virtus Investment Advisers | Cease & Desist, Censure, $13.4 million disgorgement, $2 million penalty. | P. Ex. 3 part 1 at 78 (Dkt. 222-4). |
| Ameriprise Financial Services | Cease & Desist, Censure, $6.3 million disgorgement, $1.75 million penalty | P. Ex. 3 part 2 at 80 (Dkt. 222-5). |

---

[20] Originally, Section 209(e)(2)(C) capped a third-tier penalty for a natural person at $100,000 per violation (unless the defendant's gross pecuniary gain is larger); that amount has been increased by regulatory inflation adjustments. The maximum is $150,000 for a violation between March 4, 2009 and March 5, 2013, and $160,000 for a violation between March 6, 2013 and November 2, 2015. (The comparable figures for a second-tier penalty are $75,000 and $80,000 for individuals and $375,000 and $400,000 for entities.) *See* 17 C.F.R. §201.1001 & Table I to Subpart E.

| Horter Investment Management | Cease & Desist, Censure, $482,595 disgorgement, $250,000 penalty | P. Ex. 3 part 2 at 89 (Dkt. 222-5). |
|---|---|---|
| Howard Present | Permanent injunction, $10.8 million disgorgement, $1.575 million penalty | P. Ex. 4 (Dkt. 222-6). |

The Court should order each Defendant to pay an appropriate third-tier civil penalty.

## CONCLUSION

For the reasons set forth above, the Court should enter a final judgment against the Defendants that: (a) permanently enjoins them from future violations of the Advisers Act; (b) requires them to pay, jointly and severally, disgorgement of $22,450,952, and prejudgment interest in the amount of $6,513,619 for a total of $28,964,571 and (c) requires each Defendant to pay an appropriate third-tier civil penalty.

          Respectfully submitted,

          SECURITIES AND EXCHANGE COMMISSION
          By its attorneys,

          /s/ Jennifer Cardello
          Jennifer A. Cardello (Mass. Bar No. 657253)
          Marc J. Jones (Mass. Bar No. 645910)
          William J. Donahue (Mass. Bar No. 631229)
          Robert B. Baker (Mass. Bar No. 637438)
          Attorneys for Plaintiff
          SECURITIES AND EXCHANGE COMMISSION
          33 Arch Street, 24th Floor
          Boston, MA  02110
          (617) 573-4577(Cardello)
          cardelloj@sec.gov

Dated:  March 25, 2020

**CERTIFICATE OF SERVICE**

      I hereby certify that this document was filed on March 25, 2020, through the ECF system and will be sent to the registered participants as identified on the Notice of Electronic Filing (NEF) as of the date of this filing.

      /s/ Jennifer Cardello
      Jennifer Cardello

Dated:  March 25, 2020