# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>NAVELLIER & ASSOCIATES, INC. and LOUIS NAVELLIER,<br><br>Defendants | Civil Action No. 17-cv-11633 |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO STAY ENFROCEMENT OF FINAL JUDGMENT OR TO REDUCE AMOUNT OF SUPERSEDEAS BOND

Defendants Navellier & Associates, Inc. and Louis Navellier request this Court to stay enforcement of the Final Judgment (DKT#285) and to reduce the amount of the supersedeas bond in light of today's United States Supreme Court decision in *Liu v. SEC* 591 U.S.___ (2020) a copy of which Slip Opinion is attached hereto as Exhibit 1. A stay is necessary so the SEC is enjoined from proceeding with its Administrative Proceedings File No. 3-19826 (which it filed on June 12, 2020) (Exhibit 3) pending appeal as to the propriety of this Court's summary judgment and Final Judgment. The SEC's Administrative Proceeding is based on the injunction against future violations of §206(1) and (2) which this Court issued but which the Court of

1

Appeals likely will find was erroneously awarded because there was no 206(1) or 206(2) violations by Defendants.

Moreover, a stay of enforcement of the $28,964,571 disgorgement and prejudgment interest award is necessary because that disgorgement award or at the least the amount of it will likely be overturned in light of today's Supreme Court decision in *Liu* which requires that a securities law violator's disgorgement must be limited to the net profits from wrongdoing after an accounting of both receipts and payments by the alleged violator are taken into account *Id* Slip Op p.10-12. Only net profits received directly as a result of wrongdoing are disgorgeable. Net profits that were not earned from wrongdoing are disgorgeable to the "victims." Thus, none of the $14 million for NAI's sale of its goodwill to F-Squared is disgorgeable because the NAI client "victims" were not harmed so there is no amount of the $14 million that is necessary to benefit the clients for "harm" to them, i.e., to return to the status quo. With disgorgement further limited to only the culpable actors. In this case disgorgement must be limited to zero as the amount necessary to benefit investors because they received back all their money <u>and</u> received $278 million in profits.

As disclosed in confidential financial statements and documents to be filed under seal tomorrow or after a seal order is obtained, Defendants do not have the financial assets to obtain a $32 million supersedeas bond. They were attempting to obtain a $2.8 million to $3 million supersedeas bond (before the *Liu* decision was issued today) which is the maximum bond they could obtain. Defendants' counsel had been attempting to reach an agreement and believed he had an agreement with counsel for the SEC on a $2.8 to $3 million bond but learned on Friday June 19, 2020 that the SEC would not as yet agree to such a bond. Counsel were still negotiating to reach an agreement whereby the SEC might agree to a supersedeas bond in an amount that

could be obtained by providing to the bonding company $3 million in cash or cash equivalent

before today's *Liu v. SEC* decision. *Liu* makes it clear that the maximum "digorgement", if any,

would be $25,000 so the bond would be $27,500. The parties are still negotiating to reach such

an agreement. Defendants will post a $27,500 bond which should also stay enforcement of the

permanent injunction portion of the Final Judgment.


Temporary Stay

While the parties continue to negotiate the stay and amount of the bond and while this

motion is pending, Defendants request this Court to extend the stay of enforcement beyond July

2, 2020 in order for this Court, or, if necessary, the First Circuit Court of Appeals to rule on this

stay/bond motion.

A temporary stay would extend the present stay of enforcement set to expire on July 2,

2020, so the parties could continue to attempt to reach agreement on the amount of a supersedeas

bond, if any, especially in light of today's *Liu v. SEC* decision. A stay will allow all parties'

interests to be protected (especially with Defendants' agreement to an asset restriction agreement

(Exhibit 7) and the status quo is preserved while the appeal is being decided.

Defendants do not have the assets to procure a bond in excess of $2.8 million to $3

million, and any bond should be limited to the disgorgeable amount, if any, when applying the

correct directions given by the Supreme Court in *Liu* for calculating the amount of disgorgement.

The maximum amount of "net profit" disgorgement would be $24,628. (DKT#278, p. 7, ¶'s 8-11

and schedule p. 12, a copy of which is attached as Exhibit 2). If a stay of enforcement is not

granted with a reduced supersedeas bond, Defendants may have their assets unjustly enforced

against based on a judgment that likely incorrect, especially in light of *Liu*. Defendants probably

will be irreparably and unjustly put out of business or forced into bankruptcy and unjustly lose

their assets without an opportunity to appeal or overturn the Final Judgment if a stay and reduced

bond of $27,500 is not granted.

<u>Stay of Final Judgment Injunction- Irreparable Harm</u>

The SEC has already begun enforcing the permanent injunction portion of the Final

Judgment. On June 3, 2020 SEC counsel contacted counsel for the Cavalier Fund, a mutual fund

client of Defendants, and indicated that, in the SEC's view, the effect of the permanent

injunction portion of the Final Judgment triggered section 9b of the Investment Company Act

which in the SECs view precluded the Cavalier Fund from continuing to retain NIA as its

investment sales adviser. (Exhibit 4 is a true and correct copy of SECs counsel's email sent to

counsel for Starboard). Defendants disagreed with the SEC's position, but the Cavalier Fund did

not want to become embroiled in a dispute with the SEC and the SEC possibly bringing

enforcement action against it and its employees and or agents, so it reluctantly terminated NAI

(and Mr. Navellier) as investment sub-adviser effective June 15, 2020. (Exhibit 5). Starboard's

counsel held out the possibility of reinstating Defendants if a stay or clarification of the Final

Judgment could be obtained, indicating that the Final Judgment did not preclude Defendants

from continuing to be investment advisers to mutual funds pending appeal.

The SEC has also contacted another client of Defendants, AAM, a unit investment trust

provider, asserting the same section 9b prohibition which also threatens to terminate Defendants'

business relationship with AAM. Also Defendants have been contacted by other clients who

have indicated that they were told the SEC has said that it is going to 'shut NAI and LN down

within a week' to prevent them from providing investment advice to all of Defendants'

investment advisory clients, not just mutual fund clients. The SEC is seeking self-help to put Defendants out of business before a decision by the Court of Appeals can be rendered, thereby making the Final Judgment a *fait accompli* without an opportunity to effectively review it on appeal.

The SEC has employed this tactic, using the injunction against future violations of the securities laws, as grounds to coerce clients and potential clients to cease doing business with an investment adviser even while an appeal from the judgment is pending, and to further destroy the investment adviser's business by instituting administrative proceedings to terminate the advisers' registration as an investment adviser while an appeal is pending. *Steadman v. SEC* 798 F. Supp. 733, 748 (D.D.C. 1991)

In *Steadman* the SEC obtained a judgment that the investment adviser violated Rule 10b-5 and §§206(1) and (2) of the Investment Advisers Act. As part of the Final Judgment the District Court permanently enjoined the investment adviser from violating §§206(1) and (2) in the future. The SEC was also about to initiate follow-on administrative proceedings to deregister the investment adviser, even though the investment adviser had appealed. The investment adviser moved the district court to stay enforcement of the injunction pending appeal. The district court granted the stay pending appeal, holding:

> Defendants argue that, pursuant to Section 9(a) of the Investment Company Act of 1940… an injunction will force defendants to terminate their investment-advisory business… The SEC is considering pursuing administrative proceedings… that would bar them from acting as transfer agents.
> The SEC's contentions that defendants will not be severely injured by this injunction and that the public will be harmed by a stay, are not convincing. Defendants, who have served as investment advisors and transfer agents in the mutual fund industry for decades, will be seriously injured…[by] a bar… That

> injury will be irreparable because, once defendants
> are shut out of the industry, it is doubtful that, should
> the injunction be lifted, they would be able to regain
> positions in the industry they hold today.

Defendants' loss or threatened loss of substantial business during the pendency of an appeal will cause irreparable harm which Defendants may not be able to recoup. *Florida Businessmen for Free Enterprise v. City of Hollywood* 648 F2d. 956, 958 n. 2 & 3 (5th Cir. 1981) (and cases cited therein); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S. Ct. 2561, 2568, 45 L. Ed.2d 648, 660 (1975); [possible bankruptcy without a stay].

### A Stay Will Benefit, Not Harm, Other Parties Interested In The Proceedings

A stay will not substantially harm the other parties, which is a factor which weighs in favor of a stay. Without a stay, NAI's twenty-five employees will lose their jobs, especially in the middle of the Covid-19 pandemic. The Cavalier Fund investors who have received years of satisfactory investment advisory services will lose Defendants' unique, proprietary investment advice which clients have chosen, and may suffer immediate adverse tax consequences if Defendants are enjoined from providing them without advise and they have to redeem and obtain a new investment adviser. Defendants may have to file for bankruptcy, so Appellants' other longstanding clients will lose their chosen investment advisers and unique investment skills. Other of Defendants' creditors could have their collateral made insecure or lost.

The SEC on the other hand would not be substantially harmed. There is no need for immediate enforcement. The SEC has known about the alleged "violations" since 2013, but did not file this action until August 31, 2017. It agreed to settle this case, knowing all the "facts" it asserts now, for $714,690 and with no injunction or ban against either NAI or Mr. Navellier. The

alleged violations were not substantial. The alleged misstatements were not material. NAI clients

made $278 million in profits from Defendants' Vireo AlphaSector investment advice. They were

not harmed.

A stay will also benefit the SEC by keeping Defendants solvent so if, in the unlikely

event the SEC prevails on appeal, there will be an equal or greater amount of assets available to

collect against. *Acevedo-Garcia v. Vera Monroig* 296 F.3d 13, 17 (1st Cir. 2002).


### Public Interest Lies In A Stay Of The Final Judgment

The slight risk to the public and clients that Appellants will violate 206(1) or 206(2) (they

didn't) while the appeal is pending is "acceptable". *Steadman* supra 198 F. Supp. at 748.


### I.      THE AMOUNT OF A SUPERSEDEAS BOND SHOULD BE REDUCED TO $27,500

This Court has discretion to waive or reduce the amount of the supersedeas bond below

110% of the judgment. Local Rule 62.2; *Acevedo-Garcia v. Vera Monroig* 296 F.3d 13, 17 (1st

Cir. 2002) ["nature and amount of bond is entrusted to the discretion of the trial court."];

*Cardiaq Valve Technologies v. Neovasc Inc.* 2016 WL 8710447 at *2 (D. Mass. Dec. 2, 2016);

*Athridge v. Iglesias* 464 F. Supp.2d 19, 24-25 (D. D.C. 2006); *Finova Capital Corp. v. Arledge,

Inc.* WL 828504 at *5 (D. Ariz. March 26, 2008); *Albert Sauter Company Inc. v. Richard Sauter

Company, Inc.* 368 F. Supp. 501 (E.D. Pa. 1973). A factor a court considers in waiving or

reducing the bond is if the defendant doesn't have the financial assets to pay the judgment or

obtain a full judgment and the bond would put defendants' other creditors in undue jeopardy.

*Acevedo* supra 296 F.3d at 17. As set forth in the accompanying Declaration of Louis Navellier

to be filed under seal, and financial statements to be submitted under seal, neither NAI or he

have the assets or financial capability to obtain a $32 million supersedeas bond or anything near

that amount. Defendants can obtain a $27,500 bond and were, prior to todays *Liu* decision, in the

process of applying to attempt to obtain the largest bond they can.

a. Mr. Navellier is married and has been for more than 25 years. He resides in Florida with his

wife and holds his Florida residence and all other real estate and financial accounts as tenants

by the entirety with his wife. His wife is not a judgment debtor in this case and does not

consent to have their tenants by the entirety assets available to satisfy Mr. Navellier's or

NAI's debts. Therefore, those assets which are held as tenants by the entirety are not

"disgorgeable" or available for enforcement by the SEC. *Securities and Exchange

Commission v. Yun* 208 F. Supp.2d 1279, 1284 (M.D. Fla 2002); ["Yun owns her home with

her husband as a tenant by the entirety. Under Florida state law, one spouse cannot alienate

or encumber the estate without the consent of the other. *Sitomer v. Orlan* 660 So.2d 1111,

1113 (Fla Ct. Ap 1995). Thus, Yun does not solely own her home or have the sale power to

encumber it. The Court declines to force Yun to disgorge her home"]; *Sitomer v. Orlan* 660

So 2d 1111, 1113 (1995). Mr. Navellier's personal assets that arguably are available for

enforcement are:

b. His stock ownership in NAI is held as tenants by the entirety by his wife and he and she is

not a judgment debtor and does not agree to make NAI stock available for enforcement by

the SEC or any other creditor of his or of NAI. Moreover, there is $_____ [under seal] book

value in the NAI business but [under seal] is for a promissory note which may be

uncollectable and the cash in the operating account is needed to operate the business and

keep the 25 employees and independent contractors employed and the business operating as a

going concern to maintain its current value. A true and correct copy of NAI's most recent financial statement prepared by David Machen… (balance sheet, income & expense statement) is being filed under seal (Exhibit 6).

c.  His ownership interest in Navellier Analytics also is held as tenants by the entirety which is excluded from enforceability. The only asset of the company is an appealing account to pay expenses and employees and writers. The only other asset Mr. Navellier has is personal goodwill for providing newsletter content. His wife does not consent to pledging or encumbering that stock ownership or assets to satisfy the Final Judgment.

d.  Automobiles which are also held as tenants by the entirety with his wife and intended to be held as tenants by the entirety. (Copies of titles to be filed under seal). His wife has not consented to waiving her tenants by entirety protection against their automobiles.

e.  The Florida home which is the principal residence of his wife and he is held by his wife and he as tenants by the entirety is not an asset available to satisfy his judgment debt to the SEC. *Sitomer v. Orlan* 660 So.2d 1111, 1113 (D.C.A. 1995); *Securities and Exchange Commission v. Yun* 208 F. Supp.2d 1279, 1284 (M.D. Fla 2002).

f.  He also has [under seal] in a retirement account and [under seal] in an investment account (Exhibits 9 and 10 to be filed under seal are true and current copies of his most correct account statements for said accounts) which are held and also intended as tenants by the entirety.

g.  He owns a home in Reno, Nevada with his wife as tenants by the entirety but his wife has agreed that he can pledge the equity in the Reno home as collateral for a supersedeas bond (conditioned on approval of a reduced supersedeas bond in the face amount of $3 million or less).

<u>NAI Has Little In The Way Of Assets</u>

As to NAI, it has little or no assets. It has been breaking even or had losses since the SEC issued its Wells Notice in 2016 and since it has proceeded with this case. NAI has been kept afloat by LN's infusion of cash to cover shortfalls in expenses. Mr. Navellier has not taken a salary during that entire time. NAI may have some residual goodwill but the amount is indeterminable and without NAI being a going business or Mr. Navellier being affiliated. If either NAI or Mr. Navellier is barred from being investment advisers the value of NAI's goodwill would be further irreparably reduced or eliminated.

## II.    THERE IS A LIKELIHOOD OF SUCCESS ON APPEAL

A stay should be granted and the supersedeas bond should be reduced to $27,500 because it is likely the summary judgment will be overturned and even if it is not overturned. Even if it is likely the $28,964,571 combined disgorgement and prejudgment interest amount will be eliminated or reduced to no more than $27,500 after the appeal, as required by today's *Liu v. SEC* Supreme Court case. (Exhibit 2)

## III.    THE SUMMARY JUDGMENT WILL LIKELY BE REVERSED

There is a strong likelihood the summary judgment which underlies the Final Judgment will be overturned on appeal. In its partial summary judgment decision, this Court found that Defendants' marketing materials contained "false and misleading statements regarding the performance of the AlphaSector strategies… that the strategies had been live traded since 2001" (DKT#252 p. 15). However, the SEC produced NO EVIDENCE, let alone undisputed evidence, that the statements were false. There was no evidence that the strategy upon which the

AlphaSector strategy was based had not been live traded since 2001. This Court cited no evidence to prove that the underlying strategy had not been live traded since 2001. So, there was no evidence to support the predicate- false statement- of a 206(1) or 206(2) violation. In order for the SEC to establish a 206(1) or 206(2) violation it had to prove that the statement was false or misleading. There was no such undisputed evidence and therefore it was reversible error to grant it without proof the statements were false.

Likewise the evidence and reasonable inferences therefrom was in dispute as to whether Defendants had knowledge that the statements were false (there could not have been knowledge the statements were false because the statements were not false- there was no proof the statements were false). Making a true statement is not a violation of 206(1) or (2). *In re Lululemon Securities Litigation* 14 F. Supp.3d 553, 571 (S.D.N.Y. 2014).

The evidence was also in dispute as to whether either Defendant intended to defraud clients or prospective clients. Mr. Navellier denied that he intended to defraud clients and stated he had no proof the statements were false and that he had no intent to or plan to defraud clients. Indeed, Mr. Navellier took steps to stop his firm and marketers from disseminating any statements that were not approved by NAI's compliance officers. Again, no false statements were disseminated, so there couldn't have been an artifice to defraud clients with true statements.

Likewise, the SEC's 30(b)(6) witness admitted references to the historical origin and "performance" of the underlying strategy back to 2001 were NOT material to investors making decisions to invest in Vireo in 2011 and thereafter. That is especially true where, as here, the GIPS compliant, <u>actual</u> performance record of NAI's Vireo strategies (i.e., how NAI's actual management of its Vireo clients' accounts actually performed) was presented by NAI to its Vireo clients in NAI's "allegedly misleading marketing materials". Any references to 2001

"performance" (there were no track record performance percentages given for the underlying live traded strategy) was immaterial. What was material was how NAI's management of its Vireo strategies had actually performed.

For these reasons and others, it was error for this Court to grant partial summary judgment and the Court of Appeals will likely overturn the summary judgment.

### Disgorgement, Based On The Supreme Court's Ruling In *Liu v. SEC* Was Incorrectly Calculated In The Final Judgment

Likewise, it is likely this Court's $28,964,571 disgorgement and prejudgment interest award will be overturned or be greatly reduced down to at most the $25,000 in net profits from alleged "ill-gotten gains" for initially obtaining investors to invest in NAI's two Vireo AlphaSector strategies. The $14 million goodwill sale was not causally connected to any 206(1) or 206(2) violation *SEC v. MacDonald* 699 F.2d 53-54 (1st Cir. Ap. 1983); NAI spent millions creating that goodwill. Nor was the $14 million attributable to any "ill-gotten gains" or net profits. The $14 million was obtained from F-Squared, not from any clients. The clients paid nothing for the goodwill, there are no net profits to return to them because they paid nothing to Defendants for that goodwill. There is nothing to restitute to them. There can only be disgorgement of amounts that have to be paid back to the victims for the harm (if any) actually done to them. Since there was no harm to clients, (clients paid nothing) for Defendants' sale of their goodwill, there is nothing to disgorge. Disgorgement of any of the $14 million would be punitive and improper. *Liu v. SEC* Slip Op. p. 18.

Likewise, none of the investment of $8.5 million in advisory fees are disgorgeable since they were all paid as consideration for providing the clients investment advisory services according to NAI's Vireo AlphaSector Premium and Allocator strategies. The clients got exactly

what they paid for and received $278 million in profits, so not only did they receive their original investment (all monies they put up to have invested) and all the monies ($8.5 million) they paid in advisory fees, but they received an additional $278 in profits. There were no ill-gotten gains by NAI or LN. The fees were legally earned. They were not obtained by "fraud" especially the fees received after clients became clients and remained clients. They paid for advisory services they received.

Moreover, even if disgorgement is an authorized remedy for "violations" of 206(1) and 206(2) it is restricted in amount to a restitution of the "net profit" made by the wrongdoer directly related to "fraud". Not all (or any) of the net profits are disgorgeable. Profits earned that were not received due to the "fraud" are not disgorgeable. *Liu v. SEC* Slip. Op. p. 11 citing *Serymore v. McCormick* 16 How 480, 490 (1854). In this case this Court was required to deduct from the fees NAI received from its Vireo clients NAI's expenses. That "net profit" amounted to at most $25,000, not $8.5 million. But there has to be an accounting for the $278 million returned to the clients' $278 million; so there is no disgorgement. This Court did not make the proper accounting by making those deductions. Nor did it account for the return to clients of all investment fees they paid to NAI, nor did it account for the $278 million profits returned to the clients which would be required in order to return to the status quo. In short in calculating net profits, just deducting expenses from NAI's "net profits" were, based on the evidence presented by NAI, $25,000 of "net profits" (Exhibit 2). The SEC presented no evidence as to NAI's net profits and did not refute that NAI's "net profits" (before return of clients' fees and clients' $278 million in profits) was $25,000. (Exhibit 2). When the return of fees is considered (as it must in accounting for and arriving at an equitable remedy) the disgorgement amount is zero and the prejudgment interest thereon is zero. So it is likely, especially in light of the United States

Supreme Court's ruling today in the _Liu_ case that the Court of Appeals, if it does not overturn the summary judgment, will at least vacate the monetary disgorgement award in full or remand for a proper and equitable calculation of disgorgement, if any, in light of _Liu v. SEC._

Since an equitable determination of "disgorgement", if any, would be a maximum of $25,000, even if the determination of 206(1) and (2) "violations" were upheld, the supersedeas bond amount should not exceed 110% of a monetary judgment should be, i.e., 110% of $25,000 or $27,500). (Exhibit 2).

## CONCLUSION

For the reasons set forth above, Defendants' motion to temporarily stay enforcement of any of the Final Judgment (injunctive and monetary award), including enjoining the SEC from proceeding with Administrative Proceedings at the Securities and Exchange Commission until at least this Court issues a decision on this motion, should be granted.

This Court should further stay enforcement, (including enjoining the SEC from proceeding with its Administrative Proceedings in File No. 3-19826 or threatening NAI clients (including mutual fund clients) to cease retaining Defendants as their investment advisers). Pending a decision by the First Circuit Court of Appeals on the appeal from the Final Judgment.

The Court should also either waive the requirement for a supersedeas bond or reduce the bond amount to $27,500 which is the maximum disgorgement that would be available if the summary judgment were upheld.

Respectfully submitted,

DATED: June 22, 2020          LAW OFFICES OF SAMUEL KORNHAUSER

By: /s/ Samuel Kornhauser

Samuel Kornhauser, Esq.

CA Bar No. 83528

Law Offices of Samuel Kornhauser

155 Jackson Street, Suite 1807

San Francisco, California, 94111

Telephone: (415) 981-6281

Email: skornhauser@earthlink.net

BROOKS & DeRENSIS

Steven Brooks

111 Devonshire Street, Suite 800

Boston, MA 02109

Telephone: (857) 259-5200

Email: sbrooks@bdboston.com

Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 22, 2020, a copy of the foregoing was electronically filed through the ECF system and will be sent electronically to all persons identified in the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants.


Dated: June 22, 2020                                 /s/ Dan Cowan
                                                                  Dan Cowan

# EXHIBIT 1

(Slip Opinion)          OCTOBER TERM, 2019          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LIU ET AL. *v.* SECURITIES AND EXCHANGE COMMISSION

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 18–1501.  Argued March 3, 2020—Decided June 22, 2020

To punish securities fraud, the Securities and Exchange Commission is
authorized to seek "equitable relief" in civil proceedings, 15 U. S. C.
§78u(d)(5).  In *Kokesh* v. *SEC*, 581 U. S. ___, this Court held that a
disgorgement order in a Securities and Exchange Commission (SEC)
enforcement action constitutes a "penalty" for purposes of the applica-
ble statute of limitations.  The Court did not, however, address
whether disgorgement can qualify as "equitable relief" under
§78u(d)(5), given that equity historically excludes punitive sanctions.

Petitioners Charles Liu and Xin Wang solicited foreign nationals to
invest in the construction of a cancer-treatment center, but, an SEC
investigation revealed, misappropriated much of the funds in violation
of the terms of a private offering memorandum.  The SEC brought a
civil action against petitioners, seeking, as relevant here, disgorge-
ment equal to the full amount petitioners had raised from investors.
Petitioners argued that the disgorgement remedy failed to account for
their legitimate business expenses, but the District Court disagreed
and ordered petitioners jointly and severally liable for the full amount.
The Ninth Circuit affirmed.

*Held*: A disgorgement award that does not exceed a wrongdoer's net prof-
its and is awarded for victims is equitable relief permissible under
§78u(d)(5).  Pp. 5–20.

(a) In interpreting statutes that provide for "equitable relief," this
Court analyzes whether a particular remedy falls into "those catego-
ries of relief that were *typically* available in equity."  *Mertens* v. *Hewitt
Associates*, 508 U. S. 248, 256.  Relevant here are two principles of eq-
uity jurisprudence.  Equity practice has long authorized courts to strip
wrongdoers of their ill-gotten gains.  And to avoid transforming that

Syllabus

remedy into a punitive sanction, courts restricted it to an individual
wrongdoer's net profits to be awarded for victims.  Pp. 5–14.

(1) Whether it is called restitution, an accounting, or disgorge-
ment, the equitable remedy that deprives wrongdoers of their net prof-
its from unlawful activity reflects both the foundational principle that
"it would be inequitable that [a wrongdoer] should make a profit out of
his own wrong," *Root* v. *Railway Co.,* 105 U. S. 189, 207, and the coun-
tervailing equitable principle that the wrongdoer should not be pun-
ished by "pay[ing] more than a fair compensation to the person
wronged," *Tilghman* v. *Proctor,* 125 U. S. 136, 145–146.  The remedy
has been a mainstay of equity courts, and is not limited to cases in-
volving a breach of trust or fiduciary duty, see *Root,* 105 U. S., at 214.
Pp. 6–9.

(2) To avoid transforming a profits award into a penalty, equity
courts restricted the remedy in various ways.  A constructive trust was
often imposed on wrongful gains for wronged victims.  See, *e.g., Bur-
dell* v. *Denig,* 92 U. S. 716, 720.  Courts also generally awarded profits-
based remedies against individuals or partners engaged in concerted
wrongdoing, not against multiple wrongdoers under a joint-and-sev-
eral liability theory.  See, *e.g., Ambler* v. *Whipple,* 20 Wall. 546, 559.
Finally, courts limited awards to the net profits from wrongdoing after
deducting legitimate expenses.  See, *e.g., Rubber Co.* v. *Goodyear,* 9
Wall. 788, 804.  Pp. 9–12.

(3) Congress incorporated these longstanding equitable principles
into §78u(d)(5), but courts have occasionally awarded disgorgement in
ways that test the bounds of equity practice.  Petitioners claim that
disgorgement is necessarily a penalty under *Kokesh*, and thus not
available at equity.  But *Kokesh* expressly declined to reach that ques-
tion.  The Government contends that the SEC's interpretation has
Congress' tacit support.  But Congress does not enlarge the breadth of
an equitable, profit-based remedy simply by using the term "disgorge-
ment" in various statutes.  Pp. 12–14.

(b) Petitioners briefly claim that their disgorgement award crosses
the bounds of traditional equity practice by failing to return funds to
victims, imposing joint-and-several liability, and declining to deduct
business expenses from the award.  Because the parties did not fully
brief these narrower questions, the Court does not decide them here.
But certain principles may guide the lower courts' assessment of these
arguments on remand.  Pp. 14–20.

(1) Section 78u(d)(5) provides limited guidance as to whether the
practice of depositing a defendant's gains with the Treasury satisfies
its command that any remedy be "appropriate or necessary for the ben-
efit of investors," and the equitable nature of the profits remedy gen-

Syllabus

erally requires the SEC to return a defendant's gains to wronged investors.  The parties, however, do not identify a specific order in this case directing any proceeds to the Treasury.  If one is entered on remand, the lower courts may evaluate in the first instance whether that order would be for the benefit of investors and consistent with equitable principles.  Pp. 14–17.

(2) Imposing disgorgement liability on a wrongdoer for benefits that accrue to his affiliates through joint-and-several liability runs against the rule in favor of holding defendants individually liable.  See *Belknap* v. *Schild*, 161 U. S. 10, 25–26.  The common law did, however, permit liability for partners engaged in concerted wrongdoing.  See, *e.g.*, *Ambler*, 20 Wall., at 559.  On remand, the Ninth Circuit may determine whether the facts are such that petitioners can, consistent with equitable principles, be found liable for profits as partners in wrongdoing or whether individual liability is required.  Pp. 17–18.

(3) Courts may not enter disgorgement awards that exceed the gains "made upon any business or investment, when both the receipts and payments are taken into the account."  *Goodyear*, 9 Wall., at 804.  When the "entire profit of a business or undertaking" results from the wrongdoing, a defendant may be denied "inequitable deductions."  *Root*, 105 U. S., at 203.  Accordingly, courts must deduct legitimate expenses before awarding disgorgement under §78u(d)(5).  The District Court below did not ascertain whether any of petitioners' expenses were legitimate.  On remand, the lower courts should examine whether including such expenses in a profits-based remedy is consistent with the equitable principles underlying §78u(d)(5).  Pp. 18–20.

754 Fed. Appx. 505, vacated and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, ALITO, KAGAN, GORSUCH, and KAVANAUGH, JJ., joined.  THOMAS, J., filed a dissenting opinion.

Cite as: 591 U. S. ____ (2020)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

––––––––––

No. 18–1501

––––––––––

## CHARLES C. LIU, ET AL., PETITIONERS *v.* SECURITIES AND EXCHANGE COMMISSION

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 22, 2020]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

In *Kokesh* v. *SEC*, 581 U. S. ___ (2017), this Court held that a disgorgement order in a Securities and Exchange Commission (SEC) enforcement action imposes a "penalty" for the purposes of 28 U. S. C. §2462, the applicable statute of limitations. In so deciding, the Court reserved an antecedent question: whether, and to what extent, the SEC may seek "disgorgement" in the first instance through its power to award "equitable relief" under 15 U. S. C. §78u(d)(5), a power that historically excludes punitive sanctions. The Court holds today that a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under §78u(d)(5). The judgment is vacated, and the case is remanded for the courts below to ensure the award was so limited.

I

A

Congress authorized the SEC to enforce the Securities Act of 1933, 48 Stat. 74, as amended, 15 U. S. C. §77a *et seq.*, and the Securities Exchange Act of 1934, 48 Stat. 881,

Opinion of the Court

as amended, 15 U. S. C. §78a *et seq.*, and to punish securities fraud through administrative and civil proceedings. In administrative proceedings, the SEC can seek limited civil penalties and "disgorgement." See §77h–1(e) ("In any cease-and-desist proceeding under subsection (a), the Commission may enter an order requiring accounting and disgorgement"); see also §77h–1(g) ("Authority to impose money penalties"). In civil actions, the SEC can seek civil penalties and "equitable relief." See, *e.g.*, §78u(d)(5) ("In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, . . . any Federal court may grant . . . any equitable relief that may be appropriate or necessary for the benefit of investors"); see also §78u(d)(3) ("Money penalties in civil actions" (quotation modified)).

Congress did not define what falls under the umbrella of "equitable relief." Thus, courts have had to consider which remedies the SEC may impose as part of its §78u(d)(5) powers.

Starting with *SEC* v. *Texas Gulf Sulphur Co.*, 446 F. 2d 1301 (CA2 1971), courts determined that the SEC had authority to obtain what it called "restitution," and what in substance amounted to "profits" that "merely depriv[e]" a defendant of "the gains of . . . wrongful conduct." *Id.*, at 1307–1308. Over the years, the SEC has continued to request this remedy, later referred to as "disgorgement,"[1] and

---

[1] Courts have noted the relatively recent vintage of the term "disgorgement." See, *e.g.*, *SEC* v. *Cavanaugh*, 445 F. 3d 105, 116, n. 24 (CA2 2006). The dissent contends that this recency in terminology alone removes disgorgement from the class of traditional equitable remedies, *post*, at 4 (opinion of Thomas, J.), despite seeming to recognize disgorgement's parallels to restitution-based awards well within that class, *post*, at 4–5. It is no surprise that the dissent notes such parallels, given this Court's acknowledgment that "disgorgement of improper profits" is "a remedy only for restitution" that is "traditionally considered . . . equitable." *Tull* v. *United States*, 481 U. S. 412, 424 (1987); see also *infra*, at 7.

Opinion of the Court

courts have continued to award it. See *SEC* v. *Common-wealth Chemical Securities, Inc.*, 574 F. 2d 90, 95 (CA2 1978) (explaining that, when a court awards "[d]isgorge-ment of profits in an action brought by the SEC," it is "ex-ercising the chancellor's discretion to prevent unjust en-richment"); see also *SEC* v. *Blatt*, 583 F. 2d 1325, 1335 (CA5 1978); *SEC* v. *Washington Cty. Util. Dist.*, 676 F. 2d 218, 227 (CA6 1982).

In *Kokesh*, this Court determined that disgorgement con-stituted a "penalty" for the purposes of 28 U. S. C. §2462, which establishes a 5-year statute of limitations for "an ac-tion, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture." The Court reached this conclusion based on several considerations, namely, that disgorgement is imposed as a consequence of violating public laws, it is assessed in part for punitive purposes, and in many cases, the award is not compensatory. 581 U. S., at ___–___ (slip op., at 7–9). But the Court did not address whether a §2462 penalty can nevertheless qualify as "equitable relief" under §78u(d)(5), given that equity never "lends its aid to enforce a forfeiture or penalty." *Marshall* v. *Vicksburg*, 15 Wall. 146, 149 (1873). The Court cautioned, moreover, that its decision should not be interpreted "as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings." *Kokesh*, 581 U. S., at ___, n. 3 (slip op., at 5, n. 3). This question is now squarely be-fore the Court.

——————

The dissent also observes the solid equitable roots of an accounting for profits, *post*, at 3; accord, *infra*, at 6 (discussing the equitable origins of the accounting remedy), a remedy closely resembling disgorgement, see *infra*, at 8–9. In any event, casting aside a form of relief solely "based on the particular label affixed to [it] would 'elevate form over substance,'" *Aetna Health Inc.* v. *Davila*, 542 U. S. 200, 214 (2004), leaving unresolved the question before us: whether the underlying profits-based award con-forms to equity practice.

Opinion of the Court

### B

The SEC action and disgorgement award at issue here arise from a scheme to defraud foreign nationals. Petitioners Charles Liu and his wife, Xin (Lisa) Wang, solicited nearly $27 million from foreign investors under the EB–5 Immigrant Investor Program (EB–5 Program). 754 Fed. Appx. 505, 506 (CA9 2018) (case below). The EB–5 Program, administered by the U. S. Citizenship and Immigration Services, permits noncitizens to apply for permanent residence in the United States by investing in approved commercial enterprises that are based on "proposals for promoting economic growth." See USCIS, EB–5 Immigrant Investor Program, https://www.uscis.gov/eb-5. Investments in EB–5 projects are subject to the federal securities laws.

Liu sent a private offering memorandum to prospective investors, pledging that the bulk of any contributions would go toward the construction costs of a cancer-treatment center. The memorandum specified that only amounts collected from a small administrative fee would fund "'legal, accounting and administration expenses.'" 754 Fed. Appx., at 507. An SEC investigation revealed, however, that Liu spent nearly $20 million of investor money on ostensible marketing expenses and salaries, an amount far more than what the offering memorandum permitted and far in excess of the administrative fees collected. 262 F. Supp. 3d 957, 960–964 (CD Cal. 2017). The investigation also revealed that Liu diverted a sizable portion of those funds to personal accounts and to a company under Wang's control. *Id.*, at 961, 964. Only a fraction of the funds were put toward a lease, property improvements, and a proton-therapy machine for cancer treatment. *Id.*, at 964–965.

The SEC brought a civil action against petitioners, alleging that they violated the terms of the offering documents by misappropriating millions of dollars. The District Court

Opinion of the Court

found for the SEC, granting an injunction barring petitioners from participating in the EB–5 Program and imposing a civil penalty at the highest tier authorized. *Id.*, at 975, 976. It also ordered disgorgement equal to the full amount petitioners had raised from investors, less the $234,899 that remained in the corporate accounts for the project. *Id.*, at 975–976.

Petitioners objected that the disgorgement award failed to account for their business expenses. The District Court disagreed, concluding that the sum was a "reasonable approximation of the profits causally connected to [their] violation." *Ibid.* The court ordered petitioners jointly and severally liable for the full amount that the SEC sought. App. to Pet. for Cert. 62a.

The Ninth Circuit affirmed. It acknowledged that *Kokesh* "expressly refused to reach" the issue whether the District Court had the authority to order disgorgement. 754 Fed. Appx., at 509. The court relied on Circuit precedent to conclude that the "proper amount of disgorgement in a scheme such as this one is the entire amount raised less the money paid back to the investors." *Ibid.*; see also *SEC* v. *JT Wallenbrock & Assocs.*, 440 F. 3d 1109, 1113, 1114 (CA9 2006) (reasoning that it would be "unjust to permit the defendants to offset . . . the expenses of running the very business they created to defraud . . . investors").

We granted certiorari to determine whether §78u(d)(5) authorizes the SEC to seek disgorgement beyond a defendant's net profits from wrongdoing. 589 U. S. ___ (2019).

II

Our task is a familiar one. In interpreting statutes like §78u(d)(5) that provide for "equitable relief," this Court analyzes whether a particular remedy falls into "those categories of relief that were *typically* available in equity." *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 256 (1993); see also *CIGNA Corp.* v. *Amara*, 563 U. S. 421, 439 (2011);

Opinion of the Court

*Montanile* v. *Board of Trustees of Nat. Elevator Industry Health Benefit Plan*, 577 U. S. 136, 142 (2016).  The "basic contours of the term are well known" and can be discerned by consulting works on equity jurisprudence.  *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 217 (2002).

These works on equity jurisprudence reveal two principles.  First, equity practice long authorized courts to strip wrongdoers of their ill-gotten gains, with scholars and courts using various labels for the remedy.  Second, to avoid transforming an equitable remedy into a punitive sanction, courts restricted the remedy to an individual wrongdoer's net profits to be awarded for victims.

### A

Equity courts have routinely deprived wrongdoers of their net profits from unlawful activity, even though that remedy may have gone by different names.  Compare, *e.g.*, 1 D. Dobbs, Law of Remedies §4.3(5), p. 611 (1993) ("Accounting holds the defendant liable for his profits"), with *id.*, §4.1(1), at 555 (referring to "restitution" as the relief that "measures the remedy by the defendant's gain and seeks to force disgorgement of that gain"); see also Restatement (Third) of Restitution and Unjust Enrichment §51, Comment *a*, p. 204 (2010) (Restatement (Third)) ("Restitution measured by the defendant's wrongful gain is frequently called 'disgorgement.'  Other cases refer to an 'accounting' or an 'accounting for profits'"); 1 J. Pomeroy, Equity Jurisprudence §101, p. 112 (4th ed. 1918) (describing an accounting as an equitable remedy for the violation of strictly legal primary rights).

No matter the label, this "profit-based measure of unjust enrichment," Restatement (Third) §51, Comment *a*, at 204, reflected a foundational principle: "[I]t would be inequitable that [a wrongdoer] should make a profit out of his own wrong," *Root* v. *Railway Co.,* 105 U. S. 189, 207 (1882).  At

Opinion of the Court

the same time courts recognized that the wrongdoer should not profit "by his own wrong," they also recognized the countervailing equitable principle that the wrongdoer should not be punished by "pay[ing] more than a fair compensation to the person wronged." *Tilghman* v. *Proctor*, 125 U. S. 136, 145–146 (1888).

Decisions from this Court confirm that a remedy tethered to a wrongdoer's net unlawful profits, whatever the name, has been a mainstay of equity courts. In *Porter* v. *Warner Holding Co.*, 328 U. S. 395 (1946), the Court interpreted a section of the Emergency Price Control Act of 1942 that encompassed a "comprehensiv[e] grant of "equitable jurisdiction." *Id.*, at 398. "[O]nce [a District Court's] equity jurisdiction has been invoked" under that provision, the Court concluded, "a decree compelling one to disgorge profits . . . may properly be entered." *Id.*, at 398–399.

Subsequent cases confirm the "'protean character' of the profits-recovery remedy." *Petrella* v. *Metro-Goldwyn-Mayer, Inc.*, 572 U. S. 663, 668, n. 1 (2014). In *Tull* v. *United States*, 481 U. S. 412 (1987), the Court described "disgorgement of improper profits" as "traditionally considered an equitable remedy." *Id.*, at 424. While the Court acknowledged that disgorgement was a "limited form of penalty" insofar as it takes money out of the wrongdoer's hands, it nevertheless compared disgorgement to restitution that simply "'restor[es] the status quo,'" thus situating the remedy squarely within the heartland of equity. *Ibid.*[2]

---

[2] The dissent acknowledges that this Court has "referred to disgorgement as an equitable remedy in some of its prior decisions." *Post*, at 6 (citing *Feltner* v. *Columbia Pictures Television, Inc.*, 523 U. S. 340, 352 (1998)). While the dissent attempts to discount those cases for having "merely referred to the term" only "in passing," *post*, at 6, those cases expressly "characterized as equitable . . . actions for disgorgement of improper profits" in analyzing whether certain remedies were traditionally available in equity, *Feltner*, 523 U. S., at 352 (citing *Teamsters* v. *Terry*, 494 U. S. 558, 570 (1990) ("characteriz[ing] damages as equitable where they are restitutionary, such as in 'action[s] for disgorgement of improper

Opinion of the Court

In *Great-West*, the Court noted that an "accounting for profits" was historically a "form of equitable restitution." 534 U. S., at 214, n. 2. And in *Kansas* v. *Nebraska*, 574 U. S. 445 (2015), a "'basically equitable'" original jurisdiction proceeding, the Court ordered disgorgement of Nebraska's gains from exceeding its allocation under an interstate water compact. *Id.*, at 453, 475.

Most recently, in *SCA Hygiene Products Aktiebolag* v. *First Quality Baby Products, LLC*, 580 U. S. ___ (2017), the Court canvassed pre-1938 patent cases invoking equity jurisdiction. It noted that many cases sought an "accounting," which it described as an equitable remedy requiring disgorgement of ill-gotten profits. *Id.*, at ___ (slip op., at 11). This Court's "transsubstantive guidance on broad and fundamental" equitable principles, *Romag Fasteners, Inc.* v. *Fossil Group, Inc.*, 590 U. S. ___, ___ (2020) (slip op., at 5), thus reflects the teachings of equity treatises that identify a defendant's net profits as a remedy for wrongdoing.

Contrary to petitioners' argument, equity courts did not limit this remedy to cases involving a breach of trust or of fiduciary duty. Brief for Petitioners 28–29. As petitioners acknowledge, courts authorized profits-based relief in patent-infringement actions where no such trust or special relationship existed. *Id.*, at 29; see also *Root*, 105 U. S., at 214 ("[I]t is nowhere said that the patentee's right to an account is based upon the idea that there is a fiduciary relation created between him and the wrong-doer by the fact of infringement").

Petitioners attempt to distinguish these patent cases by suggesting that an "accounting" was appropriate only because Congress explicitly conferred that remedy by statute in 1870. Brief for Petitioners 29 (citing the Act of July 8, 1870, §55, 16 Stat. 206). But patent law had not previously deviated from the general principles outlined above: This

_____
profits'"); *Tull*, 481 U. S., at 424).

Opinion of the Court

Court had developed the rule that a plaintiff may "recover the amount of . . . profits that the defendants have made by the use of his invention" through "a series of decisions under the patent act of 1836, which simply conferred upon the courts of the United States general equity jurisdiction . . . in cases arising under the patent laws." *Tilghman*, 125 U. S., at 144. The 1836 statute, in turn, incorporated the substance of an earlier statute from 1819 which granted courts the ability to "proceed according to the course and principles of courts of equity" to "prevent the violation of patent-rights." *Root*, 105 U. S., at 193. Thus, as these cases demonstrate, equity courts habitually awarded profits-based remedies in patent cases well before Congress explicitly authorized that form of relief.

## B

While equity courts did not limit profits remedies to particular types of cases, they did circumscribe the award in multiple ways to avoid transforming it into a penalty outside their equitable powers. See *Marshall*, 15 Wall., at 149.

For one, the profits remedy often imposed a constructive trust on wrongful gains for wronged victims. The remedy itself thus converted the wrongdoer, who in many cases was an infringer, "into a trustee, as to those profits, for the owner of the patent which he infringes." *Burdell* v. *Denig*, 92 U. S. 716, 720 (1876). In "converting the infringer into a trustee for the patentee as regards the profits thus made," the chancellor "estimat[es] the compensation due from the infringer to the patentee." *Packet Co.* v. *Sickles*, 19 Wall. 611, 617–618 (1874); see also *Clews* v. *Jamieson*, 182 U. S. 461, 480 (1901) (describing an accounting as involving a "'distribution of the trust moneys among all the beneficiaries who are entitled to share therein'" in an action against the governing committee of a stock exchange).

Equity courts also generally awarded profits-based remedies against individuals or partners engaged in concerted

Opinion of the Court

wrongdoing, not against multiple wrongdoers under a joint-and-several liability theory.  See *Ambler* v. *Whipple*, 20 Wall. 546, 559 (1874) (ordering an accounting against a partner who had "knowingly connected himself with and aided in . . . fraud").  In *Elizabeth* v. *Pavement Co.*, 97 U. S. 126 (1878), for example, a city engaged contractors to install pavement in a manner that infringed a third party's patent.  The patent holder brought a suit in equity to recover profits from both the city and its contractors.  The Court held that only the contractors (the only parties to make a profit) were responsible, even though the parties answered jointly.  *Id.*, at 140; see also *ibid.* (rejecting liability for an individual officer who merely acted as an agent of the defendant and received a salary for his work).  The rule against joint-and-several liability for profits that have accrued to another appears throughout equity cases awarding profits.  See, *e.g.*, *Belknap* v. *Schild*, 161 U. S. 10, 25–26 (1896) ("The defendants, in any such suit, are therefore liable to account for such profits only as have accrued to themselves from the use of the invention, and not for those which have accrued to another, and in which they have no participation"); *Keystone Mfg. Co.* v. *Adams*, 151 U. S. 139, 148 (1894) (reversing profits award that was based not on what defendant had made from infringement but on what third persons had made from the use of the invention); *Jennings* v. *Carson*, 4 Cranch 2, 21 (1807) (holding that an order requiring restitution could not apply to "those who were not in possession of the thing to be restored" and "had no power over it") (citing *Penhallow* v. *Doane's Administrators*, 3 Dall. 54 (1795) (reversing a restitution award in admiralty that ordered joint damages in excess of what each defendant received)).

Finally, courts limited awards to the net profits from wrongdoing, that is, "the gain made upon any business or investment, when both the receipts and payments are taken into the account."  *Rubber Co.* v. *Goodyear*, 9 Wall.

788, 804 (1870); see also *Livingston* v. *Woodworth*, 15 How. 546, 559–560 (1854) (restricting an accounting remedy "to the actual gains and profits . . . during the time" the infringing machine "was in operation and during no other period" to avoid "convert[ing] a court of equity into an instrument for the punishment of simple torts"); *Seymour* v. *McCormick*, 16 How. 480, 490 (1854) (rejecting a blanket rule that infringing one component of a machine warranted a remedy measured by the full amounts of the profits earned from the machine); *Mowry* v. *Whitney*, 14 Wall. 620, 649 (1872) (vacating an accounting that exceeded the profits from infringement alone); *Wooden-Ware Co.* v. *United States,* 106 U. S. 432, 434–435 (1882) (explaining that an innocent trespasser is entitled to deduct labor costs from the gains obtained by wrongfully harvesting lumber).

The Court has carved out an exception when the "entire profit of a business or undertaking" results from the wrongful activity. *Root*, 105 U. S., at 203. In such cases, the Court has explained, the defendant "will not be allowed to diminish the show of profits by putting in unconscionable claims for personal services or other inequitable deductions." *Ibid.* In *Goodyear*, for example, the Court affirmed an accounting order that refused to deduct expenses under this rule. The Court there found that materials for which expenses were claimed were bought for the purposes of the infringement and "extraordinary salaries" appeared merely to be "dividends of profit under another name." 9 Wall., at 803; see also *Callaghan* v. *Myers*, 128 U. S. 617, 663–664 (1888) (declining to deduct a defendant's personal and living expenses from his profits from copyright violations, but distinguishing the expenses from salaries of officers in a corporation).

Setting aside that circumstance, however, courts consistently restricted awards to net profits from wrongdoing after deducting legitimate expenses. Such remedies, when assessed against only culpable actors and for victims, fall

comfortably within "those categories of relief that were *typically* available in equity." *Mertens*, 508 U. S., at 256.

### C

By incorporating these longstanding equitable principles into §78u(d)(5), Congress prohibited the SEC from seeking an equitable remedy in excess of a defendant's net profits from wrongdoing. To be sure, the SEC originally endeavored to conform its disgorgement remedy to the common-law limitations in §78u(d)(5). Over the years, however, courts have occasionally awarded disgorgement in three main ways that test the bounds of equity practice: by ordering the proceeds of fraud to be deposited in Treasury funds instead of disbursing them to victims, imposing joint-and-several disgorgement liability, and declining to deduct even legitimate expenses from the receipts of fraud.[3] The SEC's disgorgement remedy in such incarnations is in considerable tension with equity practices.

Petitioners go further. They claim that this Court effectively decided in *Kokesh* that disgorgement is necessarily a penalty, and thus not the kind of relief available at equity. Brief for Petitioners 19–20, 22–26. Not so. *Kokesh* expressly declined to pass on the question. 581 U. S., at ___, n. 3 (slip op., at 5, n. 3). To be sure, the *Kokesh* Court evaluated a version of the SEC's disgorgement remedy that seemed to exceed the bounds of traditional equitable principles. But that decision has no bearing on the SEC's ability

_____

[3] See, *e.g.*, *SEC* v. *Clark*, 915 F. 2d 439, 441, 454 (CA9 1990) (requiring defendant to disgorge the profits that his stockbroker made from unlawful trades); *SEC* v. *Brown*, 658 F. 3d 858, 860–861 (CA8 2011) (*per curiam*) (ordering joint-and-several disgorgement of funds collected from investors and concluding that "'the overwhelming weight of authority hold[s] that securities law violators may not offset their disgorgement liability with business expenses'"); *SEC* v. *Contorinis*, 743 F. 3d 296, 304–306 (CA2 2014) (requiring defendant to disgorge benefits conferred on close associates).

Opinion of the Court

to conform future requests for a defendant's profits to the limits outlined in common-law cases awarding a wrongdoer's net gains.

The Government, for its part, contends that the SEC's interpretation of the equitable disgorgement remedy has Congress' tacit support, even if it exceeds the bounds of equity practice. Brief for Respondent 13–21. It points to the fact that Congress has enacted a number of other statutes referring to "disgorgement."

That argument attaches undue significance to Congress' use of the term. It is true that Congress has authorized the SEC to seek "disgorgement" in administrative actions. 15 U. S. C. §77h–1(e) ("In any cease-and-desist proceeding under subsection (a), the Commission may enter an order requiring accounting and disgorgement"). But it makes sense that Congress would expressly name the equitable powers it grants to an agency for use in administrative proceedings. After all, agencies are unlike federal courts where, "[u]nless otherwise provided by statute, all . . . inherent equitable powers . . . are available for the proper and complete exercise of that jurisdiction." *Porter*, 328 U. S., at 398.

Congress does not enlarge the breadth of an equitable, profit-based remedy simply by using the term "disgorgement" in various statutes. The Government argues that under the prior-construction principle, Congress should be presumed to have been aware of the scope of "disgorgement" as interpreted by lower courts and as having incorporated the (purportedly) prevailing meaning of the term into its subsequent enactments. Brief for Respondent 24. But "that canon has no application" where, among other things, the scope of disgorgement was "far from 'settled.'" *Armstrong* v. *Exceptional Child Center, Inc.*, 575 U. S. 320, 330 (2015).

At bottom, even if Congress employed "disgorgement" as a shorthand to cross-reference the relief permitted by §78u(d)(5), it did not silently rewrite the scope of what the

SEC could recover in a way that would contravene limitations embedded in the statute. After all, such "statutory reference[s]" to a remedy grounded in equity "must, absent other indication, be deemed to contain the limitations upon its availability that equity typically imposes." *Great-West*, 534 U. S., at 211, n. 1. Accordingly, Congress' own use of the term "disgorgement" in assorted statutes did not expand the contours of that term beyond a defendant's net profits—a limit established by longstanding principles of equity.

## III

Applying the principles discussed above to the facts of this case, petitioners briefly argue that their disgorgement award is unlawful because it crosses the bounds of traditional equity practice in three ways: It fails to return funds to victims, it imposes joint-and-several liability, and it declines to deduct business expenses from the award. Because the parties focused on the broad question whether any form of disgorgement may be ordered and did not fully brief these narrower questions, we do not decide them here. We nevertheless discuss principles that may guide the lower courts' assessment of these arguments on remand.

### A

Section 78u(d)(5) restricts equitable relief to that which "may be appropriate or necessary for the benefit of investors." The SEC, however, does not always return the entirety of disgorgement proceeds to investors, instead depositing a portion of its collections in a fund in the Treasury. See SEC, Division of Enforcement, 2019 Ann. Rep. 16–17, https://www.sec.gov/files/enforcement-annual-report-2019.pdf. Congress established that fund in the Dodd-Frank Wall Street Reform and Consumer Protection Act for disgorgement awards that are not deposited in "disgorgement fund[s]" or otherwise "distributed to victims." 124

Opinion of the Court

Stat. 1844.  The statute provides that these sums may be used to pay whistleblowers reporting securities fraud and to fund the activities of the Inspector General.  *Ibid.*  Here, the SEC has not returned the bulk of funds to victims, largely, it contends, because the Government has been unable to collect them.[4]

The statute provides limited guidance as to whether the practice of depositing a defendant's gains with the Treasury satisfies the statute's command that any remedy be "appropriate or necessary for the benefit of investors."  The equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit.  After all, the Government has pointed to no analogous common-law remedy permitting a wrongdoer's profits to be withheld from a victim indefinitely without being disbursed to known victims.  Cf. *Root*, 105 U. S., at 214–215 (comparing the accounting remedy to a breach-of-trust action, where a court would require the defendant to "refund the amount of profit which they have actually realized").

The Government maintains, however, that the primary function of depriving wrongdoers of profits is to deny them the fruits of their ill-gotten gains, not to return the funds to victims as a kind of restitution.  See, *e.g.,* SEC, Report Pursuant to Section 308(C) of the Sarbanes Oxley Act of 2002, p. 3, n. 2 (2003) (taking the position that disgorgement is not intended to make investors whole, but rather to deprive wrongdoers of ill-gotten gains); see also 6 T. Hazen, Law of Securities Regulation §16.18, p. 8 (rev. 7th ed. 2016) (concluding that the remedial nature of the disgorgement remedy does not mean that it is essentially compensatory and

——————

[4] According to the Government, petitioners "transferred the bulk of their misappropriated funds to China, defied the district court's order to repatriate those funds, and fled the United States."  Brief for Respondent 36.

Opinion of the Court

concluding that the "primary function of the remedy is to
deny the wrongdoer the fruits of ill-gotten gains"). Under
the Government's theory, the very fact that it conducted an
enforcement action satisfies the requirement that it is "ap-
propriate or necessary for the benefit of investors."

But the SEC's equitable, profits-based remedy must do
more than simply benefit the public at large by virtue of
depriving a wrongdoer of ill-gotten gains. To hold otherwise
would render meaningless the latter part of §78u(d)(5). In-
deed, this Court concluded similarly in *Mertens* when ana-
lyzing statutory language accompanying the term "equita-
ble remedy."   508 U. S., at 253 (interpreting the term
"appropriate equitable relief"). There, the Court found that
the additional statutory language must be given effect since
the section "does not, after all, authorize . . . 'equitable re-
lief' *at large*." *Ibid.* As in *Mertens*, the phrase "appropriate
or necessary for the benefit of investors" must mean some-
thing more than depriving a wrongdoer of his net profits
alone, else the Court would violate the "cardinal principle
of interpretation that courts must give effect, if possible, to
every clause and word of a statute." *Parker Drilling Man-
agement Services, Ltd.* v. *Newton*, 587 U. S. ___, ___ (2019)
(slip op., at 9) (internal quotation marks omitted).

 The Government additionally suggests that the SEC's
practice of depositing disgorgement funds with the Treas-
ury may be justified where it is infeasible to distribute the
collected funds to investors.[5] Brief for Respondent 37. It is
an open question whether, and to what extent, that practice
nevertheless satisfies the SEC's obligation to award relief

————————
   [5] We express no view as to whether the SEC has offered adequate proof
of failed attempts to return funds to investors here. To the extent that
feasibility is relevant at all to equitable principles, we observe that lower
courts are well equipped to evaluate the feasibility of returning funds to
victims of fraud. See, *e.g.*, *SEC* v. *Lund*, 570 F. Supp. 1397, 1404–1405
(CD Cal. 1983) (appointing a magistrate judge to determine whether it
was feasible to locate victims of financial wrongdoing).

Opinion of the Court

"for the benefit of investors" and is consistent with the limitations of §78u(d)(5). The parties have not identified authorities revealing what traditional equitable principles govern when, for instance, the wrongdoer's profits cannot practically be disbursed to the victims. But we need not address the issue here. The parties do not identify a specific order in this case directing any proceeds to the Treasury. If one is entered on remand, the lower courts may evaluate in the first instance whether that order would indeed be for the benefit of investors as required by §78u(d)(5) and consistent with equitable principles.

## B

The SEC additionally has sought to impose disgorgement liability on a wrongdoer for benefits that accrue to his affiliates, sometimes through joint-and-several liability, in a manner sometimes seemingly at odds with the common-law rule requiring individual liability for wrongful profits. See, *e.g.*, *SEC* v. *Contorinis*, 743 F. 3d 296, 302 (CA2 2014) (holding that a defendant could be forced to disgorge not only what he "personally enjoyed from his exploitation of inside information, but also the profits of such exploitation that he channeled to friends, family, or clients"); *SEC* v. *Clark*, 915 F. 2d 439, 454 (CA9 1990) ("It is well settled that a tipper can be required to disgorge his tippee's profits"); *SEC* v. *Whittemore*, 659 F. 3d 1, 10 (CADC 2011) (approving joint-and-several disgorgement liability where there is a close relationship between the defendants and collaboration in executing the wrongdoing).

That practice could transform any equitable profits-focused remedy into a penalty. Cf. *Marshall*, 15 Wall., at 149. And it runs against the rule to not impose joint liability in favor of holding defendants "liable to account for such profits only as have accrued to themselves . . . and not for those which have accrued to another, and in which they have no

participation." *Belknap*, 161 U. S., at 25–26; see also *Elizabeth* v. *Pavement Co.*, 97 U. S. 126 (1878).

The common law did, however, permit liability for partners engaged in concerted wrongdoing. See, *e.g.*, *Ambler*, 20 Wall., at 559. The historic profits remedy thus allows some flexibility to impose collective liability. Given the wide spectrum of relationships between participants and beneficiaries of unlawful schemes—from equally culpable codefendants to more remote, unrelated tipper-tippee arrangements—the Court need not wade into all the circumstances where an equitable profits remedy might be punitive when applied to multiple individuals.

Here, petitioners were married. 754 Fed. Appx. 505; 262 F. Supp. 3d, at 960–961. The Government introduced evidence that Liu formed business entities and solicited investments, which he misappropriated. *Id.*, at 961. It also presented evidence that Wang held herself out as the president, and a member of the management team, of an entity to which Liu directed misappropriated funds. *Id.*, at 964. Petitioners did not introduce evidence to suggest that one spouse was a mere passive recipient of profits. Nor did they suggest that their finances were not commingled, or that one spouse did not enjoy the fruits of the scheme, or that other circumstances would render a joint-and-several disgorgement order unjust. Cf. *SEC* v. *Hughes Capital Corp.*, 124 F. 3d 449, 456 (CA3 1997) (finding that codefendant spouse was liable for unlawful proceeds where they funded her "lavish lifestyle"). We leave it to the Ninth Circuit on remand to determine whether the facts are such that petitioners can, consistent with equitable principles, be found liable for profits as partners in wrongdoing or whether individual liability is required.

## C

Courts may not enter disgorgement awards that exceed the gains "made upon any business or investment, when

Opinion of the Court

both the receipts and payments are taken into the account." *Goodyear*, 9 Wall., at 804; see also Restatement (Third) §51, Comment *h*, at 216 (reciting the general rule that a defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement). Accordingly, courts must deduct legitimate expenses before ordering disgorgement under §78u(d)(5). A rule to the contrary that "make[s] no allowance for the cost and expense of conducting [a] business" would be "inconsistent with the ordinary principles and practice of courts of chancery." *Tilghman*, 125 U. S., at 145–146; cf. *SEC* v. *Brown*, 658 F. 3d 858, 861 (CA8 2011) (declining to deduct even legitimate expenses like payments to innocent third-party employees and vendors).

The District Court below declined to deduct expenses on the theory that they were incurred for the purposes of furthering an entirely fraudulent scheme. It is true that when the "entire profit of a business or undertaking" results from the wrongdoing, a defendant may be denied "inequitable deductions" such as for personal services. *Root*, 105 U. S., at 203. But that exception requires ascertaining whether expenses are legitimate or whether they are merely wrongful gains "under another name." *Goodyear*, 9 Wall., at 803. Doing so will ensure that any disgorgement award falls within the limits of equity practice while preventing defendants from profiting from their own wrong. *Root*, 105 U. S., at 207.

Although it is not necessary to set forth more guidance addressing the various circumstances where a defendant's expenses might be considered wholly fraudulent, it suffices to note that some expenses from petitioners' scheme went toward lease payments and cancer-treatment equipment. Such items arguably have value independent of fueling a fraudulent scheme. We leave it to the lower court to examine whether including those expenses in a profits-based

20                                LIU *v.* SEC

                            Opinion of the Court

remedy is consistent with the equitable principles underlying §78u(d)(5).

                           *       *       *

   For the foregoing reasons, we vacate the judgment below and remand the case to the Ninth Circuit for further proceedings consistent with this opinion.

                                              *It is so ordered.*

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–1501

_____

## CHARLES C. LIU, ET AL., PETITIONERS v. SECURITIES AND EXCHANGE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 22, 2020]

JUSTICE THOMAS, dissenting.

The Court correctly declines to affirm the Ninth Circuit's decision upholding the District Court's disgorgement order, but I disagree with the Court's decision to vacate and remand for the lower courts to "limi[t]" the disgorgement award. *Ante,* at 1. Disgorgement can never be awarded under 15 U. S. C. §78u(d)(5). That statute authorizes the Securities and Exchange Commission (SEC) to seek only "equitable relief that may be appropriate or necessary for the benefit of investors," and disgorgement is not a traditional equitable remedy. Thus, I would reverse the judgment of the Court of Appeals.

I

The Securities Exchange Act of 1934, as amended in 2005, allows the SEC to request "equitable relief" in federal district court against those who violate federal securities laws. §78u(d)(5). According to our usual interpretive convention, "equitable relief" refers to forms of equitable relief available in the English Court of Chancery at the time of the founding. Because disgorgement is a creation of the 20th century, it is not properly characterized as "equitable relief," and, hence, the District Court was not authorized to award it under §78u(d)(5).

### A

"This Court has never treated general statutory grants of equitable authority as giving federal courts a freewheeling power to fashion new forms of equitable remedies." *Trump* v. *Hawaii*, 585 U. S. ___, ___ (2018) (THOMAS, J., concurring) (slip op., at 3). "Rather, it has read such statutes as constrained by 'the body of law which had been transplanted to this country from the English Court of Chancery' in 1789." *Ibid.* (quoting *Guaranty Trust Co.* v. *York*, 326 U. S. 99, 105 (1945)). As Justice Story put it, "the settled doctrine of this court is, that the remedies in equity are to be administered . . . according to the practice of courts of equity in [England], as contradistinguished from that of courts of law; subject, of course to the provisions of the acts of congress." *Boyle* v. *Zacharie & Turner*, 6 Pet. 648, 654 (1832).

We have interpreted other statutes according to this "settled doctrine." For example, we have read the term "equitable relief" in the Employee Retirement Income Security Act of 1974 to refer to "those categories of relief that were typically available in equity." *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 256 (1993) (emphasis deleted). We have done the same for the Judiciary Act of 1789, see, *e.g.*, *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 318–319 (1999), and for provisions in the Bankruptcy Code, see *Taggart* v. *Lorenzen*, 587 U. S. ___, ___ (2019) (slip op., at 5). There is nothing about §78u(d)(5) that counsels departing from this approach.

### B

Disgorgement is not a traditional form of equitable relief. Rather, cases, legal dictionaries, and treatises establish that it is a 20th-century invention.

As an initial matter, it is not even clear what "disgorgement" means. The majority frankly acknowledges its "'"protean character."'" *Ante*, at 7 (quoting *Petrella* v.

THOMAS, J., dissenting

*Metro-Goldwyn-Mayer, Inc.*, 572 U. S. 663, 688, n. 1 (2014)). The difficulty of defining this supposedly traditional remedy is the first sign that it is not a historically recognized equitable remedy.  In contrast, an accounting for profits, or accounting—a distinct form of relief that the majority groups with disgorgement—has a well-accepted definition: It compels a defendant to account for, and repay to a plaintiff, those profits that belong to the plaintiff in equity.  Bray, Fiduciary Remedies, in The Oxford Handbook of Fiduciary Law 449 (E. Criddle, P. Miller, & R. Sitkoff eds. 2019).  The definition of disgorgement, after today's decision, is a remedy that compels each defendant to pay his profits (and sometimes, though it is not clear when, all of his codefendants' profits) to a third-party Government agency (which sometimes, though it is not clear when, passes the money on to victims).  This remedy has no basis in historical practice.

No published case appears to have used the term "disgorgement" to refer to equitable relief until the 20th century.  Even then, the earliest cases use the word in a "nontechnical" sense, Brief for Law Professors as *Amici Curiae* 22, to describe the action a defendant must take when a party is awarded a traditional equitable remedy such as an accounting for profits or an equitable lien.[1]  For example, in *Byrd* v. *Mullinix*, 159 Ark. 310, 251 S. W. 871 (1923), the Supreme Court of Arkansas affirmed the imposition of an equitable lien to prevent a debtor from "put[ting] the money in property which was itself beyond the reach of creditors, and to compel its disgorgement," *id.,* at 316–317, 251 S. W., at 872.  Likewise, in *Armstrong* v. *Richards*, 128 Fla. 561, 175 So. 340 (1937), the Supreme Court of Florida referred to "the right of the taxpayer to require an accounting from

_____

[1]An equitable lien is imposed on a defendant's property "as security for a claim on the ground that otherwise the former would be unjustly enriched."  Restatement of Restitution §161, p. 650 (1936).

and disgorgement by public officers and those in collusion with them," *id.*, at 564, 175 So., at 341. In these cases, the term "disgorgement" colloquially described what a defendant was ordered to do, not the remedy itself.

By the 1960s, published opinions began to use "disgorgement" to refer to a remedy in the administrative context. In *NLRB* v. *Local 176*, 276 F. 2d 583 (CA1 1960), the agency had "applied its . . . remedy of disgorgement of dues, requiring the union to refund to every member who had obtained employment on the Company project the dues which he had paid," *id.*, at 586 (footnote omitted). The court declined to enforce this part of the agency's order, but not because disgorgement was an impermissible form of relief. Instead, it found that, in the circumstances of the case, disgorgement "seem[ed] . . . to be an *ex post facto* penalty." *Ibid.*; see also *NLRB* v. *Local 111*, 278 F. 2d 823, 825 (CA1 1960) (enforcing a disgorgement order from the agency).

By the 1970s, courts started using the term "disgorgement" to describe a judicial remedy in its own right. When the SEC initially sought this kind of relief under the Securities Exchange Act in *SEC* v. *Texas Gulf Sulphur Co.*, 312 F. Supp. 77 (SDNY 1970), the District Court called it "restitution," *id.*, at 93, and the Court of Appeals called it "[r]estitution of [p]rofits," *SEC* v. *Texas Gulf Sulphur Co.*, 446 F. 2d 1301, 1307 (CA2 1971) (emphasis deleted). Courts soon substituted the label "disgorgement." *SEC* v. *Manor Nursing Centers, Inc.*, 458 F. 2d 1082, 1105 (CA2 1972); *SEC* v. *Shapiro*, 349 F. Supp. 46, 55 (SDNY 1972).

The late date of these cases is sufficient reason to reject the argument that disgorgement is a traditional equitable remedy. But it is also telling that, when the SEC began seeking this relief, it did so without any statutory authority. Prior to 2005, the SEC lacked the power even to seek "equitable relief" in cases like this one. See §305(b), 116 Stat. 779 (amending the Securities Exchange Act). The District Court in *Texas Gulf Sulphur* purported to "imply [a] new

Thomas, J., dissenting

remed[y]," based on its "inherent equity power" and a belief
that "the congressional purpose is effectuated by so doing."
312 F. Supp., at 91. But the sources it cited are dubious.
The court relied on *J. I. Case Co.* v. *Borak*, 377 U. S. 426
(1964), a case about implied causes of action that we have
since abrogated. See *Alexander* v. *Sandoval*, 532 U. S. 275,
287 (2001). It also relied on a securities law treatise that
advocated for what it called "restitution" but admitted that
district courts had no express authority to grant the remedy
and that the SEC had never sought this remedy in the past.
3 L. Loss, Securities Regulation 1827–1828 (1961). It is
functionally this same unauthorized remedy that the SEC
and courts now call "disgorgement." The details have var-
ied over time, but the lineage is clear: Disgorgement is "a
relic of the heady days" of courts inserting judicially created
relief into statutes. *Correctional Services Corp.* v. *Malesko*,
534 U. S. 61, 75 (2001) (Scalia, J., concurring).

Disgorgement as a remedy in its own right is also absent
from legal publications until the 20th century. Leading le-
gal dictionaries did not define the term until the turn of the
20th century. See, *e.g.*, Merriam-Webster's Dictionary of
Law 143 (1996); Black's Law Dictionary 480 (7th ed. 1999).
Nor was disgorgement included in the first Restatement of
Restitution, adopted in 1936. The remedy does not appear
until the Third Restatement, adopted in 2010, which states
that "[r]estitution remedies" that seek "to eliminate profit
from wrongdoing . . . are often called 'disgorgement' or 'ac-
counting.'" 2 Restatement (Third) of Restitution and Un-
just Enrichment §51(4), p. 203. But "Restatement" is an
inapt title for this edition of the treatise. Like many of the
modern Restatements, its "authors have abandoned the
mission of describing the law, and have chosen instead to
set forth their aspirations for what the law ought to be."
*Kansas* v. *Nebraska*, 574 U. S. 445, 475 (2015) (Scalia, J.,
concurring in part and dissenting in part). The inclusion of

THOMAS, J., dissenting

"disgorgement" in the Third Restatement, which the majority cites in support of its holding, *ante*, at 6, represents a "'novel extension'" of equity.  *Kansas*, *supra*, at 483 (THOMAS, J., concurring in part and dissenting in part) (quoting Roberts, Restitutionary Disgorgement for Opportunistic Breach of Contract and Mitigation of Damages, 42 Loyola (LA) L. Rev. 131, 134 (2008)).

I acknowledge that this Court has referred to disgorgement as an equitable remedy in some of its prior decisions.  See, *e.g.*, *Feltner* v. *Columbia Pictures Television, Inc.*, 523 U. S. 340, 352 (1998).  But these opinions merely referred to the term in passing without considering the question in depth.  The history is clear: Disgorgement is not a form of relief that was available in the English Court of Chancery at the time of the founding.

### C

The majority's treatment of disgorgement as an equitable remedy threatens great mischief.  The term disgorgement itself invites abuse because it is a word with no fixed meaning.  The majority sees "parallels" between accounting and disgorgement, *ante,* at 2, n. 1, but parallels are by definition not the same.  Even if they were, the traditional remedy of an accounting—which compels a party to repay profits that belong to a plaintiff—has important conceptual limitations that disgorgement does not.  An accounting connotes the relationship between a plaintiff and a defendant.  In the words of one scholar, "it is an accounting by A to B."  Bray, Fiduciary Remedies, at 454.  But disgorgement connotes no relationship and so is not naturally limited to net profits and compensation of victims.  It simply "is A disgorging."  *Ibid.*  Further, the traditional remedy of a constructive trust[2] or an equitable lien requires that the "money or prop-

_____

[2] A constructive trust compels a defendant "holding title to property . . . to convey it to another on the ground that he would be unjustly enriched

THOMAS, J., dissenting

erty identified as belonging in good conscience to the plaintiff . . . clearly be traced to particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 213 (2002). Disgorgement reaches further because it has no tracing requirement. By using a word with no history in equity jurisprudence, the SEC and courts have made it possible to circumvent the careful limitations imposed on other equitable remedies.

One need look no further than the SEC's use of disgorgement to see the pitfalls of the majority's acquiescence in its continued use as a remedy. The order in *Texas Gulf Sulphur* did not depart too far from equitable principles. The award was limited to the defendants' net profits and the funds were held in escrow and were at least partly available to compensate victims, 446 F. 2d, at 1307. It did not take long, however, for a district court to order a defendant to turn over both his profits and the investment "income earned on the proceeds." *Manor Nursing Centers*, 458 F. 2d, at 1105. And in the case before us today, just a half century later, disgorgement has expanded even further. The award is not limited to net profits or even money possessed by an individual defendant when it is imposed jointly and severally. See *ante*, at 5. And not only is it not guaranteed to be used to compensate victims, but the imposition of over $26 million in disgorgement and approximately $8 million in civil monetary penalties in this case seems to ensure that victims will be unable to recover anything in their own actions. As long as courts continue to award "disgorgement," both courts and the SEC will continue to have license to expand their own power.

The majority's decision to tame, rather than reject, disgorgement will also cause confusion in administrative prac-

——————

if he were permitted to retain it." Restatement of Restitution §160, at 640–641.

THOMAS, J., dissenting

tice.  As the majority explains, the SEC is expressly author-
ized to impose "'disgorgement'" in its in-house tribunals.
*Ante*, at 13 (quoting 15 U. S. C. §77h–1(e)).  It is unclear
whether the majority's new restrictions on disgorgement
will apply to these proceedings as well.  If they do not, the
result will be that disgorgement has one meaning when the
SEC goes to district court and another when it proceeds in-
house.

    More fundamentally, by failing to recognize that the
problem is disgorgement itself, the majority undermines
our entire system of equity.  The majority believes that in-
sistence on the traditional rules of equity is unnecessarily
formalistic, *ante,* at 3, n. 1, but the Founders accepted fed-
eral equitable powers only because those powers depended
on traditional forms.  The Constitution was ratified on the
understanding that equity was "a precise legal system"
with "specific equitable remed[ies]." *Missouri* v. *Jenkins*,
515 U. S. 70, 127 (1995) (THOMAS, J., concurring).  "Alt-
hough courts of equity exercised remedial 'discretion,' that
discretion allowed them to deny or tailor a remedy despite
a demonstrated violation of a right, not to expand a remedy
beyond its traditional scope." *Trump*, 585 U. S., at ___
(THOMAS, J., concurring) (slip op., at 5).  The majority, while
imposing some limits, ultimately permits courts to continue
expanding equitable remedies.  I would simply hold that the
phrase "equitable relief" in §78u(d)(5) does not authorize
disgorgement.

## II

    After holding that disgorgement is equitable relief, the
majority remands for the lower courts to reconsider the dis-
gorgement order in this case.  If the majority is going to ac-
cept "disgorgement" as an available remedy, it should at
least limit the order to be consistent with the traditional
rules of equity.  First, the order should be limited to each

THOMAS, J., dissenting

petitioner's profits. Second, the order should not be imposed jointly and severally. Third, the money paid by petitioners should be used to compensate petitioners' victims.

### A

First, the disgorgement order should be limited to "the profits actually made" by each petitioner. *Mowry* v. *Whitney*, 14 Wall. 620, 649 (1872); see also *ante*, at 11, 18–20. Defendants in equity traditionally may deduct "allowances . . . for the cost and expense of the business" from the amount of the award. *Root* v. *Railway Co.*, 105 U. S. 189, 215 (1882); see also *Callaghan* v. *Myers*, 128 U. S. 617, 665 (1888); *Elizabeth* v. *Pavement Co.*, 97 U. S. 126, 139 (1878); *Rubber Co.* v. *Goodyear*, 9 Wall. 788, 804 (1870). The rationale behind this rule is that "it is not the function of courts of equity to administer punishment." *Bangor Punta Operations, Inc.* v. *Bangor & Aroostook R. Co.*, 417 U. S. 703, 717–718, n. 14 (1974) (internal quotation marks omitted); see also 2 J. Story, Commentaries on Equity Jurisprudence §1494, p. 819 (13th ed. 1886). Here, however, the District Court reasoned that "it would be 'unjust to permit the defendants to offset against the investor dollars they received the expenses of running the very business they created to defraud those investors into giving the defendants the money in the first place.'" 754 Fed. Appx. 505, 509 (CA9 2018) (quoting *SEC* v. *J. T. Wallenbrock & Assocs.*, 440 F. 3d 1109, 1114 (CA9 2006)). On remand, the lower courts should limit the award to each petitioner's profits.

### B

Second, and relatedly, the disgorgement order should not be imposed jointly and severally. The majority analogizes disgorgement to accounting, *ante*, at 6, but this Court has rejected joint and several liability in actions for an accounting. *Elizabeth*, *supra*, at 139–140; *Keystone Mfg. Co.* v. *Adams*, 151 U. S. 139, 148 (1894); *Belknap* v. *Schild*, 161 U. S.

10, 25–26 (1896). The majority instructs the lower courts to determine whether petitioners were "partners in wrong-doing," apparently based on a case about the liability of partners. *Ante,* at 10, 18 (citing *Ambler* v. *Whipple*, 20 Wall. 546 (1874)). But the liability in that case was premised on the law of partnership, and nothing indicates that petitioners here were legal partners. The joint and several order in this case is thus at odds with traditional equitable rules.[3]

### C

Finally, the award should be used to compensate victims, not to enrich the Government. Plaintiffs in equity may claim "that which, *ex aequo et bono* [according to what is equitable and good], is theirs, and nothing beyond this." *Livingston* v. *Woodworth*, 15 How. 546, 560 (1854). The money ordered to be paid as disgorgement in no sense belongs to the Government, and the majority cites no authority allowing a Government agency to keep equitable relief for a wrong done to a third party. Requiring the SEC to only "generally" compensate victims, *ante,* at 15, is inconsistent with traditional equitable principles.

Worse still from a practical standpoint, the majority provides almost no guidance to the lower courts about how to resolve this question on remand. Even assuming that disgorgement is "equitable relief" for purposes of §78u(d)(5) and that the Government may sometimes keep the money,

---

[3] For its part, respondent cites the joint and several liability in *Jackson* v. *Smith,* 254 U. S. 586, 589 (1921), but the remedy in that case was a constructive trust, see *Smith* v. *Jackson,* 48 App. D. C. 565, 576 (1919). As explained above, there is no tracing requirement in the District Court's order as would be required in a case of constructive trust. *Supra,* at 6–7. The Court also allowed joint and several liability in *Belford* v. *Scribner*, 144 U. S. 488 (1892), a copyright case. But it based its holding on the fact that, under the relevant copyright statute, "both the printer and the publisher are equally liable to the owner of the copyright for an infringement." *Id.,* at 507; see also *Washingtonian Publishing Co.* v. *Pearson,* 140 F. 2d 465, 467 (CADC 1944).

THOMAS, J., dissenting

the Court should at least do more to identify the circumstances in which the Government may keep the money. Instead, the Court asks lower courts to improvise a solution. If past is prologue, this uncertainty is sure to create opportunities for the SEC to continue exercising unlawful power.

\*          \*          \*

I would reverse for the straightforward reason that disgorgement is not "equitable relief" within the meaning of §78u(d)(5). Because the majority acquiesces in the continued use of disgorgement under that statute, I respectfully dissent.

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> NAVELLIER & ASSOCIATES, INC., and LOUIS NAVELLIER, <br><br> Defendants. | Civil Action No. 17-cv-11633-DJC |

## ERRATA TO DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR ENTRY OF FINAL JUDGMENT (DKT#263)

Defendants' Memorandum in opposition to Plaintiff' motion for entry of final judgment contained a typographical error at the bottom of page 3 regarding the dollar amount listing $27,556,785.36. The correct amount should have been **$278,556,875.36** as correctly listed on pages 5, 6 and 16.

The Memorandum also inadvertently omitted to attach yesterday's Declaration of Henry J. Kahrs and the April 21, 2020 Declaration of John Ranft and the client profit spreadsheets prepared by Daniel Pilcic, which were referred to and cited repeatedly in the memorandum. Copies of each those inadvertently omitted declarations and the spreadsheets are attached hereto.

Respectfully Submitted

Dated: April 23, 2020

By: */s/SamuelLKornhauser*_____

Samuel Kornhauser

Law Offices of Samuel Kornhauser

155 Jackson Street, Suite 1807

San Francisco, CA

(415) 981-6281

skornhauser@earthlink.net

1   SAMUEL KORNHAUSER, State Bar No.
    LAW OFFICES OF SAMUEL KORNHAUSER
2   155 Jackson Street, Suite 1807
    San Francisco, CA 94111
3   Phone Number: (415) 981-6281

4

5   Attorneys for Defendants, NAVELLIER & ASSOCIATES, INC. and LOUIS NAVELLIER

6

7                          UNITED STATES DISTRICT COURT

8                          DISTRICT OF MASSACHUSETTS

9

10  SECURITIES AND EXCHANGE COMMISSION     Case No.: 17-cv-11633-DJC

11      vs.

12  NAVELLIER & ASSOCIATES, INC. and LOUIS  **Declaration of Henry J. Kahrs,
13  NAVELLIER                               CPA/CFF/ABV, CMA, CFE**

14

15

16

17

18  I, Henry J. Kahrs, CPA/CFF/ABV, CMA, CFE declare as follows:

19          1.      I am the Managing Partner of the Los Angeles and Orange County offices of The

20  Global Forensics Unit at Baker Tilly, an international accounting and financial advisory firm. The

21  Global Forensics Unit of Baker Tilly is a consulting firm specializing in forensic accounting,

22  economic damage analysis, and business valuation. My practice involves all three of these arenas. I

23  am a Certified Public Accountant (CPA), Certified Management Accountant (CMA), Certified

24  Fraud Examiner (CFE), Accredited in Financial Forensics (CFF), and Accredited in Business

25  Valuation (ABV).  I also received a Master of Business Administration in Finance from California

26  State University, Fullerton. I have been practicing for over 34 years and have been involved in

27  numerous cases involving financial analysis, business valuation and disgorgement of profits. I have

28

                    DECLARATION OF HENRY J. KAHRS, CPA/CFF/ABV, CFE, CMA
    SEC VS. NAVELLIER
    CASE NO. 17-cv-11633-DJC

1  personal knowledge of the facts contained in this declaration, and if called to testify at trial, I could

2  and would competently testify to those facts. I have been retained as an expert in over 800 cases

3  and have given testimony approximately 300 times, including over 100 trials. I have attached my

4  Curriculum Vitae for your consideration (See Exhibit "A" attached hereto).

5      2.      I make this declaration in support of the Defendant's objections to the Plaintiff's

6  Memorandum in Support of its Motion for Entry of Final Judgment ("Plaintiff's Memorandum").

7  As part of my review and analysis I reviewed the documents that are listed on Exhibit B.

8      3.      I reviewed the Plaintiff's Memorandum and the attached Declaration of Rory Alex,

9  as well as the attached Exhibits. I make no findings of liability or the underlying facts for this

10  declaration, I only discuss the issues that I understand are pertinent to the Court and the accounting

11  analysis related to those issues. Based on my review of the Plaintiff's Memorandum and it's

12  attachment, I note the following issues that impact the accounting and the profits earned by the

13  defendant:

14      a.  I understand there is a dispute as to the disgorgement period. Mr. Alex includes

15          the period 2010 through 2013 and also includes the sale price related to F-

16          Squared's purchase of Navellier's goodwill. I further understand that the SEC

17          has agreed the last date any alleged false advertising was used was September 30,

18          2012, while Defendant's contend that the last date was June 30, 2012. I

19          understand both sides now agree that the start date should be clients that were

20          acquired after August 10, 2011.

21      b.  I understand that the Defendants contend that only revenue related to Vireo

22          Allocator and Vireo Premium used the alleged misleading advertising. Revenue

23          related to AlphaDEX and other Vireo strategies should not be considered as they

24          are not related to the advertising.

25      c.  The analysis performed by Mr. Alex only deducts the amounts paid to F-Squared

26          and does not consider any other incremental costs such as payroll, marketing,

27          legal or other costs that might be allocable to Vireo.

28      d.  One year after the alleged misleading advertising was discontinued, Mr. Alex

DECLARATION OF HENRY J. KAHRS, CPA/CFF/ABV, CFE, CMA

SEC VS. NAVELLIER
CASE NO. 17-cv-11633-DJC

1  attributes 100% of the sale of Navellier's customers to F-Squared as related to

2  the advertising. He ignores any value that should be attributed to Navellier's

3  Goodwill before the original transaction with F-Squared in October 2009, the

4  value of Navellier's track record of actual returns (which is a key determinant of

5  customer retention, and the actual definition of Goodwill, which is forward

6  looking rather than historical. Goodwill is the present value of future cash flows

7  in excess of the current value of a company's tangible or hard assets. In other

8  words, how could F-Squared's purchase of Goodwill in the future have any

9  revenue related to advertising that had ceased over a year before the sale?

10  4.  I reviewed the financial statements provided to me by Navellier and summarized the

11  revenue and profit by year from 2009 through 2014. For illustration, I removed the $14,000,000

12  sale to F-Squared to analyze the profitability on the product separate from the sale. I have attached

13  this summary as Schedule 4. As noted on this analysis, without the sale to F-Squared, Navellier and

14  Associates actually had a net loss of $505,321 from 2009 through 2014. Adding in the sale to F-

15  Squared, total profit for the same period was $13,494,679. If the period only covers 2011 and 2012,

16  the net profit was $1,063,557; and if you add the $14,000,000 received from F-Squared, the total

17  profit is $15,063,557. Mr. Alex has calculated that Navellier made $22,450,952 in profits from the

18  alleged misleading advertising. On its face, the calculation made by Mr. Alex is incorrect.

19  5.  To calculate the total revenue for the Vireo Allocator and Alpha Sector I reviewed

20  the revenue reports by product from the Navellier accounting system. I noted that in his

21  declaration, Mr. Alex assigns $20,634,408 as revenue from September 1, 2011 through 2013. The

22  amount calculated by Mr. Alex includes revenue for AlphaDex and other strategies not at issue.

23  6.  Additionally, Mr. Alex includes revenue beyond the date that the Defendants

24  stopped using the allegedly misleading advertising. The SEC takes the position that this was in

25  September 2012 while Navellier takes the position this was in June 2012. Since Navellier bills it

26  clients quarterly, and in arrears, the cut-off date for revenue earned from the misleading advertising

27  should be the quarter end. The total revenue for the accused products from August 11, 2011

28  through June 30, 2012 is $2,018,968. If the period is extended through September 30, 2012, the

1   total revenue for the Vireo Allocator is $2,071,099. I have summarized the quarterly revenue on

2   Schedule 3.

3       7.    Using the correct revenue and deducting the costs paid to F-Squared, the net fess

4   received by Navellier through June 30, 2012 total $797,307 and through September 30, 2012 total

5   $817,997.

6       8.    Additionally, Mr. Alex does not make any attempt to review additional incremental

7   expenses. I noted that Exhibit 1 to his declaration lists many incremental expenses and summarizes

8   the income statement which ascribes direct costs to the Vireo Allocator and Vireo Premium. He

9   ignores those expenses. I reviewed the allocations made by Navellier and determined that the

10   incremental costs (including the amounts paid to F-Squared). When the direct expenses are

11   deducted from revenue the actual net profit earned on the Vireo Allocator and Vireo Premium is

12   $117,183 through June 30, 2012, as reflected on Schedule 1 and $121,885 through September 30,

13   2012, as reflected on Schedule 2.

14       9.    I have also calculated the profits earned by Navellier using the 50% reduction for

15   2011 and the 75% reduction for 2012. Using the theory from the NERA analysis and confirmed by

16   the SEC, the profit earned by Navellier from Vireo Allocator and Vireo Premium from August 11,

17   2011 through June 30, 2012 is $20,005, as shown on Schedule 1A. If the analysis is extended

18   through September 30, 2012, the total profit is $21,480, as shown on Schedule 2A.

19       10.    Mr. Alex also calculated pre-judgement interest. I understand that Mr. Alex

20   calculated the interest from the date of the payment. I further understand that the interest should be

21   calculated from the date of filing, which is August 30, 2017. I have calculated the interest on each

22   alternative. A summary of the interest calculations is reflected on Schedule 6.

23       11.    After adding interest the total amount owed to the SEC through June 30, 2012 is

24   $22,936 and the total amount through September 30, 2012 is $24,628. A summary of each analysis

25   is reflected on the SUMMARY Schedule.

26       12.    In my professional opinion, the inclusion for the purchase price in this disgorgement

27   analysis is improper. At a minimum, Mr. Alex does not even consider the tax ramifications of the

28   purchase and fails to deduct the taxes paid of $3,025,000. The larger issue is the concept of what

1   Navellier sold to F-Squared. The transaction with F-Squared was an arm's length transaction

2   between the buyer and sellers and was consummated at Fair Market Value. The definition of Fair

3   Market Value, from the book Valuing A Business by Shannon Pratt is:

4      "The price at which a willing buyer pays from a willing seller, both with no compulsion to

5      buy or sell, and both with the knowledge of all relevant facts."

6   By definition, F-Squared had knowledge of the alleged misleading advertising. If they had

7   knowledge, they could not be influenced by the alleged advertising. This is further accentuated by

8   the fact that in their own complaint, the SEC notes a settlement paid by F-Squared for the same

9   alleged misleading advertising. In fact, F-Squared licensed said advertising to Navellier. Just from

10   this fact alone, it is impossible that the allegations in the Complaint could have led to any "ill-gotten

11   gains,"

12      13.     Further, Mr. Alex does not consider the definition and components of Goodwill. The

13   Internal Revenue Service defines Goodwill as:

14      "The value of a trade or business based on expected continued customer patronage due to its

15      name, reputation or any other factor".

16   In his analysis, Mr. Alex ascribes the entire value of the business to one factor only, the misleading

17   advertising.

18      14.     IRS Revenue Ruling 59-60 lists elements that should be considered in calculating the

19   value of a business (or a portion of a business). These factors include:

20        a.   The nature of the business and the history of the enterprise from its inception.

21        b.   The economic outlook in general and the condition and outlook of the specific

22           industry in particular.

23        c.   The book value of the stock and financial condition of the business.

24        d.   The earnings capacity of the Company.

25        e.   The dividend paying capacity.

26        f.   Whether or not the enterprise has goodwill or other intangible value.

27        g.   Sales of the stock and the size of the block of stock to be valued.

28        h.   The market price of stocks of corporations engaged in the same or a similar line

1    of business having their stocks actively traded in the same or similar line of

2    business having their stocks actively traded in a free and open market, either on

3    an exchange or over-the-counter.

4    15.    Mr. Alex ignores all of the factors included the IRS Revenue Ruling 59-60 and does

5  not allocate any potential profit purchased by F-Squared to any customer that came to Navellier due

6  to the misleading advertising, and more importantly does not consider how the customers future

7  earnings to F-Squared include any relation to the advertising that happened in 2011 and 2012.

8    16.    I also reviewed the Assignment & Asset Purchase Agreement and attached schedules

9  for the sale of assets from Navellier to F-Squared.  In the list of acquired assets F-Squared acquired:

10   a.   Vireo Portfolio Names

11   b.   Vireo Trademark and Servicemarks

12   c.   Vireo Logotype

13   d.   Vireo Brand Names

14   e.   Vireo Trade Name and All Derivatives of Vireo Trade Name

15   f.   Vireo Domain Name

16   g.   Vireo Portfolio Performance Track Record

17   h.   Vireo Porfiolio Performance Record Composites

18   i.   GIPS Standards Certification and Associated Data

19   j.   Business Intangibles and Goodwill, including all right under the VAS accounts

20       and VAS IA Agreements, Trade Name, Trademark, Logo Type, Brand Name,

21       Trade Name Vireo, Domain, Name, Track Record, Composites and GIPS

22       Certificates

23   k.   Access to the client names and accounts which hold and manage assets of

24       approximately$1,443,000,000.

25   17.    Included in the assets under management were clients that had invested prior to

26  Vireo, others were clients that invested in a period before August 2011, there were additional clients

27  that invested more due to Navellier's track record, and many that had AlphaDex, but not the

28  strategies that were allegedly relying on the misleading advertising.  A proper disgorgement

DECLARATION OF HENRY J. KAHRS, CPA/CFF/ABV, CFE, CMA
SEC VS. NAVELLIER
CASE NO. 17-cv-11633-DJC

1   analysis would include only those clients that relied on the misleading advertising.  Mr. Alex made

2   no efforts to analyze the amount of the sales price that were related to clients that would be related

3   to the criterion for disgorgement.   In summary, Mr. Alex did not use the typically peer –reviewed

4   analyses of typically seen in disgorgement of profits and business valuation analyses.

5          18.     I reviewed an e-mail from William Donohue, Senior Counsel to the SEC in which

6   the SEC concedes on a number of these points.  In fact, this e-mail recalculates the alleged "ill-

7   gotten gains" to be $1,085,285.   This includes $360,935 in disgorged profits and $724,350 related

8   to the sale of the business, plus interest and penalties.  In the SEC calculation, they agree to an

9   adjustment for the AlphaDex revenue (34% of total revenue), a downward adjustment due to

10  Navellier's long track records and the concept that the effect of the misleading advertising becomes

11  less important over time (an adjustment of 50% for 2011 and 75% for 2012) a reduction of

12  $3,025,000 for taxes paid on the F-Squared transaction and a reduction of 34% of the sales price for

13  AlphaDex and 90% of the goodwill.  I understand that based on further negotiations the SEC has

14  agreed that the Goodwill should be completely eliminated.

15         19.     The reduction for the misleading advertising as time passes is consistent with an

16  analysis done by the economic group NERA related to the F-Squared SEC case.  I reviewed the

17  NERA analysis and agree with its conclusions and the reduction made by Mr. Donohue.

18         20.     I also reviewed excerpts from the deposition of Mr. Robert Baker which also agree in

19  theory to the concessions made in the Donohue e-mail.

20         21.     Finally, I note the customers of Navellier have the option of leaving that firm's asset

21  management at any time.  Once the funds are deposited with Navellier, customers will remain due

22  to the performance of the assets.  Also, I have reviewed quarterly reports that are sent to Navellier

23  customers and prospective customers that outlines the actual performance of Navellier and

24  specifically the assets at issue in the SEC's claim.  If a customer was induced to invest with

25  Navellier (I have seen no evidence that any specific customer did), and that customer chose to

26  remain based on the actual performance of the investment, one could easily argue the only potential

27  "ill-gotten gain" that stemmed from the advertising could be earned by Navellier in the first quarter

28  of managing the assets.  Any additional revenue earned would be based on the actual returns.

1    22.    Navellier has suffered reputational damages due to the SEC allegations.  I

2  summarized the revenue and profit from 2009 through 2018 on Schedule 5.  Before the allegations,

3  Navellier had consistent revenue for products other than Vireo that exceeded $10 million annually.

4  After the allegations revenue dropped down to $4.6 to $6 million annually.  Since 2016 Navellier

5  has net operating losses of almost $6 million.

6    23.    I reserve the right to update my analyses if additional information becomes available.

7    I declare under the penalty of perjury under the laws of the State of California and the

8  United States that the foregoing is true and correct.

9

10   Executed April 22, 2020 at Orange, California.

11

12

13

14

15   _____

16   Henry J. Kahrs
     CPA/CFF/ABV, CMA, CFE

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF HENRY J. KAHRS, CPA/CFF/ABV, CFE, CMA
SEC VS. NAVELLIER
CASE NO. 17-cv-11633-DJC

*SEC v. Navellier & Associates*



## SUMMARY OF POTENTIAL DISGORGEMENT

*Summary*

| Description | Per Mr. Alex | Actual 8/10/11 - 6/30/2012 | Per SEC Discount 8/10/11 - 6/30/2012 | Actual 8/10/11 - 9/30/2012 | Per SEC Discount 8/10/11 - 9/30/2012 |
|---|---|---|---|---|---|
| Gross Fees | $ 20,634,408 | $ 2,018,968 | $ 581,660 | $ 2,071,099 | $ 594,692 |
| Payments To F-Squared | 12,183,456 | 1,221,661 | 352,803 | 1,253,102 | 360,663 |
| Net Fees | 8,450,952 | 797,307 | 228,856 | 817,997 | 234,029 |
| Less Other Incremental Costs | - | 680,124 | 208,851 | 696,112 | 212,548 |
| Operating Profit Available For Disgorgement | $ 8,450,952 | $ 117,183 | $ 20,005 | $ 121,885 | $ 21,480 |
| Sale Of Assets To F-Squared | $ 14,000,000 | $ - | $ - | $ - | $ - |
| Total Profit Available For Disgorgement | $ 22,450,952 | $ 117,183 | $ 20,005 | $ 121,885 | $ 21,480 |
| Pre-Judgment Interest | $ 6,513,619 | $ 17,172 | $ 2,931 | $ 16,773 | $ 3,148 |
| Grand Total | $ 28,964,571 | $ 134,355 | $ 22,936 | $ 138,657 | $ 24,628 |

EXHIBIT 3

# UNITED STATES OF AMERICA
## Before the
## SECURITIES AND EXCHANGE COMMISSION

**INVESTMENT ADVISERS ACT OF 1940**
**Release No. 5520 / June 12, 2020**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-19826**

<table>
<tr>
<td>

In the Matter of

    **LOUIS NAVELLIER and**
    **NAVELLIER & ASSOCIATES, INC.,**

Respondents.

</td>
<td>

**ORDER INSTITUTING ADMINISTRATIVE**
**PROCEEDINGS PURSUANT TO**
**SECTIONS 203(e) and 203(f) OF THE**
**INVESTMENT ADVISERS ACT OF 1940**
**AND NOTICE OF HEARING**

</td>
</tr>
</table>

## I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted pursuant to Sections 203(e) and 203(f) of the Investment Advisers Act of 1940 ("Advisers Act") against Louis Navellier and Navellier & Associates, Inc. ("NAI", collectively,"Respondents").

## II.

After an investigation, the Division of Enforcement alleges that:

A.    <u>RESPONDENTS</u>

1.    From at least 2010 to the present, Respondents acted as investment advisers pursuant to the definition in the Advisers Act, 15 U.S.C. § 80b-2(a)(11).

2.    From the founding of NAI through the present, Mr. Navellier was NAI's Chief Investment Officer and Chief Executive Officer. He also owned at least 75% of NAI during that time, increasing his ownership to 100% after August 2013. Mr. Navellier is 62 years old and resides in Manalapan, Florida and Reno, Nevada.

3.    NAI is located in Reno, Nevada, and has been registered with the Commission as an investment adviser since October 1987.

B.   ENTRY OF THE INJUNCTIONS

4.    On June 2, 2020, a final judgment was entered against Respondents, permanently enjoining them from future violations of Sections 206(1) and 206(2) of the Advisers Act, in the civil action entitled Securities and Exchange Commission v. Navellier & Associates, Inc., et al., Civil Action Court 1:17-CV-11633, in the United States District Court for the District of Massachusetts.  The final judgment also orders Respondents jointly and severally to pay disgorgement of $28,964,571, including $6,513,619 in prejudgment interest, as well as civil penalties against Navellier & Associates in the amount of $2,000,000 and against Mr. Navellier in the amount of $500,000.

5.    The Commission's complaint alleged that, from at least 2010 to approximately August 2013, defendants breached their fiduciary duties and defrauded their advisory clients and prospective clients through the use of marketing materials that included false and misleading statements regarding the performance of the firm's Vireo AlphaSector investment strategies that they offered.

6.    In its February 13, 2020 Order granting the Commission's motion for partial summary judgment, the District Court found that Respondents knew there were misleading statements in their marketing materials and that there had been inadequate due diligence, yet they failed to inform their clients.  Instead, as the court determined, the defendants continued to sell the Vireo AlphaSector investment strategies despite their knowledge that representations about the strategies were false and misleading.  The District Court concluded that each Respondent acted with scienter.

## III.

In view of the allegations made by the Division of Enforcement, the Commission deems it necessary and appropriate in the public interest that public administrative proceedings be instituted to determine:

A.   Whether the allegations set forth in Section II hereof are true and, in connection therewith, to afford Respondents an opportunity to establish any defenses to such allegations;

B.   What, if any, remedial action is appropriate in the public interest against Mr. Navellier pursuant to Section 203(f) of the Advisers Act; and,

C.   What, if any, remedial action is appropriate and in the public interest against Navellier & Associates, Inc. pursuant to Section 203(e) of the Advisers Act.

## IV.

IT IS ORDERED that a public hearing before the Commission for the purpose of taking evidence on the questions set forth in Section III hereof shall be convened at a time and place to be fixed by further order of the Commission, pursuant to Rule 110 of the Commission's Rules of Practice, 17 C.F.R. § 201.110.

2

IT IS FURTHER ORDERED that Respondents shall file Answers to the allegations contained in this Order within twenty (20) days after service of this Order, as provided by Rule 220(b) of the Commission's Rules of Practice, 17 C.F.R. § 201.220(b).

IT IS FURTHER ORDERED that the Division of Enforcement and Respondents shall conduct a prehearing conference pursuant to Rule 221 of the Commission's Rules of Practice, 17 C.F.R. § 201.221, within fourteen (14) days of service of the Answer. The parties may meet in person or participate by telephone or other remote means; following the conference, they shall file a statement with the Office of the Secretary advising the Commission of any agreements reached at said conference. If a prehearing conference was not held, a statement shall be filed with the Office of the Secretary advising the Commission of that fact and of the efforts made to meet and confer.

If a Respondent fails to file the directed Answer, or fails to appear at a hearing or conference after being duly notified, the Respondent may be deemed in default and the proceedings may be determined against him or it upon consideration of this Order, the allegations of which may be deemed to be true as provided by Rules 155(a), 220(f), 221(f) and 310 of the Commission's Rules of Practice, 17 C.F.R. §§ 201.155(a), 201.220(f), 201.221(f), and 201.310.

This Order shall be served forthwith upon Respondents by any means permitted by the Commission's Rules of Practice.

Attention is called to Rule 151(b) and (c) of the Commission's Rules of Practice, 17 C.F.R. § 201.151(b) and (c), providing that when, as here, a proceeding is set before the Commission, all papers (including those listed in the following paragraph) shall be filed with the Office of the Secretary and all motions, objections, or applications will be decided by the Commission. The Commission requests that an electronic courtesy copy of each filing should be emailed to APFilings@sec.gov in PDF text-searchable format. Any exhibits should be sent as separate attachments, not a combined PDF.

The Commission finds that it would serve the interests of justice and not result in prejudice to any party to provide, pursuant to Rule 100(c) of the Commission's Rules of Practice, 17 C.F.R. § 201.100(c), that notwithstanding any contrary reference in the Rules of Practice to filing with or disposition by a hearing officer, all filings, including those under Rules 210, 221, 222, 230, 231, 232, 233, and 250 of the Commission's Rules of Practice, 17 C.F.R. §§ 201.210, 221, 222, 230, 231, 232, 233, and 250, shall be directed to and, as appropriate, decided by the Commission. This proceeding shall be deemed to be one under the 75-day timeframe specified in Rule of Practice 360(a)(2)(i), 17 C.F.R. § 201.360(a)(2)(i), for the purposes of applying Rules of Practice 233 and 250, 17 C.F.R. §§ 201.233 and 250.

The Commission finds that it would serve the interests of justice and not result in prejudice to any party to provide, pursuant to Rule 100(c) of the Commission's Rules of Practice, 17 C.F.R. § 201.100(c), that the Commission shall issue a decision on the basis of the record in this proceeding, which shall consist of the items listed at Rule 350(a) of the Commission's Rules of Practice, 17 C.F.R. § 201.350(a), and any other document or item filed with the Office of the

Secretary and accepted into the record by the Commission. The provisions of Rule 351 of the Commission's Rules of Practice, 17 C.F.R. § 201.351, relating to preparation and certification of a record index by the Office of the Secretary or the hearing officer are not applicable to this proceeding.

The Commission will issue a final order resolving the proceeding after one of the following: (A) The completion of post-hearing briefing in a proceeding where the public hearing has been completed; (B) The completion of briefing on a motion for a ruling on the pleadings or a motion for summary disposition pursuant to Rule 250 of the Commission's Rules of Practice, 17 C.F.R. § 201.250, where the Commission has determined that no public hearing is necessary; or (C) The determination that a party is deemed to be in default under Rule 155 of the Commission's Rules of Practice, 17 C.F.R. § 201.155, and no public hearing is necessary.

In the absence of an appropriate waiver, no officer or employee of the Commission engaged in the performance of investigative or prosecuting functions in this or any factually related proceeding will be permitted to participate or advise in the decision of this matter, except as witness or counsel in proceedings held pursuant to notice. Since this proceeding is not "rule making" within the meaning of Section 551 of the Administrative Procedure Act, it is not deemed subject to the provisions of Section 553 delaying the effective date of any final Commission action.

For the Commission, by its Secretary, pursuant to delegated authority.

Vanessa A. Countryman
Secretary

# EXHIBIT 4

**From:** Long, Robert (Shld-DAL-LT)
**Sent:** Wednesday, June 3, 2020 11:57 AM
**To:** Davis, Terrence O. (Shld-ATL-CP) <davist@gtlaw.com>; Boyle, Tanya L. (OfCnl-DAL-CP) <boyleta@gtlaw.com>
**Subject:** FW: Final Judgment Against Adviser Who Sub-Advises the Cavelier Funds

Terry and Tanya, see below and attached.

**Robert Long**
Shareholder

Greenberg Traurig, LLP
2200 Ross Avenue, Suite 5200 | Dallas, TX 75201
T +1 214.665.3659  |  F +1 214.665.5974
longr@gtlaw.com  |  www.gtlaw.com  |  View GT Biography

## GT GreenbergTraurig

**From:** Baker, Robert [mailto:BakerR@sec.gov]
**Sent:** Wednesday, June 3, 2020 10:53 AM
**To:** Long, Robert (Shld-DAL-LT) <longr@gtlaw.com>
**Cc:** Jones, Marc <JonesMarc@SEC.gov>
**Subject:** Final Judgment Against Adviser Who Sub-Advises the Cavelier Funds

**\*EXTERNAL TO GT\***

Robert,

I'm reaching out to you based on your representation of Starboard Investment Trust in another matter.  A district court judge in the District of Massachusetts issued the attached final judgment yesterday, enjoining Navellier & Associates, Inc. and Louis Navellier from violation Sections 206(1) and 206(2) of the Advisers Act.  We understand that Navellier & Associates is the sub-adviser of the Cavelier Fundamental Growth Fund, which I understand from the fund's prospectus is a series of the Starboard Investment Trust and that Greenberg is counsel to the fund.  I wanted someone at Greenberg and Starboard to be aware of the injunction given its implications under Section 9 of the Investment Company Act.  I don't have any more information to share or need any type of response at this point, but if you could let me know if there is someone else at your firm I should contact with respect to the Cavelier Funds, please let me know.  Thanks, Robert

**Robert B. Baker, JD, CFA**
Assistant Director
Asset Management Unit
Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 23rd Floor
Boston, MA 02110
Tel: (617) 573-8918
Fax:(617) 573-4590
e-mail: BakerR@sec.gov

---

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate the information.

# EXHIBIT 5

**samuel.kornhauser@gmail.com**

| | |
|---|---|
| **From:** | Louis Navellier <lnavellier@navellier.com> |
| **Sent:** | Friday, June 12, 2020 12:32 PM |
| **To:** | Sam K |
| **Cc:** | Tanya Alexander; Pete Koelewyn |
| **Subject:** | FW: Starboard Investment Trust - Termination Notice |
| **Attachments:** | Navellier Notice.pdf |

FYI ... We do not have to worry about Cavalier, effective Monday.

---

**From:** Tracie Coop <tracie.coop@ncfunds.com>
**Date:** Friday, June 12, 2020 at 3:24 PM
**To:** Louis Navellier <lnavellier@navellier.com>
**Cc:** Kate Honey <kate.honey@ncfunds.com>, Legal <Legal.Department@ncfunds.com>
**Subject:** Starboard Investment Trust - Termination Notice

Mr. Navellier,

At the meeting of the Board of Trustees of the Starboard Investment Trust held on June 11, 2020, the Board determined to terminate the sub-advisory agreement with Navellier & Associates in connection with the Cavalier Fundamental Growth Fund effective June 15, 2020.  Attached please find the notice of termination.  A hard copy of the notice has also been mailed to your attention.

Best regards,
Tracie





Tracie Coop | General Counsel
Ph: 252.984.3807
116 S Franklin Street, PO Box 69, Rocky Mount, NC 27802-0069
tracie.coop@ncfunds.com | www.nottinghamco.com

VOTED BEST FUND ADMINISTRATOR FOR SMALL AND STARTUP FUNDS.
FUND INTELLIGENCE OPERATIONS & SERVICES AWARDS 2019

**PRIVILEGED AND CONFIDENTIAL** This electronic message and any attachments are confidential property of the sender. The information is intended only for the use of the person to whom it was addressed. Any other interception, copying, accessing, or disclosure of this message is prohibited. The sender takes no responsibility for any unauthorized reliance on this message. If you have received this message in error, please immediately notify the sender and purge the message you received. Do not forward this message without permission.

DISCLAIMER This email message is intended only for the personal use of the recipient(s) named above. This message may be privileged and confidential. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by email and delete the original message. Navellier & Associates Inc.'s outgoing and incoming emails are electronically archived and may be subject to review and/or disclosure to someone other than the intended recipient. The SEC suggests that clients compare the accuracy of portfolio statements provided by Navellier & Associates Inc. to statements provided to clients by their custodian Navellier & Associates, Inc. 1 East Liberty, Ste. 504 Reno, Nevada 89501 info@navellier.com Visit us on the web at: http://www.navellier.com

# STARBOARD INVESTMENT TRUST

116 S. Franklin Street
P.O. Box 69
Rocky Mount, N.C. 27802-0069

Navellier & Associates, Inc.
1 East Liberty
Suite 504
Reno, Nevada 89501

June 12, 2020

Dear Mr. Navellier,

At a meeting held on June 11, 2020, the Board of Trustees of the Starboard Investment Trust (the "Trust") determined to terminate the Investment Sub-Advisory Agreement between Cavalier Investments, LLC and Navellier & Associates, Inc. ("Navellier"), on behalf of the Cavalier Fundamental Growth Fund (the "Agreement"), effective June 15, 2020. The Agreement is being terminated in connection with the final judgment issued on June 2, 2020 by the District Court of Massachusetts which found that Navellier violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 and enjoined Navellier from future violations of the same. As a result of this injunction issued by the District Court, Navellier is disqualified from serving as an investment sub-adviser to the Cavalier Fundamental Growth Fund under Section 9 of the Investment Company Act of 1940, as amended.

Sincerely,

Katherine M. Honey
President

# NAI FINANCIAL STATEMENT TO BE FILED UNDER SEAL

# EXHIBIT 7

DRAFT

## ASSET RESTRICTION AGREEMENT

In consideration of the Securities and Exchanges Commission's agreement to stay enforcement of the $28,964,571 in disgorgement and prejudgment interest and the $2.5 million in penalties, awarded by the June 2, 2020 Final Judgment entered against Navellier & Associates, Inc. ("NAI") and Louis Navellier jointly and severally (except penalties which are several) in *SEC v. Navellier & Associates, Inc. et al* No. 17-cv-11633, (a copy of which is attached and made a part hereof) NAI and Louis Navellier (collectively "Defendants") agree not to further encumber their assets against which enforcement could be had ("Restricted Assets"), or to sell, transfer, gift or otherwise dispose of or alienate said Restricted Assets as set forth herein. NAI and Louis Navellier further agree as a condition of this agreement to post a supersedeas bond or equivalent security acceptable to the SEC in the amount of $2,800,000.

The Defendants shall comply with each of the following conditions:

(1) Defendants will do everything in their power to maintain the value of all their Restricted Assets against which enforcement could be had by the SEC and prevent a decrease in the value thereof.

(2) Defendants shall not pay any notes, debts, or other obligations to one another. Louis Navellier agrees to waive and not receive salary, or compensation from NAI and Mr. Navellier further agree to waive and not receive compensation for NAI's management of the Navellier/Dial High Income Opportunities Series Unit Investment Trust during the term of this agreement.

(3) Defendants shall make no financial commitments or expenditures for capital improvements or additions in connection with NAI without court approval.

(4) Defendants shall not pay any debts in whole or part except to trade creditors in the ordinary course of business and debt obligations as set forth on the financial statements heretofore furnished to the SEC.

D. SEC shall have the right to select an independent auditor to inspect any and all records of the corporate defendant NAI in order to ascertain whether the Defendants are complying with provisions of this Agreement and Order and shall receive monthly profit and loss statements and balance sheets from the NAI defendant within two weeks following the end of each month during the effective period of this Agreement and Order.

E. In the event of changed circumstances which substantially reduce the value of the Restricted Assets, the SEC has the right to request the Court to increase the security which must be escrowed or, in the event that additional security is not available, to dissolve the stay of execution of judgment, or enter another appropriate order.

F. All of the foregoing limitations and escrow arrangements will terminate with the filing of a final decision of the Court of Appeals, or court of last resort.


NOW THEREFORE, the parties hereby stipulate and agree that NAI may continue to make payments and engage in other activities in the ordinary course of business, including payment of payroll costs and legal costs. NAI may not pay any shareholder dividends, make asset transfers outside the United States or Canada that are not in the ordinary course of business, acquire assets outside the scope of the ordinary course of business, or pay compensation outside the scope of ordinary business. Louis Navellier will not be paid any salary or other compensation from NAI

until a final decision on appeal is rendered by a court of last resort or the June 2, 2020 Final

Judgment is reversed, vacated or modified. NAI must seek prior agreement from SEC or

approval from the Court should it seek any exceptions regarding any such transactions. Apart

from legal costs as they come due and ordinary-course payroll costs, NAI will also seek prior

agreement from SEC or approval from the Court for any outbound payment transactions not in

the ordinary course of business involving more than $25,000.

SECURITIES AND EXCHANGE COMMISSION

Dated:                                     By_____


Louis Navellier

Dated:                                     By_____


Navellier & Associates, Inc.

Dated:                                     By_____