## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. 1:17-cv-11633 |
| Plaintiff, | |
| v. | |
| NAVELLIER & ASSOCIATES, INC., and LOUIS NAVELLIER, | |
| Defendants. | |

### DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MEMORANDUM AND PROPOSED DISGORGMENT FINDINGS OF FACT AND CONCLUSIONS OF LAW (DKT#340, 341)

*Liu v. SEC* 140 S. Ct. 1936 (2020) mandates that disgorgement can only be awarded, if at all, for "net gains" tethered to each defendant's violation, of the securities laws after deducting all legitimate business expenses and offsetting payments made to the "victims." This Court should follow the dictates of the Supreme Court in *Liu v. SEC* 140 S. Ct. 1936 (2020) and deny in its entirety the SEC's request for $28.5 million in "disgorgement" and prejudgment interest. The SEC should not be awarded disgorgement.

### <u>The Law</u>

The Supreme Court in *Liu* made clear that the SEC can no longer use disgorgement as a disguised penalty or forfeiture to punish a defendant for allegedly violating the securities law. The SEC can no longer seek huge blanket disgorgement awards for all revenue the defendant

received. The Supreme Court made clear in *Liu* that principles of equity must apply in determining whether to award disgorgement, and if so, in what amount. The federal court, in exercising its equitable discretion, must first separate a defendant's receipts received from the defendants' "wrongful" conduct from the defendants' legitimately earned revenue. Only the revenue the defendant received as a result of his/its "wrongdoing" is counted in calculating the gross amount that is potentially disgorgeable. *Liu* p. 1945.

"Wrongdoing" is conduct by a particular defendant that he/it did that violated the securities laws. *Liu* p. 1945; 15 U.S.C. §78u(d)(5). Amounts that were not obtained by violating the securities laws, but rather were legitimately earned by the defendant, for providing services or consideration to the "victim," are excluded from the calculation of the gross disgorgement amount. *Liu* 1945; *Livingston* supra; *Seymour v. McCormick* 16 How 480, 490 (1854) [rejecting a rule that infringing one component of a machine warranted a remedy measured by the full amount of the profits earned from the machine]; *Mowry v. Whitney* 14 Wall 620, 649 (1872) [vacating an accounting that exceeded the profits from the infringement alone.]

Disgorgement is further restricted to only those amounts obtained during the time the defendant is actually violating the law and during "no other period." *Liu* p. 1945; *Livingston v. Woodworth* 15 How 546, 559-560 (1854).

### Disgorgement Is Restricted To the "Net Gain" Obtained From Wrongdoing After Deducting Defendants' Legitimate Business Expenses and Crediting The Defendant With Payments Made To The Victim

After limiting the gross disgorgeable amount to revenue only from wrongdoing, the court "must" deduct from that disgorgeable amount, all "legitimate expenses" in operating the business that produced the revenues that are subject to disgorgement. *Liu* p. 1945. The wrongdoer is

entitled to a deduction from the disgorgeable amount for his/its legitimate expenses, because equity courts "may not enter disgorgement awards that exceed the gains made when both receipts and *payments* are taken into *the* account." (*Liu* 1949-1950 (emphasis added).

Legitimate expenses are those marginal costs and expenses incurred by the defendants in operating the business that produced the wrongful amount, i.e., all expenses paid to vendors, and to non-party employee salaries and compensation. *Liu* 1950. Only bogus "expenses" paid to the wrongdoers that are really "disguised dividends" are not deducted in calculating disgorgeable gains.

### Payments To The "Victim" Are Credits To The Defendant Which Are Offsets Against Any Disgorgeable Net Gains

Finally, returns and payments made to the victims are offset against the disgorgeable "net gain" and credited to the wrongdoer so that, in equity, the wrongdoer is not punished by paying more than a *fair* compensation to the person wronged." (emphasis added) *Liu* p. 1943; Restatement (Third) Restitution and Unjust Enrichment §51(h) illustration 22. Section 78u(d)(5) "restricts equitable relief to that which may be appropriate or necessary for the benefit of investors." *Liu* 1947.

### No Joint and Several Liability

If there are multiple defendants, the disgorgement and liability awards, if any, are determined against each defendant separately in accordance with his or its separate wrongdoing; not jointly. *Liu* 1949. Also the award, if any, can only be for the amount of net gain he or it received from his or its own wrongdoing. Requiring proof of individual wrongdoing, limited to only the amount of "net gains" each individual defendant received, prevents the court from transforming an equitable profits-focused remedy into a penalty. *Liu* 1949. In this case there is no joint and several liability. No amount is disgorgeable from Mr. Navellier. He did not make or

market the allegedly false marketing material. He did not manage any Vireo client accounts.

Thee is no evidence that the supposedly false statement was false. Nor is any amount

disgorgeable from NAI.

The SEC can no longer impose blanket joint and several liability unless it proves

concerted action by the defendants. *Liu* 1949. In this case there is no claim and no proof of

concerted action by NAI or Mr. Navellier. The SEC dismissed, with prejudice, its aiding and

abetting claim. (DKT#260).

### No Wrongdoing

Despite the SEC's repeated *allegation* that NAI's marketing material contained a false

statement- that the Vireo strategy was live traded back to 2001 and was not back tested- the SEC

presented *no evidence* to prove that allegation! (See Defendants' Proposed Findings Of Fact

No.'s 75-110). No matter how many times the SEC repeated that baseless allegation in its

summary judgment papers, and no matter how many times it repeats that baseless allegation in

its proposed findings of fact and conclusions of law, the SEC's *allegations* are not proof. The

undeniable fact is that the SEC presented *no evidence* that NAI's statement was false.

(Defendants' Proposed Findings No. 76). In fact Defendants presented evidence that proved the

statement was *true*. (Defendants' Proposed Findings No.'s 77-80; Exhibits A, B, C, D)[1]. Without

proof of a false statement there is no proof of a 206(1) or 206(2) violation by either NAI or Mr.

Navellier. *ZPR Investment Management v. SEC* 861 F.3d 1239, 1247 (11th Cir. 2017).

Where, as here, the SEC has not proved that either NAI or Mr. Navellier violated 206(1)

or 206(2), then there is no "wrongdoing" by either one and the SEC cannot seek, and this Court

---

[1] References to "Exhibit __" are to Defendants' exhibits in the record submitted in connection with the summary judgment motions and previous remedies/final judgment pleadings, copies of which are attached hereto.

cannot award, disgorgement in any amount *Liu* p. 1941; *Kokesh v. SEC* 137 S. Ct. 1635, 1643-1644 (2017). Nor can it award $2 million or any penalty against NAI. Nor can it award a $500,000 or any penalty against Mr. Navellier. Nor can it award injunctive relief. Where, as here, there is no violation, there is no basis for any amount of disgorgement. *Kokesh* supra 137 S. Ct. at 1643-1644.

### The SEC's Rush To Judgment Before The Supreme Court Decided *Liu*

The SEC misled this Court into finding liability without any proof that the marketing statement was in fact false. It wasn't. (Exhibits A, B, C, D). The SEC then induced this Court (over NAI's and Mr. Navellier's strenuous stay requests) to rush to issue a $28.9 million disgorgement judgment before it had the benefit of Supreme Court guidance[2] on the limits of awarding disgorgement.

After the Supreme Court issued its *Liu* decision, the SEC knew this Court's disgorgement decision was erroneous, so it sought a remand so it could attempt to wordsmith the *Liu* decision into something to support its $28.5 million demand.

Instead of following the dictates of *Liu*, the SEC again asks this Court to commit error and ignore the holdings of *Liu* and continue to apply disgorgement law as a vehicle for punishment and forfeiture; the very thing the SEC had been doing for 50 years before the Supreme Court put a stop to it. The Supreme Court has now held the SEC can no longer seek forfeiture dressed up as disgorgement. *Liu* 1946. Rather than seek equity and "*fair* compensation to the person wronged" *Liu* 1945, the SEC continues to seek $28.5 million to punish Defendants

---

[2] The SEC was the plaintiff in the *Liu* case and knew full well that the very issues being raised here regarding the limits on awarding it disgorgement were going to be decided by the Supreme Court shortly and would have an outcome determinative impact on this Court's decision. Yet the SEC urged this Court to commit further error by following its arguments rather than the law that was about to come down from the Supreme Court.

and forfeit NAI's legitimate earnings. There were no victims, NAI provided its Vireo Allocator

and Vireo Premium clients (the only "victims" of the allegedly "false" statement) with excellent

investment management, plus paid them $37,581,016 in profits. Neither NAI nor Mr. Navellier

harmed any of its Allocator or Premium clients (or any other clients). NAI benefited them by

$37,581,016. NAI did not wrongfully take a penny from them.

       The SEC seeks $22,077,593 in disgorgement including disgorgement of $14 million in

unrelated goodwill proceeds, even though the SEC agreed that only $360,935 was disgorgeable

and dropped its $14 million demand completely. (Exhibit K, p. 1 and Exhibit L). And it seeks

$28.5 million from Mr. Navellier individually despite the fact it settled with no claims at all

against Mr. Navellier (Exhibits K and L).


### The SEC Wrongly Seeks Disgorgement Of Fees Not Connected To "Wrongdoing" By Either Defendants

       In contravention of *Liu*, the SEC wrongly seeks to disgorge <u>all</u> fees NAI received from all

Vireo clients for all nine (9) of NAI's Vireo strategies. The SEC seeks all fees from all Vireo

clients from September 1, 2011 through December 2013, even though the SEC concedes these

other seven strategies that contained allegedly false marketing material (Exhibit M) and even

though the SEC concedes NAI removed the statement September 2012 (Exhibits K, L, N).


### Only Allocator or Premium Fees Are Arguably Disgorgeable

       Only advisory fees obtained from allegedly "wrongful" conduct are disgorgeable *Liu* p.

1946. When the SEC moved for partial summary judgment it presented "evidence" that only two

of NAI's nine (9) Vireo strategies, the Allocator and the Premium strategies had marketing

materials that contained the supposedly "false" statement.

**Only Allocator or Premium Fees From August 10, 2011 Through June 30, 2012 Are Arguably Disgorgeable**

Only investment advisory fees received from Allocator or Premium during the period of August 11, 2011 and June 30, 2012[3] (Exhibit O) were arguably derived from "wrongful" conduct- the marketing statement. Fees from Allocator or Premium marketing material before August 10, 2011 cannot be disgorged because recovery is barred by the five (5) year statute of limitations. 28 U.S.C. §2462; *Kokesh v. SEC* 137 S. Ct. 1635, 1643-1644 (2017).

Allocator or Premium Fees obtained after September 14, 2012 are not disgorgeable because the allegedly false statement was removed from Allocator and Premium marketing material starting in the third quarter 2012 (July 1, 2012) (Exhibit O). Allocator or Premium advisory fees received from clients who became clients after September 14, 2012 could not have been falsely induced to become clients and pay advisory fees based on a supposedly false statement that was not even in the marketing material after September 14, 2012. (Exhibits K, O, L p. 5).

Instead of adhering to the requirements of *Liu*, to restrict its disgorgement demand to only net gains from wrongful acts, and only for the period the wrongful act was committed and "no other", as the Supreme Court ordered the SEC to do, the SEC seeks to disgorge $20,634,408 in advisory fees paid to NAI from clients in all nine (9) Vireo strategies, not just the Allocator and Premium clients- the only two strategies the SEC claimed contained the allegedly false

---

[3] The SEC concedes that by "September 2011 NAI had removed the supposedly false "not backtested" language (Exhibit L, p. 5, ¶12) and that by September 14, 2012 NAI had stopped disseminating marketing material with the "based on live trading" statement. (Exhibit L, p. 5 ¶13; Exhibit K, p. 1). The SEC conceded that only $360,935 in fees was "disgorgeable" from marketing material from those two strategies during the applicable August 10, 2011 to September 14, 2012 after which September 14, 2012 date the allegedly "false" statement was removed from Allocator and premium marketing materials (Exhibits    ). The allegedly false statement was removed from NAI marketing material after September 14, 2012 (Exhibit K)

statement.

### NAI's Arguably Disgorgeable Fees Are At Most $53,008

The gross Allocator advisory fees and gross Premium advisory fees that NAI[4] received during the applicable August 10, 2011 through September 14, 2012 (when the allegedly "wrongful" marketing material was used), was $4,289,956 for Allocator fees and $347,351 for Premium fees (Exhibit F). However, as the SEC concedes, a licensing fee had to be paid by NAI to F2 for each advisory fee NAI received. So the net fees (after deducting the licensing fee) NAI received for Allocator was $1,917,620. The net Premium advisory fees were $129,668 for a total of $2,047,288 in net fees for the two strategies.

However, only the fees attributable to the wrongful "component" of NAI's acts are disgorgeable. Legitimately earned fees for value given are not disgorgeable. *Liu* p. 1945. Therefore, even if, *arguendo*, the SEC had proved that the marketing statement was false (it didn't), and even if the SEC had proved that the statement had induced a client to initially become a client and pay the initial first quarter advisory fees (the SEC didn't), only the fees paid by the client during the first Quarter he/she was a client would arguably be disgorgeable. The SEC presented no evidence that clients continued to pay advisory fees after the first Quarter of being a client because of the "false" statement, as opposed to continuing to pay fees because they were satisfied with NAI's services. The most that the "false" marketing statement could be deemed to be causally connected to is fees a client paid for his/her first Quarter (3 months) of advisory service. After that if the client decided he/she was satisfied with the advisory services and stayed as a client and continued to pay fees, it was causally connected to the client's satisfaction with NAI's services and performance, not to the initial "false" statement in the

---

[4] The SEC presented no evidence, and there is none, that Mr. Navellier received any investment advisory fees from any Vireo clients. He was not an investment adviser for any Vireo clients (Proposed Finding of Fact 15).

marketing material.

Therefore at most only the $285,034 in fees paid by Allocator clients and the $17,178 in fees paid by Premium clients for the first quarter after they became clients is arguably disgorgeable. However net fees after deducting the licensing fees attributable to those first quarter fees is disgrogeable. The net fees Allocator clients paid during their first quarter was $127,829 and $7,106 for Premium clients for a total of $134,935 in arguable disgorgeable client first Quarter fees. (Exhibit F).

The fees paid by Allocator and by Premium clients, *after* being clients for a Quarter, were legitimate fees for valuable advisory services NAI provided to them. Those legitimately earned fees (NAI returned $37,581,016 in profits to its Allocator and Premium clients) must be excluded in calculating any disgorgeable amount, since they are not causally connected to the earlier, allegedly false statement. NAI's valuable, profitable services, after the first Quarter of service, broke and superseded any causal link between the statement and payment of fees thereafter. *Liu* at p. 1945; *SEC v. MacDonald* 699 F.2d 47, 54 (1983).

Therefore the total disgorgeable amount of advisory fees, before further deduction for NAI's other legitimate Vireo business expenses, is $134,935. When the legitimate NAI Vireo business expenses for marketing (see Defendants' Responses To Proposed Findings 50-57), and for employee salaries and bonuses (Defendants' Response 58) and other business expenses are deducted, the arguable net gains from arguable wrongful advisory fees is $53,008 (Kahrs Declaration ¶19). It is not the blanket, non-causally connected $8,022,000 the SEC improperly claims for all strategies for all times (August 10, 2011 through December 2013).

**None of the $14 Million From Goodwill Sales Proceeds Is Disgorgeable**

*Liu* makes clear that for the SEC to be able to equitably disgorge monies received by NAI (or Mr. Navellier[5]) the monies must be causally connected to each defendant's "wrongdoing." *Liu* pp. 1946, 1949.

Here, there is no proven wrongdoing; only unsupported allegation. The alleged, but unproven "wrongdoing" in this case is the allegedly "false" statement in the Allocator and in the Premium marketing material during the August 10, 2011 through September 14, 2012 time period. The SEC's totally speculative and unproven theory is that all of NAI's Allocator and Premium clients were induced to become clients because of the "false" marketing statement (as opposed to NAI's two (2) year actual performance record managing its own clients' Allocator and Premium accounts) (Exhibit N).

The SEC then embellishes its speculation by alleging, but not proving, that these clients remained clients for two to three years after becoming clients because of the "false" marketing statement two to three years earlier; and not because of the excellent and profitable performance they received from NAI, which generated for them $37,581,016 in profits.[6]

The SEC again has produced no evidence that any client, not a single one, was induced to initially become a client because of the "false" marketing statement as opposed to NAI's already nearly two year actual performance for clients (Exhibit N). In fact, Defendants produced evidence that clients became clients because of NAI's actual performance for the two years before these clients became clients, not because of some allegedly false statement about the 10 year old origins of the strategy.

Ken Zannoni, whom the SEC interviewed, but declined to produce, told the SEC what it didn't want to hear- that he and his clients didn't care about the allegedly false statement about

---

[5] Mr. Navellier did not receive the $14 million in goodwill proceeds, NAI did.
[6] $278 million in profits to all Vireo clients.

hypothetical index performance; what mattered to him and his clients and what caused them to become clients and remain clients was NAI's actual performance. (Exhibit H).

Likewise, John Ranft, NAI's former head of marketing, testified that clients became clients and, more importantly, remained clients, because of the actual performance they received from NAI (Exhibit I).

The SEC produced no evidence that any clients remained clients for 1, 2, or 3 years because of being induced to initially become clients by an allegedly false statement years before. The SEC's theory is pure speculation, not evidence. The SEC has the burden to prove a causal connection between a client initially allegedly being "falsely" induced to become a client and that client remaining a client after years of service. It has failed to do so. There can be no disgorgement of any of the goodwill proceeds because the SEC has not proven that the goodwill proceeds NAI received from F2 were causally connected to any wrongful conduct by NAI or Mr. Navellier. There is no legal or equitable authority for disgorging any of the $14 million. None of the $14 million sales price is causally connected to the allegedly "false" marketing material. *Liu* 1945; *SEC v. MacDonald* supra 699 F.2d at 54.

Whatever purely speculative causal connection the SEC alleges caused clients to become clients, was broken once NAI started profitably managing their accounts. Any connection to the initial "false" statement was too attenuated and remote to allow for disgorgement of any of the goodwill *Liu* 1945, 1946. ["Congress prohibited the SEC from seeking an equitable remedy in excess of a defendant's net profits from *wrongdoing*."]; Restatement (Third) Restitution and Unjust Enrichment §51(5)(a); §51(h); *SEC v. MacDonald* supra at p. 54.

NAI was not unjustly enriched by its sale of the goodwill it had created over three years of excellent performance for its clients.

Also, the SEC, in its unauthorized attempt to obtain disgorgement of all of the $14 million, makes no attempt to create a causal link to the clients that transferred and the allegedly "false" statement. Thus it simply ignores the fact that 79% of the $1.4 billion that clients transferred to F2 management was form clients that were not even in the Allocator or Premium strategies. So there couldn't have been a link between the allegedly "false" statement (which did not even appear in *their* marketing material) and their decisions to transfer to F2.

Only $304,193,621 of the $1,479,682,738, i.e., 21% of all the clients that transferred their assets were Allocator or Premium clients. So even if the SEC had produced evidence that all of the Allocator and Premium clients switch because of the allegedly false statement, most of the Allocator and Premium clients became clients after the "false" statement was removed, so there is no causal connection for them and their percentage of the $14 million is not disgorgeable. As to the remaining few Allocator and Premium clients, the SEC produced no evidence that a single one of them switched because of the allegedly false statement. Therefore none of the $14 million is disgorgeable.

NAI earned goodwill by providing its clients with years of valuable and profitable investment advisory services (that earned the Allocator clients $33,689,836 in profits and the Premium clients $6,270,948 in profits (Exhibit F).

In addition, an investment advisor can sell its goodwill. It is not a violation of 206(1) or 206(2) for an investment advisor to sell its goodwill. Since selling its goodwill is not "wrongful", the SEC cannot disgorge any of the $14 million in sale proceeds. *Liu* 1946 [Congress prohibited the SEC from seeking an equitable remedy in excess of defendants' net profits *from wrongdoing*].

### No "Continuing Duty"

The SEC attempts to get around the absence of a causal connection to the goodwill sales proceeds by arguing that NAI and Mr. Navellier each had a continuing fiduciary duty to inform "their" clients of the allegedly "false" statement in the initial marketing material. As set forth above, and in proposed findings No.'s 75 through 110, the SEC presented no evidence and did not prove that the allegedly false statement was, in fact, false. It wasn't (Exhibits A, B, C, D).

Since there had been no false statement disseminated to the clients, there was no duty, let alone a continuing duty, to inform clients that the *true* statement in the marketing material was "false." Both defendants testified that they reasonably believed the statement was true (Defendants Proposed Statement of Fact No. 101).

Also, the SEC has again failed to produce any evidence that a single client continued to remain as a client because he/she didn't know the alleged "false" statement was false. SEC did not produce any evidence that a single client would have ceased being a client or wouldn't have still switched to F2 if he/she had been told that the statement was "false."

Allegations, arguments and unfounded speculation are not evidence and cannot be a basis for equitable disgorgement. The SEC is required to prove a causal connection between the supposedly wrongful act and NAI receiving proceeds for the sale of <u>its</u> goodwill. The SEC has failed to prove any such causal connection. No disgorgement of any of the $14 million is allowed.

### <u>Defendants Are Entitled To An Offset (Credit) Against Disgorgement For $37,581,016 In Profit NAI Paid To Its Allocator and Premium Clients</u>

When equitably accounting for the "net gains," the Defendants are entitled to an offset or credit against the disgorgement amount for payments or returns defendants provided to the clients. *Liu* 1949-1950. NAI is entitled to a credit for the $37,581,016 in profits it paid to its Allocator and Premium "victim" clients. Under *Liu* that $37,581,016 payment to clients must be

offset against the $53,008 in arguably disgorgeable fees. That results in zero in disgorgement.

Even if the SEC was correct that any of the $14 million is disgorgeable (it is not), the $37,581,016 in profits to clients offsets all of the SEC's unfounded $14 million goodwill and $8,077,593 fee disgorgement (forfeiture) demand. *Liu* 1943 ["the wrongdoer should not be punished by paying more than a fair compensation to the person wronged"].

Here, the SEC is not seeking to extract a "fair" compensation to the persons wronged. There were no persons wronged. The clients have already received fair compensation for valuable and profitable investment advisory services they paid for. Plus they got $37,581,016 in profits. The clients received more than fair compensation. They were not wronged; they suffered no harm. Disgorging any amount would be an extreme and inequitable penalty- not fair compensation to the persons wronged.

### No Prejudgment Interest

Since there is no amount of equitable disgorgement there can be no prejudgment interest.

### No Penalties

The SEC failed to prove a wrongdoing. The clients were not harmed. The Allocator and Premium clients profited to the tune of over $37,581,016. All the Vireo clients were paid profits of $278 million. There is no basis for a statutory penalty where there is no proof of a violation by Mr. Navellier or by NAI.

The SEC cites no case, and Defendants are not aware of any, were the fiduciary did not use the clients' assets, returned all principal invested, to the client, provided valuable and profitable services for fair compensation and paid the beneficiary all the profits earned on the invested principal and yet was still ordered to pay disgorgement. The Restatement §51(h) and the Pennsylvania Supreme Court in *Brooks v. Conston* 72 A.2d 75, 79 (1950) when it was

confronted with such an inequitable demand for disgorgement refused to award it even though the defendant had defrauded the plaintiff out of his business. The situation is more inequitable here. Defendants took nothing from their clients, and have already paid them $37 million in profits. That is more than fair compensation to the victims of NAI's profitable investment advice. An order to pay any amount of "disgorgement" in these circumstances would be an unauthorized penalty or forfeiture which "Congress prohibited the SEC from seeking." *Liu* p. 1946.

CONCLUSION

The SEC's request for disgorgement does not follow the mandate of *Liu.* Under *Liu*, no disgorgement of any amount is allowable in this case. This Court should exercise its discretion equitably. Equity and *Liu* require that no disgorgement or prejudgment interest or penalties be allowed.

Respectfully submitted,

DATED: November 15, 2020          LAW OFFICES OF SAMUEL KORNHAUSER

By:/s/ Samuel Kornhauser
Samuel Kornhauser, Esq.
CA Bar No. 83528
Law Offices of Samuel Kornhauser
155 Jackson Street, Suite 1807
San Francisco, California, 94111
Telephone: (415) 981-6281
Email: skornhauser@earthlink.net

BROOKS & DeRENSIS
Steven Brooks
111 Devonshire Street, Suite 800
Boston, MA 02109
Telephone: (857) 259-5200
Email: sbrooks@bdboston.com

Attorneys for Defendants

-15-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed on this date through the ECF system and will be sent to the registered participants as identified on the Notice of Electronic Filing (NEF) as of this date of this filing.

November 16, 2020                                         By:  *<u>Dan Cowan</u>*
                                                                    Dan Cowan

# EXHIBIT A

**NASDAQ OMX**

October 26, 2009

David Martin
Chief Compliance Officer
Virtus Investment Partners
100 Pearl Street
Hartford, CT 06103

Dear Mr. Martin,

The attached document is a summary of the activity that NASDAQ OMX conducted on behalf of F-Squared Investments and the AlphaSector Rotation Index. Please do not hesitate to contact me if I can be of further benefit.

I have also reviewed the letter from Howard Present of F-Squared Investments to you dated October 12, 2009, and find that it is factual and accurate in regard to all references to NASDAQ.

Sincerely,

Robert J. Hughes
Director - Index Services - Global Financial Products
NASDAQ OMX Group

EXHIBIT
403
6/25/19

*A Summary of Activity by NASDAQ OMX on Behalf of F-Squared Investments' AlphaSector Rotation Index (ASRX and ASRN):*

In August, 2008 F-Squared Investments approached our firm with the intent of having NASDAQ act as a calculation agent for purposes of calculating and disseminating the values of their Index to various market data vendors. In early September, 2008 we completed the contract negotiations and began the process of converting their existing live investment strategy to a daily valued, public index.

F-Squared provided a broad spectrum of data to us in order for us to begin the project. Our delivery requirements were to calculate the historical return stream reflecting their active investment strategy in a manner that was as consistent as possible within an index environment, as well as to begin daily calculation and dissemination as soon as possible. We went live with the daily calculation component on October 15, 2008, with the ticker symbols ASRX (dividends and interest reinvested) and ASRN (price only).

F-Squared provided NASDAQ the following data and information:
- Portfolio Construction Methodology (which is included as Exhibit A);
- Constituents of the Index, currently and historically;
- Portfolio trade decisions, which F-Squared referred to as "Signals". These Signals reflected the actual output of their proprietary analytical model historically, and when used in conjunction with the Methodology and Constituency allowed us to recreate their historical track record using our data feeds and calculation engine;
- Confirmation that the data was approved by their Index Investment Committee.

F-Squared is the Manager for the Index, has provided confirmation that they, through their subsidiary Active Index Solutions, own the IP associated with the index, and provide us the ongoing data feeds that allows NASDAQ to rebalance and reconstitute the Index on a monthly basis.

The aspects of this strategy that facilitated its conversion to a daily valued index are the following:
- A rule based portfolio construction methodology;
- A quantitatively driven investment decision process;
- Historical output reflecting the actual security trading decisions;
- Supervision and oversight by a credible Index Investment Committee;
- Periodic trading decisions (e.g. monthly).

There were a few items that had to be worked through in order to successfully recreate the historical track record and prepare daily calculations. These were resolved in a manner that met industry standards as we define them regarding index calculations.

First, the ETF that traded as a category was not available back to the inception date of the track record. We worked with F-Squared to identify an appropriate non-ETF return proxy to use for periods prior to the availability of the Treasury ETF.

Second, the timing of data feeds from F-Squared to NASDAQ needed to be worked through. The agreed to final approach was for F-Squared to deliver to our operations team the updated index holdings and weights on the Monday prior to the last Friday in the month. We construct the Index on a pro forma basis based on start of day pricing for that Monday, but do not implement the new index structure until the close of business on the following Friday. The final weights used reflect the appropriate market

impact from Monday through Friday's close. This approach was used consistently in the calculation of all historical index values.

I understand that some of the drivers behind requesting this letter are in regard to the assessment of the inception date of the Index. We understand that this is a situation that occurs from time to time, especially when index calculation agents are changed after inception of an index, and is not necessarily unique to ASRX. There is of course a material difference between backtested data and historical data. The key facts as I understand them are:

1. NASDAQ OMX began publishing and disseminating the Index value on a daily basis beginning October 13, 2008. We began generating the index values prior to October 13, 2008 for internal purposes, but these data points were not disseminated on a live basis.

2. NASDAQ calculated historical values of the index back to the inception date as defined by F-Squared. It is our understanding that all ASRX and ASRN values that F-Squared publishes are the values calculated by NASDAQ.

3. NASDAQ calculated the historical data based on data feeds provided to us. This data was indicated to represent live, historical investment decisions, and was to have been reviewed and approved by their Investment Committee.

4. In the week preceding the date that NASDAQ initially began disseminating the ASRX and ASRN values, we distributed to the industry's market data vendors a package of information, including 1) index name and ticker symbol, 2) index description, and 3) historical track record as calculated by our firm. The historical track record went back to the inception date of April 1, 2001.

One question that has been asked of us is the availability of historical index values on our website, specifically index values that would proceed the date we began publicly disseminating index data.

The difficulty we have in providing this from our public database is that, prior to publishing the index values on our main production platform, we use a secondary database to calculate the historical returns, verify methodology accuracy, and run the index on a simulated basis for a test period prior to live production. Our systems do not currently allow us to transfer these historical index values to our production platform retroactively.

This is a concern that has appeared for other clients as well. To resolve this concern, we will shortly be making available the historical index values on our website for several clients, including F-Squared, however these data sets will still not be available on the production platform. It will clearly indicate that the index values have been calculated by NASDAQ using a methodology and approach identical to that currently in use. We anticipate completing this effort for F-Squared within the next several weeks.

If I can be of any further support, please let me know.

Sincerely,

Robert J. Hughes
Director - Index Services - Global Financial Products
NASDAQ OMX Group

3(4)

## Exhibit A: ASRX – AlphaSector™ Rotation: Index Construction Methodology

The AlphaSector™ Rotation Index (ticker symbol ASRX, the "Index") is a quantitatively driven index that mirrors an investment strategy that dates back to 2001. The index is governed by the Index Investment Committee of Active Index Solutions, LLC ("AIS"). AIS is a wholly owned subsidiary of F-Squared Investments Inc, and is exclusively in the business of constructing and licensing index products.

The AIS Index Investment Committee is responsible for approving the analytical engine determining buy and sell signals for the Index, and requires a 80% approval vote for any changes to the model. The Committee meets at least annually to review the Index and investment methodology.

The Index is calculated and disseminated on behalf of Active Index Solutions, LLC by NASDAQ OMX.[1]

### Index Construction

The eligible investments within the Index are the nine Select Sector SPDRs exchange traded funds ("ETFs") and an ETF representing 1 – 3 month Treasuries (ticker BIL). The Index has the potential to be invested in any combination of the nine SPDRs including all nine at the same time, a combination of sector SPDRs and the Treasury ETF, or can be 100% invested in the Treasury ETF.

The Index is re-evaluated for modifications to the existing constituency on a monthly basis, as well as rebalanced on a monthly basis. The decisions for which sector ETFs are included in the portfolio at any time is made by a proprietary analytical engine that evaluates "true" sector trends while adjusting for market noise and for changing levels of volatility in the market. This engine has been developed over a period of time dating back to 2001, and has had Private Wealth Client assets managed based on its output over that entire time period.

The Index uses a binary model for determining weights of represented sector ETFs. If a sector receives a positive signal for investing, it is included in the Index. If a sector receives a neutral or negative signal, it is removed from the Index. All sectors represented are equal weighted, with a maximum allocation capped at 25% of the Index at the time of rebalancing.

If there are 3 or fewer sectors represented at a given time, the remainder of the portfolio (reflecting the 25% maximum cap per sector) is invested in the short term Treasury ETF (ticker BIL), representing cash equivalents. The Index can be 100% invested in BIL if all sectors receive a neutral or negative rating at the time of reconstitution.

The Index is reconstituted and rebalanced at the close of trading on the last Friday of every month. If the market is closed on the last Friday, it would be reconstituted at the end of trading on the prior Thursday.

There are two performance track records generated for the Index, reflecting a Price Return (ASRN) and a Total Return (ASRX) calculation. ASRX reflects a reinvestment of all dividends and interest distributions made by any of the underlying ETFs.

4(4)

# EXHIBIT B

**From:** Howard Present <hpresent@f-squaredinvestments.com>
**Sent:** Tuesday, August 26, 2008 11:36 AM
**To:** David Morton <david.morton@mortonfin.com>
**Subject:** RE: NewFound Research
**Attach:** image004.png



Thanks. Call when reviewed and I will swing by and put ink to paper.

*Howard Present*

*F-Squared Investments, Inc.*
*Thought Leadership. Cost Leadership.™*

70 Walnut Street, Wellesley, MA 02481
hpresent@f-squaredinvestments.com
p: 781-237-3008; f: 781-239-8005; c: 617-610-5570





www.f-squaredinvestments.com; www.activeindexsolutions.com

> **From:** David Morton [mailto:david.morton@mortonfin.com]
> **Sent:** Tuesday, August 26, 2008 11:15 AM
> **To:** hpresent@f-squaredinvestments.com
> **Subject:** RE: NewFound Research
>
> 2003.. similar model.. tom, my guy is reviewin again..should have by 4
>
> *Learn more about our firm by visiting our website at www.mortonfin.com*

## MORTON FINANCIAL

*asking questions, finding solutions*
*David J. Morton*
*Director, Morton Financial*

62 Walnut St. 3rd Floor Wellesley, MA 02481
Tel: 781-263-1688  •  Toll Free: 800-782-4451  •  Fax: 781-431-1883
**Wellesley**    ❖    **Vineyard Haven**    ❖    **Sherborn**

*Securities exclusively through Raymond James Financial Services, Inc. Member FINRA/SIPC*
Raymond James Financial Services does not accept orders and/or instructions regarding your account by e-mail, voice mail, fax or any alternate method. Transactional details do not supersede normal trade confirmations or statements. E-mail sent through the Internet is not secure or confidential. Raymond James Financial Services reserves the right to monitor all e-mail. Any information provided in this e-mail has been prepared from sources believed to be reliable, but is not guaranteed by Raymond James Financial Services and is not a complete summary or statement of all available data necessary for making an investment decision. Any information provided is for informational purposes only and does not constitute a recommendation. Raymond James Financial Services and its employees may own options, rights or warrants to purchase any of the securities mentioned in e-mail. This e-mail is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this message in error, please contact the sender immediately and delete the material from your computer.

> **From:** Howard Present [mailto:hpresent@f-squaredinvestments.com]
> **Sent:** Tuesday, August 26, 2008 10:22 AM
> **To:** David Morton
> **Subject:** NewFound Research
>
> Jay,

Confidential Treatment Requested By F-Squared

Case 1:17-cv-11633-DJC   Document 244-7   Filed 11/16/20   Page 24 of 104
Case 1:17-cv-11633-DJC   Document 236-7   Filed 09/03/19   Page 171 of 465
Case 1:14-cv-14692-LTS   Document 188-16   Filed 10/28/16   Page 2 of 2

Great update meeting with Corey this am.  Just what I needed.

His new approach is thoughtful, and creates a lot more resolution, but need to confirm back-tested versus live periods.  The original data/approach was based off of rolling 40-week periods.  Therefore two quick questions:

1. How long has live money been managed against a version of this sector rotation model?
2. Was the original model similar to the rolling 40 week version, or something else?

HP

*Howard Present*

*F-Squared Investments, Inc.*
*Thought Leadership.  Cost Leadership.*™

*70 Walnut Street, Wellesley, MA  02481*
*hpresent@f-squaredinvestments.com*
*p:  784-237-3008;  f:  781-239-8005;  c:  617-610-5570*

*www.f-squaredinvestments.com; www.activeindexsolutions.com*

Confidential Treatment Requested By F-Squared

# EXHIBIT C

Case 1:17-cv-11633-DJC Document 344 Filed 11/16/20 Page 26 of 104
Case 1:17-cv-11633-DJC Document 236-7 Filed 09/03/19 Page 199 of 465
Case 1:14-cv-14692-LTS Document 188-28 Filed 10/28/16

**EXHIBIT**
**#22**

| | |
|---|---|
| From: | Howard Present <hpresent@f-squaredinvestments.com> |
| Sent: | Wednesday, September 3, 2008 12:49 PM |
| To: | 'Corey Hoffstein' <corey@hoffstein.com> |
| Subject: | RE: Spoke with Jay |

If you would that would be ideal.

Howard Present

F-Squared Investments, Inc.
Thought Leadership. Cost Leadership.TM

16 Laurel Avenue, Suite 150
Wellesley, MA 02481
hpresent@f-squaredinvestments.com
p: 781-237-3008; f: 781-235-9155; c: 617-610-5570

www.f-squaredinvestments.com; www.activeindexsolutions.com

-----Original Message-----
From: Corey Hoffstein [mailto:corey@hoffstein.com]
Sent: Wednesday, September 03, 2008 12:11 PM
To: Howard Present
Subject: Spoke with Jay

Howard,
    I spoke with Jay. He said before I began systemizing, he used the 60
week moving average. If you are interested, I can pull up the
historic information for you.

Corey

EXHIBIT 174
WIT: Hoffstein
DATE: 1/2/11
JILL E. SHEPHERD, RPR, CSR

Confidential Treatment Requested By F-Squared

**EXHIBIT #23**

| | |
|---|---|
| From: | Howard Present <hpresent@f-squaredinvestments.com> |
| Sent: | Wednesday, September 3, 2008 1:50 PM |
| To: | 'Juan Vargas' <jvargas@f-squaredinvestments.com> |
| Subject: | FW: Spoke with Jay |
| Attach: | 60 week sma.zip; ATT00054.txt |

Howard Present

F-Squared Investments, Inc.
Thought Leadership. Cost Leadership.TM

16 Laurel Avenue, Suite 150
Wellesley, MA 02481
hpresent@f-squaredinvestments.com
p: 781-237-3008; f: 781-235-9155; c: 617-610-5570

www.f-squaredinvestments.com; www.activeindexsolutions.com

-----Original Message-----
From: Corey Hoffstein [mailto:corey@hoffstein.com]
Sent: Wednesday, September 03, 2008 1:08 PM
To: hpresent@f-squaredinvestments.com
Subject: Re: Spoke with Jay

Attached.

| | | PLTF. |
|---|---|---|
| EXHIBIT | 660 | DEFT. |
| WITNESS | Present | |
| CONSISTING OF | 84 | PAGES |
| DATE | 8-11-16 | |

BEHMKE REPORTING AND VIDEO SERVICES, INC.



Confidential Treatment Requested By F-Squared

F902

| Date | Price | 40 Week SMA | Trend Direction |
|---|---|---|---|
| 2/25/2001 | 18.75 | 17.86114754 | -1 |
| 3/4/2001 | 19.51 | 17.81016393 | -1 |
| 3/11/2001 | 17.62 | 17.75196721 | -1 |
| 3/18/2001 | 17.19 | 17.70606557 | -1 |
| 3/25/2001 | 17.38 | 17.66393443 | -1 |
| 4/1/2001 | 17.82 | 17.65278689 | -1 |
| 4/8/2001 | 18.58 | 17.65344262 | 1 |
| 4/15/2001 | 19 | 17.67081967 | 1 |
| 4/22/2001 | 19.51 | 17.69786885 | 1 |
| 4/29/2001 | 19.75 | 17.73721311 | 1 |
| 5/6/2001 | 19.77 | 17.75409836 | 1 |
| 5/13/2001 | 21.22 | 17.78754098 | 1 |
| 5/20/2001 | 20.1 | 17.7952459 | 1 |
| 5/28/2001 | 20.14 | 17.80606557 | 1 |
| 6/3/2001 | 20.39 | 17.82459016 | 1 |
| 6/10/2001 | 19.43 | 17.82901639 | 1 |
| 6/17/2001 | 19.06 | 17.8304918 | 1 |
| 6/24/2001 | 19.29 | 17.82868852 | -1 |
| 7/1/2001 | 19.12 | 17.81885246 | -1 |
| 7/8/2001 | 19.57 | 17.81508197 | -1 |
| 7/15/2001 | 19.56 | 17.83508197 | 1 |
| 7/22/2001 | 18.94 | 17.83836066 | 1 |
| 7/29/2001 | 18.97 | 17.85180328 | 1 |
| 8/5/2001 | 19 | 17.86344262 | 1 |
| 8/12/2001 | 18.98 | 17.89081967 | 1 |
| 8/19/2001 | 19.45 | 17.93409836 | 1 |
| 8/26/2001 | 19.15 | 17.97229508 | 1 |
| 9/3/2001 | 18.32 | 17.98229508 | 1 |
| 9/9/2001 | 15.52 | 17.95622951 | -1 |
| 9/23/2001 | 16.89 | 17.95655738 | 1 |
| 9/30/2001 | 17.22 | 17.95852459 | 1 |
| 10/7/2001 | 17.77 | 17.9552459 | -1 |
| 10/14/2001 | 17.33 | 17.94754098 | -1 |
| 10/21/2001 | 18.19 | 17.96081967 | 1 |
| 10/28/2001 | 17.99 | 17.97442623 | 1 |
| 11/4/2001 | 18.5 | 18.00459016 | 1 |
| 11/11/2001 | 19.23 | 18.06065574 | 1 |
| 11/18/2001 | 19.59 | 18.13491803 | 1 |
| 11/25/2001 | 19.54 | 18.19885246 | 1 |
| 12/2/2001 | 19.5 | 18.25672131 | 1 |
| 12/9/2001 | 18.65 | 18.31590164 | 1 |
| 12/16/2001 | 18.85 | 18.38180328 | 1 |
| 12/23/2001 | 19.08 | 18.43786885 | 1 |
| 12/30/2001 | 19.7 | 18.4857377 | 1 |
| 1/6/2002 | 18.69 | 18.51819672 | 1 |

F904

# EXHIBIT D



**EXHIBIT #84**

## In The Matter Of:

*Securities and Exchange Commission v.*
*Howard B. Present*

---

*Howard Brian Present*
*February 16, 2016*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California  94105*
*(415) 597-5600*

Original File 28762Present.txt
Min-U-Script® with Word Index

Securities and Exchange Commission v.
Howard B. Present

Howard Brian Present
February 16, 2016

Page 97

1    A. We eventually came up with a formal
2    decision. The -- the date that we wanted to start
3    with was designed to match what -- when Morton
4    started running live assets. For this, this is just
5    a pricing template. So as long as it went at least
6    as far back as that, that would have been fine.
7    Q. And when did you -- when did Morton
8    Financial start applying its sector rotation
9    strategy to ETF's?
10   A. We were informed, or at least I was
11   informed by him of April of 2001.
12   Q. Okay. Did you ever see anything in writing
13   that showed that that was true?
14   A. Not for the April 1st of 2001 in writing.
15   I haven't seen anything that specifies that.
16   Q. Wasn't it important, if that was going to
17   be the start date for the AlphaSector index, and if
18   you were intending to match that index to something
19   that Morton Financial had actually done, wasn't it
20   kind of important to find out what they really did
21   and not just take Mr. Morton's word for it?
22   A. Well, he provided in writing an email
23   confirmation that there is a five-year track record
24   for the sector rotation strategy with live client
25   assets, and then in subsequent communications

Page 98

1    between him and Mr. Hoffstein or from him and Mr.
2    Hoffstein, they indicated that they actually went
3    prior to that, and I believe the final determination
4    of April of 2001, which added a year and a half or
5    so on to it, came from a phone conversation.
6    Q. Do you have any notes of that phone
7    conversation?
8    A. Not that I've seen.
9    Q. All right. Let's go to the next exhibit.
10   Actually, before we do, Mr. Present, I'm
11   sorry. Who was that phone call with?
12   A. Mr. Morton.
13   Q. And when did it take place?
14   A. I believe in early September of 2008.
15   Q. Before or after F-Squared entered into the
16   data provider agreement?
17   A. I believe it was after.
18   Q. Okay. Well, let me show you what was
19   previously marked as Deposition Exhibit 48.
20   A. (Pause.) Okay.
21   Q. Is -- is Exhibit 48 a chain of emails
22   between yourself and Mr. Morton on August 26th,
23   2008?
24   A. Yes.
25   Q. And if you look at the early -- your

Page 99

1    early -- the earliest email in the chain, which
2    starts at the bottom of the first page and carries
3    over, were you telling Mr. Morton about some -- a
4    meeting you had had with Mr. Hoffstein?
5    A. Yes.
6    Q. And when you wrote "His new approach is
7    thoughtful, and creates a lot more resolution," what
8    did you mean?
9    A. Well, as I recall, or certainly as some of
10   this -- my memory's been refreshed, but he walked me
11   through -- "he" being Mr. Hoffstein had a
12   presentation deck, and they walked through me and --
13   and probably Mr. Vargas through the operations of
14   the current algorithm that was in place. I think
15   you've referred to this as the Hoffstein algorithm.
16   And we got some insight into some of the technology
17   and mathematics that went into it. And in this
18   case, I'd be saying that it creates better
19   resolution on buy and sell timing than the simple
20   moving average version prior.
21   Q. Okay. And in this context, what does
22   "resolution" mean?
23   A. It's in all likelihood referring to the
24   accuracy of when to buy and when to sell.
25   Q. So was it your understanding at this point

Page 100

1    that Mr. Hoff -- well, strike that.
2    Was Mr. Hoffstein still working on the
3    algorithm, as you understood it, here in late August
4    2008?
5    A. Well, as I testified earlier, I tend to
6    view these things as always work in product -- or
7    work in process. So I assumed he was still working
8    on making enhancements.
9    Q. And then -- all right. And then you wrote,
10   "The original data/approach was based off of rolling
11   40-week periods."
12   Is that another way of referring to the
13   simple moving average?
14   A. Yes.
15   Q. Over a 40-week period?
16   A. Yes.
17   Q. Okay. And then you asked a couple of
18   questions about how long live money had been managed
19   against it and was the original model similar to the
20   rolling 40-week version. Is that -- did I sort of
21   summarize that okay?
22   A. Yes.
23   Q. All right. If you'll look at the next
24   email --
25   MR. COLLORA: Next email in that same exhibit?

Case 1:17-cv-11633-DJC Document 344 Filed 11/16/20 Page 32 of 104
Case 1:17-cv-11633-DJC Document 236-7 Filed 03/03/19 Page 136 of 405
Case 1:14-cv-14692-LTS Document 188-91 Filed 10/28/16 Page 42 of 122

Securities and Exchange Commission v.
Howard B. Present

Howard Brian Present
February 16, 2016

---

**Page 161**

1   2008, did you ask Mr. Vargas to try to get the data
2   for those time series all the way back to the
3   beginning of 2001 and all the way forward to the end
4   of 2008 — July 2008?
5     A. I don't remember having a conversation that
6   specific, but I do know we were preparing materials
7   for our index investment committee review that
8   month, and that would have been something that not
9   only would have been valuable, but I believe was
10  presented at that meeting.
11    Q. Okay. Did you — strike that.
12     Okay. Let's go to the next exhibit. I'd
13  like to show you what was previously marked as
14  Exhibit 53.
15    A. (Pause.) Okay.
16    Q. Is Exhibit 53 an email that you sent to the
17  employees at F-Squared on September 5th, 2008?
18    A. Yes.
19    Q. And who prepared the attachments to
20  these — oh, yeah. Who prepared the attachments to
21  the exhibit?
22    A. I believe Juan Vargas.
23    Q. Okay. Now, again, this is a yes-or-no
24  question: You did not consult an attorney about
25  this email before sending it to the F-Squared

---

**Page 162**

1   employees; is that fair to say?
2    A. I don't believe so.
3    Q. Okay. Now, looking at the email in the
4  first paragraph, you began by writing, "We have
5  compiled the pro forma 'true' track record for the
6  product."
7     Starting with the phrase, what does "pro
8  forma" mean in this context?
9    A. I'm not sure. I know what "true" means.
10  I'm not sure what I meant by "pro forma."
11    Q. Okay. And we're looking at the phrase
12  "'true' track record." Why did you put the word
13  "true" in quotation marks?
14    A. Because we had to splice output from three
15  different data engines to reflect the various time
16  periods that Morton had been using those engines for
17  their sector rotation product.
18    Q. Okay. And I think that's — moving ahead
19  to the next sentence, the 60-week simple moving
20  average, the 40-week simple moving average, and
21  signals from Mr. Hoffstein's algorithm, are those
22  the "discrete data 'engines,'" in quotes, that you
23  were referring to?
24    A. Yes.
25    Q. Now, do you — I'm sorry. Just a second.

---

**Page 163**

1   (Pause.) I'll come back to that.
2    Do you consider a simple moving average to
3  be a, quote, data engine?
4    A. It can be.
5    Q. Okay. I guess what does the term "data
6  engine" mean —
7    A. Well —
8    Q. — to you?
9    A. — any calculation that you have inputs and
10  generates consistent outputs.
11    Q. And when you wrote "it reflects" — quote,
12  "it reflects the true calendar periods that each
13  data engine was in use," what did you mean?
14    A. I mean it was a reflection of what we
15  understood Morton Financial had been using — for
16  the time period they'd been using those three
17  different data engines that they had sent us.
18    Q. Okay. And what did you understand the —
19  the different calendar periods to be at the time you
20  sent this email on September 5th, 2008?
21    A. I understood them to be the time periods
22  that those products were in use at Morton's shop.
23    Q. Okay. But let's be — you've identified
24  two different simple moving averages, and then Mr.
25  Hoffstein's algorithm. How did you line them up

---

**Page 164**

1   sequentially in time as you understood it?
2    A. As I understood them, April 2001 forward
3  would have been the 60-week, and somewhere in 2003
4  would have transitioned to the 40-week, and then in
5  the summer of 2008 transitioned to the custom
6  engine.
7    Q. Now, did you ever get anything in writing
8  from Morton Financial that confirmed that chronology
9  that you just laid out for us?
10    A. Yes.
11    Q. What did you get from them?
12    A. Well, we had the information from Hoffstein
13  indicating the custom engine came online in the
14  summer of 2008, and I had an email from Morton
15  referring to a 2003 start date for the 40-week.
16    Q. Okay. Any other documents that confirmed
17  the chronology, as you've laid it out for us, beside
18  those two?
19    A. Not that I've seen.
20    Q. Now, if you — looking at the exhibits,
21  what —
22    MR. COLLORA: Exhibit 53?
23    MR. HUNTINGTON: I'm sorry. I meant the word
24  "attachments." Sorry about that.
25    MR. COLLORA: Okay.

---

Case 1:17-cv-11633-DJC Document 246-7 Filed 11/16/20 Page 33 of 104
Case 1:14-cv-14692-LTS Document 236-7 Filed 09/03/19 Page 192 of 465
Securities and Exchange Commission v.          Document 188-91   Filed 10/28/16   Page 33 of 122
Howard B. Present
Howard Brian Present
February 16, 2016

Page 125

1   Q.  What was your understanding at the time?
2   A.  That would have been based on conversations
3   with Mr. Hoffstein, Mr. Nicastro, Mr. Morton, and
4   Mr. Capobianco.
5   Q.  Do you have a different understanding
6   today?
7   A.  No.  I have further understanding -- I mean
8   I have a better understanding of that today.  So
9   there's more documents that have been added to the
10  list.
11  Q.  Okay.  When Mr. Hoffstein wrote, "He said
12  before I began systemizing," and you assumed that
13  the "he" meant Mr. Morton; is that fair to say?
14  A.  That's the way I read this.
15  Q.  Okay.  And then Mr. Hoffstein wrote, "he
16  used the 60-week moving average," did you have an
17  understanding of what the word "used" meant in that
18  sentence?  In what way did Morton Financial use a
19  60-week moving average?
20  A.  Seems pretty obvious to me, he meant that
21  he used it on behalf of his clients.  And since this
22  was being sent to me by Mr. Hoffstein, I assumed it
23  was with regard to the sector rotation strategy.
24  Q.  Okay.  Well, did you understand that Mr.
25  Morton sometimes consulted a 60-week moving average

Page 126

1   when making investment suggestions to a client?
2   A.  No.
3   Q.  Okay.  Did you -- what did you -- did you
4   understand that whenever the 60-week moving average
5   trend changed, he did something on behalf of a
6   client?
7   A.  Can you -- what time frame are you
8   referring --
9   Q.  Well, what did you understand -- when Mr.
10  Hoffstein sent this to you, and he used the word
11  "used," Morton Financial "used the 60-week moving
12  average," you -- what did the word "used" mean?
13  There are different ways to use a moving average.
14  What did you think?
15  MR. COLLORA:  Objection.
16  A.  Yeah.  I --
17  MR. COLLORA:  Argumentative.
18  A.  Well, as I believe I testified, given the
19  context, he's referring to the custom algorithm, and
20  since Corey Hoffstein, the only interaction I had
21  with him is in regard to the sector rotation
22  strategy.  So I interpreted this to mean that he had
23  used, in addition to the 40-week simple moving
24  average and the custom algorithm, that he had also
25  used a 60-week algorithm to manage client assets for

Page 127

1   the sector rotation strategy.
2   Q.  Okay.  And did you understand that whenever
3   the trend in the 60-week moving average changed for
4   a particular ETF, Morton Financial did something on
5   behalf of -- you know, with respect to the
6   investment for real clients?
7   A.  I would assume they would have used it in a
8   similar manner, so it would have been information
9   that would have been deployed for the benefit of
10  their clients.
11  Q.  Okay.  Would --
12  A.  Or some of their clients.
13  Q.  Would -- as you understood it, was --
14  Morton Financial provided investment suggestions or
15  advice to clients; is that -- did you understand
16  that?
17  A.  I didn't have a lot of insight to how Mr.
18  Morton or Capobianco ran their business.
19  Q.  Okay.  You didn't think that Morton
20  Financial had the actual ability to make the
21  investment decisions on behalf of their clients, did
22  you?
23  A.  That's one of the two options.
24  Q.  But did they?  Did you understand that they
25  actually had custody of investor -- of client assets

Page 128

1   and were making decisions on behalf of the clients?
2   A.  Well, my understanding would have been they
3   would have controlled custody, either at Wachovia
4   Securities or Raymond James.  They may have been
5   able to custody -- I know they did business with
6   Fidelity, so they may have been able to custody at
7   Fidelity.  So they controlled custody decisions.
8   And firms and individuals set up either a
9   discretionary or nondiscretionary approach, and it
10  was really based on their business model.  I don't
11  have insight to how they made that determination.
12  Q.  Okay.  As of the summer of 2008, did you
13  have -- did you believe that Morton Financial
14  exercised investment discretion over any client
15  assets?
16  A.  I don't know that I had insight into those
17  decisions.
18  Q.  Okay.  Did you understand -- if they
19  didn't -- strike that.
20  What kind of -- strike this too.
21  So in what way did you think Morton
22  Financial, you know, used a 40-week or a 60-week
23  simple moving average?  I mean how do you -- you get
24  information every week or every month; is that fair
25  to say?

Page 345

```
 1      Q.  No.  It's all right.
 2         MR. HUNTINGTON: Okay.  Mr. Present, you'll be
 3   happy to know I think we're done, unless your -- Mr.
 4   Collora wants to ask anything.
 5         MR. COLLORA: I have three hours of questioning.
 6         MR. HUNTINGTON: Hey, I'll stay as long as it
 7   takes, Mike.
 8         MR. COLLORA: We're done.
 9         MR. HUNTINGTON: We're done.
10         THE VIDEOGRAPHER: The time is 6:38.  We are
11   going off the record.
12            (At 6:39 P.M., the deposition
13         proceedings concluded.)
14
15
16            _____
17            HOWARD BRIAN PRESENT
18
19
20
21
22
23
24
25
```

Page 346

```
 1   COMMONWEALTH OF MASSACHUSETTS )
 2   SUFFOLK              )
 3         I hereby certify that the witness in the
 4   foregoing deposition, HOWARD BRIAN PRESENT, was by me
 5   duly sworn to testify to the truth, the whole truth and
 6   nothing but the truth, in the within-entitled cause;
 7   that said deposition was taken at the time and place
 8   herein named; and that the deposition is a true record
 9   of the witness's testimony as reported by me, a duly
10   certified shorthand reporter and a disinterested
11   person, and was thereafter transcribed into typewriting
12   by computer.
13         I further certify that I am not interested in
14   the outcome of the said action, nor connected with nor
15   related to any of the parties in said action, nor to
16   their respective counsel.
17         IN WITNESS WHEREOF, I have hereunto set my
18   hand this 24th day of February, 2016.
19   Reading and Signing was:
20   ___ requested  ___ waived  _X_ not requested
21
22       James A. Scally
23
24   JAMES A. SCALLY,, RMR, CRR, CSR,
25   NOTARY PUBLIC; COMMISSION EXPIRES APRIL 8, 2022
```

# EXHIBIT E

**samuel.kornhauser@gmail.com**

| | |
|---|---|
| **From:** | Daniel Pilcic <Dan_Pilcic@navellier.com> |
| **Sent:** | Monday, April 27, 2020 2:53 PM |
| **To:** | skornhauser@earthlink.net |
| **Cc:** | Tanya Alexander |
| **Subject:** | Data Request |
| **Attachments:** | Vireo Account Length Window.xlsx |

Hi Sam,

Attached are the account values as of 9/30/2013 for accounts opened in Alpha Sector Premium and Allocator between 8/10/2011 and 9/14/2012.

Best Regards,

**Daniel Pilcic**
Software Developer


Navellier & Associates
1 E Liberty Suite 504, Reno, NV 89501
800 365 8471 x 431 toll-free
(775) 785-9431, (775) 562-8255 fax
danielp@navellier.com
www.navellier.com

DISCLAIMER This email message is intended only for the personal use of the recipient(s) named above. This message may be privileged and confidential. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by email and delete the original message. Navellier & Associates Inc.'s outgoing and incoming emails are electronically archived and may be subject to review and/or disclosure to someone other than the intended recipient. The SEC suggests that clients compare the accuracy of portfolio statements provided by Navellier & Associates Inc. to statements provided to clients by their custodian Navellier & Associates, Inc. 1 East Liberty, Ste. 504 Reno, Nevada 89501 info@navellier.com Visit us on the web at: http://www.navellier.com

| Years Open | Column Labels | | |
| Row Labels | Alpha Sector Premium | Allocator | Grand Total |
| 1 | $27,735,527.71 | $166,502,261.29 | $194,237,789.00 |
| 2+ | $915,296.78 | $26,255,800.41 | $27,171,097.19 |
| Grand Total | $28,650,824.49 | $192,758,061.70 | $221,408,886.19 |

| Style | Portfolio | Title | Start Date | Start Amount | Assets 9/30/13 | Years Open |
|---|---|---|---|---|---|---|
| Alpha Sector Premium | 89843011 | Toothman, | 9/23/2011 | $100,000.00 | $136,142.24 | 2+ |
| Alpha Sector Premium | 182400 | Krise, Timo | 9/26/2011 | $300,000.00 | $409,974.15 | 2+ |
| Alpha Sector Premium | 258415 | Kotchey, K | 9/28/2011 | $120,000.00 | $163,679.37 | 2+ |
| Alpha Sector Premium | 726877 | Emigh, Emi | 9/28/2011 | $150,000.00 | $205,501.02 | 2+ |
| Alpha Sector Premium | 31215353 | Gerber, Jay | 10/4/2011 | $199,220.00 | $274,068.63 | 1 |
| Alpha Sector Premium | 31367304 | H M S & B I | 10/5/2011 | $149,600.00 | $255,435.00 | 1 |
| Alpha Sector Premium | 31371497 | Crenshaw, | 10/5/2011 | $140,532.00 | $195,546.31 | 1 |
| Alpha Sector Premium | 996572 | Richardson | 10/6/2011 | $135,000.00 | $204,508.55 | 1 |
| Alpha Sector Premium | 31366290 | Hurd, Anne | 10/10/2011 | $101,750.00 | $137,806.96 | 1 |
| Alpha Sector Premium | 31387049 | John T. & J | 10/12/2011 | $151,613.00 | $204,609.94 | 1 |
| Alpha Sector Premium | 158941 | Caruso, Joa | 10/17/2011 | $200,000.00 | $340,251.44 | 1 |
| Alpha Sector Premium | 31367382 | Dana Bedic | 10/27/2011 | $150,000.00 | $228,557.99 | 1 |
| Alpha Sector Premium | 31379331 | Scott, Gary | 10/31/2011 | $149,682.00 | $201,558.35 | 1 |
| Alpha Sector Premium | 31380299 | David Way | 10/31/2011 | $149,745.00 | $235,987.94 | 1 |
| Alpha Sector Premium | 31378914 | Arnold, Kat | 11/3/2011 | $124,337.00 | $243,467.71 | 1 |
| Alpha Sector Premium | 31380358 | Watson, A | 11/4/2011 | $150,000.00 | $301,248.62 | 1 |
| Alpha Sector Premium | 393606 | Andrew Be | 11/4/2011 | $55,500.00 | $76,102.42 | 1 |
| Alpha Sector Premium | 820261 | Bernstein, | 11/7/2011 | $111,000.00 | $153,208.36 | 1 |
| Alpha Sector Premium | 339946 | Mariano, R | 11/9/2011 | $115,000.00 | $156,174.32 | 1 |
| Alpha Sector Premium | 31380584 | Farris, Grar | 11/10/2011 | $146,253.00 | $196,884.34 | 1 |
| Alpha Sector Premium | 31380927 | Grizzly Pea | 11/10/2011 | $349,433.00 | $463,581.48 | 1 |
| Alpha Sector Premium | 31381456 | Sawyer, Ro | 11/15/2011 | $149,807.00 | $200,534.99 | 1 |
| Alpha Sector Premium | 31215758 | Grams, De | 11/16/2011 | $99,665.00 | $132,851.53 | 1 |
| Alpha Sector Premium | 31382642 | Zink, Donal | 11/16/2011 | $598,734.00 | $806,430.12 | 1 |
| Alpha Sector Premium | 31383166 | George C. l | 11/16/2011 | $150,000.00 | $223,170.61 | 1 |
| Alpha Sector Premium | 419168 | Ruben, Ricl | 11/16/2011 | $200,000.00 | $484,389.63 | 1 |
| Alpha Sector Premium | 31381060 | Newcomer | 11/17/2011 | $149,688.00 | $203,147.03 | 1 |
| Alpha Sector Premium | 12057769 | Foreman, D | 11/18/2011 | $140,000.00 | $191,474.54 | 1 |
| Alpha Sector Premium | 31381801 | Humes, Ro | 11/25/2011 | $146,618.00 | $202,038.42 | 1 |
| Alpha Sector Premium | 79409987 | Clint E. Nev | 11/25/2011 | $241,250.00 | $323,230.26 | 1 |
| Alpha Sector Premium | 31376883 | Henry, Dr. | 11/28/2011 | $258,636.00 | $348,913.06 | 1 |
| Alpha Sector Premium | 31385447 | Helsinger, | 11/29/2011 | $150,652.00 | $202,974.17 | 1 |
| Alpha Sector Premium | 554642 | Benovitz, D | 12/5/2011 | $452,000.00 | $693,903.33 | 1 |

| Allocator | 69576300 | Eddington, | 9/11/2012 | $150,000.00 | $160,436.28 | 1 |
| Allocator | 56297398 | Askoff, Keil | 9/12/2012 | $100,000.00 | $238,270.60 | 1 |
| Allocator | 76522314 | Mittelstadt | 9/12/2012 | $147,057.29 | $157,351.14 | 1 |
| Allocator | 70358911 | Fuller, Chri. | 9/13/2012 | $127,981.09 | $134,689.54 | 1 |

| Style | Style Name | | Date | Market Value |
|-------|------------|--|------|--------------|
| ADX | Alpha Sector AlphaDex | | 9/30/2013 | $415,408,849.00 |
| AEP | Alpha Sector Equity Plus | | 9/30/2013 | $50,980,403.96 |
| AGP | Alpha Sector Global Premium | | 9/30/2013 | $17,906,059.10 |
| AIP | Alpha Sector International Premium | | 9/30/2013 | $14,432,231.67 |
| ASP | Alpha Sector Premium | | 9/30/2013 | $224,787,113.01 |
| AWP | Vireo Allocator | | 9/30/2013 | $460,080,207.31 |
| AEX | Vireo AlphaDEX Equity Plus | | 9/30/2013 | $54,484,850.54 |
| AGX | Vireo AlphaDEX Global | | 9/30/2013 | $21,912,634.35 |
| AWX | Vireo AlphaSector AlphaDEX Allocator | | 9/30/2013 | $219,690,389.82 |
| | **Total** | | | **$1,479,682,738.76** |

# EXHIBIT F

# PROFITS RECEIVED AND FEES PAID BY CLIENTS WHO BECAME ALLOCATOR CLIENTS BETWEEN 8/10/2011 AND 9/30/2012

| Portfolio | Title | Start Date | Closure Date | FA Compar | FA Name | Fee Type | Start Amount | Flows | Closure Amount | Gain / Loss | Net IRR | Gross Revenue | Net Revenue | Gross First Qtr | Net First Qtr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 002777 | Williams, J. | 8/29/2011 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $102,000.00 | $0.00 | $119,984.12 | $17,984.12 | 17.63 | $2,144.62 | $631.15 | $0.00 | $0.00 |
| 002942 | Karsten, Gl | 10/11/2011 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $327,995.00 | $1,126.66 | $397,984.94 | $68,863.28 | 18.55 | $6,731.81 | $1,981.17 | $677.82 | $199.48 |
| 003007 | Smith, Jeff | 10/28/2011 | 1/2/2013 | Benjamin E | Russell Har | FIXCO | $166,000.00 | $100,329.21 | $287,332.40 | $21,003.09 | 10.12 | $2,716.97 | $799.60 | $0.00 | $0.00 |
| 003015 | Sampsell, D | 10/27/2011 | 12/2/2013 | Benjamin E | Russell Har | FIXCO | $347,375.00 | $0.00 | $404,914.55 | $57,539.55 | 16.56 | $6,755.91 | $1,988.27 | $603.54 | $177.62 |
| 003023 | Scollere, La | 10/28/2011 | 8/29/2013 | Benjamin E | David Hans | FIXCO | $200,000.00 | -$98,000.00 | $129,616.32 | $27,616.32 | 14.48 | $3,571.03 | $1,050.96 | $0.00 | $0.00 |
| 003197 | Irvin, Mark | 1/19/2012 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $275,000.00 | $0.00 | $293,287.32 | $18,287.32 | 12.59 | $4,493.64 | $1,322.48 | $511.32 | $150.48 |
| 003221 | Bredeman, | 2/1/2012 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $1,000,000.00 | $0.00 | $1,123,488.86 | $123,488.86 | 12.35 | $16,274.69 | $4,789.64 | $0.00 | $0.00 |
| 003262 | Heraty, Mi | 2/28/2012 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $234,256.00 | $0.00 | $258,962.87 | $24,706.87 | 10.92 | $3,603.07 | $1,060.39 | $0.00 | $0.00 |
| 003270 | Dorian, The | 2/28/2012 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $150,000.00 | $0.00 | $165,342.33 | $15,342.33 | 10.60 | $2,304.47 | $678.20 | $0.00 | $0.00 |
| 003288 | Heafey, Ka | 3/2/2012 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $68,513.00 | $0.00 | $75,972.53 | $7,459.53 | 10.82 | $1,049.85 | $308.97 | $0.00 | $0.00 |
| 003296 | Walls, Pete | 3/1/2012 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $108,000.00 | $0.00 | $119,615.27 | $11,615.27 | 10.64 | $1,658.87 | $488.20 | $0.00 | $0.00 |
| 006124 | Crosby Fan | 12/7/2011 | 12/2/2013 | T D Amerit | Jim Miller | 85 bps - AD | $50,000.00 | $57,000.00 | $121,745.13 | $14,745.13 | 14.22 | $1,465.71 | $366.44 | $27.95 | $6.99 |
| 006132 | Edward & I | 12/7/2011 | 12/2/2013 | T D Amerit | Jim Miller | 85 bps - AD | $60,000.00 | $0.00 | $67,629.86 | $7,629.86 | 12.72 | $982.19 | $245.56 | $33.53 | $8.38 |
| 008225 | James Cror | 12/2/2011 | 12/2/2013 | T D Amerit | Jim Miller | 85 bps - AD | $75,000.27 | $55,000.00 | $149,474.09 | $19,473.82 | 16.21 | $1,865.94 | $466.50 | $47.16 | $11.79 |
| 010544 | Thompson, | 12/2/2011 | 12/2/2013 | T D Amerit | Jim Miller | 85 bps - AD | $200,000.77 | $57,445.00 | $302,097.61 | $44,651.84 | 17.79 | $4,017.84 | $1,004.47 | $125.75 | $31.44 |
| 021502 | Moore, Cha | 2/9/2012 | 10/22/2013 | Morgan St | Christophe | 1% - ADV | $73,858.32 | $0.00 | $82,904.18 | $9,045.86 | 12.25 | $1,057.30 | $475.79 | $103.20 | $46.44 |
| 065069 | Johanna L. | 2/21/2012 | 10/22/2013 | Morgan St | Lorn Lymar | 1% - ADV | $198,633.88 | -$12,286.31 | $208,129.85 | $21,782.28 | 11.27 | $3,256.72 | $1,465.53 | $212.24 | $95.51 |
| 10191000 | Centercare | 6/4/2012 | 10/14/2013 | Wells Farg | Brian Boll | 1% - ADV | $683,830.74 | $461,180.75 | $1,302,248.36 | $157,236.87 | 15.81 | $14,576.36 | $6,559.36 | $485.78 | $218.60 |
| 10212840 | Drapeau, R | 12/20/2011 | 10/14/2013 | Ameriprise | Bruce Bevi | 1% - ADV | $525,857.00 | -$82,000.40 | $512,813.02 | $68,956.42 | 14.14 | $9,275.25 | $4,173.86 | $0.00 | $0.00 |
| 10265573 | Kennedy, E | 1/12/2012 | 10/14/2013 | Wells Farg | Steven Har | 1% - ADV | $199,516.00 | $62,500.00 | $291,796.86 | $29,780.86 | 13.80 | $3,890.68 | $1,750.81 | $431.83 | $194.32 |
| 10465988 | Detuncq, C | 1/4/2012 | 9/17/2012 | Wells Farg | Shawn Der | 1% - ADV | $99,683.00 | $0.00 | $108,147.01 | $8,464.01 | 8.49 | $756.01 | $340.21 | $237.60 | $106.92 |
| 10555133 | Mains, Gre | 2/10/2012 | 10/14/2013 | Wells Farg | Matthew R | 1% - ADV | $341,193.94 | $0.00 | $375,841.91 | $34,647.97 | 9.92 | $5,754.47 | $2,589.51 | $448.69 | $201.91 |
| 10572990 | Morrow, C | 10/27/2011 | 10/14/2013 | Wells Farg | Cameron N | 1% - ADV | $99,731.00 | $0.00 | $105,817.41 | $6,086.41 | 13.63 | $1,972.38 | $887.59 | $177.60 | $79.92 |
| 10625551 | Alexander, | 1/10/2012 | 10/14/2013 | Wells Farg | Richard Cis | 1% - ADV | $105,936.00 | -$12,500.00 | $103,733.40 | $10,297.40 | 9.44 | $1,902.65 | $856.18 | $235.09 | $105.79 |
| 10741031 | Stephen Sr | 4/9/2012 | 10/3/2013 | Stifel Nicol | Dave West | 85 bps - AD | $169,348.00 | $0.00 | $191,330.12 | $21,982.12 | 13.89 | $2,609.33 | $1,174.20 | $379.41 | $170.73 |
| 10747951 | Andoga Far | 2/28/2012 | 10/14/2013 | Wells Farg | Advisors | 85 bps - AD | $349,762.02 | $98,315.51 | $514,388.82 | $66,311.29 | 30.41 | $1,176.22 | $529.30 | $305.80 | $137.61 |
| 10828038 | Smith, Pau | 7/6/2012 | 10/14/2013 | Wells Farg | Eric Smith | 1% - ADV | $243,638.28 | -$120,000.00 | $150,339.22 | $26,700.94 | 11.47 | $3,162.52 | $1,423.13 | $559.17 | $251.63 |
| 11096204 | Stumer, Irv | 3/22/2012 | 10/14/2013 | Wells Farg | Dominick C | 90 bps - AD | $141,956.21 | -$8,000.00 | $148,613.18 | $14,656.97 | 10.71 | $2,128.04 | $957.63 | $0.00 | $0.00 |
| 11130003 | Smith, Leo | 11/11/2011 | 10/14/2013 | Wells Farg | John Adam | 1% - ADV | $92,804.00 | $0.00 | $107,259.17 | $14,455.17 | 14.71 | $1,603.26 | $721.47 | $122.04 | $54.92 |
| 11251636 | Greater An | 10/27/2011 | 10/14/2013 | Wells Farg | Matthew R | 1% - ADV | $146,956.00 | -$1,000.00 | $166,908.08 | $20,952.08 | 14.41 | $2,753.44 | $1,239.05 | $261.70 | $117.77 |
| 11267905 | Dexter, Jan | 11/17/2011 | 10/14/2013 | Wells Farg | Dwight Ens | 1% - ADV | $330,258.00 | -$90,956.00 | $253,803.17 | $14,501.17 | 13.21 | $6,045.54 | $2,720.50 | $398.12 | $179.15 |
| 11323328 | Robert M. | 10/19/2011 | 11/28/2011 | RBC Wealt | Tim R Bock | 1% - ADV | $299,095.00 | $0.00 | $298,112.47 | -$982.53 | -0.33 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11383997 | Boivin, Gre | 9/22/2011 | 9/16/2013 | Wells Farg | Beth Spark | 1% - ADV | $137,963.00 | $0.00 | $168,202.50 | $30,239.50 | 21.92 | $3,046.14 | $1,370.78 | $0.00 | $0.00 |
| 11592117 | Knue, Thac | 12/21/2011 | 5/24/2013 | LPL Financi | Zack Alkha | FIXCO | $133,948.00 | $0.00 | $154,456.74 | $20,508.74 | 15.31 | $2,173.07 | $977.90 | $0.00 | $0.00 |
| 11646962 | Kirkpatrick | 11/15/2011 | 10/14/2013 | Wells Farg | David Brad | 1% - ADV | $124,808.00 | $100,000.00 | $250,903.72 | $26,095.72 | 15.29 | $3,273.78 | $1,473.19 | $157.29 | $70.78 |
| 11740382 | Ansley T. T | 7/3/2012 | 11/13/2013 | Investmen | Bart Jones | 1% - ADV | $162,264.23 | $34,742.29 | $179,911.57 | -$17,094.95 | 11.86 | $2,100.88 | $945.39 | $390.14 | $175.56 |
| 11818721 | SR & SE Sch | 6/27/2012 | 10/14/2013 | Wells Farg | Richard Cis | 1% - ADV | $229,181.26 | $92,811.09 | $352,840.25 | $30,847.90 | 14.38 | $3,326.34 | $1,496.87 | $0.00 | $0.00 |
| 11882997 | Meadows, | 2/8/2012 | 10/14/2013 | Wells Farg | Roger Vlac | 1% - ADV | $99,676.25 | -$30,705.62 | $76,890.20 | $7,919.57 | 10.01 | $1,465.64 | $659.54 | $142.00 | $63.90 |
| 11958035 | Eckhoff, Cl | 10/27/2011 | 10/14/2013 | Wells Farg | Steve Perg | 1% - ADV | $249,686.00 | $0.00 | $290,295.40 | $40,609.40 | 16.26 | $5,141.91 | $2,313.87 | $444.65 | $200.09 |
| 12029073 | Beckett, W | 8/19/2011 | 10/14/2013 | Wells Farg | Matthew C | 1% - ADV | $113,136.00 | $0.00 | $133,785.25 | $20,649.25 | 18.25 | $2,589.69 | $1,165.35 | $123.98 | $55.79 |
| 12102988 | Asciutto, Jc | 8/26/2011 | 10/14/2013 | Wells Farg | Dominick C | 90 bps - AD | $218,267.00 | $0.00 | $256,626.19 | $38,359.19 | 17.57 | $4,781.17 | $2,151.52 | $197.34 | $88.80 |
| 12125433 | Lewis, Kay | 4/11/2012 | 10/14/2013 | Wells Farg | Terri Osnes | 1% - ADV | $99,666.21 | $0.00 | $110,322.35 | $10,656.14 | 10.69 | $1,523.17 | $685.42 | $217.85 | $98.03 |
| 12163615 | Armstrong | 10/5/2011 | 10/14/2013 | Wells Farg | Greg Wegg | 1% - ADV | $152,397.00 | $20,000.00 | $201,890.59 | $29,493.59 | 18.07 | $3,590.92 | $1,615.91 | $363.25 | $163.46 |
| 12166848 | The Alaska | 2/10/2012 | 10/14/2013 | Wells Farg | Alan & Det | 1% - ADV | $199,747.80 | $46,000.00 | $275,551.63 | $29,803.83 | 12.19 | $3,155.92 | $1,420.17 | $262.68 | $118.21 |
| 12173103 | Heiskell Jol | 9/20/2011 | 8/19/2013 | Wells Farg | Sam Cricht | 1% - ADV | $401,798.00 | $56,012.71 | $515,698.50 | $57,887.79 | 19.70 | $9,219.29 | $4,148.68 | $0.00 | $0.00 |
| 12316949 | Fahring, Di | 12/9/2011 | 8/28/2013 | Wells Farg | Michael W | 1% - ADV | $77,581.00 | $60,635.84 | $147,981.82 | $9,764.98 | 12.58 | $1,654.17 | $744.39 | $42.51 | $19.13 |
| 12365765 | Hauser, Te | 10/19/2011 | 10/14/2013 | Wells Farg | Mike Zahle | 1% - ADV | $180,787.00 | $0.00 | $190,378.47 | $29,591.47 | 17.35 | $3,647.83 | $1,641.53 | $361.57 | $162.71 |
| 12402618 | McKnelly, I | 8/15/2012 | 8/12/2013 | Wells Farg | Brooks Cor | 1% - ADV | $104,911.52 | $25,000.00 | $139,179.04 | $9,267.52 | 8.77 | $1,223.39 | $550.53 | $131.86 | $59.34 |
| 1251125_ | Forlenza, R | 4/26/2012 | 10/14/2013 | Wells Farg | Frank Delfi | 1% - ADV | $107,215.65 | $0.00 | $117,751.73 | $10,536.08 | 9.83 | $1,583.85 | $712.73 | $190.41 | $85.68 |
| 12559119 | Jones, Mar | 11/23/2011 | 9/6/2013 | Wells Farg | Advisors | 1% - ADV | $207,151.00 | -$9,508.56 | $232,783.57 | $35,141.13 | 17.34 | $4,124.38 | $1,855.98 | $209.99 | $94.50 |
| 12732319 | Jon Tkac, Ir | 8/29/2011 | 10/14/2013 | Wells Farg | James Chui | 1% - ADV | $456,841.00 | $0.00 | $532,723.64 | $75,882.64 | 16.84 | $10,191.92 | $4,586.35 | $400.52 | $180.23 |
| 12747081 | Orion Inves | 8/30/2011 | 10/14/2013 | Wells Farg | Advisors | 1% - ADV | $499,674.00 | $0.00 | $595,935.76 | $96,261.76 | 19.35 | $8,283.71 | $3,727.67 | $424.38 | $190.97 |
| 12753350 | Hazel, Thor | 9/26/2011 | 8/20/2013 | Wells Farg | Brian Hill | 1% - ADV | $229,975.00 | $0.00 | $263,871.30 | $33,896.30 | 14.74 | $4,954.48 | $2,229.51 | $0.00 | $0.00 |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 89804207 | Miller, Jack | 12/6/2011 | 11/28/2012 | Wells Farg | Matthew R | 1% - ADV | $104,889.00 | $0.00 | $111,832.44 | $6,943.44 | 6.51 | $1,168.71 | $525.92 | $71.84 | $32.33 |
| 89879046 | Carell, Jam | 1/27/2012 | 10/14/2013 | Wells Farg | David Brad | 1% - ADV | $99,732.00 | $30,000.00 | $144,608.92 | $14,876.92 | 11.84 | $2,211.05 | $994.97 | $169.41 | $76.23 |
| 89879864 | Bryant, Ga | 9/7/2011 | 1/11/2012 | Raymond J | Wonnie Sh | 1% - ADV | $99,870.00 | $0.00 | $101,339.01 | $1,469.01 | 1.47 | $310.71 | $139.82 | $62.93 | $28.32 |
| 907673 | Sirosky, Da | 1/6/2012 | 12/2/2013 | T D Amerit | Jim Miller | 85 bps - AD | $130,000.00 | $0.00 | $150,510.93 | $20,510.93 | 15.78 | $2,039.50 | $509.88 | $251.27 | $62.82 |
| 907699 | Sluman, Th | 12/14/2011 | 12/2/2013 | T D Amerit | Jim Miller | 85 bps - AD | $50,000.00 | $0.00 | $56,370.26 | $6,370.26 | 13.83 | $814.98 | $203.76 | $0.00 | $0.00 |
| 910206 | Sillyman, S | 12/9/2011 | 12/2/2013 | T D Amerit | Jim Miller | 85 bps - AD | $50,000.00 | $0.00 | $56,071.04 | $6,071.04 | 12.14 | $812.65 | $203.18 | $23.29 | $5.82 |
| 913182 | Deats, W. [ | 12/7/2011 | 12/2/2013 | T D Amerit | Jim Miller | 85 bps - AD | $75,000.00 | $44,752.44 | $137,609.84 | $17,857.40 | 15.41 | $1,750.04 | $437.52 | $41.92 | $10.48 |
| 97882150 | Sherrod, Br | 6/8/2012 | 11/13/2013 | Investmen | Scott Wint | 1% - ADV | $465,822.34 | $0.00 | $537,277.09 | $71,454.75 | 15.34 | $6,557.80 | $2,951.01 | $0.00 | $0.00 |
| | Alle | | | | | | $255,241,186.20 | | $297,942,201.85 | $33,689,836.22 | | $4,289,956.86 | $1,917,620.49 | $285,034.14 | $127,829.85 |
| | Prem | | | | | | $23,315,689.16 | | | | | | | | |

| | | |
|---|---|---|
| $278,556,875.36 | Plus Premium> | $6,270,948.50 |
| | Total | $39,960,784.72 |

# PROFITS RECEIVED AND FEES PAID BY CLIENTS WHO BECAME PREMIUM CLIENTS BETWEEN 8/10/2011 AND 9/30/2012

*(handwritten annotations at top: "fees pd to WFA", "net fee after license fee", "license fee fees", "net Revenue fees", "fees")*

| Portfolio | Title | Start Date | Closure Date | FA Company | FA Name | Fee Type | Start Amount | Flows | Closure Amount | Gain / Loss | Net IRR | Gross Revenue | Net Revenue | Gross First Qtr | Net First Qtr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 002777 | Williams, J. | 8/29/2011 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $102,000.00 | $0.00 | $119,984.12 | $17,984.12 | 17.63 | $2,144.62 | $631.15 | $0.00 | $0.00 |
| 002942 | Karsten, Gl | 10/11/2011 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $327,995.00 | $1,126.66 | $397,984.94 | $68,863.28 | 18.55 | $6,731.81 | $1,981.17 | $677.82 | $199.48 |
| 003007 | Smith, Jeff | 10/28/2011 | 1/2/2012 | Benjamin E | Russell Har | FIXCO | $166,000.00 | $100,329.21 | $287,332.40 | $21,003.19 | 10.12 | $2,716.97 | $799.60 | $0.00 | $0.00 |
| 003015 | Sampsell, D | 10/27/2011 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $347,375.00 | $0.00 | $404,914.55 | $57,539.55 | 16.56 | $6,755.91 | $1,988.27 | $603.54 | $177.62 |
| 003023 | Scoliere, La | 10/28/2011 | 8/29/2013 | Benjamin E | Russell Har | FIXCO | $200,000.00 | -$98,000.00 | $129,616.32 | $27,616.32 | 14.48 | $3,571.03 | $1,050.96 | $0.00 | $0.00 |
| 003197 | Irvin, Mark | 1/19/2012 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $275,000.00 | $0.00 | $293,287.32 | $18,287.32 | 12.59 | $4,493.64 | $1,322.48 | $511.32 | $150.48 |
| 003221 | Bredeman | 2/1/2012 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $1,000,000.00 | $0.00 | $1,123,488.86 | $123,488.86 | 12.35 | $16,274.69 | $4,789.64 | $0.00 | $0.00 |
| 003262 | Heraty, Mi | 2/28/2012 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $234,256.00 | $0.00 | $258,962.87 | $24,706.87 | 10.92 | $3,603.07 | $1,060.39 | $0.00 | $0.00 |
| 003270 | Dorian, The | 2/28/2012 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $150,000.00 | $0.00 | $165,342.33 | $15,342.33 | 10.60 | $2,304.47 | $678.20 | $0.00 | $0.00 |
| 003288 | Heafey, Ka | 3/2/2012 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $68,513.00 | $0.00 | $75,972.53 | $7,459.53 | 10.82 | $1,049.85 | $308.97 | $0.00 | $0.00 |
| 003296 | Walls, Pete | 3/1/2012 | 12/2/2013 | Benjamin E | David Hans | FIXCO | $108,000.00 | $0.00 | $119,615.27 | $11,615.27 | 10.64 | $1,658.87 | $488.20 | $0.00 | $0.00 |
| 006124 | Crosby Fam | 12/7/2011 | 12/2/2013 | T D Amerit | Jim Miller | 85 bps - AL | $50,000.00 | $57,000.00 | $121,745.13 | $14,745.13 | 14.22 | $1,465.71 | $366.44 | $27.95 | $6.99 |
| 006132 | Edward & I | 12/7/2011 | 12/2/2013 | T D Amerit | Jim Miller | 85 bps - AL | $60,000.00 | $0.00 | $67,629.86 | $7,629.86 | 12.72 | $982.19 | $245.56 | $33.53 | $8.38 |
| 008225 | James Cror | 12/2/2011 | 12/2/2013 | T D Amerit | Jim Miller | 85 bps - AL | $75,000.27 | $55,000.00 | $149,474.09 | $19,473.82 | 16.21 | $1,865.94 | $466.50 | $47.16 | $11.79 |
| 010544 | Thompson | 12/2/2011 | 12/2/2013 | T D Amerit | Jim Miller | 85 bps - AL | $200,000.77 | $57,445.00 | $302,097.61 | $44,651.84 | 17.79 | $4,017.84 | $1,004.47 | $125.75 | $31.44 |
| 021502 | Moore, Ch. | 2/9/2012 | 10/22/2013 | Morgan St | Christophe | 1% - ADV | $73,858.32 | $0.00 | $82,904.18 | $9,045.86 | 12.25 | $1,057.30 | $475.79 | $103.20 | $46.44 |
| 065069 | Johanna L. | 2/21/2012 | 10/22/2013 | Morgan St | Lorn Lymar | 1% - ADV | $198,633.88 | -$12,286.31 | $208,129.85 | $21,782.28 | 11.27 | $3,256.72 | $1,465.53 | $212.24 | $95.51 |
| 10191000 | Centercare | 6/4/2012 | 10/14/2013 | Wells Farg | Brian Boll | 1% - ADV | $683,830.74 | $461,180.75 | $1,302,248.36 | $157,236.87 | 15.81 | $14,576.36 | $6,559.36 | $485.78 | $218.60 |
| 10212840 | Drapeau, R | 12/20/2011 | 10/14/2013 | Ameriprise | Bruce Bevi | 1% - ADV | $525,857.00 | -$82,000.40 | $512,813.02 | $68,956.42 | 14.14 | $9,275.25 | $4,173.86 | $0.00 | $0.00 |
| 10265573 | Kennedy, E | 1/12/2012 | 10/14/2013 | Wells Farg | Steven Pai | 1% - ADV | $199,516.00 | $62,500.00 | $291,796.86 | $29,780.86 | 13.80 | $3,890.68 | $1,750.81 | $431.83 | $194.32 |
| 10465988 | Detuncq, C | 1/4/2012 | 9/17/2012 | Wells Farg | Shawn Der | 1% - ADV | $99,683.00 | $0.00 | $108,147.01 | $8,464.01 | 8.49 | $756.01 | $340.21 | $237.60 | $106.92 |
| 10555133 | Mains, Gre | 2/10/2012 | 10/14/2013 | Wells Farg | Matthew R | 1% - ADV | $341,193.94 | $0.00 | $375,841.91 | $34,647.97 | 9.92 | $5,754.47 | $2,589.51 | $448.69 | $201.91 |
| 10572990 | Morrow, C | 10/27/2011 | 10/14/2013 | Wells Farg | Cameron N | 1% - ADV | $99,731.00 | $0.00 | $105,817.41 | $6,086.41 | 13.63 | $1,972.38 | $887.59 | $177.60 | $79.92 |
| 10625551 | Alexander, | 1/10/2012 | 10/14/2013 | Wells Farg | Richard Cis | 1% - ADV | $105,936.00 | -$12,500.00 | $103,733.40 | $10,297.40 | 9.44 | $1,902.65 | $856.18 | $235.00 | $105.79 |
| 10741031 | Stephen Sr | 4/9/2012 | 10/3/2013 | Stifel Nicol | Dave West | 85 bps - AL | $169,348.00 | $0.00 | $191,330.12 | $21,982.12 | 13.89 | $2,609.33 | $1,174.20 | $379.41 | $170.73 |
| 10747951 | Andoga Far | 2/28/2012 | 10/14/2013 | Wells Fargo Advisors | | 85 bps - AL | $349,762.02 | $98,315.51 | $514,388.82 | $66,311.29 | 30.41 | $1,176.22 | $529.30 | $305.80 | $137.61 |
| 10828038 | Smith, Pau | 7/6/2012 | 10/14/2013 | Wells Farg | Eric Smith | 1% - ADV | $243,638.28 | -$120,000.00 | $150,339.22 | $26,700.94 | 11.47 | $3,162.52 | $1,423.13 | $559.17 | $251.63 |
| 11096204 | Stumer, Irv | 3/22/2012 | 10/14/2013 | Wells Farg | Dominick C | 90 bps - AL | $141,956.21 | -$8,000.00 | $148,613.18 | $14,656.97 | 10.71 | $2,128.04 | $957.63 | $0.00 | $0.00 |
| 11130003 | Smith, Leo | 11/11/2011 | 10/14/2013 | Wells Farg | John Adam | 1% - ADV | $92,804.00 | $0.00 | $107,259.17 | $14,455.17 | 14.71 | $1,603.26 | $721.47 | $122.04 | $54.92 |
| 11251636 | Greater An | 10/27/2011 | 10/14/2013 | Wells Farg | Matthew R | 1% - ADV | $146,956.00 | -$1,000.00 | $166,908.08 | $20,952.08 | 14.41 | $2,753.44 | $1,239.05 | $261.70 | $117.77 |
| 11267905 | Dexter, Jar | 11/17/2011 | 10/14/2013 | Wells Farg | Dwight Ens | 1% - ADV | $330,258.00 | -$90,956.00 | $253,803.17 | $14,501.17 | 13.21 | $6,045.54 | $2,720.50 | $398.12 | $179.15 |
| 11323328 | Robert M. | 10/19/2011 | 11/28/2011 | RBC Wealt | Tim R Bock | 1% - ADV | $299,095.00 | $0.00 | $298,112.47 | -$982.53 | -0.33 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11383997 | Boivin, Gre | 9/22/2011 | 9/16/2013 | Wells Farg | Beth Spark | 1% - ADV | $137,963.00 | $0.00 | $168,202.50 | $30,239.50 | 21.92 | $3,046.14 | $1,370.78 | $0.00 | $0.00 |
| 11592117 | Knue, Thac | 12/21/2011 | 5/24/2013 | LPL Financi | Zack Alkha | FIXCO | $133,948.00 | $0.00 | $154,456.74 | $20,508.74 | 15.31 | $2,173.07 | $977.90 | $0.00 | $0.00 |
| 11646962 | Kirkpatrick | 11/15/2011 | 10/14/2013 | Wells Farg | David Brad | 1% - ADV | $124,808.00 | $100,000.00 | $250,903.72 | $26,095.72 | 15.29 | $3,273.78 | $1,473.19 | $157.29 | $70.78 |
| 11740382 | Ansley T. T | 7/3/2012 | 11/13/2013 | Investmen | Bart Jones | 1% - ADV | $162,264.23 | $34,742.29 | $179,911.57 | -$17,094.95 | 11.86 | $2,100.88 | $945.39 | $390.14 | $175.56 |
| 11818721 | SR & SE Scl | 6/27/2012 | 10/14/2013 | Wells Farg | Richard Cis | 1% - ADV | $229,181.26 | $92,811.09 | $352,840.25 | $30,847.90 | 14.38 | $3,326.34 | $1,496.87 | $0.00 | $0.00 |
| 11882997 | Meadows, | 2/8/2012 | 10/14/2013 | Wells Farg | Roger Vlac | 1% - ADV | $99,676.25 | -$30,705.62 | $76,890.20 | $7,919.57 | 10.01 | $1,465.64 | $659.54 | $142.00 | $63.90 |
| 11958035 | Eckhoff, Cl | 10/27/2011 | 10/14/2013 | Wells Farg | Steve Perg | 1% - ADV | $249,686.00 | $0.00 | $290,295.40 | $40,609.40 | 16.26 | $5,141.91 | $2,313.87 | $444.65 | $200.09 |
| 12029073 | Beckett, W | 8/19/2011 | 10/14/2013 | Wells Farg | Matthew C | 1% - ADV | $113,136.00 | $0.00 | $133,785.25 | $20,649.25 | 18.25 | $2,589.69 | $1,165.35 | $123.98 | $55.79 |
| 12102988 | Asciutto, Jc | 8/26/2011 | 10/14/2013 | Wells Farg | Dominick C | 90 bps - AL | $218,267.00 | $0.00 | $256,626.19 | $38,359.19 | 17.57 | $4,781.17 | $2,151.52 | $197.34 | $88.80 |
| 12125433 | Lewis, Kay | 4/11/2012 | 10/14/2013 | Wells Farg | Terri Osner | 1% - ADV | $99,666.21 | $0.00 | $110,322.35 | $10,656.14 | 10.69 | $1,523.17 | $685.42 | $217.85 | $98.03 |
| 12163615 | Armstrong | 10/5/2012 | 10/14/2013 | Wells Farg | Greg Wegg | 1% - ADV | $152,397.00 | $20,000.00 | $201,890.59 | $29,493.59 | 18.07 | $3,590.92 | $1,615.91 | $363.25 | $163.46 |
| 12166848 | The Alaska | 2/10/2012 | 10/14/2013 | Wells Farg | Alan & Deb | 1% - ADV | $199,747.80 | $46,000.00 | $275,551.63 | $29,803.83 | 12.19 | $3,155.92 | $1,420.17 | $262.68 | $118.21 |
| 12173103 | Heiskell Jo | 9/20/2011 | 8/19/2013 | Wells Farg | Sam Cricht | 1% - ADV | $401,798.00 | $56,012.71 | $515,698.50 | $57,887.79 | 19.70 | $9,219.29 | $4,148.68 | $0.00 | $0.00 |
| 12316949 | Fahring, Di | 12/9/2011 | 8/28/2013 | Wells Farg | Michael W | 1% - ADV | $77,581.00 | $60,635.84 | $147,981.82 | $9,764.98 | 12.58 | $1,654.17 | $744.39 | $42.51 | $19.13 |
| 12365765 | Hauser, Te | 10/19/2011 | 10/14/2013 | Wells Farg | Mike Zahle | 1% - ADV | $180,787.00 | -$20,000.00 | $190,378.47 | $29,591.47 | 17.35 | $3,647.83 | $1,641.53 | $361.57 | $162.71 |
| 12402618 | McKnelly, I | 8/15/2012 | 8/12/2013 | Wells Farg | Brooks Cor | 1% - ADV | $104,911.52 | $25,000.00 | $139,179.04 | $9,267.52 | 8.77 | $1,223.39 | $550.53 | $131.86 | $59.34 |
| 1251125_ | Forlenza, R | 4/26/2012 | 10/14/2013 | Wells Farg | Frank Delfi | 1% - ADV | $107,215.65 | $0.00 | $117,751.73 | $10,536.08 | 9.83 | $1,583.85 | $712.73 | $190.41 | $85.68 |
| 12559119 | Jones, Mar | 11/23/2011 | 9/6/2013 | Wells Fargo Advisors | | 1% - ADV | $207,151.00 | -$9,508.56 | $232,783.57 | $35,141.13 | 17.14 | $4,124.38 | $1,855.98 | $209.99 | $94.50 |
| 12732319 | Jon Tkac, I | 8/29/2011 | 10/14/2013 | Wells Farg | James Chu | 1% - ADV | $456,841.00 | $0.00 | $532,723.64 | $75,882.64 | 16.84 | $10,191.92 | $4,586.35 | $400.52 | $180.23 |
| 12747081 | Orion Inves | 8/30/2011 | 10/14/2013 | Wells Fargo Advisors | | 1% - ADV | $499,674.00 | $0.00 | $595,935.76 | $96,261.76 | 19.35 | $8,283.71 | $3,727.67 | $424.38 | $190.97 |
| 12753350 | Hazel, Thor | 9/26/2011 | 8/20/2013 | Wells Farg | Brian Hill | 1% - ADV | $229,975.00 | $0.00 | $263,871.30 | $33,896.30 | 14.74 | $4,954.48 | $2,229.51 | $0.00 | $0.00 |

| 79590691 | Kinneberg, | 8/24/2012 | 10/14/2013 | Wells Farg( D. Scott Ph 1% - ADV | $500,000.00 | $500,000.00 | $590,933.55 | -$409,066.45 | 18.19 | $5,796.68 | $2,608.51 | $478.14 | $215.16 |
| 800465 | Bennett, A | 12/22/2011 | 12/19/2012 | RCL Adviso Barbara Ra 85 bps - AE | $130,000.00 | $100,000.00 | $250,616.64 | $20,616.64 | 11.81 | $1,851.06 | $462.76 | $0.00 | $0.00 |
| 800503 | Armistead, | 1/13/2012 | 10/3/2013 | Camelback Matthew A 85 bps - AC | $50,000.00 | $0.00 | $64,481.82 | $14,481.82 | 28.96 | $802.63 | $200.66 | $87.33 | $21.83 |
| 802522 | Rosen, Elai | 3/8/2012 | 1/2/2014 | Congress V Ken Zannoi 80 bps - AR | $166,361.87 | -$16,178.36 | $195,920.92 | $45,737.41 | 23.26 | $1,832.99 | $458.25 | $0.00 | $0.00 |
| 814687 | Joseph & N | 12/12/2011 | 10/25/2012 | Camelback Matthew A 85 bps - AC | $70,000.00 | $0.00 | $80,356.38 | $10,356.38 | 11.87 | $688.72 | $172.18 | $0.00 | $0.00 |
| 81644533 | Nevada Cit | 9/20/2012 | 10/9/2013 | Baird   Kenneth M 1% - ADV | $100,000.00 | $81,549.82 | $196,473.90 | $14,924.08 | 14.99 | $1,062.49 | $478.11 | $0.00 | $0.00 |
| 820261 | Bernstein, | 11/7/2011 | 1/2/2014 | Congress V Ken Zannoi 80 bps - AR | $111,000.00 | $0.00 | $153,208.36 | $42,208.36 | 35.78 | $1,719.48 | $429.88 | $0.00 | $0.00 |
| 827959 | Brodie, Eva | 7/9/2012 | 1/29/2014 | Congress V Ken Zannoi 80 bps - AR | $299,223.41 | -$7,548.87 | $327,918.09 | $36,243.55 | 12.09 | $1,205.60 | $301.40 | $0.00 | $0.00 |
| 87464443 | The Colleer | 4/20/2012 | 11/13/2013 | Schneider I Nancy Skea 80 bps - AC | $120,000.00 | $0.00 | $150,505.89 | $30,505.89 | 25.42 | $1,454.29 | $363.58 | $180.98 | $45.25 |
| 88040849 | West, Robe | 8/20/2012 | 10/14/2013 | Wells Farg( Miriam Cav 1% - ADV | $100,000.00 | $0.00 | $115,869.31 | $15,869.31 | 15.87 | $1,161.12 | $522.50 | $112.02 | $50.41 |
| 89424597 | Kent R. Wil | 7/30/2012 | 8/21/2013 | Schwallier ' Adam Schv 1% - ADV | $100,000.00 | $0.00 | $118,667.67 | $18,667.67 | 18.92 | $1,257.25 | $565.77 | $169.40 | $76.23 |
| 89558026 | Russell, Da | 8/3/2012 | 10/14/2013 | Wells Farg( William Hu 1% - ADV | $119,759.51 | $83,160.51 | $228,639.04 | $25,719.02 | 19.85 | $1,675.35 | $753.91 | $183.24 | $82.46 |
| 897353 | Duzak, Tho | 3/16/2012 | 10/15/2013 | Schneider I Nancy Skea 80 bps - AC | $120,000.00 | $1,300.00 | $147,771.83 | $26,471.83 | 21.86 | $1,562.35 | $390.60 | $0.00 | $0.00 |
| 89843011 | Toothman, | 9/23/2011 | 11/13/2013 | Schneider I Nancy Skea 80 bps - AR | $100,000.00 | $0.00 | $136,142.24 | $36,142.24 | 36.14 | $1,844.48 | $461.14 | $0.00 | $0.00 |
| 9216003 | Leahy, Patr | 6/21/2012 | 1/2/2014 | Congress V Ken Zannoi 80 bps - AR | $55,274.46 | $10,152.26 | $68,467.66 | $3,040.94 | 24.78 | $499.30 | $124.83 | $0.00 | $0.00 |
| 92573403 | Lynn S. Ma | 4/30/2012 | 11/13/2013 | Frank Finar Todd Frank 1% - ADV | $100,000.00 | $0.00 | $121,807.90 | $21,807.90 | 21.81 | $1,502.14 | $675.97 | $166.67 | $75.00 |
| 930250 | Roberts, Rc | 6/26/2012 | 12/18/2012 | Sanders M Nick Esche FIXCO | $100,000.00 | $0.00 | $106,440.84 | $6,440.84 | 6.44 | $503.98 | $148.32 | $0.00 | $0.00 |
| 93192169 | Stavi, Giorz | 6/14/2012 | 10/25/2013 | Charles Schwab Institu 80 bps - AC | $50,000.00 | $1,042,077.71 | $1,694,691.68 | $602,613.97 | 20.65 | $17,318.40 | $7,793.28 | $0.00 | $0.00 |
| 947776 | Durant, Joh | 3/21/2012 | 1/2/2014 | Congress V Ken Zannoi 80 bps - AR | $250,000.00 | $0.00 | $308,923.61 | $58,923.61 | 23.57 | $2,757.45 | $689.37 | $0.00 | $0.00 |
| 971308 | Cardinale, | 4/17/2012 | 1/2/2014 | Congress V Ken Zannoi 80 bps - AR | $150,000.00 | $400,000.00 | $586,634.61 | $36,634.61 | 24.75 | $1,578.73 | $394.69 | $0.00 | $0.00 |
| 987597 | Harron, Ke | 4/17/2012 | 1/2/2014 | Congress V Ken Zannoi 80 bps - AR | $123,052.50 | $0.00 | $151,086.45 | $28,033.95 | 23.44 | $1,276.67 | $319.18 | $0.00 | $0.00 |
| 988081 | Graham, M | 4/27/2012 | 10/15/2013 | Schneider I Nancy Skea 80 bps - AC | $175,000.00 | $1,500.00 | $217,125.69 | $40,625.69 | 23.01 | $2,127.53 | $531.89 | $237.16 | $59.29 |
| 989380 | Campbell, I | 4/12/2012 | 12/30/2013 | Congress V Ken Zannoi 80 bps - AR | $300,000.00 | $526,369.83 | $1,008,618.40 | $182,248.57 | 24.48 | $5,711.46 | $1,427.87 | $0.00 | $0.00 |
| 996572 | Richardson | 10/6/2011 | 1/2/2014 | Congress V Ken Zannoi 80 bps - AR | $135,000.00 | $12,500.00 | $204,508.55 | $57,008.55 | 37.69 | $2,346.93 | $586.74 | $0.00 | $0.00 |
| 998680 | Cramer, Fre | 2/2/2012 | 1/2/2014 | Congress V Ken Zannoi 80 bps - AR | $222,008.46 | $0.00 | $283,006.50 | $60,998.04 | 27.48 | $2,774.09 | $693.54 | $0.00 | $0.00 |
| | | | | | $23,315,689.16 | | | $6,270,948.50 | | $347,351.09 | $129,668.08 | $17,178.82 | $7,106.06 |

# EXHIBIT G

EXECUTIVE SUMMARY

f2 – F-SQUARED INVESMENTS

October 5, 2009

Introduction

F2 is a registered investment advisor that provides research in the form of 2 sector ETF indices. They have two index products (1) a lower cost monthly program and (2) a higher cost ("Premium") weekly program. The index holdings for both products are driven by a momentum/statistical model that generates buy and sell signals. The model is based primarily on pricing and different rolling average time series, with a VIX overlay. The indices' performances show high single digit annual returns with attractive/low single digit monthly standard deviation. Virtus, an $8.2B fund shop, completed its due diligence and signed an exclusive with f2 for use of their monthly model in 40 Act funds. Other advisors are signing on, for example, Essex ($2.3B AUM).

Opportunities

Given the low volatility, high single digit steady returns, f2 may be a desirable low volatility "aging boomer" product for Navellier. Navellier would enter a "Model Manager" agreement with f2 to receive the trading signals.

1. Navellier might brand an alpha sector-based product using the f2 provided research. F2 has agreed to some exclusivity, likely geographical and with earn-in milestones.
2. The research may have application to existing products by providing an indication of which sectors to overweight.
3. F2 has indicated that it will refer clients/advisors to a Navellier AlphaSector product.

Original Source of the Trading System

The AlphaSector trading system was originally developed and used by a large wealth management group ("Wealth") located on the east coast. They are not in the business of promoting such systems and therefore licensed it to f2. There is a confidentiality agreement that prevents f2 from divulging who they are. The licensing agreement with Wealth is terminable by either party on 90-days notice. If f2 terminates, f2 is obligated to pay in perpetuity the fee based on the AUM at date of termination. If Wealth terminates, f2 is not prevented from using the technology/math behind the system; f2 would be please if Wealth terminated. F2 doesn't terminate because they like the business partnership and "we don't do business that way, a deal is a deal" (Rubbish!).

The Trading System

F2 describes the system as a statistical, mechanistic price pattern recognition program that produces probability/predictive measures of price direction (this is Bob Barnes' language). F2 states that the

system is very simplistic and easily duplicated. They describe it as consisting of a set of moving averages using various time series, on which volatility measures are overlayed. The primary input is the price/total return of a given sector ETF. There is a significant "adjustment calculation" used to pinpoint the best moving average time series for a given level of volatility. In essence, the greater the volatility, the shorter the moving average period; the rate of change of the volatility is also a factor; the faster the rate of change, the shorter the moving average.

Due Diligence on Trading System

They flat out won't show the math to us, which would knock them out of contention but for the following factors:

First, Virtus is a medium-sized mutual fund family ($8.3B) that performed significant DD and presented their findings to their mutual fund board, who voted to go forward with a 40 Act fund using the monthly AlphaSector model. Apart from testing the system ourselves, this is our best test of the legitimacy of f2 and the system. Virtus (1) received the same system explanation as we did; (2) analyzed the monthly holdings and weekly signals; and (3) f2 believes they zeroed in on the model inputs but lacked confidence they had them exactly.

Second, f2 began reporting the holdings/trades to the NASDAQ, which has used the data to calculate and publish the indices performances since October 2008. That these are now public indices (ASRN and ASRX) adds to the legitimacy of the analytical system.

Third, f2 has an investment committee/Board of Advisors with independent members, including Arthur Laffer and Ron Santangelo (formely with Merrill as manager of Managed Solutions and Analytics Group). We have not spoken to any board members, but f2 claims they each performed independent DD before agreeing to be associated with f2.

Combined with the backgrounds of the principals of f2, the above give a good deal of verification that the system is a repeatable, mechanistic trading program.

Trading/Turnover/Ops

Since annual turnover is 100% or lower and the ETFs traded are highly liquid, trading/ops for this product are straightforward. F2 sends the trade signals simultaneously for all subscribers/advisors. They also have a low cost trading relationship with Foliofn, which might be a good solution for Navellier direct clients and would obviate any trading burden at Navellier.

Marketing Battle Plan

First, target sub-advisory business with firms we know well, who are leaders in the retirement and annuity channels. Based upon feedback we've received from the research teams at Prudential, Ameriprise Financial, and River Source, they are looking for a product that is 'different', not style box driven, which is a solution for their retirement business. It would appear the f2 product meets this demand.

Set up the Premium (weekly) product on the dual contract platforms for advisors.

Second, the monthly product has been well received by the Fidelity and Schwab retail offices in the Boston area. Over $100 million in referrals have been made by Fidelity and Schwab to two RIA firms who embraced the product and are offering it in addition to their traditional management. We would pitch the Premium product to the Schwab Research team in SF, targeting their National SELECT program.

Third, Navellier can market the Premium product direct to our database of individual investors. Where appropriate to the relationship and acceptable to the client ,the accounts can be held at Foliofn, and the trading executed by f2.

# EXHIBIT H

(1)

3/13/17   B-03078 Narellier
10:00     Phone Interview w/ Ken Jannini ] ←

        SEC
(BD)  Bill Donahue ] ←      (KZ) Ken Jannini
      Kim Alay              (LC) Luke Cadigan
      Marc Jones            (CM) Claire Metcalfe
      James Lempest         (PL) Paul Lonergan


Bill Donahue went through the standard
disclosures pursuant to 1974 Privacy
Act — Form 1662
— Share information w/ authorities
— Voluntary
— Must be truthful and not misleading
— Right to an attorney (LC - Cooley).
KZ consents to interview

First introduced to Virec product
May 2010 — F- Squared (F2)
gave them names of companies
wanted to use the product as
a sub-advisor. Names were
Narellier + Cadrian.

(A.SS.)   Had been using the AlphaSector
          strategy since 2009 — through F2.

(2)

- Initially placing trades ~~through~~ in house.

- Didn't want to do that anything. Decided to go w/ Navellier. Could add [Adhesion] but only used Navellier.

- More familiar w/ Navellier as an Investment Co.

- Paula Bode = original contact. Email from Kelly Howe but Pj was primary. Maybe used emails from others

- Assumed Wholesalers to asset. Probably had internal + External w/s.

- Marketing Angle Sect. Premium Vara. Shows of different products. List of diff. strategies. But only used the one

③

Already understood A.S.S.
Historical performance. It was
apparent it was a hypothetical
strat. up until start date
of around 2008

1 1½ Guard driven
9 sectors S + P 500
ETF was included
It was explained that
if traded in this manner
returns would be what 2001—
2008 returns. Nothing traded 2001-08.

If it wasn't real it wasn't live

Talked about an Index they
(F3) Created:

Don't remember when the index
started
                    work
Minimize Slan a sect sheet

Assumed up until 2008 perform.
was hypothetical because
comp didn't exist before 2001

④

Had already used it for over
a year. Completely new it worked.
It was more strat to use Navellier

Assumed it was back tested
The original presentation by
F2 was that it was hypothetical

Howard Present
George McCullen

Focused on how strat. would behave
going forward. Didn't care
about back testing.

Pretty sure some internal stuff
stated something about returns
not being live they didn't think
it was live until 2001. Comp
didn't exist until 2008.

Private Wealth Mg in Boston
Not an indepth understanding
but it was a strat. being
traded. a persons who are
product create based on
idea.

5)

Trainings McManny provided
It was only the one product
+ had already been using it for
a year.

Wealth Manager = sell concepts
and now it point to a portfolio

Was Less than 5% of their portfolio
would send clients a Naveller
document from Website
or a presentation from Howe

Assumed material was updated
Quarterly but not sure. It
was never 10% of someones
portfolio. a small portion of
portfolios

Sure there were questions about
past performance and they
would tell them it was
hypothetical until 2008

If someone asked about a
particular strategy they
would send a fact sheet.

Assuming someone asked about
past performance but can't remember
anything specific

Explained Tactical — ability
to get defensive recommend
less volatility. Investors
were concerned w/ traditional
approach of riding it out —
Seeing general trend shifts
Clients had previously experienced
down turns and wanted a
more defensive strategy.

Q/a When you sell something or
performance you are putting
yourself into a box if it
doesn't go well. Didn't focus
on performance.

2013 — First put a client into
ISS.
Converted over to a New product

①

Were about 20-25 clients invested in F2. Converted over n time

Explained strategy, to clients they used a 3rd party to mange it

F2 didnt want to be in the client business. Wanted to give it to advisors.

Presentations to clients would be F2 or Verio materials

XXXXX
Clients would request information on all the strategies they were interested in. Materials they were sent included whitepapers on benefits and concept of buy and hold not best way to do it

Never had to put clients in contact with Naveller.

(12)

In August or Sept 2013
Navellier sold Vivio back to F2

Did not move forward w/ that.
Thinks F2 assumed they would
convert back. to F2.

Never moved forward w/ that.
Killed the strategy at end of
2013. Shifted to a Conquess
Wealth product

Call ended at 11:53

# EXHIBIT I

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>    v.<br><br>NAVELLIER & ASSOCIATES, INC., and LOUIS NAVELLIER,<br><br>                    Defendants. | Civil Action No. 17-cv-11633 |

## DECLARATION OF JOHN RANFT

   I, John Ranft, declare as follows:

1.  I am over the age of 18 and have personal knowledge of the facts set forth herein and if

    called as a witness would be competent to testify thereto.

2.  During the period which I understand is the relevant period (August 2011 through September

    2012), I was the Director of Marketing for Navellier & Associates, Inc. ("NAI"). As such, I

    was responsible for the implementation of the promotion of NAI investment strategies,

    including the Vireo AlphaSector Allocator ("Allocator") and Vireo AlphaSector Premium

    ("Premium") strategies. I constantly communicated, by email, telephone and in person, with

1

various brokers and investment advisers and representatives of the advisory firms which offered these Vireo strategies on their platforms.

3. NAI updated in writing the actual GIPS compliant performance for its Vireo Allocator and Vireo Premium client accounts on a quarterly basis by providing these brokers and advisers with the then most current actual performance by NAI. Advisers and brokers constantly asked me and my marketing staff for the actual current performance record of these strategies.

4. I do not recall, and I do not believe, any broker or adviser (or client) ever notified me or indicated that he/she was relying on the 2001 hypothetical performance or "live traded, not back tested" statements in those Vireo Allocator and Vireo Premium marketing materials, as the reason for investing with NAI or remaining invested in these strategies.

5. I was, however, frequently asked by brokers and advisers to provide them with NAI's actual performance record and was most frequently asked to provide current quarterly performance.

6. It was my understanding that the reason advisers and brokers recommended that their clients initially hire NAI to manage their investments according to the Vireo Premium and Vireo Allocator strategies was based on NAI's actual performance (not hypothetical performance) and that the reason those clients remained NAI Vireo clients was the actual performance they received.

7. This was consistent with my 30 plus years of experience in the securities investment business marketing various other securities and investment strategies. In my experience what clients care about and why they remain clients or leave, is because of how their investments have actually performed. If the adviser successfully performs, the clients generally stay with the

2

adviser and the investment strategy. If the performance is not satisfactory for several

quarters, the clients generally terminate the relationship.

8. That was my experience with Vireo where the performance was excellent and clients stayed.

I declare under penalty of perjury the following is true and correct and was executed by

me in Philadelphia, Pennsylvania on April 21, 2020.

John Ranft

3

# EXHIBIT J

**From:** Arjen Kuyper
**Sent:** Friday, September 14, 2012 2:22 PM
**To:** ALL Employees
**Cc:** Louis Navellier
**Subject:** Use of unapproved marketing materials

**To: All Marketing/Sales Personnel**

**Re: Approved Vireo Marketing Materials**

All, it has come to our attention that <u>un-approved</u> marketing materials may have been or is currently being used by Navellier Sales personnel to promote the Vireo Investment Strategies.

To be crystal clear about this issue:
Anyone found to be utilizing marketing materials that have not <u>been approved by the Navellier Compliance Department will be subject to immediate termination.</u> This includes F2 presentations, Morningstar Sheets for the F2 Indexes, F2 Fact Sheets, F2 Power Points or any older marketing materials. This also includes any references to websites that have not been approved for use by the Navellier Compliance Department.

Very simply: any hard copy, soft copy or websites or any representations used or made without the Navellier logo <u>and without Navellier Compliance Department approval is unauthorized marketing materials and cannot be used.</u> The use of any of the aforementioned will result in immediate termination.

If you have any questions about the use of any marketing materials and/or whether it is approved for use, please contact me directly regarding any marketing materials you are using or presenting in any of your marketing efforts. Please send copies of any materials that you are using if you have any doubts about the use of these materials.

Sincerely,


**Arjen Kuyper**
President

- - - - - - - - - - - - - - - - - - - - - - - - - -


NAVELLIER
*Calculated Investing*

- - - - - - - - - - - - - - - - - - - - - - - - - -

Navellier & Associates
1 East Liberty Street
Suite 504
Reno, NV 89501
800 365 8471 x 421 toll-free
775 785 9421, 775 562 8214 fax

# EXHIBIT K

>
>
>
> Navellier & Associates Inc. (B-03078) - Confidential Settlement Communication Pursuant to FRE 408
>
> Peter and Joe,
>
> As promised in our call this morning, please see below for further information concerning how the staff arrived at its revised settlement demand of $1.7 million to resolve the above-referenced matter. The staff could recommend negligence based charges against Navellier (the entity) only including the following violations of the Investment Advisers Act and rules thereunder: Section 206(2); Section 204(a) and Rule 204-2(a)(16) (Books and Records rule); Rule 206(4)-1(a)(5) (Advertising rule); and Rule 206(4)-7 (Compliance rule).
>
> With respect to the individual components of our recommended settlement demand, it includes approximately $1,085,285 in disgorgement, $130,436 in pre-judgment interest and a $500,000 civil penalty for a total of $1,715,721. The components of disgorgement include $414,160 in investment management fees ($360,935 disgorgement plus $53,225 prejudgment interest) and $801,561 ($724,350 disgorgement plus $77,211 in prejudgment interest) for the sale of Vireo.
>
> The revised settlement demand takes into account significant discounts relative to time period and product type. As discussed in the call, the investment management fees are comprised of a percentage of those fees Navellier received for Vireo AlphaSector products during a significantly reduced time period from August 10, 2011 (the beginning date of the agreed tolling period) until September 14, 2012 (the date upon which Mr. Kuyper's all employees email went out to Navellier staff demanding no further use of "unapproved" F-Squared marketing materials).
>
> The staff adjusted the investment management fees down by 34% based on Attorney Kornhauser's January 4, 2017 correspondence that Navellier prepared Vireo AlphaDEX marketing materials never contained any F-Squared historical performance for the 2001-07 time period. (Mr. Kornhauser supplied numbers indicating that that approximately 34% of revenues were derived from AlphaDEX products.) The staff further reduced the investment management fees by crediting Navellier's argument that the 2001-2008 track record was less important over time, especially as Navellier had developed a longer GIPS track record for its Vireo strategy. Consequently, investment management fees were

1

discounted for the time period August 10, 2011 to December 31, 2011 at a 50% rate, while those fees from January 1, 2012 to September 14, 2012 received a 75% rate reduction.
>
> For the sale of Vireo, the staff also applied significant discounts. The original $14 Million sale price was reduced by the tax paid on the sale ($3,025,000). The subtotal of $10,975,000 was then reduced further by 34% to $7,243,500 (based on Mr. Kornhauser's representations discussed above) to account for removal of the AlphaDEX products from the calculation. The staff then reduced the remainder by 90% to $724,350 to account for Navellier's position that the importance of the historical track record diminished even further by August 2013.
>
> Please note that the above terms reflect the staff's proposed recommendation for a settlement in this matter.  All staff recommendations are subject to approval by both the Division of Enforcement and the Commission.  No settlement is final unless and until it is approved by the Commission.  Please let us know by Friday, April 28 if Navellier wishes to proceed on the above terms.
>
> Thank you,
>
> Bill
>
>
>
> William J. Donahue
> Senior Counsel
> Enforcement Division
> U.S. Securities & Exchange Commission
> Boston Regional Office
> 33 Arch Street, 24th Floor, Boston, MA 02110
> tel: (617) 573-8915 | email: donahuew@sec.gov<mailto:donahuew@sec.gov>
>
>
>
> Joseph C. Mauro
>
> Associate
>
>
>
> Arent Fox LLP | Attorneys at Law
>
> 1717 K Street, NW
>
> Washington, DC 20006-5344
> 202.857.6321 DIRECT | 202.857.6395 FAX
>
> <mailto:Joseph.Mauro@arentfox.com> joseph.mauro@arentfox.com | <http://www.arentfox.com> www.arentfox.com
>
>
>
> From: donahuew sec.gov [mailto:sec.notification@zixmessagecenter.com]
> Sent: Monday, April 24, 2017 4:05 PM
> To: Mauro, Joseph C. <Joseph.Mauro@arentfox.com>
> Subject: SEC smail

2

-----Original Message-----
From: Unger, Peter [mailto:Peter.Unger@arentfox.com]
Sent: Tuesday, May 30, 2017 11:32 AM
To: Donahue, William
Cc: Baker, Robert; Jones, Marc; Kelly, Anthony S.; Carter, Hunter T.; Mauro, Joseph C.
Subject: Re: Navellier

After much discussion, I think that we can make this work if we can get the penalty down to $300 k. Regards.

JavaScript is needed for this application. Please turn on JavaScript for your Internet browser or contact your administrator.

U.S. Securities and Exchange Commission Secure Email



Skip Navigation

- Inbox
- Address
- Compose
- Sent Mail
- Drafts

Help

?

Sign Out

U.S. Securities and Exchange Commission Secure Email Message View

joseph.mauro@arentfox.com



More Actions ▼

Last Sign In: May 12, 2017 12:47 PM

Received: May 30, 2017 4:01 PM
Expires: Aug 28, 2017 4:01 PM
From: donahuew@sec.gov
To: peter.unger@arentfox.com
Cc: joseph.mauro@arentfox.com, bakerr@sec.gov, hunter.carter@arentfox.com, keilya@sec.gov, jonesmarc@sec.gov
Subject: RE: small Navellier

Peter,



Case 1:17-cv-11633-DJC   Document 183   Filed 04/29/19   Page 357 of 389

Case 1:17-cv-11633-DJC   Document 98-1   Filed 01/11/19   Page 4 of 37

Thank you for your email.  We can recommend that the Commission institute settled cease-and-desist and administrative proceedings pursuant to Sections 203(e) and 203(k) of the Advisers Act and order that:

1) Navellier willfully violated and shall cease and desist from committing or causing any violations and any future violations of Sections 204(a), 206(2), and 206(4) of the Advisers Act and Rules 204-2(a)(16), 206(4)-1(a)(5), and 206(4)-7 thereunder;

2) Navellier is censured; and

3) Navellier shall pay  $414,160 disgorgement ($360,935 disgorgement and $53,225 prejudgment interest) and a $300,000 penalty.

We'll try and get you drafts of the order and offer later this week.

Separately, the trial team in the Howard Present case (Rachel Hershfang, Frank Huntington, and Jennifer Cardello) would like to meet with Peter Nicolas and possibly John Ranft sometime this summer in advance of the trial starting on September 11.  Mr. Kornhauser represented both of them during the investigation when we took their testimony.  Should the trial team reach out to you to request a meeting(s)?  I believe Mr. Nicolas lives in the Boston area and Mr. Ranft lives in the Philadelphia area.

Regards,

Bill

William J. Donahue
Senior Counsel
Enforcement Division
U.S. Securities & Exchange Commission
Boston Regional Office

**Robert B. Baker, JD, CFA**
**March 28, 2019**

|  |  |
|---|---|
| VOLUME: | 1 |
| PAGES: | 1-256 |
| EXHIBITS: | 1-16 |

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

---

SECURITIES AND EXCHANGE COMMISSION

     Plaintiff                    Civil Action No.

V.                               17-cv-11633

NAVELLIER & ASSOCIATES, INC., and

LOUIS NAVELLIER

     Defendants

---

VIDEOTAPED DEPOSITION OF

SECURITIES AND EXCHANGE COMMISSION

by and through its designee

ROBERT B. BAKER, JD, CFA

Thursday, March 28, 2019, 9:35 a.m.

BROOKS & DERENSIS

111 Devonshire Street

Boston, Massachusetts

----- Sonya Lopes, RPR, CSR -----

REPORTERS, INC.

CAPTURING THE OFFICIAL RECORD

617.786.7783 - www.reportersinc.com

**Robert B. Baker, JD, CFA**
**March 28, 2019**

90..93

### Page 90

```
 1       A.  Specifically during that time period, do I
 2   remember?  No.
 3       Q.  Okay.  And was there any discussion about a
 4   ban -- lifetime ban against Navellier -- Louie
 5   Navellier or Navellier & Associates during that
 6   period of time?
 7           MR. JONES:  Do you mean without -- with
 8   counsel for Navellier?
 9       Q.  Well, you weren't talking to Mr. Navellier,
10   were you?
11           MR. JONES:  Well, I just meant as
12   opposed to internally.
13       Q.  Yeah.  I'm talking about with
14   representatives of Navellier -- Mr. Navellier and
15   Navellier & Associates.
16       A.  I'd love to have a beer with that man or
17   something like that at some point in time, but I've
18   never met with him one-on-one without his counsel
19   present, no.
20       Q.  Right.  So -- all right.  So there were no
21   discussions during that time period -- April 24 to
22   May 31 -- about a ban of Navellier & Associates or
23   Mr. Navellier; correct?
24       A.  I would -- I don't recall that -- that ever
```

### Page 91

```
 1   coming up during that time period, no.
 2       Q.  Okay.  And during that time period, you
 3   were -- the SEC was negotiating for a settlement
 4   with both Mr. Navellier and Navellier & Associates.
 5   Isn't that correct?
 6       A.  During the time period of April 24th to
 7   May 31st?
 8       Q.  Right.
 9       A.  The topic of discussion during that period
10   dealt with a settlement that the staff could
11   recommend to the Commission with only Navellier &
12   Associates.
13       Q.  Right.  Meaning no claims or charges being
14   brought against Mr. Navellier personally.  Isn't
15   that right?
16       A.  He wasn't even part of the discussion at
17   that point in time in terms of, you know, the staff
18   bringing a case against him.
19           I think the parties were on the same page
20   that if we could reach a negotiated resolution
21   dealing with the matter that was similar to Virtus
22   from our respects, we'd be done with this case.
23       Q.  Well, so "done with the case" meaning there
24   wouldn't be any claims brought against Mr. Navellier
```

### Page 92

```
 1   individually; correct?
 2       A.  I'm pretty sure we were all on the same
 3   page on that.  That's certainly my recollection of
 4   the communications we had.
 5       Q.  When you say "we all," you're talking about
 6   SEC and counsel for Navellier?
 7       A.  Right.  In other words, we had Wellsed
 8   (verbatim) both Navellier and -- Navellier &
 9   Associates and Mr. Navellier.  And the ensuing
10   settlement discussions that occurred all the way
11   through were, you know, only with Navellier &
12   Associates being resolved and no case being brought
13   against Mr. Navellier.
14       Q.  Right.  In fact, even after the proposed
15   order, the negotiations were still with resolving
16   the -- whatever the terms were.  But it wouldn't be
17   bringing any claims against Mr. Navellier; correct?
18       A.  I don't think that's entirely accurate.  So
19   at a certain point in time, it becomes clear that
20   this censure issue was one that mattered a lot to
21   the firm and that they weren't willing to settle
22   with a censure being part of it -- that was
23   communicated to us -- and that they were going to
24   put together an offer to present to the Commission
```

### Page 93

```
 1   -- that they would have present to the Commission,
 2   which they're allowed to do under the rules, that
 3   would not include a censure and that our
 4   communication back to the firm at that point in time
 5   was that we would take in the offer when we got it,
 6   decide what to do but that if it didn't have a
 7   censure that we anticipated that we would be making
 8   a recommendation to the Commission for a litigated
 9   action that would include both Navellier and
10   Mr. Navellier, the two parties that were Wellsed
11   prior in the year.
12       Q.  But if Navellier & Associates accepted
13   censure, there wouldn't be any charges against
14   Mr. Navellier personally; correct?
15       A.  That was the whole idea all along that --
16   in the settlement discussions that were serious
17   during this period of time of April and May of 2017
18   that if the parties could reach a resolution as to
19   Navellier & Associates, the case would end.  There
20   would be no further investigation.
21       Q.  Right.
22       A.  There wouldn't be any further charges
23   against Mr. Navellier.
24       Q.  So the carrot was -- or, I mean, the stick
```

# EXHIBIT L

Case 1:17-cv-11633-DJC   Document 224-4   Filed 08/02/19   Page 186 of 583
Case 1:17-cv-11633-DJC   Document 183   Filed 04/29/19   Page 360 of 389

Case 1:17-cv-11633-DJC   Document 98-1   Filed 01/11/19   Page 5 of 37
Case 1:17-cv-11633-DJC   Document 53-1   Filed 04/13/...   Page 141 of 148
To: Sam Kornhauser   Page 3 of 5
From: Bob Fuller

**DRAFT**
**FOR SETTLEMENT PURPOSES ONLY**
3/2/2018 12:43 PM

UNITED STATES OF AMERICA
**Before the**
SECURITIES AND EXCHANGE COMMISSION

INVESTMENT ADVISERS ACT OF 1940
Release No.

ADMINISTRATIVE PROCEEDING
File No.

| | |
|---|---|
| In the Matter of<br><br>NAVELLIER & ASSOCIATES, INC.,<br><br>Respondent. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 203(e) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") against Navellier & Associates, Inc. ("Respondent" or "Navellier").

II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over Respondent and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

Case 1:17-cv-11633-DJC Document 244 Filed 08/02/19 Page 82 of 104
Case 1:17-cv-11633-DJC Document 183 Filed 04/29/19 Page 364 of 389
Case 1:17-cv-11633-DJC Document 98-1 Filed 01/11/19 Page 9 of 37
Case 1:17-cv-11633-DJC Document 53-1 Filed 04/13/18 Page 145 of 148

To: Sam Kornhauser

From: Bob Fuller

DRAFT
FOR SETTLEMENT PURPOSES ONLY
3/2/2018 12:43 PM

performance of the back-tested track record for the strategy during this period based on the false information provided by F-Squared. Navellier advised clients to invest in the AlphaSector strategies based on their historical performance.

12.     Navellier's Vireo advertising disclosures changed over time. By September 2011, Navellier removed references to the historical performance being "not back-tested" from its disclosures. Navellier's Vireo advertisements now identified the historical returns as "hypothetical" and noted "hypothetical back-tested performance has many inherent limitations." By June 2012, Navellier had removed from its Vireo advertising all references to the historical performance for the 2001-2008 time period.

13.     Although Navellier's disclosures for its own Vireo advertisements changed over time, until September 2012, Navellier sales staff continued to use F-Squared produced marketing materials when presenting to clients and prospective clients. Many of these F-Squared materials falsely claimed that the AlphaSector strategy was "not backtested," and included the overstated historical performance. On September 14, 2012, Navellier's President issued a directive to all Navellier employees to stop using F-Squared marketing materials.

14.     In September of 2013, Navellier sold its Vireo business line to F-Squared. Prior to the sale, Navellier did not disclose to its Vireo AlphaSector clients that its prior marketing materials contained the false track record and inflated performance.

## Navellier Failed to Adopt and Implement Adequate Policies and Procedures

15.     Navellier was required to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and its rules. As an adviser that often relied on subadviser or other third-party-produced performance and marketing materials, both in hiring or retaining subadvisers and in marketing a subadviser to its own clients or prospective clients, Navellier should have adopted and implemented policies and procedures reasonably designed to address the accuracy of such materials. However, Navellier had no written policies and procedures for evaluating and monitoring the accuracy of advertisements or performance information where the information came from third-party sources, such as F-Squared, and was then directly or indirectly published, circulated, or distributed by Navellier to other persons. Navellier also failed to adopt and implement reasonably designed written policies and procedures regarding the retention of books and records necessary to support the basis for performance information in advertisements directly or indirectly circulated or distributed by Navellier.

## Navellier Failed to Maintain Adequate Books and Records

16.     Navellier was required to make and keep true, accurate and current records or documents necessary to form the basis for or demonstrate the calculation of the performance or rate of return that it published, circulated or distributed to ten or more persons. In marketing its own advisory services, Navellier published, circulated and distributed the 2001 to 2008 historical

5

Case 1:17-cv-11633-DJC Document 244-4 Filed 03/6/29 9 Page 83 of 104 83
Case 1:17-cv-11633-DJC Document 183 Filed 04/29/19 Page 366 of 389

Case 1:17-cv-11633-DJC Document 98-1 Filed 01/11/19 Page 11 of 37
To: Sam Komh...Case 1:17-cv-11633-DJC Document 53-1 Filed 04/13/... Page 147 of 148

DRAFT
FOR SETTLEMENT PURPOSES ONLY
3/2/2018 12:43 PM

calculation of the performance or rate of return of any or all managed accounts or securities recommendations in any notice, circular, advertisement, newspaper article, investment letter, bulletin or other communication that the investment adviser circulates or distributes, directly or indirectly, to 10 or more persons.

### IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent's Offer.

Accordingly, pursuant to Sections 203(e) and 203(k) of the Advisers Act, it is hereby ORDERED that:

A.    Navellier shall cease and desist from committing or causing any violations and any future violations of Sections 204(a), 206(2), and 206(4) of the Advisers Act and Rules 204-2(a)(16), 206(4)-1(a)(5), and 206(4)-7 thereunder.

B.    Navellier is censured.

C.    Navellier shall, within ten (10) days of the entry of this Order, pay disgorgement of $360,935, prejudgment interest of $33,225, and a civil money penalty in the amount of $300,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600 and 31 U.S.C. §3717. Payment must be made in one of the following ways:

(1)    Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)    Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)    Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Navellier as the Respondent in these proceedings, and the file number of these proceedings; a copy of the

Case 1:17-cv-11633-DJC  Document 224-4  Filed 08/12/19  Page 84 of 104
Case 1:17-cv-11633-DJC  Document 183  Filed 04/29/19  Page 367 of 389
Case 1:17-cv-11633-DJC  Document 98-1  Filed 01/11/19  Page 12 of 37
Case 1:17-cv-11633-DJC  Document 53-1  Filed 04/13/...  Page 148 of 148

To: Sam Komhauser                                    04/13/2016 16:50:56  0756-88204  From: Bob Fuller

DRAFT
FOR SETTLEMENT PURPOSES ONLY
3/2/2018 12:43 PM

cover letter and check or money order must be sent to Robert B. Baker, Assistant Director, Asset Management Unit, Securities and Exchange Commission, 33 Arch Street, 24th Floor, Boston, MA 02110-1424.

D.    Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.

Brent J. Fields
Secretary

8

# EXHIBIT M

EXHIBIT
16

# ❧ VIREO

## INVESTMENT ADVISORY AGREEMENT: FIXED FEE
### ($50,000 minimum)

---

❏ Navellier Vireo AlphaSector Allocator Premium

❏ Navellier Vireo AlphaSector International Premium

❏ Navellier Vireo AlphaSector Global Premium

I (We) the undersigned ("client") agree to compensate Navellier for investment management services as follows:

1.00% per annum

---

**Investment Management Navellier & Associates, Inc.** Navellier & Associates, Inc. ("Navellier"), agrees to act as an investment advisor to the undersigned ("Client") and shall have full discretionary authority to direct registered broker-dealers to purchase or sell securities in Client's account(s) covered by this Agreement (the "Account"). Navellier is a registered investment advisor under the Investment Advisors' Act of 1940. Navellier will supervise the investment and reinvestment of the securities, cash, and other investments in the Account, and Navellier is hereby authorized to make investments in securities of any nature whatsoever, including but not limited to purchases, short sales, or purchases on margin of stocks, options, bonds, notes, warrants, or securities of investment companies. **Client understands that the past performance of Navellier or its managed funds and accounts does not necessarily indicate future performance.**

**Power-of-Attorney Authorization** Client authorizes Navellier to make all investment decisions regarding Client's Account, including reinvestment decisions, without prior authorization from client. Client hereby appoints Navellier as its true and lawful attorney-in-fact with full power and authority to act in place of Client to conduct all matters pertaining to the account, to give and place any and all transaction orders, including but not limited to orders to purchase or sell, exchange, convert, borrow against, margin, and otherwise to trade the assets in the Account, and to act on Client's behalf in all matters necessary or incidental to handling transactions of the Account. This power-of-attorney shall not be affected by the subsequent disability or incompetence of Client, and shall terminate upon notice to Navellier of Client's death. Otherwise, this power-of-attorney shall remain in full force and effect unless terminated by Client or by Navellier in accordance with the provisions for terminating this Agreement. Any termination of this power-of-attorney will constitute a termination of this Agreement.

**Other Services** As requested in writing by client from time to time, Navellier will furnish Client with reports indicating the valuation of the Account. Client shall appoint a custodian ("Custodian") to hold the assets of the Account. Navellier shall not be the Custodian. Navellier shall have no liability with respect to custody arrangements or any act, conduct, or omission of the Custodian. All transactions will be effected through the services of registered broker-dealers. Transactions may be effected through a broker-dealer having custody of Client's Account or a broker-dealer affiliated with such custodian, except as applicable laws and regulations may require otherwise in particular situations (see "Brokerage," below). Client further understands that Navellier and its affiliates may perform, among other things, research, investment advisory, and other services for other clients in exchange for consideration. Navellier may take action in the performance of its duties to other clients that may differ from the action taken with respect to Client's Account. Client recognizes that the performance of the Account may vary from that of other clients' accounts for various reasons, including but not limited to differences in timing of deposits and withdrawals, amounts invested, allocation of positions, investment strategy and objectives, and normal dispersion of investments and results.

**Brokerage** Adviser shall enter orders for the Account with brokers in accordance with the instructions set forth below. Adviser may utilize some of Client's brokerage commissions to pay for research services in compliance with Section 28(e) of the Securities Exchange Act of 1934, and as a result, Client may pay a commission on transactions in excess of the amount of commission another broker or dealer would have charged. Adviser shall not be liable to Client for any act, conduct, or omission of any broker.

One East Liberty, Third Floor, Reno, Nevada 89501 • 775.785.2300

designated by the Equity Management Portfolio(s) selected by Client through the use of Navellier's proprietary fundamental and quantitative analysis. Client (in conjunction with Client's professional investment consultant, if applicable) has directed Navellier to invest the Account in one or more Equity Management Portfolios, which Client has determined to be appropriate for Client's objectives. Client (in conjunction with Client's professional investment consultant, if applicable) has determined that Navellier's investment strategy and the selected portfolio(s) are appropriate for Client in light of Client's particular financial circumstances and goals, and acknowledges and agrees that Navellier has no role or responsibility with respect to this determination.

**Fees** Compensation for the services provided by Navellier to Client will be according to the schedule set forth above. Fees are accrued daily and payable in advance on a quarterly basis, calculated based on the market value of the Account as of the first business day of each calendar quarter. In the case of the first quarter, such fees are calculated on the effective date of this Agreement and, in the event the Agreement becomes effective after the first day of a calendar quarter, are calculated proportionately based on the number of days remaining in the quarter. There is no minimum fee. If this Agreement is terminated before the last day of a calendar quarter, a pro-rata portion of the previously paid fees shall be refunded based on the number of days remaining in the calendar quarter. Client hereby authorizes Navellier to withdraw any outstanding fees owed to Navellier by Client directly from the Account following termination of this Agreement. The portfolio value used by Navellier to measure performance is the bank's or securities broker's month-end or quarterly statement. In the event the client's portfolio contains securities for which no readily available market quotations exist, the value of such securities will be determined, for purposes of fee computation, based on a quotation by an independent market maker or specialist for said security.

The foregoing fees will be reflected in the periodic report sent to Client. Fees cover Navellier's investment advisory, reporting, and account-related services. Fees do not cover any execution-related expenses, commissions and margin interest, if any, securities exchange fees, or other fees required by law or charged by the broker-dealer with custody of the Account. Client acknowledges that different fee structures may be available upon request.

**Investment Company Shares** Client understands and agrees that Account funds held may be invested in shares of Investment Companies, including without limitation money market funds and Exchange-Traded Funds. Client, along with other shareholders, will bear a proportionate share of the expenses of Investment Company funds in which Client's assets are invested, including, to the extent permitted by law, management and distribution fee expenses. These fees and expenses are outlined in the relevant Investment Company fund prospectuses, a copy of which will be furnished to the Client. These fees will not be deducted from the fees that Client pays to Navellier for its services under this Agreement.

**ERISA Provisions (if applicable)** If Client is a retirement plan or employee benefit plan subject to ERISA, Client agrees to obtain and to maintain for the period of this Agreement any bond required pursuant to the provisions of ERISA or other applicable law and to include within the coverage of such bond Navellier, any manager and any of their officers, directors, and employees whose inclusion is required by law. Client agrees to provide Navellier promptly with appropriate documents evidencing such coverage upon request. Client and Navellier each acknowledge that the Account is only a portion of the assets of the plan and that Navellier does not have notice or knowledge of the investments made by or for such other assets and thus is not responsible for overall compliance of the plan's assets with the standards of ERISA or any other governing law or documents. Client represents and warrants (a) that its governing documents provide that an "investment manager" as defined in ERISA may be appointed; (b) that the person executing and delivering this Agreement on behalf of the Client is a "named fiduciary" as defined in ERISA, or designated as such under the procedure described in ERISA who has the power under the plan to appoint an investment manager; and (c) that its governing instruments expressly reserve to the "named fiduciary" the right to vote proxies.

**Proxies and Other Legal Notices** Decision on voting of proxies will be made by Client unless Client directs to the contrary in writing. Navellier shall not render any advice or take any action with respect to securities or other investments presently or formerly held in the Account, or the issuers thereof, which become the subject of any legal proceedings, including class actions and bankruptcies.

**Assignment or Termination** This Agreement may not be assigned by Navellier without the Client's written consent. Client may cancel this Agreement without any charge or penalty within five (5) days after signing this Agreement. This agreement may be terminated by either party at will, for any reason or for no reason, upon written notice to the other. Termination will become effective upon receipt of written notice by Navellier. Termination will not affect the parties' liabilities or obligations arising from transactions initiated prior to termination. Upon termination of this Agreement, Navellier shall be under no obligation to provide further services with respect to Client or the Account.

**Arbitration; Applicable Law** Client agrees that any controversy arising from or relating to this Agreement, Client's Account, transactions with or for Client, or the relationship between Client and Navellier shall be finally determined by arbitration in accordance with the Arbitration Rules then in effect of the Financial Industry Regulatory Authority

# EXHIBIT N



## VIREO
*Confidence Rising*

# Vireo Premium

An all equity portfolio, represented by the nine S&P 500 sectors, using SPDR and
iShares Sector ETFs.

## Vireo - Defensive ETF Portfolios

"The #1 rule of making money is not to lose money.
The second rule is to never forget rule #1."

Warren Buffet, The Sage of Omaha

VIREO is a unique suite of investment strategies with a single-minded focus: limiting losses during extended market downturns. For today's investor, what you make is not nearly as important as what you keep! Based on the AlphaSector Indexes, owned and published by Active Index Solutions LLC, this strategy, known as defensive allocation, also allows Vireo to deliver improved returns in up markets by constantly working from a position of strength (i.e., the portfolio's attempt to avoid losses before making new gains). The Vireo portfolios are designed to deliver attractive risk-adjusted returns through multiple investment markets via diversification and defensive re-allocation, including the use of cash.

## Vireo Premium Portfolio Key Features

- Utilizes only simple, readily available ETFs (iShares and Select Sector SPDRs ) and cash equivalents

- Uses NO shorting, leverage, inverse ETFs, or exotic derivative investments

- Focuses primarily on downside risk management, especially in weak markets

- Under extreme market conditions, the portfolio can build and hold substantial cash positions to avoid losses

- Participates in rising markets with the ability to outperform in down markets

- 100% quantitative process, highly disciplined, weekly calculation

### Extreme losses can destroy any investment plan.

| Loss | Gain Required to Recover | Years Required for Full Recovery |
|---|---|---|
| -5.0% | 5.1% | 0.3 |
| -10.0% | 11.1% | 1.0 |
| -20.0% | 25.0% | 2.0 |
| -30.0% | 42.9% | 3.3 |
| -40.0% | 66.7% | 4.7 |
| -50.0% | 100.0% | 6.3 |
| -51.0% | 104.1% | 6.5 |

In less than one year (5/18/2008 - 3/7/2009), the S&P 500 lost 51%; full recovery requires a gain of 104%.

Source: F-Squared Investments, Active Index Solutions.

Potential investors should consult with their financial advisor before investing in any investment product. Performance results presented herein do not necessarily indicate future performance. Investment in equity strategies involves substantial risk and has the potential for partial or complete loss of funds invested. Results presented include reinvestment of dividends and other earnings. See important disclosures at end of document.

## Historical Diversification and Re-allocation 

March 1, 2010 - June 30, 2013

The AlphaSector Portfolio invests in nine sector ETFs and a cash equivalent. Based upon a weekly risk assessment calculation, each sector may be "turned on" or "turned off" and under certain circumstances, the portfolio has the potential to have a 100% allocation to a cash equivalent.

**For Illustration Purposes Only**



Legend:
- Utilities
- Technology
- Materials
- Healthcare
- Industrials
- Financials
- Energy
- Cons. Staples
- Cons. Disc.
- Cash

**Note periods where the Portfolio goes to cash:** 

Quarterly allocations presented for each ETF represent the allocation as of the last day of the period.
Source: Navellier

## ETF Universe: Vireo Premium Covers all of the S&P 500 Sectors

| U.S. Equity ETFs* | | Cash Equivalent |
|---|---|---|
| Consumer Discretionary | XLY | |
| Consumer Staples | XLP | |
| Energy | IYE | |
| Financials | IYF | |
| Healthcare | IYH | |
| Industrials | IYJ | |
| Materials | XLB | |
| Technology | IYW | |
| Utilities | IDU | |

*Effective June 15, 2012, six SSgA Sector SPDR ETFs in the U.S. Equity sleeve will transition to six sector iShares® ETFs as the sectors are "turned off" and "turned on" during the natural trading windows for the affected ETFs. XLE (Energy) will be replaced with IYE, XLF (Financials) with IYF; XLV (Healthcare) with IYH; XLI (Industrials) with IYJ; XLK (Technology) with IYW; and XLU (Utilities) with IDU. New accounts will continue investing in the sector SPDR ETFs until the sector is "turned off" and "turned on" as described above.

Potential investors should consult with their financial advisor before investing in any investment product. Investment in equity strategies involves substantial risk and has the potential for partial or complete loss of funds invested. Results presented do not necessarily indicate future performance. All performance figures include reinvestment of dividends, interest, and other income. Please read important disclosures at the end of this presentation.

## Vireo Premium - Wrap Composite Results

Vireo
Premium Wrap
Composite
Results

SUPPLEMENTAL
INFORMATION

### Performance Returns

| Annualized Returns through 6/30/13 | Vireo Premium Wrap Composite | | S&P 500 Index |
|---|---|---|---|
| | (Pure Gross) | Net | |
| 2nd Quarter | 1.51% | 1.00% | 2.91% |
| Year-to-Date | 13.14% | 12.01% | 13.82% |
| Trailing 1 Year | 18.51% | 16.19% | 20.60% |
| Trailing 3 Years | 18.41% | 16.05% | 18.45% |
| Since Inception (3/1/10) | 13.26% | 11.04% | 14.29% |
| Cumulative Return (3/1/10-6/30/13) | 51.45% | 41.79% | 56.09% |

### Return/Risk Analysis

| 3/1/2010 to 6/30/2013 | Vireo Premium Wrap Composite | | S&P 500 Index |
|---|---|---|---|
| | (Pure Gross) | Net | |
| Best Month | 9.79% | 9.77% | 10.93% |
| Worst Month | -7.79% | -7.82% | -7.99% |
| % of Up Month | 70% | 70% | 68% |
| % of Down Month | 30% | 30% | 32% |
| Maximum Drawdown (%) | -13.67% | -13.72% | -16.26% |

### Yearly Returns

| | Vireo Premium Wrap Composite | | S&P 500 Index |
|---|---|---|---|
| | (Pure Gross) | Net | |
| 2012 | 12.81% | 10.55% | 16.00% |
| 2011 | 3.19% | 1.13% | 2.11% |
| 2010 (10 months) | 15.00% | 13.18% | 15.77% |

Source: Navellier & Associates.
All returns over 1 year are annualized.
* Annualized standard deviation since inception
** Calculated since inception vs S&P 500 Index

### Comparative Return/Risk Analysis

| 3/1/2010 to 6/30/2013 | Vireo Premium Wrap Composite | S&P 500 Index |
|---|---|---|
| | (Pure Gross) | |
| Alpha ** | 2.58% | 0.00% |
| Beta ** | 0.74% | 1.00% |
| Standard Deviation * | 12.21% | 14.56% |
| R-Squared ** | 77.71% | 100.00% |
| Up Capture Ratio | 80.20% | 100.00% |
| Down Capture Ratio | 77.50% | 100.00% |

The information shown above represents the actual composite data of all wrap Vireo Premium accounts. The composite's inception is March 1, 2010. (For a complete description of the composite, please refer to the full disclosure statement on the next page.)

Potential investors should consult with their financial advisor before investing in any investment product. Investment in equity strategies involves substantial risk and has the potential for partial or complete loss of funds invested. Results presented do not necessarily indicate future performance. All performance figures include reinvestment of dividends, interest, and other income. Please read important disclosures at the end of this presentation.

VIREO PREMIUM WRAP COMPOSITE
Reporting Currency U.S. Dollar

| Year | Firm Assets ($M) | Composite Assets ($M) | Percentage of Firm Assets | Number of Accounts | Composite Pure Gross Return (%) | Composite Net Return (%) | S&P 500 Index Return (%) | Composite Dispersion (%) |
|------|------|------|------|------|------|------|------|------|
| 2012 | 3,412 | 34 | 1% | 152 | 12.81 | 10.59 | 16.00 | 0.64 |
| 2011 | 2,728 | 23 | <1% | 100 | 3.19 | 1.13 | 2.11 | 0.14 |
| 2010[1] | 2,365 | 3 | <1% | 21 | 15.00 | 13.18 | 15.77 | N/A[2] |

[1]Performance calculations for the period ended December 31, 2010 only includes 10 months of history.

[2]N/A information is not statistically meaningful due to an insufficient number of portfolios in the composite for the entire year.

*This space left intentionally blank.*

**1. Compliance Statement** – Navellier & Associates, Inc. claims compliance with the Global Investment Performance Standards (GIPS®) and has prepared and presented this report in compliance with GIPS standards. Navellier & Associates, Inc. has been independently verified for the periods January 1, 1995 through December 31, 2012 by Ashland Partners & Company LLP. Verification assesses whether (1) the firm has complied with all the composite construction requirements of the GIPS standards on a firm-wide basis and (2) the firm's policies and procedures are designed to calculate and present performance in compliance with the GIPS standards. The Vireo Premium Wrap Composite has been examined for the periods March 1, 2010 through December 31, 2012. The verification and performance examination reports are available upon request.

**2. Definition of Firm** – Navellier & Associates, Inc. is a registered investment adviser established in 1987. Navellier & Associates, Inc. manages a variety of equity assets for primarily U.S. and Canadian institutional and retail clients. The firm's list of composite descriptions as well as information regarding the firm's policies for valuing portfolios, calculating performance, and preparing compliant presentations are available upon request.

**3. Composite Description** - The Vireo Premium Wrap Composite includes all discretionary Vireo Premium equity accounts that are charged a wrap fee and are managed with similar objectives for a full month, including those accounts no longer with the firm. The strategy attempts to track an index known as the AlphaSector Premium Index ("Index"). Navellier & Associates, Inc. pays a licensing fee to F-Squared Investments, Inc. to provide a model of the Index. The Index is quantitatively driven and applies a weekly trading protocol to nine sector ETFs and an exchange traded fund ("ETF") representing 1-3 month Treasuries. Note that the Vireo Premium accounts managed by Navellier & Associates, Inc. may invest in a cash equivalent, such as money market funds,

in place of the 1-3 month Treasury ETF. The index has the potential to be invested in any combination of the nine sector ETFs including all nine at the same time, a combination of sector ETFs and the Treasury ETF, or can be 100% invested in the Treasury ETF. There is no guarantee that Navellier will achieve returns similar to the index, and in fact the strategy's returns may vary from the index due to the timing of trades and after fees are taken into account, including management fees, brokerage or transactions costs, or other administrative or custodian fees. Performance is calculated on a "time-weighted" and "asset-weighted" basis. Performance figures that are net of fees take into account advisory fees and any brokerage fees or commissions that have been deducted from the account. "Pure" gross-of-fees returns do not reflect the deduction of any trading costs, fees, or expenses, and are presented only as supplemental information. Performance results are total returns and include the reinvestment of all income, including dividends. The composite was created March 1, 2010. Valuations and returns are computed and stated in U.S. Dollars.

**4. Management Fees** - The management fee schedule for accounts ranges from 75 to 100 basis points, depending on account size and brokerage selected. Some incentive fee, fixed fee, and fulcrum fee accounts may be included. Fees are negotiable, and not all accounts included in the composite are charged the same rate. Bundled fee accounts make up 100% of the composite for all periods shown. Fee schedules are provided by independent sponsors and are available upon request from the respective sponsor. Wrap fees generally range from 100 to 200 basis points and custody, trading expenses, and other expenses associated with the management of the account. The client is referred to the firm's Form ADV Part 2A for a full disclosure of the fee schedule.

**5. Composite Dispersion** - If applicable, the dispersion of annual returns is measured by the standard deviation across asset-weighted portfolio returns represented within the

composite for the full year.

**6. Benchmark** - The primary benchmark for the composite is the S&P 500 Index. The S&P 500 consists of 500 stocks chosen for market size, liquidity and industry group representation. It is a market value weighted index with each stock's weight in the index proportionate to its market value. The reported returns reflect a total return for each quarter inclusive of dividends. The asset mix of the composite may not be precisely comparable to the presented indices. Presentation of index data does not reflect a belief by the Firm that the S&P 500 Index, or any other index, constitutes an investment alternative to any investment strategy presented in these materials or is necessarily comparable to such strategies.

**7. General Disclosure** - The three-year annualized standard deviation is not presented because 36 months of history is not available. Actual results may differ from composite results depending upon the size of the account, custodian related costs, the inception date of the account and other factors. *Performance results presented herein do not necessarily indicate future performance. Investment in equity strategies involves substantial risk and has the potential for partial or complete loss of funds invested. Results presented include reinvestment of all dividends and other earnings.* The securities identified and described do not represent all of the securities purchased, sold, or recommended for client accounts. It should not be assumed that any securities recommendations made by Navellier in the future will be profitable or equal the performance of securities made in this report. A list of recommendations made by Navellier & Associates, Inc. for the preceding twelve months is available upon request.

Navellier & Associates, Inc.
One East Liberty, Suite 504
Reno, Nevada 89501
800-897-8671

# EXHIBIT O



# NAVELLIER

## Outgoing Marketing and/or Sales Material Request for Review Form

| | |
|---|---|
| Today's Date: | August 30, 2011 |
| Requested By: | Traci Sinclair |
| Title of Piece: | 2Q11 AS Allocator ppt |
| Description: | Updated index disclosure |
| Anticipated Date of First Use: | Upon approval |
| Target Audience and/or Recipients: | b/d's |
| Method of Delivery (eMail, U.S. Mail, etc.): | Email, hardcopy |

## THIS SECTION TO BE COMPLETED BY PORTFOLIO MANAGER, PRINCIPAL and/or CCO:

### PORTFOLIO MANAGER REVIEW:
Material Approved ☐
Revision(s) Needed ☐
Comments:

PM's Signature                    Name                         Date

### INITIAL PRINCIPAL and/or CCO REVIEW:
Material Approved ☐
Revision(s) Needed ☐
Comments:    See edits

Principal's Signature              Name                    9/15 Date

### FINAL CCO REVIEW:
Material Approved ☐

Principal's Signature              Name                    9/27 Date

☐ Mutual Fund related – Approved by IFS



# VIREO™
## Confidence Rising

# Introducing Vireo

*An exciting, new, defensive ETF portfolio*

## Vireo AlphaSector Allocator Premium Portfolio

www.vireoinvestments.com

B-083011

*AlphaSector Allocator Premium Index provides investors critical benefits rarely seen in long-only strategies*

- **Alpha is expressed where it is needed the most**
  - Traditional managers attempt to deliver their highest alpha in strong bull markets
    - Traditional portfolios typically exhibit underperformance or modest outperformance in bear markets
  - AlphaSector Allocator Premium Index has historically delivered consistent alpha in "normal" markets and <u>highest alpha in negative markets</u>
    - However, the portfolio can lag in strong bull markets

- **AlphaSector Allocator Premium has the potential to improve consistency of returns across multiple markets**

- **Live track record for U.S. equity sleeve – stress tested across *two* bear markets**
  - Live assets began tracking the strategies:
    - U.S. Equity – April 1, 2001          International – May 1, 2009
    - Fixed Income – December 1, 2009     Alternatives – December 1, 2009

For Financial Consultant One-on-One Use Only. Copyright 2009 – Confidential. Patents pending. Performance results presented herein do not necessarily indicate future performance. Investment in equity strategies involves substantial risk and has the potential for partial or complete loss of funds invested. Results presented include reinvestment of all dividends and other earnings. Please read important disclosures at the end of this presentation.



5



# VIREO ™

*Confidence Rising*

# *Introducing Vireo*

*An exciting, new, <u>defensive</u> ETF portfolio*

## *Vireo AlphaSector Allocator Premium Portfolio*

www.vireoinvestments.com

093011 Vireo Allocator Sales
Presentation_Retail

Case 1:17-cv-11633-DJC   Document 244-2   Filed 09/26/19   Page 3 of 8

## *AlphaSector Allocator Premium Index provides investors critical benefits rarely seen in long-only strategies*

- **Alpha is expressed where it is needed the most**

  – Traditional managers attempt to deliver their highest alpha in strong bull markets

    • Traditional portfolios typically exhibit underperformance or modest outperformance in bear markets

  – AlphaSector Allocator Premium Index has historically delivered consistent alpha in "normal" markets and <u>highest alpha in negative markets</u>

    • However, the portfolio can lag in strong bull markets

- **AlphaSector Allocator Premium has the potential to improve consistency of returns across multiple markets**





VIREO

5

**EXHIBIT 25**

**From:** Traci Sinclair <Traci_Sinclair@navellier.com>
**Sent:** Wednesday, August 10, 2011 2:03 PM
**To:** Angela Villasenor
**Cc:** Nancy Samson
**Subject:** Vireo Allocator
**Attachments:** 063011 Vireo Allocator Sales Presentation_b.pptx; 063011 Vireo Allocator Sales Presentation_r.pptx

Ang – attached are the broker and retail versions.

**Traci Sinclair**
Institutional Marketing Manager
------------------------------------------------



------------------------------------------------
Navellier & Associates
1 E Liberty 3rd Fl, Reno, NV 89501
775 785 9463
775 562 8235 eFax
tracis@navellier.com
www.navellier.com
------------------------------------------------

Visit Our Blogs

---

DISCLAIMER

This email message is intended only for the personal use of the
recipient(s) named above. This message may be privileged and
confidential. If you are not an intended recipient, you may
not review, copy or distribute this message. If you have
received this communication in error, please notify us
immediately by email and delete the original message.

Navellier & Associates Inc.'s outgoing and incoming emails are
electronically archived and may be subject to review and/or
disclosure to someone other than the intended recipient.

The SEC suggests that clients compare the accuracy of portfolio statements provided by Navellier & Associates Inc. to
statements provided to clients by their custodian

Navellier & Associates, Inc.
1 East Liberty, 3rd Floor
Reno, Nevada 89501

info@navellier.com

Visit us on the web at: http://www.navellier.com



## VIREO™

*Confidence Rising*

# Introducing Vireo

*An exciting, new, <u>defensive</u> ETF portfolio*

## Vireo AlphaSector Allocator Premium Portfolio

R-080111

Case 1:17-cv-11633-DJC   Document 222-27   Filed 08/12/19   Page 3 of 15

## AlphaSector® Allocator Premium Index provides investors critical benefits rarely seen in long-only strategies

- **Alpha is expressed where it is needed the most**

  – Traditional managers attempt to deliver their highest alpha in strong bull markets

    • Traditional portfolios typically exhibit underperformance or modest outperformance in bear markets

  – AlphaSector Allocator Premium Index has historically delivered consistent alpha in "normal" markets and <u>highest alpha in negative markets</u>

    • However, the portfolio can lag in strong bull markets

- **AlphaSector Allocator Premium has the potential to improve consistency of returns across multiple markets**

- **Live track record for U.S. equity sleeve – stress tested across two bear markets**

  • Live assets began tracking the strategies:

    U.S. Equity – April 1, 2001                     International – May 1, 2009

    Fixed Income – December1, 2009          Alternatives – December 1, 2009

For Financial Consultant One-on-One Use Only. Copyright 2009 – Confidential. Patents pending. Performance results presented herein do not necessarily indicate future performance. **Investment in equity strategies involves substantial risk and has the potential for partial or complete loss of funds invested.** Results presented include reinvestment of all dividends and other earnings. Please read important disclosures at the end of this presentation.



VIREO

5

Case 1:17-cv-11633-DJC   Document 222-27   Filed 08/12/19   Page 4 of 15

*Supplemental Information*

# *Limiting risk in down markets and participating in up markets*

AlphaSector Allocator Premium Index is designed to consistently outperform the Dow Jones Moderate Global Index and outperform cash

- Quality downside risk management, especially in weak markets
- Powerful but simple story, and uses **NO** derivatives, leverage, or shorting

### AlphaSector Allocator Premium Index Performance
Apr 2001 – Jun 2011

Cumulative Return

| | | | 4/01 |
| 50 | | | 3/02 |
| 100 | | | 3/03 |
| 150 | | | 3/04 |
| 200 | | | 3/05 |
| 250 | | | 3/06 |
| 300 | | | 3/07 |
| 350 | | | 3/08 |
| 400 | | | 3/09 |
| | | | 3/10 |
| | | | 3/11 6/11 |

— AlphaSector Allocator Premium Index (Pure Gross)
— DJ Moderate Global Index
— AlphaSector Allocator Blended Index

As of Jun 2011

| | AlphaSector Allocator Premium Index (Pure Gross) | vs. DJ Moderate Global Index | AlphaSector Allocator Premium Index (Pure Gross) | vs. AlphaSector Allocator Blended Index |
|---|---|---|---|---|
| Cum. Return | 262.4% | 99.0% | 262.4% | 66.6% |
| 1 Yr Return | 22.9% | 20.8% | 22.9% | 22.4% |
| 3 Yr Return | 14.9% | 5.5% | 14.9% | 3.7% |
| 5 Yr Return | 15.2% | 5.4% | 15.2% | 4.3% |
| Max Drawdown | -8.2% | -35.1% | -8.2% | -39.3% |
| Std. Dev. | 7.3% | 10.7% | 7.3% | 11.4% |
| Alpha | 9.7% | N/A | 10.8% | N/A |
| R-Squared | 51% | N/A | 52% | N/A |
| Beta | 0.5% | N/A | 0.5% | N/A |
| Ann. Excess Return | 6.4% | N/A | 8.3% | N/A |
| 5 Yr Up Capture Ratio | 100% | N/A | 93% | N/A |
| 5 Yr Down Capture Ratio | 38% | N/A | 33% | N/A |

For Financial Consultant One-on-One Use Only. Source: Zephyr StyleAdvisor. F-Squared Investments, Inc. Performance results presented herein do not necessarily indicate future performance. **Investment in equity strategies involves substantial risk and has the potential for partial or complete loss of funds invested.** Results presented include reinvestment of all dividends and other earnings. Please read important disclosures at the end of this presentation.



VIREO

8

Case 1:17-cv-11633-DJC   Document 222-27   Filed 08/12/19   Page 7 of 15

# Important Disclosures

Navellier Vireo AlphaSector Allocator Premium is a new strategy that attempts to track an index known as the AlphaSector Allocator Premium Index, owned and published by Active Index Solutions, LLC ("AIS"). The AlphaSector Allocator Premium Index is a quantitatively driven index that applies a weekly trading protocol to nine Select Sector SPDRs, a Treasury exchange traded fund, two international ETFs, five fixed income ETFs, two "alternative" ETFs, and a S&P 500 SPDR. There is no guarantee that the advisor will be successful in achieving returns similar to the AlphaSector Allocator Premium Index, and in fact, client returns will be significantly lower than the index returns after actual fees are taken into account, including management fees, brokerage or transaction costs, or other administrative or custodian fees a client may incur.

The "U.S. equity sleeve" referenced in the materials refers to the AlphaSector Premium Index, with the strategy that the AlphaSector Premium Index is based on having an inception date of April 1, 2001. The process of converting the active strategy to an index implies that the returns presented, while not back-tested, reflect theoretical performance an investor would have obtained had it invested in the manner shown and does not represent returns that an investor may have actually attained, as an investor cannot invest directly into an index. Theoretical and hypothetical performance have many inherent limitations. The performance is adjusted to reflect the reinvestment of dividends.

AlphaSector Allocator Premium Index is the exclusive property of F-Squared Investments, Inc. and AIS. AIS calculates and publishes the value of the index on a monthly basis. Source: Morningstar Direct. Although AlphaSector Indexes do not short securities nor utilize leverage or derivatives, the ETFs that AlphaSector tracks may make use of such financial instruments or strategies.

"AlphaSector" is a service mark of F-Squared Investments, Inc. and AIS.  Neither AIS nor F-Squared Investments, Inc., is affiliated with Navellier & Associates, Inc.  Navellier & Associates, Inc. has entered into a Model Manager Agreement with F-Squared pursuant to which it timely receives any changes made to the AlphaSector Allocator Premium Index holdings.  Investment products such as the Navellier Vireo AlphaSector Allocator Premium strategy that are based on the AlphaSector Allocator Premium Index are not necessarily sponsored by AIS or F-Squared, and AIS and F-Squared do not make any representation regarding the advisability of investing in them.  One cannot directly invest in an index.  Index returns presented represent past performance and are not a guarantee of future results or indicative of any specific investment.

