UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

    v.

NAVELLIER & ASSOCIATES, INC. and
LOUIS NAVELLIER,
    Defendants.

Case No. 17-cv-11633-DJC

## COMMISSION'S AMENDED[1] MEMORANDUM IN SUPPORT OF DISGORGEMENT FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Commission respectfully asks this Court to order disgorgement to deprive Defendants Louis Navellier ("Navellier") and Navellier and Associates, Inc. ("NAI") of the unjust profits they made from their repeated fraudulent marketing misrepresentations and failures to disclose material information to clients about the Vireo products.  The disgorgement amount requested by the Commission is consistent with the historical equitable principles underpinning disgorgement and with the principles the Court set forth in *SEC v. Liu*, 140 S. Ct. 1936 (2020). The Commission respectfully requests that the Court enter the proposed findings of fact and conclusions of law attached here, and order disgorgement of $22,734,487 plus prejudgment interest of $6,635,403, for a total of $29,369,890, to be paid jointly and severally by Defendants.

---

[1] The Commission submits this amended brief, with amended accompanying materials, based on a change to the statute of limitations in Pub. L. 116-283, §6501(a)(3) & (b), Jan. 1, 2021, 134 Stat. 3388 (extending the limitations period applicable here to ten years).  The Commission detailed this change in ECF No. 351 (as well as p. 10 below) and sought leave to file these amended materials.  With this Amended Memorandum, the Commission has filed: Amended Proposed Findings of Fact and Conclusions of Law; an Amended Alex Declaration (reflecting revised disgorgement calculation); an Amended Ex. 3 (pre-judgment interest calculation);an Amended Donahue Declaration (reflecting revised salaries calculation); and an Amended Final Judgment.  The Commission has also filed redline versions of each of these, reflecting what changes were made from the original documents.  The Commission has not refiled Exhibits that did not change as a result of the amended briefing.

The Commission also respectfully requests the Court enter the proposed Amended Final Judgment, also attached here, reflecting the new disgorgement amount.

## PERTINENT PROCEDURAL HISTORY

On February 13, 2020, the Court granted the SEC's Motion for Partial Summary Judgment on Counts One and Two, and found that the Defendants intentionally or recklessly violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"). [D. 252.]  On March 25, 2020, the Commission moved (with Defendants' assent) to dismiss the remaining unresolved counts (Three and Four) [D. 260], which the Court granted the next day. [D. 266.  The Commission also moved for entry of final judgment, requesting this Court enter joint and several disgorgement and prejudgment interest in the amount of $28.9 million, impose injunctions on each Defendant, and set an appropriate civil penalty for each.  [D. 262.]  The Court entered its Final Judgment on June 2, 2020, granting the Commission's request for $28.9 million in joint and several disgorgement and prejudgment interest, enjoining Defendants, and setting penalties of $2 million on defendant NAI and $500,000 on defendant Louis Navellier. [D. 295.]  Defendants noticed their appeal three days later.  [D. 297.][2]

On June 22, 2020, the Supreme Court decided *Liu v. SEC,* 140 S. Ct. 1936, 1940 (2020). As detailed below, *Liu* upheld the Commission's ability to seek and receive disgorgement, but required courts to consider additional factors when deciding whether to order disgorgement, how much, and whether the disgorgement could be joint and several.  As the disgorgement requested by the Commission and ordered by this Court touched on all three issues, because the *Liu* decision came out after the Court's order of final judgment, and because the Defendants had

---

[2] Defendants' prior appeal of the Court's grant of the Commission's motion for partial summary judgment D. 273, filed Apr. 13, 2020], was dismissed by the First Circuit on June 15, 2020 for lack of jurisdiction.  [Case No. 20-1437, Doc. No. 00117602120].  The First Circuit found that the "theories of appellate jurisdiction offered by appellants are inapplicable and unpersuasive."

made disgorgement a ground for their appeal, the Commission filed with the First Circuit a "Motion for a Limited Remand and Stay of the Briefing Schedule to Allow the District Court to Make Additional Factual Findings and Conclusions of Law Regarding the Disgorgement Award in Light of *Liu v. SEC*." The First Circuit allowed the Commission motion on August 20, 2020, and remanded for that limited purpose. D. 322.

The parties subsequently submitted proposed findings of fact and conclusions of law with accompanying memoranda, reply, and surreply. On January 1, 2021, Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") was amended, changing the limitations period applicable to the Commission's claims for disgorgement and equitable relief, to ten years. The Commission filed a Notice of Change of Law (ECF No. 351) on January 12, 2021. The Commission files this Amended Memorandum, and the accompanying amended findings and amended declarations to reflect that change of law.

Each section of this Memorandum below corresponds to findings in the amended proposed Findings of Fact and Conclusions of Law, as designated in the section heading.

## ARGUMENT

## I.   The Court Has Broad Discretion to Order Disgorgement – Findings 1-11

15 U.S.C. § 78u(d)(5) authorizes the Commission to seek "any equitable relief that may be appropriate or necessary for the benefit of investors." The Supreme Court recently reaffirmed the Commission's authority to obtain disgorgement for violations of any provision of the federal securities laws. *Liu*, 140 S. Ct. at 1940. The Court held that, "A disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief under [15 U.S.C.] §78u(d)(5)." *Id.*

Disgorgement is a "profit-based measure of unjust enrichment" that is measured by the defendant's "wrongful gain," and is ordered to reflect the "foundational principle" of equity that

"it would be inequitable that a wrongdoer should make a profit out of his own wrong." *Liu*, 140 S. Ct. at 1943 (internal quotation marks omitted); *SEC v. Sargent*, 329 F.3d 34 (1st Cir. 2003) (disgorgement "is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws").

Here, Defendants' fraudulent scheme resulted in millions of dollars of profits from investors who were fraudulently induced to become the Defendants' clients.  Then, in violation of their fiduciary duty of honesty, Defendants retained those clients by repeatedly failing to tell the truth about the (lack of) historical track record for the AlphaSector strategies.  Thus, disgorgement of their unjust profits fulfills the equitable goals underlying the statute and accords with the *Liu* decision.

A wrongdoer can be required to give up unjust enrichment "without the need to show that the claimant has suffered a loss."  Restatement (Third) of Restitution and Unjust Enrichment § 1, cmt. a; *see generally, e.g.*, *Magruder v. Drury*, 235 U.S. 106, 118-20 (1914) (trustee liable for profits gained in breach of fiduciary duty, and "[i]t makes no difference that the estate was not a loser in the transaction, or that the commission was no more than the services were reasonably worth").  Thus, the Commission need not establish what loss was suffered by Defendants' clients.  Because disgorgement is measured by a violator's "wrongful gains" as opposed to the victim's damages, *Liu*, 140 S. Ct. at 1944, disgorgement can be ordered in an amount that is different from, or even exceed the victim's loss.  *See Kansas v. Nebraska*, 574 U.S. 445, 463 (2015) (ordering disgorgement that exceeded the victim's "actual damages"); *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993) ("[A] disgorgement order might be for an amount more or less than that required to make the victims whole.").

Disgorgement in the amount an investment adviser illicitly obtained is an appropriate

4

remedy for violations of the Investment Advisers Act of 1940.  *See, e.g.*, *SEC v. Kokesh*, 884 F.3d 979, 980 (10th Cir. 2018); *Montford & Co., Inc. v. SEC*, 793 F.3d 76, 83-84 (D.C. Cir. 2015); *SEC v. Illarramendi*, 260 F. Supp. 3d 166, 182 (D. Conn. 2017); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 384-85 (S.D.N.Y. 2007).

Because "flexibility is inherent in equitable remedies," the Court has broad discretion in determining the amount of disgorgement.  *Kansas*, 574 U.S. at 464-45 ("[D]isgorgement need not be all or nothing."); *see also SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004) (standard of review); *SEC v. Wyly*, 56 F.Supp.3d 394, 426 (S.D.N.Y. 2014) (a disgorgement order "gives courts flexibility to determine the appropriate remedy to fit the wrongful conduct").

The amount of disgorgement ordered "need only be a reasonable approximation of profits causally connected to the violation," and the "risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty."  *SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004) (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231-1232 (D.C. Cir. 1989)); *SEC v. Yang*, 2020 WL 4530630, at *2 (9th Cir. Aug. 6, 2020) (applying this standard after *Liu*); *SEC v. Mizrahi*, 2020 WL 6114913, at *2-4 (C.D. Cal. Oct. 5, 2020) (same); *SEC v. Smith*, 20-cv-1056, Dkt. 65 at 3-4 (C.D. Cal. Oct. 19, 2020) (same).

As it did in its pre-appeal request for disgorgement, the Commission has submitted to the Court a conservative estimate using the information available from the parties' pleadings, depositions, and discovery documents.  And, as before, the calculations for that disgorgement amount are summarized here, and detailed in the Declaration of the Commission's forensic accountant, Rory Alex ("Alex Decl.").[3]  "Once the SEC shows that the disgorgement is a

---

[3] With this Memorandum, the Commission has submitted a new Alex Declaration, which repeats information from the prior declaration, adds additional information and calculations about Defendants' expenses, and revises the total disgorgement and prejudgment interest figures.

reasonable approximation of disgorgement, the burden shifts to the defendant to demonstrate that the amount of disgorgement is not a reasonable approximation." *Happ*, 392 at 31. To the extent there is a "risk of uncertainty in calculating disgorgement," that risk falls on Defendants who are the "wrongdoer[s] whose illegal conduct created that uncertainty. *Id.*; *see also Rubber Co. v. Goodyear*, 76 U.S. 788, 803-04 (1870) (explaining that no deduction is appropriate for claimed expenses where the "manner in which the books … were kept renders such an account impossible," reasoning that the defendants' "conduct in this respect has not been such as to commend them to a court of equity," and holding that "[u]nder the circumstances, every doubt and difficulty should be resolved against them") (cited with approval in *Liu*, 140 S. Ct. at 1945-46, 1950); *United States v. Rapower-3, LLC*, 18-4119 (10th Cir. July 17, 2020) (denying rehearing petition based on *Liu* where the petition "fail[ed] to identify any expenses that were not part and parcel of Petitioners' scheme and should be deducted from the disgorgement order under the standard stated in *Liu*"). "[D]oubts are to be resolved against the defrauding party." *SEC v. MacDonald*, 699 F.2d 47, 55 (1st Cir. 1983).

The Commission has revised its request for disgorgement in light of the *Liu* Court's statements on disgorgement deductions for legitimate business expense, as detailed in Section V.

## II. Defendants Are Jointly and Severally Liable for Disgorgement – Findings 12-19

*Liu* held that courts have the flexibility to impose joint and several liability against "partners" engaged in "concerted wrongdoing." 140 S. Ct. at 1949; *see also SEC v. Janus Spectrum, LLC*, 2020 WL 3578077, at *2 (9th Cir. July 1, 2020) ("[T]he imposition of joint and several liability for a disgorgement award is permissible so long as it is 'consistent with equitable principles.'") (quoting *Liu*, 140 S. Ct. at 1949). Imposing joint and several liability for profits resulting from breach of a fiduciary duty is consistent with equitable principles. *See Crites, Inc., v. Prudential Ins. Co. of Amer.*, 322 U.S. 408, 414 (1944) ("Any profits that might have resulted

from a breach of [a fiduciary duty], including the profits of others who knowingly joined [the fiduciary] in pursuing an illegal course of action, would have to be disgorged and applied to the estate.") (citing cases).

Where an owner-officer and a company together violate the securities laws, a court may order them to pay disgorgement on a joint and several basis. *SEC v. Esposito, et al.*, Civ. No. 16-cv-10960-ADB, 2018 WL 2012688, *9 (D. Mass. April 30, 2018) (ordering managing director and entity jointly and severally liable for total disgorgement where violations are closely intertwined); *SEC v. Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d 355, 369 (D. R.I. 2011) (holding entity and entity's sole owner, an individual, jointly and severally liable for disgorgement).

Here Defendants were engaged in concerted wrongdoing. First, Navellier formed, owned, and controlled all aspects of NAI during the relevant time period. D. 53 (Amended Answer) at ¶15. Navellier served as NAI's Chief Investment Officer and Chief Executive Officer, during that time. *Id.* Navellier had the authority to hire, promote, demote, and fire NAI employees. *Id.* He had authority, along with the Board of Directors of NAI, to decide what products and investment vehicles NAI offered to its clients during the relevant time period. *Id.* He also had authority along with the Board of Directors of NAI to sell NAI business lines, including the Vireo AlphaSector business. *Id.* In other words, Navellier had final authority over NAI's fraudulent activity. *See SEC v. First Jersey Sec., Inc.*, 101 F.3d at 1475-76 (finding, under Exchange Act § 20(a), "where a firm has received gains through its unlawful conduct, where its owner and chief executive officer has collaborated in that conduct and has profited from the violations … it is within the discretion of the court to determine that the owner-officer too should be subject, on a joint and several basis, to the disgorgement order").

Second, Navellier committed his violations of Counts I and II in concert with NAI.  He knew the marketing was misleading, had the power to stop NAI from its fraudulent marketing efforts, and authorized his NAI staff to continue the marketing campaign anyway.  *See* Order and Memorandum, D. 252, at 5-6 (detailing Navellier's approvals of the continued marketing of the Vireo AlphaSector products using the misleading advertising, despite his knowledge that due diligence had been inadequate, that NAI lacked support for its marketing statements, and that the product "smelled like fraud") and at 7 (detailing Navellier's effort to sell NAI's Vireo line of business as a result of NAI's "massive due diligence failure," risk of SEC liability, and F-Squared's fake indexes which Defendants used in their Vireo marketing). Navellier had the power to decide what products NAI offered.  He authorized the selling of the Vireo AlphaSector products, even though he was well aware that the Vireo AlphaSector performance claims were unsupported.  D. 252 at 5; *see also* D. 222-46, D. 222-47.  But he did not stop sales of the Vireo products or notify clients of any of Defendants' misrepresentations.  *Id.*  In the end, he decided to sell the Vireo assets despite what he considered "a massive due diligence failure."  *Id.* at 6-7; *see also* D. 222-48, 222-63, 222-64.

Third, both Defendants benefited from their concerted wrongdoing.  From 2009 to August 2013, Navellier owned at least 75% of NAI and in 2013, Navellier acquired complete ownership of NAI.  D. 53 (Amended Answer), ¶15.  Navellier is now the sole owner of NAI and shares in all profits and proceeds received by NAI.  *Id.*; *see also* D. 222-2 at 8-9.

On these facts, the imposition of joint and several liability does not implicate the concerns expressed by the Court in *Liu.*  There, the Court discussed the practice of imposing disgorgement liability "on a wrongdoer for benefits that accrue to his affiliates," which the Court stated "could transform any equitable profits-focused remedy into a penalty."  140 S. Ct. at 1949.

Here, however, benefits that accrued to NAI accrued to Navellier.  So Defendants may properly be held joint and severally liable for disgorgement as partners engaged in concerted wrongdoing.

### III.  Disgorgement Here Will Be "For the Benefit of Investors" – Findings 20-25

An award of disgorgement here would be for the benefit of investors.  The "equitable nature of the profits remedy generally requires the SEC to return a defendant's gain to wronged investors for their benefit."  *Liu,* 140 S. Ct. at 1948.  Because of the "delicate fiduciary nature of an investment advisory relationship" investment advisers have "an affirmative duty of utmost good faith, and full and fair disclosure of all materials facts, as well as an affirmative obligation to employ reasonable care to avoid misleading [their] clients."  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963).  But Defendants breached these duties in this case to the detriment of their clients and prospective clients.  D. 252 at 16.

The Commission intends to distribute disgorgement to Defendants' Vireo AlphaSector clients any disgorgement awarded here.  The Commission has the names, investment amounts, and time period of investment with Defendants has been produced to the Commission in discovery.  Based on that information and the amount of disgorgement this Court previously ordered in this case, the Commission has determined that distribution of disgorgement can feasibly be distributed to injured clients, if Defendants timely pay what is owed.

If Defendants do not timely pay their full disgorgement, the Commission will reassess the feasibility of the distribution based on the amount paid and, if still feasible, will distribute funds to clients consistent with this Court's Amended Final Judgment.  If the Commission determines at that time that a distribution is not feasible given the amount Defendants have paid in disgorgement, it will advise the Court and will seek the Court's guidance on whether "a specific order … directing any proceeds to the Treasury" is permissible.  *Liu,* 140 S. Ct. at 1949.  But this determination is premature at this time.

**IV.  Defendants Should Be Deprived of the Profits They Gained from Their Illegal Conduct—Findings 26-37**

Disgorgement should amount to the "net profits from wrongdoing after deducting legitimate expenses." *Liu*, 140 S. Ct. at 1946.  By net profits, the Court is referring to "gains 'made upon any business or investment, when both the receipts and payments are taken into the account.'" *Id.* at 1949-50 (quoting *Goodyear*, 9 Wall., at 804).  "[A] defendant may be denied inequitable deductions" and expenses that "are merely wrongful gains under another name." *Id.* at 1950 (internal quotation marks omitted).  As of January 1, 2021, the statute of limitations for disgorgement applicable to disgorgement in this case has been changed to ten years.  Pub. L. 116-283, §6501(a)(3) & (b), Jan. 1, 2021, 134 Stat. 3388.  So, all profits of the Defendants' fraudulent scheme can be disgorged, as the earliest profits received by the Defendants from their fraudulent conduct occurred in 2011, less than ten years before the filing of this case.  The Commission includes revenues and expenses paid from January 1, 2011 through Defendants' sale of the Vireo business (when they presumably stopped receiving revenue or incurring expenses for that business).

**A.     Revenues—Findings 31-37**

Defendants' misconduct resulted in two types of revenue:  fees paid by clients and the proceeds of the sale of the Vireo business.  Each type represents "ill-gotten gains" obtained by the Defendants as a result of the fraudulent marketing scheme and their failure to disclose to their clients the significant fraudulent misrepresentations that had been made to them by Defendants about the Vireo products.  *See SEC v. AbsoluteFuture.com*, 115 Fed. App'x. 105, 106-107 (2d. Cir. 2004) (affirming order to disgorge all profits received as result of fraud).

As detailed below, Defendants received $36,775,867 from their misconduct, the sum of the profit earned by Defendants for the Vireo AlphaSector business and the sale price paid to

10

Defendants for the Vireo AlphaSector assets.  Alex Decl. at ¶¶ 8-9.

### 1.    Fees Paid By Clients – Findings 32-34

Defendants' many material misrepresentations about Vireo AlphaSector worked, and Defendants collected millions in advisory fees from thousands of people they had deceived into becoming clients and continued to deceive when they were clients.  According to Navellier's income statements, revenue from the Vireo AlphaSector business was $22,775,867 from 2011 through 2013.  This amount represents the total investment advisory fees paid by Defendants' clients for the Vireo products during that time.  Alex Decl. at ¶8.

### 2.    Sale of Vireo – Findings 35-37

In addition to the fees earned, Navellier subsequently sold the Vireo AlphaSector assets (namely, its client relationships) on September 23, 2013 for $14,000,000, which should also be disgorged.  Alex Decl. at ¶ 9 & Ex. 2 (NAI's business checking account statement for September 2013).  The value Defendants received in the sale is causally connected to its wrongdoing in violating the Advisers Act.  Defendants "actions contributed to the value of the Vireo AlphaSector business that Defendants then sold to F-Squared."  D.252 at pp. 22-23.  This is particularly true as, up to and including through the sale, Defendants did not fulfill their on-going obligation to disclose the falsity of their marketing representations that was their fiduciary duty.  D. 252 at 17-18.  As the Vireo sale price was largely dependent on the number of clients who transferred to F-Squared (instead of terminating their client relationship), Defendants had a substantial incentive not to disclose their misrepresentations and the reason they were selling the business.  The Vireo sale included "all rights … under … investment advisory contracts … with clients or with other investment advisors" including the right to "payment for services provided under" those contracts.  Defendants sold their Vireo assets:  the advisory clients and the future advisory fee payments those clients would make.  In fact, the Vireo asset sale agreement allowed

for an adjustment to the purchase price F-Squared paid for Vireo based on the value of the client accounts transferred from NAI to F-Squared.  D. 224-5 ("Assignment and Asset Purchase Agreement"), p. 34.  In other words, Defendants engaged in additional fraudulent omissions to keep the sale price high.  And, Navellier appears to have wanted to sell the Vireo business before the fraud became public and the firm faced a "big SEC enforcement fine," instead of disclosing to clients the problems.  Ex. 15.  Thus, there is no "clear break in or considerable attenuation of the causal connection between the illegality and the ultimate profits" from the sale.  *Happ*, 392 F.3d at 32 (quoting *First City Fin. Corp., Ltd.*, 890 F.3d at 1232).

The sale amount, which in reality was the price paid by F-Squared to collect future fees from Vireo clients, provides a good measure of the value of what Defendants received by their fraud (in addition to advisory fees collected), and thus what should be disgorged.  "The value for restitution purposes of benefits obtained by the misconduct of the defendant … is not less than their market value.  Restatement (Third) of Restitution and Unjust Enrichment, § 51(2) (Am. Law Inst. 2011).  If "a defendant is unjustly enriched by a transaction in which … the connection between unjust enrichment and the defendant's ownership of a particular property makes it equitable that the claimant have recourse to that property ... the claimant may be granted an equitable lien", or, put in this context, disgorgement of those profits for the benefit of harmed investors is appropriate.  *Wilmington Sav. Fund Soc'y, FSB v. Collart*, No. CV 17-12204-RGS, 2019 WL 1430118, at *6 (D. Mass. Mar. 29, 2019) (citing Restatement (Third) of Restitution and Unjust Enrichment, ¶ 56(1)).  Here, Defendants were enriched by selling Vireo, after fraudulent inducing the clients to sign up and without making any required disclosures about the fraudulent marketing.  So the unjust enrichment is directly connected to the property (the Vireo client relationships and right to future fees sold to F-Squared).  The Commission seeks to recover

12

that unjust enrichment for clients, who would otherwise be the "claimants."

Adding the sale proceeds to the Vireo AlphaSector revenues discussed above, the total revenues equals $36,775,867 ($14,000,000 plus $22,775,867).

## V.  Non-Fraud Expenses May Be Deducted.  Fraud-Furthering Expenses Should Not Be – Findings 38-60

In *Liu*, an offering fraud case, the SEC claimed as disgorgement the proceeds of the illegal offering, whose purported purpose was to raise funds to develop a cancer-treatment center.  *Liu*, 140 S. Ct. at 1942.  The Supreme Court held that expenses relating to the legitimate business, such as payments for cancer-treatment equipment, might appropriately be deducted because they "arguably have value independent of fueling a fraudulent scheme."  *Id.* at 1950. The Court remanded the case to the District Court to determine what expenses equitably should be deducted from the disgorgement award.  *Id.* at 1950 ("we leave it to the lower court to examine whether including those expenses in a profits-based remedy is consistent with the equitable principles underlying § 78u(d)(5)").

The Commission and Defendants in this matter start from essentially the same list of expenses.  These expenses have already been apportioned to the Vireo business, so as to exclude any expenses that relate to the non-Vireo part of the investment advisory business.  *See* Ex. 1; D. 278 at 13 (Report of Ds' Expert, Schedule 1).

### A.    Legitimate Expenses that Should Be Deducted from Revenues – Findings 41-48

The Court should only deduct expenses related to legitimate investment advisory business conducted by NAI, and not those expenses incurred to accomplish the actual fraud.  In other words, what expenses went to providing investment advisory services to Defendants' clients versus what expenses went to fraudulently inducing people to become and stay clients?

The Court can determine what business expenses should be deducted from the disgorgement by looking at the investment advisory agreement between Defendants and their victimized clients to see what services Defendants contracted to provide to them.

1.      **Research Expenses – Findings 43-45**

From the investment advisory agreements, the Court can conclude that the investment advisory fee was primarily to implement the AlphaSector Strategy for clients (i.e., for the periodic trade instructions that would be implemented in client accounts so that their investment followed the strategy.)  Ex. 16, p. 2-3 "to invest in securities in the market segment(s) designated … through the use of Navellier's proprietary fundamental and quantitative analysis").

For the Vireo AlphaSector strategies, those instructions were exclusively supplied by F-Squared.  Ex. 17 at 2.  That expense is represented by the "Research" line of the Vireo Income Statement.  Navellier paid $13,502,785 to F-Squared over this period in connection with a fee-sharing arrangement whereby F-Squared would get a percentage of the Vireo revenue.  Alex Decl. at ¶10; Ex. 17.  The initial disgorgement amount requested by the Commission and awarded by this Court already deducted this Research cost as an expense of the legitimate business activity performed for clients (the actual investment of their money) and it should continue to be deducted from the disgorgement award here.

2.      **Salaries for Transmitting Instructions to Brokers, Trading and Other Administrative Tasks – Findings 46-48**

Next, NAI had to implement the AlphaSector trading instructions in client accounts. Once a week or once a month (for each of the strategies), NAI needed to send the trade instructions that arrived from F-Squared to the clients' brokers or custodians, or to implement the trades in the client accounts itself.  The cost of the time of the employee who transmitted these instructions and/or implemented the trades can be deducted from the disgorgement award as a

cost of managing client accounts.

Finally, investment advisory fees also were used to pay for administrative tasks for client accounts, including setting up new client accounts, handling account paperwork, billing and processing account terminations.  This work was intermittent and NAI was a small shop where administrative duties were shared and conducted for all NAI products not just Vireo.  The portion of salaries of people performing these administrative tasks that are attributed to Vireo in the income statement can be deducted from revenues in this disgorgement calculation.

The Commission has estimated the amount of salary that should be deducted for trade instructions, trading, and administrative expenses, by estimating (below) the salaries of the Vireo marketing/sales staff and deducting that amount from total salaries.  The amount left (the non-marketing salaries) is the Commission's reasonable approximation of salaries deductible from revenues in the disgorgement calculation.  In other words, if the salaries are not marketing salaries, the Commission has assumed that they are deductible from disgorgement and has subtracted them from revenues as part of its disgorgement calculation.  By doing so, the Commission conservatively assumes that all non-marketing salaries at Vireo were for work done for the Defendants' clients.

## B.      Expenses That Should Not Be Deducted – Findings 49-60

Many of the expenses Defendants seek to deduct from disgorgement (based on their prior remedies briefing) have no value independent of their fraudulent scheme.  Defendants cannot receive credit for expenses incurred for the purpose of furthering their fraud, according to both *Liu* and long-standing equitable principles.  *See Liu*, 140 S. Ct. at 1950 (emphasizing the deduction of "legitimate expenses"); Restatement (Third) of Restitution and Unjust Enrichment, § 51(5)(c) ("A conscious wrongdoer or a defaulting fiduciary … will ordinarily be denied any

credit for … expenditures incurred directly in the commission of a wrong to the claimant."); *id.*, cmt. (h) ("The defendant will not be allowed a credit for the direct expenses of an attempt to defraud the claimant, even if these expenses produce some benefit to the claimant.").

### 1.   Marketing Expenses – Findings 50-57

The whole purpose of Defendants' large marketing/sales/wholesaler staff was to amplify the harm caused by the Defendants' fraudulent marketing by repeating the misleading statements in order to acquire new investors.  Ex. 18 (R. 30(b)(6) Depo. of NAI) at 21:8-22:4.  Unlike the *Liu* example of cancer treatment equipment (140 S. Ct. at 1950), Defendants' marketing expenses were not spent to provide Navellier's clients with investment advisory services, quite the opposite, those expenses which include marketing staff salaries, incentive pay, bonuses traveling expenses, etc. directly contributed to expanding the fraud and so those expenses should not be deducted from the disgorgement award.

Navellier's marketing department functioned like an advertising agency, meeting with prospective investment advisers and brokers to bring in clients, providing a continuous stream of false marketing materials, and negotiating incentives with advisers to entice more and more victims and generate more and more fraudulent fees.  These expenditures can be thought of as profits of the fraud that were reinvested to obtain new clients (i.e., new victims of the fraud) and, in turn, additional fraud revenues.  Thus, the Court should not deduct the sales and marketing expenses from revenues, including the following categories of expenses on the Vireo income statement:  salaries (for the sales and marketing staff), "marketing" costs, as well as meals, lodging, travel, entertainment, and automobile.  Restatement (Third), Restitution and Unjust Enrichment, § 51, cmt. h (conscious wrongdoer's attempt to deduct the cost of services that the victim didn't ask for (here, marketing to other prospective clients) will "predictably be denied").

The Commission has estimated the salaries of the sales and marketing staff, using the

limited discovery materials Defendants produced containing compensation information.  Despite the Commission's repeated attempts to obtain compensation discovery, Defendants refused to answer any questions on that topic, objecting that it was "private" and refusing to let witnesses answer questions about it.  E.g., Ex. 19 (Czyz Deposition, 59:22-60:8; Lee Deposition, 26:5-9).  The Commission noticed NAI's Rule 30(b)(6) deposition and included Topic 13: "All compensation, remuneration, or money received pursuant to any employment agreement or ownership of NAI or any related entity by each officer of NAI between 2010 and 2014, including any money received as a consequence of the sale of the Vireo line of business (or assets)."  Ex. 20 (R. 30(b)(6) Depo. Notice).  But when NAI's witness was asked the first question about compensation she was unprepared to answer.  Defendants' Counsel immediately ended any further questioning on Topic 13.  Ex. 18 at 225:4-229:23.  When the Commission moved for sanctions, the witness' unpreparedness was one of the grounds.  D.185 at 15-16.  As a consequence of Defendants' refusal to provide compensation information during testimony and largely in document discovery, they should be precluded here from offering any new information on salaries they wish to be deducted from disgorgement.

Using the limited information from the Defendants, the Commission has estimated marketing salaries to be, in the aggregate over the relevant time period: $1,574,729.  Declaration of William Donahue ("Donahue Decl."), ¶8.  This total represents roughly 76 % of the salaries listed on the Vireo income statement over the relevant time period.[4]  Alex Decl., ¶16.

The Vireo Income Statement also lists other expenses—"marketing," meals, lodging, travel, entertainment, and automobile—which all appear solely to support sales and marketing efforts.  Ex. 21 (showing Navellier marketing trips).  For the reasons already stated, these

---

[4] This percentage will be used to apportion other expenses (such as lease) into marketing and non-marketing expenses, below.

expenses should be characterized as "marketing" expenses and should not be deducted from disgorgement.

### 2.    Incentive Pay and Bonus – Finding 58

At NAI, incentive pay and bonuses were tied, generally speaking, to the assets under management for Vireo in that year.  Exs. 5, 9, 13.  In other words, the incentive pay and bonus amounts were tied to the increases in managed client assets that Defendants were able to attain through their marketing.  Because incentive pay and bonuses were closely related to the acquisition of more client assets, and not to the provision of services to clients, they are not (as applied here) legitimate business expenses and should not be deducted.

### 3.    Legal Expenses – Finding 59-60

At the end of the disgorgement period, a new $400,000 expense for "Legal & Accounting" appears that did not appear in prior years.  Ex. 1.  In 2013, NAI had two new legal expenses not previously incurred, both related to Vireo.  First, the sale of the Vireo business to F-Squared.  Second, NAI's response to the Commission's subpoena for documents.  Similar to the other expenses discussed above, neither is deductible as an expense related to the provision of services to Defendants' clients.  The first is related to the continuation of the fraud, by selling clients' accounts to F-Squared without disclosing to those clients the fraudulent misrepresentations.  D. 252 at 22-23.  The second is a litigation expense related to both the F-Squared litigation and, eventually, to this one.  Ex. 22 (Commission subpoena to NAI). As these legal expenses are unrelated to the provision of legitimate investment advisory services to clients, they should not be deducted.

## VI.   Additional Expenses Should Be Apportioned to Separate the Legitimate Expenses from Those That Should Not Be Deducted – Findings 61-65

"In determining net profit the court … may make such apportionments … as reason and

fairness dictate, consistent with the object of" disgorgement.  Restatement, Third, Restitution and Unjust Enrichment, §51(5) (2011).  Apportionment "may involve … the proportion of overhead or other common expenses properly charged against these results in determining the net profits of the business in question."  *Id.* at § 51, cmt g.  Here, the expenses listed as office/misc., delivery, postage, printing, all may relate to both the provision of investment advisory services to clients and to Defendants' marketing efforts.  These expenses should thus be apportioned, and only the expenses related to the provision of client services deducted.  The ratio of marketing salaries to total salaries provides a good proxy for the relative amounts of office expenses dedicated to marketing versus non-marketing expenses.  This ratio is $1,574,729 (marketing salaries) to $2,069,327 (total salaries), over the relevant time period, or approximately 76%.  Alex Decl., ¶16.  The total of the office-related expenses over the relevant time period is $184,077.  *Id*.  Multiplying that percentage by the total office, delivery, postage, and printing expenses for the time period yields $140,080, as the amount of these expenses attributable to marketing.  The residual, $43,997, should be deducted from disgorgement.  *Id.*

## VII.  Disgorgement Total – Findings 66-68

As detailed above, Defendants' total gross profit from their fraudulent scheme equals $36,775,867 ($14,000,000 plus $22,775,867).  "Legitimate expenses" deductible from revenues equals $14,041,380 (Research = $13,502,785, Non-Marketing Salaries = $494,598 and Related Non-Marketing Expenses (Office, Postage, Delivery and Printing) = $43,997).  Thus, Defendants' total disgorgement (*i.e.*, their net profits) equals $22,734,487  Alex Decl., ¶¶9-17..

## VIII.  The Court Should Order the Defendants to Pay Prejudgment Interest – Findings 69-73

The Court previously ordered Defendants to pay pre-judgment interest on the ordered disgorgement amount, and should continue this order now.  A district court has "broad

discretion" to order a defendant to pay prejudgment interest on the disgorgement amount. *First Jersey*, 101 F.3d at 1476. "Courts have recognized that an assessment of prejudgment interest, like the disgorgement remedy, is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws." *Sargent*, 329 F.3d at 40 (citation omitted). Without an award of prejudgment interest, a securities law violator receives an "interest-free loan" on his unjust enrichment. *Id*. at 41. In SEC cases, courts typically calculate prejudgment interest using the rate established by the Internal Revenue Service for tax underpayment, which reasonably approximates the unjust benefit of a defendant's use of the money. *See First Jersey*, 101 F.3d at 1476; *SEC v. Druffner*, 517 F. Supp. 2d 502, 512-13 (D. Mass. 2007).

Using the Internal Revenue Service's interest rate for unpaid balances, prejudgment interest on $22,734,487 is $6,635,403 for a total disgorgement of $29,369,890. Alex Dec., ¶¶17-19.[5] The Court should order the Defendants to pay prejudgment interest, because they have enjoyed the financial benefits of their wrongful conduct since the 2011 to 2013 period.

## CONCLUSION

The Commission respectfully requests that the Court enter the proposed findings of fact and conclusions of law attached here, and order disgorgement of $22,734,487 plus prejudgment interest of $6,635,403, for a total of $29,369,890, to be paid jointly and severally by Defendants. (Finding 74.) The Commission also respectfully requests the Court enter the proposed Amended

---

[5] The Commission has used April 30, 2020 as the date for the end of the prejudgment interest period. This is the same date used in the Commission's prior Motion for Final Judgment.

Final Judgment, also attached here, reflecting the new disgorgement amount.


Dated:  January 19, 2021                    Respectfully submitted,

                                            **SECURITIES AND EXCHANGE**
                                            **COMMISSION**

                                            By its Attorneys,

                                            /s/   Marc J. Jones
                                            Marc J. Jones (Mass. Bar No. 645910)
                                            Jennifer A. Cardello (Mass. Bar No. 657253)
                                            William J. Donahue (Mass. Bar No. 631229)
                                            Robert B. Baker (Mass. Bar No. 654023)

                                            Boston Regional Office
                                            33 Arch Street
                                            Boston, MA  02110
                                            (617) 573-8947 (Jones direct)
                                            (617) 573-4590 (fax)
                                            JonesMarc@sec.gov

                         **CERTIFICATE OF SERVICE**

       I certify that on January 19, 2021, a copy of the foregoing was electronically filed
through the ECF system and will be sent electronically to all persons identified in the Notice of
Electronic Filing and that paper copies will be sent to those indicated as non-registered
participants.

Dated: January 19, 2021                     /s/ Marc J. Jones